UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GENESYS TELECOMMUNICATIONS LABORATORIES, INC., | ) ) ) Cause No. |
| Plaintiff, | ) 1:19-cv-0695-TWP-DML ) Indianapolis, Indiana |
| vs. | ) **December 2, 2019** ) 2:04 p.m. |
| TALKDESK, INC., et al., | ) ) |
| Defendants. | ) |

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
HEARING ON PRELIMINARY INJUNCTION

Court Reporter:                David W. Moxley, RMR, CRR, CMRS
                               United States District Court
                               46 East Ohio Street, Room 340
                               Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

APPEARANCES:

**For Plaintiff:**                    John R. Maley, Esq.
                                      Thomas C. Payne, Esq.
                                      Barnes & Thornburg, LLP
                                      11 South Meridian Street
                                      Indianapolis, IN  46204-3535

**For Defendants:**                   David S. Moreland, Esq.
                                      John W. Harbin, Esq.
                                      Meunier Carlin & Curfman, LLC
                                      Suite 1300
                                      999 Peachtree Street, NE
                                      Atlanta, GA  30309

                                      James P. Strenski, Esq.
                                      Paganelli Law Group, LLC
                                      Suite 450
                                      10401 North Meridian Street
                                      Indianapolis, IN  46290

# I N D E X

**PLAINTIFF'S WITNESSES:**                              **PAGE**

MICHAEL STRAHAN

Video deposition played on record ..............10


MARK HERTEL

Video deposition played on record ..............10


RALPH MANNO

Video deposition played on record ..............10


ALEXANDER ELMO BALL

Direct Examination by Mr. Payne ................11


YANIV SCHIFF

Direct Examination by Mr. Maley ................60
Cross-examination by Mr. Moreland ..............64

# I N D E X   O F   E X H I B I T S

**PLAINTIFF'S EXHIBITS:**                                    **PAGE**

101 .............................................8
102 .............................................8
103 .............................................8
104 .............................................8
105 .............................................8
106 .............................................8
107 .............................................8
108 .............................................8
109 .............................................8
110 .............................................8

111 .............................................8
112 .............................................8
113 .............................................8
114 .............................................8
115 .............................................8
116 .............................................8
117 .............................................8
118 .............................................8
118 .............................................8
119 .............................................8
120 .............................................8

121 .............................................8
122 .............................................8
123 .............................................8
124 .............................................8
125 .............................................8
126 .............................................8
127 .............................................8
128 .............................................8
129 .............................................8
130 .............................................8

131 .............................................8
132 .............................................8
133 .............................................8
134 .............................................8
135 .............................................8
136 .............................................8
137 .............................................8
139 .............................................8
140 .............................................8

**PLAINTIFF'S EXHIBITS:**                               **PAGE**

141 .............................................8
142 .............................................8
143 .............................................8
144 .............................................8
145 .............................................8
146 .............................................8
147 .............................................8
157 .............................................8
160 .............................................8
161 ............................................63
162 ............................................66
163 ............................................66
164 ............................................67

**DEFENDANT'S EXHIBITS:**                               **PAGE**

200 ............................................22
201 ............................................22
202 ............................................22
203 ............................................22
204 ............................................22
205 ............................................22
206 ............................................22
207 ............................................22
208 ............................................22
209 ............................................22
210 ............................................22

211 ............................................22
212 ............................................22
213 ............................................22
214 ............................................22
215 ............................................22
216 ............................................22
217 ............................................22
218 ............................................22
219 ............................................22
220 ............................................22

221 ............................................22
222 ............................................22
223 ............................................22
224 ............................................22
225 ............................................22
226 ............................................22
234 ............................................22

1             (In open court.)

2        THE COURT:  Good afternoon.  We are on the record.

3   This is Genesys Telecommunications Laboratories, Inc., versus

4   Danielle Morales, Michael Strahan, Mark Hertel, Ralph Manno,

5   and Talkdesk, Inc.  And we are here this afternoon for a

6   hearing on Plaintiff's motion for a preliminary injunction.

7        And we'll begin by having counsel state your name

8   and introduce those at your table, beginning with Plaintiff's

9   table.

10        MR. MALEY:  Thank you, Your Honor.  John Maley,

11   counsel for plaintiff, along with Thomas Payne, both of us

12   from Barnes & Thornburg; and corporate representative Alex

13   Ball.

14        THE COURT:  Good afternoon.

15        MR. MORELAND:  Good afternoon, Your Honor.  David

16   Moreland for Defendants.  I have with me my colleague John

17   Harbin and also Jim Strenski from the Paganelli firm.

18        THE COURT:  Okay.  Good afternoon.

19        For the record, our court reporter this afternoon is

20   David Moxley.

21        And, Counsel, I've read all of your briefing,

22   including Plaintiff's reply that was filed this morning, and

23   the Court set aside two hours for your hearing.  Is anyone

24   going to present live witnesses?

25        MR. MALEY:  Judge, we will have one, possibly two,

1  live witnesses, depending on how the proceedings go today.

2          THE COURT:  Okay.  And, Defendants, do you intend to

3  call any live witnesses?

4          MR. MORELAND:  No, Your Honor.  We'll point out that

5  in the conference we had with Judge Lynch, the timing of this

6  hearing, and the two hours was emphasized, in that we would

7  have very little time for live witnesses.

8          THE COURT:  That's correct.

9          MR. MORELAND:  Yes.  No live witnesses for the

10  defendants.

11          THE COURT:  So if you have filed deposition

12  designations -- which I know you all filed a lot this

13  afternoon, I haven't read them yet -- and declarations and

14  affidavits, those count just as much as live testimony; okay?

15          All right.  So, Mr. Maley, it's the plaintiff's

16  motion, so how do you intended to proceed?  And we do have a

17  time clock.  I don't know if you can see everything.  And your

18  poor technology man, can you see what you need to see?

19          (Off the record.)

20          THE COURT:  Okay.  All right.  Because I'm so sorry.

21  Our system wasn't working well.

22          So, Mr. Maley, how will you -- would you like to

23  proceed?

24          MR. MALEY:  Thank you, Your Honor.  Consistent with

25  Your Honor's courtroom procedures, we'll start off with moving

1    the admission of the stipulated plaintiff's exhibits --

2              THE COURT:  Okay.

3              MR. MALEY:  -- which we've provided to court staff.

4    Those would be Exhibits 101 through 147, consecutively; as

5    well as 157 and 160.  And I believe we've tendered that

6    notebook to the Court with those.

7              THE COURT:  Okay.  So 101 through 147,

8    consecutively; and then 157 and 160?

9              MR. MALEY:  That's correct, Your Honor.

10             THE COURT:  Do you agree?

11             MR. MORELAND:  Yes, Your Honor.

12             THE COURT:  Those exhibits are admitted into

13   evidence without objection and pursuant to stipulation between

14   the parties.

15             *(Plaintiff's Exhibits 101 - 147, 157, 160*

16              *were received in evidence.)*

17             MR. MALEY:  And with that, Your Honor, then we would

18   proceed with our first witness by designations, and we'll use

19   some video today.

20             THE COURT:  Okay.

21             MR. MALEY:  And the first witness would be Michael

22   Strahan, a defendant.

23             THE COURT:  All right.  Is he here?

24             MR. MALEY:  No, he's not, so we'll --

25             THE COURT:  That's him on the screen?

1        MR. MALEY:  That's correct, Your Honor.

2        THE COURT:  Okay.

3        MR. MALEY:  And we filed the designations, as well

4   as a consecutive summary.  I don't know if the Court would

5   want a copy of that in paper.

6        THE COURT:  Why don't you let me --

7        MR. MALEY:  I'll approach, Your Honor.

8        THE COURT:  Thank you.  Please, Mr. Maley.

9        MR. MALEY:  Thank you, Judge.

10        THE COURT:  Thank you.

11        MR. MORELAND:  Your Honor, I do have one question

12   just as far as timing.  I'm assuming that the plaintiffs will

13   just have one hour to present however many witnesses by

14   deposition --

15        THE COURT:  That's correct.

16        MR. MORELAND:  -- they would like to present and

17   their arguments?

18        Okay.

19        THE COURT:  This is Mr. Maley's time; okay?

20        MR. MORELAND:  Okay.

21        MR. MALEY:  Thank you, Your Honor.  With that, we'll

22   proceed with Mr. Strahan.

23        THE COURT:  Okay.  And we'll start the clock when

24   Mr. Strahan begins.

25

10

1                    **MICHAEL STRAHAN, PLAINTIFF'S WITNESS**

2                    (Video playing in open court.)

3                    THE COURT:  I think this is a repeat.

4                    (Video playing in open court.)

5                    MR. MALEY:  We conclude that witness at that point,

6      Your Honor.

7                    THE COURT:  Okay.

8                    MR. MALEY:  Mark Hertel, defendant, also by

9      deposition designation --

10                   THE REPORTER:  I'm sorry.  Is your microphone on?

11                   MR. MALEY:  Sorry about that.

12                   We'll conclude Mr. Strahan there.  We'll move to

13     Mark Hertel by designation with some video clips of his

14     testimony.

15                   THE COURT:  You may.

16                   **MARK HERTEL, PLAINTIFF'S WITNESS**

17                   (Video playing in open court.)

18                   MR. MALEY:  That concludes the designations of Mark

19     Hertel.  In the interest of time, Your Honor, we're going to

20     skip the Danielle Morales designations and move forward to

21     Ralph Manno, the defendant.

22                   THE COURT:  You may.

23                   MR. MALEY:  Thank you, Your Honor.

24                   **RALPH MANNO, PLAINTIFF'S WITNESS**

25                   (Video playing in open court.)

 1          MR. MALEY:  Judge, we'll, in the interest of time,

 2  stop those video clips.  And Mr. Payne will now question live

 3  Alex Ball.

 4          THE COURT:  Okay.  Where is Mr. Ball?

 5          Sir, if you would come on up to the witness stand,

 6  remain standing, and raise your right hand.

 7          (The witness is sworn.)

 8          THE COURT:  You may have a seat.

 9          And, Counsel, you may examine your witness.

10          MR. PAYNE:  Thank you, Your Honor.

11          **ALEXANDER ELMO BALL, PLAINTIFF'S WITNESS, SWORN**

12                      **<u>DIRECT EXAMINATION</u>**

13  BY MR. PAYNE:

14  Q.  Mr. Ball, will you state your name and spell it for the

15  Court.

16  A.  Alexander Elmo Ball.  It's A-L-E-X-A-N-D-E-R; Elmo,

17  E-L-M-O; Ball, B-A-L-L.

18  Q.  Mr. Ball, are you employed?

19  A.  Yes.

20  Q.  Where are you employed at?

21  A.  At Genesys.

22  Q.  And what is your position at Genesys?

23  A.  I'm the vice president of sales for Mid-Market and

24  Velocity.

25  Q.  How long have you been in that role?

1  A.  In that role since November 1st of 2018.

2  Q.  And who was in that role prior to you?

3  A.  Ralph Manno.

4  Q.  I would like to direct you to Exhibit 101.

5          MR. PAYNE:  Your Honor, may I approach the witness?

6          THE COURT:  You may, Counsel.

7  BY MR. PAYNE:

8  Q.  What is this exhibit?

9  A.  It's an employee agreement between Mike Strahan and

10 Interactive Intelligence.

11 Q.  Does this employment agreement contain any successor

12 assigns language?

13 A.  It does, Section 13.

14 Q.  And what page is that on?

15 A.  Page 6.

16 Q.  Is Interactive Intelligence still an active company?

17 A.  No.

18 Q.  What happened to Interactive Intelligence?

19 A.  Genesys acquired Interactive Intelligence in July of

20 2018 -- 2017 -- 2018 -- '17.  Sorry.

21 Q.  Are you aware of the employment agreements between Ralph

22 Manno and Interactive Intelligence and Mark Hertel and

23 Interactive Intelligence?

24 A.  Yes.

25 Q.  Do they contain similar successor assigns language?

1  A.  They do, yes.

2  Q.  I'd like to next direct your attention to Exhibit 137.

3  What is this document?

4  A.  It is an e-mail from Mark Hertel to Tiago Paiva, who is

5  the CEO of Talkdesk, with Genesys MPS information.

6  Q.  And when was that e-mail sent?

7  A.  The e-mail was sent November 10th with the e-mail to

8  Tiago.  The original e-mail was from July.

9  Q.  And can you tell how Mr. Hertel forwarded that e-mail

10 along?

11 A.  He forwarded it from a Yahoo account, but he was on the

12 original e-mail from -- the original Genesys e-mail.

13 Q.  And when did he forward that to a Yahoo account?

14          MR. MORELAND:  Objection, foundation.

15          MR. PAYNE:  It's an admitted exhibit, Your Honor.

16 They stipulated to the authenticity and admissibility of this

17 exhibit.

18          THE COURT:  Yes, it's in evidence, so I'll overrule

19 the objection.

20 A.  It was forwarded to the Yahoo account in -- July 19th.

21 BY MR. PAYNE:

22 Q.  So what was attached -- strike that.

23          Mr. Ball, were on you the original e-mail?

24 A.  I was, yes.

25 Q.  And who was that sent from?

1  A.  Musa Hanhan, who is our global head of MPS.

2  Q.  And what was attached to this e-mail?

3  A.  There was two documents attached.  One was a summary of

4  MPS information and then the second was a spreadsheet with

5  verbatim information from the customers.

6  Q.  Is this the spreadsheet you're referring to?

7  A.  It is, yes.

8  Q.  Can you explain for the Court what this MPS data is?

9  A.  MPS is a score that is compiled of the likelihood of a

10  customer to promote a brand or a platform, and these are the

11  raw information.  So we send a survey out twice a year and

12  have customers respond to it.  So each line is an individual

13  customer's response with their score and any verbatim

14  information they wanted to provide.

15  Q.  And who compiles this information?

16  A.  Musa's team sends out the survey and then compiles all the

17  data.

18  Q.  Is that an internal Genesys employee?

19  A.  Yes.

20  Q.  So is this a Genesys-created document?

21  A.  Yes.

22  Q.  Are customers able to leave reviews themselves on-line in

23  various formats?

24  A.  Yes, they can.

25  Q.  How is this information different?

1  A.  Well, this information is a lot more data pointed about

2  the customer.  Specifically the vertical, their contact

3  information, as well as specific items that they would like to

4  see the company address.

5  Q.  Is this information considered confidential by Genesys?

6  A.  Yes.

7  Q.  As a Genesys vice president of sales, why would you be

8  concerned with this information being obtained by a competitor

9  like Talkdesk?

10  A.  One of the columns is their score, basically their ranking

11  of us, and it would be pretty easy to sort that in reverse

12  order and then start making phone calls and shooting off

13  e-mails.

14  Q.  I would like to direct your attention to Exhibit 119.

15  What is this document?

16  A.  It's an e-mail from Ralph to four individuals, which are

17  some of his direct reports, with the forecast file asking

18  information about deals.

19  Q.  And were you included on the original e-mail setting

20  this --

21  A.  I was, yes.

22  Q.  And was there an attachment to this e-mail?

23  A.  There was.  There's a forecast file, Excel spreadsheet.

24  Q.  And what is that forecast file?

25  A.  So the forecast file is for all of North America, and it

1  provides individual deal information, dollar amounts,

2  prospective close states, as well as ones that have already

3  closed.

4  Q.  And what is this forecast document used for?

5  A.  We roll it up on a weekly basis to predict what we would

6  finish a quarter at from a sales perspective.

7  Q.  Using that spreadsheet, can you determine when a

8  customer's contract would be coming up for renewal?

9  A.  You could make a highly accurate guess.  The spreadsheet

10 includes the close dates of when the deals were booked.  And,

11 typically, the contracts are 12, 24, or 36 months long, so it

12 could be -- you could make a reasonable guess as to when a

13 renewal would be.

14 Q.  As a vice president of sales for Genesys, what is your

15 concern with a competitor like Talkdesk having access to your

16 forecast file along with the MPS data?

17 A.  So if you combine the two, you could cross-reference the

18 forecast file to say what opportunities exist, what companies

19 are evaluating software.  And if you could then also correlate

20 that they're a current Genesys customer that's unhappy, they

21 become a very prime target if you weren't already aware of it.

22 Q.  And how, with that MPS raw data spreadsheet, would you

23 determine who the unhappy customers are at Genesys?

24 A.  So MPS detractors or anybody that has a score of zero to

25 six, so I would start there.

BALL - DIRECT/PAYNE                    17

1  Q.  And you could sort that spreadsheet?

2  A.  Yeah.

3  Q.  Mr. Ball, how does Genesys protect its confidential

4  information?

5  A.  All of the confidential information is stored on Genesys'

6  network devices, which employees can access if their roles

7  allow, using two-factor authentication.  So a user name and a

8  password and then a code that changes.

9  Q.  Do our sales employees sign employment agreements with

10 Genesys?

11 A.  Yes.

12 Q.  Do those employment agreements contain confidentiality

13 language?

14 A.  Yes, they do.

15 Q.  And what does that language prohibit employees from doing?

16 A.  It prohibits them from sharing confidential information

17 with individuals that are not supposed to have it outside the

18 company.

19 Q.  Does Genesys maintain any type of information or security

20 policies that employees have to abide by?

21 A.  Yes.  We have policies that we review annually.  We're

22 required to change the passwords every 90 days.  Pretty strict

23 rules around that.

24 Q.  I'd like you to look at Exhibit 108.  What is this

25 document?

1  A.  It's the acceptable use policy, which defines what

2  individuals and employees are allowed to do, prohibited -- you

3  know, prohibited activities and allowed activities using

4  Genesys information.

5  Q.  Mr. Ball, are you aware of when Genesys sent cease and

6  desist letters to the defendants in this case?

7  A.  Yes.  I believe it was November of 2018.

8  Q.  And are you aware of any continued recruitment by Talkdesk

9  of Genesys sales personnel after that date?

10  A.  Yes.  I have received --

11          MR. MORELAND:  Objection, foundation and hearsay.

12  I'm not sure what he's going to say here, but objection.

13          MR. PAYNE:  I asked if he was aware.

14          THE COURT:  I'll overrule.  He said he was aware.

15  BY MR. PAYNE:

16  Q.  How are you aware of recruitment of Genesys sales

17  employees?

18  A.  I received recruitment letters from Talkdesk recruiters.

19  Q.  And when was that?

20  A.  March of 2019.

21  Q.  Of what year?

22  A.  2019.

23  Q.  And what was -- what did that communication say?

24  A.  It said the sales leadership at Talkdesk is impressed with

25  your background and experience and would like to discuss

*BALL - DIRECT/PAYNE*                    19

1   opportunities at Talkdesk.

2   Q.  And who do you know to be involved in the Talkdesk sales

3   leadership?

4   A.  Ralph Manno and Mike Strahan and Mark Hertel.

5   Q.  Whose job did you take over last fall, 2018?

6   A.  Ralph Manno.

7   Q.  And following the departure of the defendants and other

8   Genesys sales employees, what impact did that have on the

9   Mid-Market Sales group at Genesys?

10  A.  So that was right at the beginning of our fourth quarter,

11  and our fourth quarter was the worst quarter that we've had

12  ever.  So it was -- from a sales numbers perspective, it was

13  challenging.  And then, secondarily, on top of that, it was a

14  bit of chaos, if that's an appropriate word to use, but a lot

15  of questions, a lot of hiring, a lot of empty holes, people

16  stretched pretty thin.

17  Q.  And what do you attribute that chaos to in the fourth

18  quarter of last year?

19  A.  We had nine, nine or ten individuals leave all at once, so

20  that was the factor.

21  Q.  And how -- how have you -- have you filled those

22  positions?

23  A.  We filled most of them, not all of them.  But we have

24  filled a number of them.

25          MR. PAYNE:  Thank you, Mr. Ball.

1              That's all I have, Your Honor.

2              THE COURT:  All right.

3              All right, do you have any cross?

4              So you can cut the clock off.  We'll let them save

5      their six minutes.

6              MR. MORELAND:  No cross.

7              THE COURT:  No cross?

8              MR. MALEY:  Your Honor, we'll reserve the balance of

9      our time for rebuttal, then.  Thank you, Your Honor.

10             THE COURT:  You may.

11             All right.  Thank you, sir.  You may step down.

12             THE WITNESS:  Thank you, Your Honor.

13             (Witness excused.)

14             MR. MALEY:  And, of course, Your Honor, as

15     indicated, we'll rest otherwise on the designations and

16     exhibits submitted.  Thank you, Your Honor.

17             THE COURT:  Thank you, Counsel.

18             All right, you may come up to the lectern.  And,

19     Mr. Moreland, you may make your presentation.

20             (Off the record.)

21             MR. MORELAND:  Your Honor, while we wait, if I could

22     tender some exhibits.

23             THE COURT:  Sure.

24             MR. MORELAND:  So I have Exhibits 200 through 222,

25     225, 226, 234, and also Exhibits 223 through 224.  These are

 1  all exhibits that were also filed with the response briefing

 2  and are available through the ECF.

 3          The plaintiff has no objection to 223 to 224, but

 4  reserved an objection as to the other ones on a timeliness

 5  basis.  And I would submit that they are timely.  They're

 6  public documents that were submitted with the response.

 7          THE COURT:  Which ones?

 8          MR. MORELAND:  200 to 222, 225, 226, and 234.

 9          THE COURT:  Those are the ones that they object to

10  timeliness?

11          MR. MORELAND:  Yes.

12          THE COURT:  Okay.

13          MR. MORELAND:  I don't know if they continue the

14  objection, but --

15          THE COURT:  Do you object to those?

16          MR. MALEY:  Yes, Your Honor, Plaintiff does object

17  as to 200 through 222, 225, 226, and 234 as to untimeliness.

18  Those were first disclosed on November 27, 26 days after the

19  November 1st court due date for exhibit lists.

20          THE COURT:  And why were they late, Counsel?

21          MR. MORELAND:  Your Honor, they were in response to

22  the brief that was filed.  And the documents concern public

23  information available on the Internet that would establish

24  that what Plaintiff contends are trade secrets are not.  And

25  it was directly responsive to the arguments made in the brief

1  by Genesys, to which we did not have a brief from them until

2  they filed that brief in November, so after the witness -- the

3  exhibit list was filed.

4     THE COURT:  Okay.  I'll overrule the objection and

5  allow those exhibits.  And so there's no objection to the

6  other exhibits; correct?

7     MR. MORELAND:  223 and 224, there was no objection.

8  They did not respond as to 227 and 246 to 251, and those were

9  all in the exhibit list, as well.  I'm not sure why.  I'll go

10 ahead and tender --

11    THE COURT:  Do you have any objection to those?

12    MR. MALEY:  I'm sorry.  Which numbers were they?

13    THE COURT:  227, 246 --

14    MR. MORELAND:  To 251?

15    THE COURT:  -- to 251.

16    MR. MALEY:  Just on timeliness, Your Honor.  And,

17 again, everything that we put in our brief was disclosed back

18 on the November 1st exhibit deadline.  But just that

19 objection, Your Honor.

20    THE COURT:  All right.  I'll overrule and I'll admit

21 227, 246, and 251 into evidence over objection.  And the other

22 exhibits are also admitted over objection, the ones that --

23 all of the untimely exhibits are admitted over objection.

24    *(Defendant's Exhibits 200 - 226, 234 were*

25     *received in evidence.)*

1          MR. MORELAND:  If I could approach, Your Honor.  I

2    have the exhibits here.

3          THE COURT:  Those are your exhibits?

4          MR. MORELAND:  Yes.  That's the admitted exhibits.

5          THE COURT:  Okay.

6          MR. MORELAND:  And those were also provided as

7    exhibits to the response brief.  Those are obviously not

8    exhibits, but I will reference those declarations as I proceed

9    through this proceeding.

10          THE COURT:  That's fine.

11          MR. MALEY:  Your Honor and Counsel, just one

12   housekeeping question.  I don't know if Mr. Moreland has a

13   copy of the slide deck he'll be showing.  Just given our

14   technology today --

15          THE COURT:  Right, because they can barely -- they

16   can't see it.

17          MR. MORELAND:  Yes.  Sure, I do, I do.

18          MR. MALEY:  Thank you, Your Honor.

19          Thank you, Counsel.

20          MR. MORELAND:  Use the version that I have in --

21          THE COURT:  And we do apologize for the --

22          MR. MORELAND:  I have another version --

23          THE COURT:  This is a mess, because they can't see

24   the screens.

25              (Off the record.)

1          THE COURT:  And, Mr. Maley, you're welcome to stand

2    if you want to see the screen.  I know it's a mess.

3          MR. MALEY:  Thank you, Judge.  I might do that.

4          THE COURT:  Okay.

5          MR. MORELAND:  Your Honor, I think we're ready to

6    proceed.  Sorry about the technical difficulty there.

7          So I just want to -- I'm going to guide the Court

8    through a presentation here on the evidence, the arguments

9    that have been made, the relief that is requested, and why

10   it's appropriate in this case.  And I'll start with just, at

11   the beginning, the relief requested here is for a preliminary

12   injunction.  Obviously, it's an extraordinary remedy.  The

13   case law would say that it's rare instances in which that

14   should be provided, and only when the facts are clearly within

15   the moving -- excuse me, the facts and law are clearly within

16   the moving party's favor.

17         There's a two-phase test under the federal procedure

18   of the Seventh Circuit.  In the first phase, you look for a

19   threshold showing of irreparable harm, no adequate remedy at

20   law, and a reasonable likelihood of success on the merits.

21   Only if that first phase is met does the movant -- or does the

22   Court look at the second -- or fourth and fifth prongs, I

23   should say, which considers the public and provident interests

24   and the harm that would attend to the moving party or the

25   nonmoving party were the injunction entered.

1          So let me start with just a brief overview of the
2  call center industry, because I think it's important to
3  understand that this is a very competitive industry.  If one
4  were to do a search on Google or go to one of the many search
5  platforms that discuss this information, you would find that
6  there are, just in one search, over 315 different companies
7  that compete in this space.  It's call center technology that
8  routes calls to agents, provides contextual data, actionable
9  reporting, and metrics, and so forth.
10          Just in this space, I've listed a few of the
11  competitors.  Avaya is a name that may be familiar to the
12  Court given some of the briefing; Genesys, of course;
13  Talkdesk; Five9; LiveAgent; NICE-inContact; and Zendesk.
14          THE REPORTER:  I'm sorry.  You're going to have to
15  slow down.
16          MR. MORELAND:  Sorry.  LiveAgent, NICE-inContact,
17  and Zendesk.
18          THE COURT:  What do they do, exactly?
19          MR. MORELAND:  They call -- they provide a cloud
20  solution for contact centers.  So for enterprise, if you were
21  a, I don't know, an eBay or any company that needed call
22  center support, then they could use Talkdesk or Genesys or
23  Avaya to provide a solution so that the customer agents could
24  receive the calls and have information coming in.
25          For the most part, "CCaaS" is a term you'll see.

1  It's call center as a service, which is basically call center

2  in the cloud.  So all of the features are being provided in

3  the cloud.

4          THE COURT:  All right.

5          MR. MORELAND:  So let's talk about this -- the case

6  was started with this allegation of rating, or targeting, and

7  that's just not the case.  As I mentioned, CCaaS is a type of

8  service that Talkdesk provides.  It's an enterprise solution

9  and one that Talkdesk only started to provide in the 2007-2018

10 range.  It was a solution that they needed sales

11 representatives to handle sales of the solution.  And so they,

12 like any company would, went and looked for those sales

13 representatives.

14         Sourcers for Talkdesk first contacted Manno.  I

15 think you heard his testimony that he was contacted by someone

16 at Talkdesk.  They then passed along that information to

17 Knudson.  That's in the transcript.  The Knudson transcript

18 has already been submitted to the Court at 29:3 through 17.

19 And Talkdesk also spoke with other candidates about positions,

20 not just Manno.  I'll say that's at the Knudson transcript, at

21 29:21 through 30:10.

22         Ms. Knudson, who is the team lead of sales

23 recruiting, specifically testified that Genesys was not

24 targeted by Talkdesk.  Obviously, Genesys sells products in

25 enterprise space, so it has sales representatives who sell

1   those products in the enterprise space.

2           To the extent that those recruits were found on

3   Linked-in or any of the other public Web sources, they were

4   reached out to as part of Talkdesk's efforts to build a sales

5   team for the CCaaS solution.  But Talkdesk contacted talent

6   from companies other than Genesys, and that would include

7   InContact, Five9, Serenova, 8x8, and RingCentral.  And that's

8   at Knudson transcript 77:4 to 6.  And I'll just say for the

9   record, the Knudson transcript at 80:8 to 13 is her stating

10  that Genesys was not specifically targeted by Talkdesk.

11          Document number 168-3, which is Exhibit 9 to the

12  briefing that was filed by Plaintiff, also exhibits the fact

13  that Genesys was not a key target of Talkdesk.  This is a list

14  of recruiting activity that was happening in October of 2018.

15  And as the Court can see from the screen, there were only two

16  of 13 individuals on the list that are Genesys-based employees

17  at that time.  And, again, this information is the Talkdesk

18  recruiting team's information and their efforts to recruit,

19  not the defendants in this case.

20          So I want to talk through the nonsolicitation

21  provisions briefly, because I think this -- we need to look at

22  the provisions and consider the equities in those provisions.

23  And I'll start with Strahan.  He was -- his is the oldest of

24  the -- of the covenant not to competes, and his was signed in

25  September of 2000.  And I won't go into the details of the

1   actual covenant.  It's listed under Section 7 as a covenant

2   not to compete, and it obviously has nonsolicitation

3   provisions.

4           As I understand it and have been told, Genesys is

5   not seeking to enforce the noncompete provisions of these

6   agreements, only the nonsolicitation of customers and

7   employees.

8           MR. MALEY:  That is correct, Your Honor.

9           THE COURT:  Okay.  Thank you.

10          MR. MORELAND:  But I will point out for the Strahan

11  agreement, this is an addendum, it's at tab 1, page 8, it's

12  Plaintiff's exhibits, tab 1, and the commencement, of course,

13  September 5th, 2000.  Mr. Strahan was hired at that point in

14  time by Interactive Intelligence to be a test engineer, but

15  as -- part of his agreement was compensation in the form of

16  stock options and other benefits, such as medical, vision, and

17  so forth.

18          Mr. Manno's employment agreement and his

19  nonsolicitation provisions were signed four years later, in

20  2004.  The agreements are essentially identical between Manno

21  and Strahan except for, of course, the addendum also includes

22  stock options and benefits, such as medical, vision, and

23  dental insurance.

24          And I point those out, those specific features or

25  parts of the employment agreement out, because it does matter

1   in the sense that Genesys did change compensation, did change

2   employment benefits when it merged or took over Interactive

3   Intelligence in 2017.  So, to the extent these employment

4   agreements existed at that point in time, they were modified

5   by Genesys, a California company operating under the

6   California business code, to alter stock options and

7   compensation and benefits.

8           The same thing for Mr. Hertel.  He signed his in --

9   December 2nd of 2013.  His also -- his specific features of

10  his employment agreement relate to salary and benefits.

11  Mr. Hertel, of course, is a California citizen.  His -- and

12  there -- and as I'll talk about in a minute, there is a

13  provision in California that would restrict the enforcement of

14  any action against a California citizen outside the state of

15  California.

16          And key to that is, if you'll look at what is at tab

17  3, page A-1 of Plaintiff's exhibits is, again, we have

18  Mr. Hertel's compensation and other benefits listed in his

19  employment agreement.  And then, if you'll notice at the very

20  bottom, it's hard to read, but it says, "The company, in its

21  sole discretion, may modify, adjust or change...Employee's

22  compensation," or, "benefits," meaning that -- there's been

23  argument in this case about Mr. Hertel not signing, cosigning,

24  or some authorized representative not signing something to

25  modify his employment agreement.

1          This provision allows it to be modified without any

2    signature whatsoever, and that modification happened in 2017

3    and in 2018.  And as we'll get to in a minute, that would

4    trigger the provisions of Section 925 under the California

5    Code.

6          So in our response brief, Defendants went through

7    the factors under restatement 188 and 187, and I won't belabor

8    the Court other than to say there is a choice of law here and

9    conflict of law between Indiana and California.  And 188 just

10   confirms that California is the right state to be in that

11   conflict-of-law analysis under what would be 187.  So 187 is

12   the public interest exception, if you will, in Indiana, where

13   the analysis of whose interest is greater is weighed.  188 is

14   the test as to whose law would apply or which law would be

15   favored absent a choice-of-law provision.

16         So the factors go to -- that we've, you know, gone

17   through in the brief, and we won't spend much time other than

18   just to say that we have -- you know, in this -- in this

19   particular case, we have Hertel, a California citizen,

20   obviously working out of California, generating 70, 80 percent

21   of his revenue out of California.  We have Mr. Manno, who is a

22   St. Louis, Missouri, citizen, Missouri citizen, who is -- who

23   is directing sales nationwide for Genesys at the time, and

24   I'll go through exactly the specifics on him in just a second.

25         But I will point out that, obviously, Genesys is a

1  California company incorporated and headquartered in

2  California.  That's shown in Exhibit 234.  Talkdesk's

3  principal place of business is in San Francisco.  And that's

4  where the effect of these nonsolicitation provisions will be

5  felt.  That is the company that is impacted by these

6  nonsolicitation provisions.

7           And, of course, as we pointed out in the brief, the

8  choice of law was not negotiated.  The contracts were not

9  negotiated between these parties and Genesys.  They were

10 provided to the parties and they were signed.  So there is --

11 under the 188 factors, there is no -- there -- the place of

12 contracting is an insignificant factor in the analysis, to

13 begin with, but the negotiation factor is obsolete.  There is

14 no negotiation that occurred here.

15          So, really, the factor that dominates in that

16 analysis would be the place of residence and -- excuse me, the

17 headquarters and the corporation -- the state -- incorporation

18 of the parties or the individuals.  And, of course, in

19 Hertel's case, Hertel is in California, and Genesys is all

20 California.  And the others, Genesys is all California.  And,

21 of course, Talkdesk is California.

22          So I'll run through these factors -- these facts

23 real quick.  Hertel is a California citizen, worked from home

24 in Anaheim and office in Irvine.  70 to 80 percent of his

25 sales originated from California.  That's his declaration at

1  paragraph 10.  His business cards and e-mail signatures listed

2  Irvine --

3           THE REPORTER:  I'm sorry.  I lost you.

4           MR. MORELAND:  Sorry about that.

5           His business cards and e-mail signatures listed

6  Irvine.  He coordinated employment and benefits with Tracy

7  Coté, who is located in Daly City, California.  His personal

8  commission rates for sales performance were negotiated with

9  the finance team located at Genesys headquarters.  He reported

10  to Manno.  Manno is in Missouri.  Manno reported to Rick

11  Brown, who is in Newport Beach, California.  So the ultimate

12  head of sales, or the person that was overseeing sales, was in

13  California, as well.

14           Mr. Hertel attended quarterly business reviews in

15  Newport Beach, annual kickoff sessions in Daly City.  And he

16  also sold products -- and this is for all of these defendants.

17  He sold products and negotiated sales agreements that were

18  governed by California law.

19           And I'll just -- I'll just pull up the Genesys sales

20  contract, and this is our Exhibit 222.  These are the sales

21  agreements that these individuals were actually negotiating

22  for customers.  And this sales agreement states that

23  Genesys -- that the customers contracting with the following

24  Genesys entity, the one in this case, and the governing law is

25  California.  So Genesys itself recognizes that California is

33

1  the proper application of laws for sales activities.  It just

2  doesn't as to these specific defendants.

3        For Manno, very similar.  He was a remote sales

4  employee for Genesys from his home in St. Louis.  30 -- and

5  this is all in his declaration.  30 to 40 percent of his sales

6  originated from California.  And that was, by far, the largest

7  percentage of any state.

8        He reported to Rick Brown, as I mentioned earlier,

9  he traveled to California very frequently, if not most

10 frequently.  His personal commission rates were negotiated

11 there.  He relied on California personnel.  He attended the

12 QBRs, the quarterly business reviews, attended the sales

13 kickoffs, worked with human resources.  Again, he sold

14 products and negotiated sales agreements governed by

15 California law.  And, of course, he now works for Talkdesk, as

16 are all of these employees, where the performance of those

17 nonsolicitation provisions are now trying to be enforced

18 directly onto these defendants who are now employees of a

19 California company.

20        Similar for Strahan.  Mr. Strahan considered --

21 considered himself -- and this is in his -- is all in his

22 declaration -- considered himself to be a remote sales

23 employee for Genesys' headquarters.  His business cards

24 indicated a California office.  He reported to Manno, again,

25 who reported to Rick Brown in California.  He had frequent

1  contact with sales professionals and human resources in

2  Genesys' headquarters in California.  The personal commission

3  rates were negotiated similar as the other defendants.

4          He also attended quarterly business reviews and

5  kickoff sessions.  He had very minimal -- and this is in the

6  briefing and in declaration -- very minimal Indiana sales.  If

7  you look at the amount of sales, his largest sales would be to

8  Texas and his smallest sales would be to Indiana.  And I can't

9  think of the other state offhand right now.  He also,

10 obviously, now works remotely from Talkdesk in California,

11 where the solicitation provisions -- nonsolicitation

12 provisions, the effect would be felt.

13         And I will point out that in Mr. Strahan's case, the

14 facts are very similar to the application of the law that was

15 provided in the Avaya case that we submitted to the Court as

16 docket number 130-1.  We had some supplemental briefing on

17 that issue.  This is a case that Genesys was involved in, is

18 not a party, but it was a defendant.  One of its employees had

19 come from Avaya to Genesys.  Avaya asserted a noncompetition

20 clause against Genesys, and a Genesys employee responded

21 saying that the California law would apply and that therefore

22 the provisions would be void.  And the Court in the

23 Delaware -- the Delaware Chancery Court agreed with that and

24 found that that was a basis to deny the preliminary injunction

25 motion in that case.

1          And I'll just point out that in that case, Genesys

2    and Avaya -- actually, I can't say Avaya.  I take that back.

3    I know Genesys, obviously, is a California company.  I'm not

4    sure if Avaya was a Delaware corporation.  I believe it may

5    have been.  The choice-of-law provision was Delaware.  The

6    employee was a resident of North Carolina.  So, a similar

7    situation where the performance is centered on California of

8    the remote employee's duties as an employee of the company,

9    very similar to Mr. Strahan, who was sitting in Indiana, but

10   operating as a sales rep for Genesys' headquarters.

11          So, once we get past the issue of which law to look

12   at, we now have California, we have Indiana, so we go to

13   Section 187 of the restatement.  And I know that within the

14   reply brief that was filed today, there was an assertion that

15   maybe -- that the Court does not need to look to restatement

16   187 to do a conflict-of-law analysis.  And I'll submit that

17   that's just incorrect.

18          The -- Indiana does have a public policy section

19   under choice-of-law analysis.  One of the cases that's cited

20   by Genesys -- and let me find -- I'm sorry.

21          I'll give that cite to you in a minute, but one of

22   the cases cited in -- by Genesys in this case actually

23   analyzes the Section 187 test.  It does it for a Louisiana

24   choice-of-law provision, so the choice there was, I believe,

25   Indiana or Louisiana law.  And there it found that there was

1  not an opposed view, if you will, of nonsolicitation

2  provisions, and so, therefore, it was not a public policy-type

3  exception that would apply.

4        Here, in this case, California's interest in voiding

5  nonsolicitation provisions has been clear for a long time,

6  since the early 1900s.  It's California Business and

7  Professions Code, Section 16600.  It says, "Every" contact "by

8  which" -- excuse me.  "Every contract by which anyone is

9  restrained from engaging in a lawful profession, trade, or

10  business of any kind is to that extent void."  And California

11  courts have extended that -- or not extended that, but ensured

12  that that does extend to nonsolicitation of employees and

13  nonsolicitation of customers.

14        And *Edwards*, which is 44 Cal. 4th at 948,

15  provides -- is a -- the California Supreme Court confirms that

16  customer solicitation -- nonsolicitation provisions are void

17  under Section 16600.

18        And *Barker v. Insight* is a recent case in

19  California, in the Northern District of California, that

20  observed that post-*Edwards*, that employee nonsolicitation

21  provisions are void under California Section 16600.

22        Courts have also looked to see -- other courts have

23  analyzed, is there an opposing view between Indiana and

24  California law on this issue?  And *In re Gault* -- excuse me.

25  *In re Gault*, which is 2008 WL 4065843 in the Northern District

1   of California, said that there is a conflict between Indiana

2   law -- Indiana law and the strong public policy of California,

3   as reflected in Section 16600.

4           And a case in Illinois in 2012 found that

5   California's public policy against restraints on employment

6   are strong enough and of such a fundamental nature as to

7   justify overriding the chosen law of the parties, exactly what

8   would be applicable in this case under Section 187 -- or,

9   excuse me, under restatement 187.  Because California's policy

10  is so strong on this issue, the choice-of-law provision should

11  yield to it.  And that case is *LKQ Corp.*, 2012 WL 1405774.

12          Now, I was mentioning as to Mr. Hertel, there's yet

13  another labor code provision -- or a provision in California

14  law that would apply in this case, and that's Section 925.

15  And that would prohibit Genesys from actually seeking what it

16  is seeking in this case, in this forum.  The California labor

17  code says that an employer cannot require the employee to

18  adjudicate outside of California a claim arising in

19  California.  Again, Mr. Hertel is a California citizen.  His

20  activities would have occurred in California.  Section 925

21  would apply, because his agreement was modified by Genesys

22  after January 1st, 2017.

23          Okay, we'll step back a little bit now.  I've talked

24  about California law, and I will submit that California law

25  should apply to void the nonsolicitation of customer and

1  employee provisions in the three agreements at issue: Hertel,

2  Manno, and Strahan.

3        Even if this Court were to find that Indiana law

4  should apply, there is still -- it is still the plaintiff's

5  burden to show that the covenants are reasonable and necessary

6  in light of the circumstances.  And, specifically, Indiana law

7  requires that the scope of the noncompete, nonsolicitations be

8  reasonable in terms of time, activity, and geographic area

9  restricted.  And that's in *Zimmer v. Sarpe*, 651 F.Supp 2d 840,

10 Northern District of Indiana, 2009.

11       This is -- what I have on the screen is from tabs 1

12 and 2, page 3.  It's the employment agreements of Manno and

13 Strahan.  They're identical, so I just put up one.  But you

14 can see that it prohibits soliciting any customer of the

15 company.

16       And then you can see I've highlighted in Section B

17 that a customer is deemed to be any person, business,

18 partnership, proprietorship, firm, organization, or

19 corporation which has done business with the company, okay, or

20 which has been solicited or serviced in any manner, directly

21 or indirectly, by the company within 18 months prior to the

22 date of the termination of the employee.

23       What this provision doesn't say is that Mr. Manno or

24 Mr. Strahan had to have any direct contact with these

25 employees -- with -- excuse me, with these customers or that

1  they would have to have any knowledge of who these customers

2  or organizations are, or individuals, persons.

3          Hertel's provision is very similar.  The company

4  customers -- this is at tab 3, pages 5 and 6 -- means any

5  person or entity to whom the company sold or provided any

6  products and/or services at any time during the 24 months

7  immediately preceding the termination of the employer's

8  employment with the company.  And then -- that's as to the

9  customer provision.  And then the employee nonsolicitation

10  provision is drawn to any person who is an employee of the

11  company.

12          Again, these are not drawn to Hertel's connections

13  with any specific individuals.  These are drawn to the

14  company's customers, whether they're known or not known by

15  Mr. Hertel, Manno, or Strahan.

16          And on that point, I want to point the Court to

17  *Seach v. Richards*, which is an Indiana Court of Appeals 1982

18  case, 439 N.E.2d 208.  That case found that to expect an

19  employee to be acquainted with every past and prospective

20  client of the firm is unrealistic.  And then in *Standard

21  Register Company v. Cleaver*, 30 F.Supp 2d 1084, the Court

22  there held that certainly any restriction involving past

23  noncustomers, or who were at least not customers at the time

24  of the defendant's termination, cannot be an enforceable

25  covenant.

1        And, again, these are -- the reason that these --

2   these cases are being -- or holding this way is because the

3   protectable interest that the employer has a burden of showing

4   is that there's something special about the relationship of

5   these individuals with customers' employees that would make

6   solicitation harmful going forward.  So, therefore, these

7   broad enforcement -- this broad enforcement language,

8   especially as it relates to all past customers, all

9   prospective customers, the court in *Seach* and in *Standard*

10  *Register* dealt with both of those and said those were just

11  not -- those are not proper.

12       I want to also talk about what are tolling

13  provisions in each of the agreements.  At tab 1, page 3, Manno

14  is -- excuse me.  Strahan is at tab 1, page 3.  Manno is at

15  tab 1 -- tab 2, page 3 --

16       THE REPORTER:  I'm sorry.  I lost you.

17       MR. MORELAND:  Manno is tab 2, page 3, and Hertel is

18  tab 3, page 6.  Just some of those -- those provisions

19  essentially allow the period of enforcement to be tolled for

20  an indefinite period of time based on noncompliance with the

21  nonsolicitation provisions.  Although I've not found a case,

22  we've not found a case in Indiana that's directly on point on

23  this, although certainly for a preliminary injunction there's

24  cases that would say you cannot extend past the original term.

25  You can't toll, for example, on a preliminary injunction.

1        But a case in Georgia has found that these tolling

2   provisions do make the contract undeterminable as to time.

3   And so I'll submit that as another reason why this -- these

4   provisions that are at issue in this case under Indiana law

5   would be overbroad.

6        Okay.  So now let's move to the threat of

7   solicitation.  As we talked about, there has to be a threat of

8   irreparable harm.  And I'll -- and you've seen the evidence

9   that was submitted by Plaintiff earlier today.  The

10  solicitations that the plaintiff is pointing to are prior to

11  the employees moving over to Talkdesk.  And they're prior to

12  November of 2018, when these employees had received cease and

13  desist letters and copies of their agreements from Plaintiff.

14  Mr. Manno actually, in his deposition, discusses that -- you

15  know, measures taken to comply with the alleged nonsolicit

16  provisions, that there were measures taken within the company.

17       And the preliminary injunction is not directed to

18  Morales.  I just wanted to make that point clear.  It's only

19  directed as to Manno, Hertel, and Strahan.  And each of those

20  individuals, in their declarations, have submitted that no

21  Genesys customers are being solicited, no Genesys employees

22  are being solicited, so there's no threat of solicitation here

23  in this case.  It's something that's just missing from the

24  record.

25       Also, the issue of whether or not the harm could be

1  quantified is also -- is also an issue here.  And Defendants

2  would submit that the mere economic injury, which is what has

3  been alleged to have occurred in this case, is not entitled to

4  injunctive relief, because damages would be sufficient.  So

5  even if you get past whether California law, Indiana law

6  applies, are the provisions -- are the provisions enforceable

7  or void, is there actually an existing threat, which we submit

8  there's not, then we get to the harm.  Is there actually a

9  potential for irreparable harm?

10       And I would submit the answer is no.  What Genesys

11  is complaining about is monetary in nature.  I mean, we've

12  already heard today that Mr. Manno was quickly replaced by

13  Mr. Ball after he left Genesys.  So, certainly, Genesys cannot

14  say that it was not able to fulfill that role in a timely

15  manner.

16       I also point out that, while we did hear claims of

17  damages to the company, we've not received any kind of expert

18  report on that issue.  This is the first time that Defendants

19  have heard anything about any loss of revenue or loss of

20  anything as it relates to these individuals, these individuals

21  moving from Genesys to Talkdesk.

22       All right, so now let me get through trade secret

23  misappropriation.  And, again, we'll start with the burden

24  that Plaintiff has.  Plaintiff must show that the information

25  has independent value, is not readily ascertainable, that the

1 information was unique and not previously known in the

2 marketplace, that Plaintiff took reasonable steps to protect

3 it, and that Defendants actually used the trade secret

4 information.

5         On that last point, that the documents used the

6 trade secret information, what we've heard is that there were

7 documents -- for example, Exhibit 119 was cited by Mr. Ball

8 during his examination, and there was a statement that that

9 information had certain protectable information within it.

10 I'll note that Exhibit 119 is an internal e-mail of Genesys in

11 September of 2018 when Mr. Manno was still vice president of

12 sales for Genesys.  He therefore is acting in his capacity at

13 Genesys when he would have received that information.  And

14 there's been no evidence that any of that information has been

15 distributed outside of Genesys for anyone's benefit.

16         So I'll submit for you the Leavitt, or Leavitt,

17 declaration, at paragraphs 9 to 11, the Leavitt declaration

18 was submitted, and our response is attached to our response

19 brief.  Mr. Leavitt is an employee of Eide Bailly.

20 Mr. Hickman is a former employee of Eide Bailly.  Mr. Hickman

21 was hired to work with the parties to ensure that any

22 information that had been taken by Mr. Hertel or Ms. Morales,

23 downloaded to USB drives, was collected and isolated.

24         And what that resulted in is that the two USB drives

25 that were taken by those individuals, the two Apple laptops

1  that Talkdesk had provided to those individuals, and the data

2  that was on the Google Drive that Ms. Morales had looked at

3  some of the documents with, all of that was collected and

4  isolated and removed from Talkdesk premises.  Talkdesk and

5  none of the defendants have any of this information anymore.

6  Neither do they have access to the information.

7          THE COURT:  Was it removed, Counsel?

8          MR. MORELAND:  So -- I'll show you.  So this is at

9  Exhibit 224.  And it's really hard to read, but this is

10 Monday, February 25th, 2019.

11         THE COURT:  Okay.

12         MR. MORELAND:  So earlier this year.  You can see

13 that I've highlighted, "Richard has both drives and was going

14 to advise on progress tomorrow," both drives being -- I'm not

15 sure if that's actually the -- let me see.  I believe

16 Mr. Maley had posed a question to confirm that Richard's firm

17 now has possession of the two drives.

18         I'm assuming that's the flash drives, the USB

19 drives?  Mr. Hickman says, yes, we have those.  And that's in

20 February.

21         In April, Exhibit 223, April 30th of 2019, that's

22 when the information on the Google Drive from Ms. Morales was

23 collected and isolated.  So February, the drives and the

24 computers were isolated and removed from Talkdesk and the

25 defendants.  And in April, the -- it appears that the Google

1 Drive was -- it's quoted, "Permanently deleted from Talkdesk

2 systems and is preserved at Eide Bailly."  Those were -- those

3 efforts were undertaken, again, jointly by the parties in good

4 faith to ensure that this information -- that there was no

5 threat of harm.

6          What we see in the briefing, though, is repeated

7 citation to documents that are on these USB drives, or are

8 alleged to be on the USB drives, that are no longer in any of

9 the defendants' possession, that are alleged to have

10 confidential information that could harm Genesys.  The fact

11 that they're not in the defendants' possession would rebut

12 that point.

13          So now let's talk about some of the other documents

14 and arguments that Genesys has made about pricing,

15 architecture, information that can be received from customers.

16 All of this is not trade secret under the law.  If it can come

17 from a customer, it's not a trade secret.  Pricing -- if you

18 have provided pricing information to a customer, it's not

19 trade secret.

20          Architecture has been publicly disclosed,

21 architecture of the cloud computing system.  And what I

22 mean -- when I say "architecture," I mean the cloud computing,

23 the way it's set up, you know, servers in certain locations,

24 the use of AWS services, which is an Amazon Web service, to

25 form certain features, all of that is in the public record.

46

1          And so while we have Genesys pointing and making

2     general statements about information being confidential or

3     proprietary, there's nothing to back that up.  And, in fact,

4     when the documents are reviewed and public information is

5     sourced, the information is there.

6          So I'll point you to -- point the Court to

7     Economic -- Ec -- I can't say this -- *Economation v. Automated*

8     *Conveyor Systems*.  This is a Southern District of Indiana case

9     out of 1988.  It says, "Once information is known to the

10    customers, that information is readily ascertainable and is

11    not a trade secret."

12         General knowledge that has infiltrated, if you will,

13    the defendants' minds over their course of their career is not

14    a trade secret either.  This is *Lawler Manufacturing*, which is

15    a 2007 Southern District of Indiana case.  2000 WL 1456336 is

16    the cite.  And it reads, "Plaintiff would have had no legal

17    basis for demanding that Defendant refrain from using general

18    knowledge he gained during his employment at Plaintiff while

19    working for Defendant's employer," meaning the information

20    that's in their head, the general knowledge, cannot be a trade

21    secret.

22         Now I want to go through some of the public

23    information that's out there.  This is at Exhibit 202.

24    Genesys pricing information is publicly available.

25    Performance statistics at Exhibit 204.  There are outages, if

47

1   you will.  If someone wants to know how often Genesys has

2   outages, you track the outage information on their Web site.

3        There are many, many trade publications and Web

4   sites dedicated to reviewing and allowing customers to comment

5   on these products.  Again, it's a very competitive space.

6   I've listed one, two, three, four, five, six here.  GetVoIP at

7   Exhibit 205.  I'll just run through the exhibit numbers.

8   Exhibit 206, Exhibit 207, 208, 209, and 210, all are examples

9   of the type of information that customers freely provide

10  relating to Genesys' architecture, pricing, terms, and so

11  forth.

12       The next slide, I'll just give a few more examples.

13  In Exhibit 214, just discussion about PureCloud service being

14  a wrong approach, that Genesys --

15       THE REPORTER:  I'm sorry.  I lost you.

16       MR. MORELAND:  PureCloud -- a discussion about

17  PureCloud being a wrong approach, that Genesys has difficult

18  support at Exhibit 205, page 2.  There's lack of transparency,

19  Exhibit 210.  Again, these are -- these are -- this is

20  information that's available on the -- on the Web -- on the

21  Internet, freely available.

22       But Genesys' architecture is also -- the way that it

23  operates is also available on-line.  Genesys itself, at

24  Exhibit 217, discusses how its Edge architecture works, how it

25  uses an SIP gateway and an SIP proxy.  There are documents

1  available that discuss Genesys' PureCloud architecture, such

2  as Exhibit 218, which is a document that originated at

3  Genesys, but because it was distributed widely within Genesys,

4  apparently was disclosed outside of Genesys on a Web site.

5          And this document talks about -- it describes, "This

6  resource includes information on PureCloud architecture, buyer

7  personas, and roadmaps."  And it talks about how this document

8  will guide the sales individuals to have a "unified rallying

9  cry," meaning the information that's presented in this

10  document is meant to be distributed to the customers that

11  they're servicing.

12          There is a -- I'm just going to skip ahead here.

13  Exhibit 214 is another detailed document regarding PureCloud,

14  Genesys' cloud customer contacts service, architecture that

15  was publicly distributed by Interactive.  Exhibit 214 has Don

16  Brown, CEO of Interactive Intelligence's name on it.  It was a

17  2015 document.  It goes into a very, very detailed

18  description.  It's very hard to see on my slide, but it talks

19  about architecture, it talks about stability.  The Court can

20  look at the exhibit to see.  There's -- it's a lot of it.

21          And what I want to point out to the Court, and make

22  sure that the Court is aware, is that this document nowhere

23  has any confidentiality marking on it.  So, while Genesys may

24  take that document and put a confidential stamp on it,

25  Interactive did not.  Interactive freely disclosed that

1  information.  So when Genesys says that information that may

2  be relating to its architecture is not in the public domain,

3  that document would disagree with that.

4        So let's continue with what is not a trade secret.

5  Again, price quotations are not cognizable.  Trade secrets,

6  that's the *Economation* case.  And the reason that they're not,

7  that once you -- once a party gives information to customers,

8  and why that can no longer be a trade secret is because of

9  this case, *Standard Register*, which lays it out very plainly.

10 The evidence reveals that customers are quite willing to shop

11 around and that they will reveal their needs and competing

12 quotes to competitive salesmen.

13       So let's look at what happened in this case.  They

14 discuss Bank of Hawaii a good bit in their briefs.  The

15 information from Exhibit -- or, excuse me, tab 31, which is

16 one of the exhibits the plaintiff shows very well that Bank of

17 Hawaii was freely giving information to Talkdesk relating to

18 the terms of the agreement that it was negotiating with

19 Genesys, meaning it was trying to get the best deal it could.

20 It was likely doing the same for Genesys -- to Genesys.  But

21 what we can certainly tell is that Sheh, S-H-E-H, and T-E-I-K

22 are two individuals who worked for Bank of Hawaii, were

23 providing information to Talkdesk as the sales process went

24 through.  Tab 36, another of Plaintiffs' exhibits, also

25 describes and shows that this information from Bank of Hawaii

1    was available.

2              Again, going back to the *Standard Register* case,

3    once that information is provided to a customer, the customer

4    can do what they want with it.  It's not a trade secret any

5    longer.  I know Genesys will cite to, or may cite to, an NDA

6    from 2016.  The facts would show that NDA was not in place, at

7    least at this point, that the NDA may have covered activities

8    in their original quotation for Bank of Hawaii, but as of this

9    point, Bank of Hawaii was doing what customers will do,

10   getting the best deal they could for themselves.

11             That aside, on the point of harm and whether there

12   could be any harm as to Bank of Hawaii, there could not be,

13   and especially at it relates to Genesys' pricing information

14   that was alleged to have been distributed by Mr. Hertel.

15   Talkdesk did not compete with Genesys on price.  It offered a

16   zero -- a zero fee license.  Public information would show

17   what Talkdesk -- excuse me, what Genesys would like to charge

18   for its -- for its service.  That range would be between that

19   price shown on the Internet, maybe more, and zero.

20             Talkdesk was willing to do it for free.  And still,

21   despite that, they did not -- Talkdesk did not get the

22   business, and Genesys continued to service Bank of Hawaii, and

23   does to this day.  So, even getting over all this information

24   about what's a trade secret or what's not, when we get down to

25   it, is there a threat of irreparable harm?  No.  That deal has

1   been done.  Is there a threat of harm at all?  No, Genesys

2   retained that business.

3            I'll just point out the PowerSchool response.  So

4   PowerSchool is another customer that's cited in the briefs.

5   And there's no information -- one, there's no evidence of any

6   confidential information ever being distributed to

7   PowerSchool.  There's also no evidence of any kind of

8   confidentiality restrictions that would have been placed on

9   anything that Genesys would have provided to PowerSchool, so,

10  again, falling into that case law that says anything given to

11  a customer is not going to be a trade secret.

12           I'll touch on master agents really quick.  They're

13  described in the declarations, Hertel, at paragraph 23.

14  PowerSchool is one where a master agent intervened.  A master

15  agent is a third party.  It's another one of these resources,

16  if you will, in the industry that provide insight into what is

17  best for the customer and can -- how do we pair you up with

18  the best solution for the best price?

19           There's also information or argument in the briefs

20  about the Interactive SOC II.  I think you may have heard

21  about that in the briefs.  Mr. Strahan says that was -- that

22  that information was published on Interactive's Web site.  And

23  it is consistent with the other document, Exhibit 214, that we

24  were looking at earlier today, which has almost identical

25  information within it relating to the architecture and

1  features of the PureCloud software that, again, was

2  distributed by Interactive without any confidentiality

3  markings.

4          So I just put up a demonstrative here at slide 57

5  that shows figures from the SOC II report on the right and

6  from the architectural spotlight on the left, Exhibit 214.

7  They're identical.  The information was in the public demand.

8          We also heard some information about Net Promoter

9  Scores.  The Net Promoter Score, or NPS, is a system and

10 methodology designed by Fred Reichheld.  Exhibit 211 shows

11 this.  And he provided this methodology to everyone.  Anyone

12 can use the methodology.  It consists of -- if you look at

13 Exhibit 211, it exists -- it consists of just asking customers

14 are they happy.  Again, if that information comes from a

15 customer, it cannot be a trade secret.  The fact that we have

16 easily ascertainable information from a customer cannot be a

17 trade secret.

18         But this NPS data is also widely available in the

19 market.  Exhibit 212 is from Satmetrix, which is a group

20 designed to gather NPS data on industries and provide it for a

21 fee to any company that wants it.  If you want NPS data on

22 your rival, then go to Satmetrix.  And you can see at the very

23 bottom, "Review NPS performance for your entire industry or

24 just a select group of your fiercest competitors."  Again,

25 these are services that are provided.

1          So I want to come back to this idea of customer

2    information and the tests requiring that it be imbued with --

3    that the information also be shown to be a trade secret by

4    showing some economic value in its secrecy.  Again,

5    information from customers as to what -- you know, information

6    that can come freely from customers would not have such

7    independent economic value, because it's generally known.

8          And then even customer lists, customer names that

9    can be found in the market.  This *Steenhoven* case at footnote

10   6, it's 460 N.E. 2d 974, says, "Policyholder information

11   cannot be considered a trade secret because it was readily,"

12   available -- excuse me, "ascertainable from the policyholders

13   themselves."

14         Talkdesk has a team dedicated to finding out

15   information from customers, going out to prospective

16   customers, asking them when contracts are to come due, asking

17   them who they're using, asking them the details of those

18   contracts, which they are provided.  That is a function of a

19   team at Talkdesk.  This is in the Strahan declaration at

20   paragraph 29.  There's nothing improper with that.  It just

21   shows that this information is readily ascertainable.  If

22   someone wants to get it, they can.

23         I want to touch on the threat of inevitable

24   disclosure.  The theory of inevitable disclosure has not been

25   adopted in Indiana.  It's cited in the briefs as being -- as

1  being a theory that has been adopted, and the ALQ -- *AL-KO*
2  *Axis* case, which is 2013 WL 12309288, says otherwise.  And,
3  again, in this case, there has to be some threat of
4  disclosure.  So they can't just say that it will inevitably be
5  disclosed.  There has to be more than that to meet the
6  standard.
7         Again, the evidence focuses on pre-November 2018.
8  The materials were collected and isolated.  The declarants
9  have said there's no confidential information in their hands.
10  Morales is no longer employed by Talkdesk.  She can't disclose
11  confidential information to anyone at Talkdesk or otherwise.
12         Also, if you get past the threat of harm, is there
13  any basis for irreparable harm?  In that, there is a
14  presumption as to that, but it can be overcome based on the
15  evidence.  And here we have evidence that, despite alleged
16  trade secrets being shared with Bank of America -- Bank of
17  Hawaii, they remained a Genesys customer.  We have information
18  that is Bank of Hawaii, SOC II, and MPS, all outdated
19  information, if you will, that if they -- that as *Standard*
20  *Register* says, would have limited and diminishing potential
21  value.  So there is no basis for harm in this case, as well.
22         And then, finally, the harm can be quantifiable.
23  Just as we talked about with the nonsolicits, the *Lawler* case
24  is particularly on point.  That says Lawler can clearly
25  articulate its losses as a result of Bradley's entry into the

1   emergency valve business.

2           Again, so we've talked about the first part of the

3   test.  The second part of the test looks to the public and

4   private interests.  And I'll just submit for the Court that

5   the public interests would favor open competition.  To the

6   extent California law would apply, an injunction based on

7   solicitation agreements would run counter to that law.  It

8   would also run counter to Indiana law, would uphold -- which

9   upholds solicitation agreements in only narrow instances.  An

10  injunction could impact third parties.

11          And, finally, the relief is certainly overbroad.

12  I'll cite for you the -- I'm sorry.  The --

13          THE COURT:  You're fine.

14          (Off the record.)

15          MR. MORELAND:  Sorry, Your Honor.

16          So this -- I'll just cite this for the Court.

17  *Patriot Homes, Inc., v. Forest River Housing, Inc.*  I have a

18  bullet point on my slide that says Genesys' requested relief

19  is not narrowly tailored.  It says, "Prohibit Talkdesk and the

20  defendants from using any trade secrets."  It doesn't try to

21  define those trade secrets.  Again, we're going back to, what

22  is their trade secret that they're trying to enforce here?  It

23  is not specific as to what solicitation provisions and how the

24  employees could possibly violate those.

25          And this *Patriot Homes* case, which is 512 F.3d 412,

56

1  would state that a -- if an injunction were to issue, it would

2  need to be a very specific injunction in reasonable detail.

3  Again, an injunction is not warranted under the facts of this

4  case.  They've not -- they've not satisfied the first prong to

5  show valid trade secrets.  The fact that they would not be

6  able to craft an injunction to specify any trade secrets lends

7  itself both to the probative nature or lack of probative value

8  in their arguments as to trade secrets, as well as to the fact

9  that it would be impossible to enforce an injunction given

10  what the plaintiff has argued in the case.

11          So with that, I think I've got five minutes, unless

12  you have any questions.

13          THE COURT:  I don't have any questions.  You've

14  answered them.  Thank you.

15          MR. MORELAND:  Thank you.

16          THE COURT:  Mr. Maley, you have about six minutes.

17          MR. MALEY:  Thank you, Your Honor.  Before I bring a

18  rebuttal witness up, I just, for the record, wanted to note an

19  objection to the two untimely declarations.  That was of

20  Ms. Close and of Mr. Leavitt.  Those were not listed witnesses

21  back during the Court's November 1 deadline.  And for

22  Mr. Leavitt, no 26(a)(2) disclosure was provided.  So we

23  object on the untimeliness grounds and also the lack of a

24  26(a)(2) disclosure with Mr. Leavitt.

25          THE COURT:  Okay.  And those are Mr. Leavitt and

1  Ms. Close?

2          MR. MALEY:  That is correct, Your Honor.

3          THE COURT:  Okay.

4          MR. MORELAND:  Your Honor, can I respond to those?

5          THE COURT:  You may.

6          MR. MORELAND:  Yes.  Okay.  So Mr. Maley is very

7  aware, as we just went through the facts relating to

8  Mr. Hickman's involvement in this case.  Mr. Hickman left Eide

9  Bailly's, as I mentioned earlier.  He actually, himself, has a

10 noncompete that he can't -- cannot work for individuals

11 associated with Eide Bailly.

12         So, therefore, Mr. Trent Leavitt, who is an Eide

13 Bailly employee who worked with Mr. Hickman to make sure that

14 the documents and information were gathered and isolated, he

15 was able just to confirm the facts of what's presented in the

16 e-mail testimony -- or, excuse me, the e-mail exhibits that we

17 provided to the Court, as well, that these documents -- or,

18 excuse me, that the USB drives, the Mac computer, and the

19 Google Drive were, in fact, isolated and collected and remain

20 in the possession of Eide Bailly and not in the possession of

21 the defendants.  Again, Genesys is well aware of that given

22 its involvement in that process in February and April of this

23 year.  So that's as to one.

24         As to Ms. Close, there's an argument as -- there has

25 been an argument in this case that any information that would

1  have been provided relating specifically from Mr. Strahan to

2  other individuals at Talkdesk -- which we would contend is

3  just general knowledge of Mr. Strahan that he's provided and,

4  again, is not trade secret in any manner -- but that that

5  information was then used in a competitive intelligence

6  playbook that is -- that is used by sales employees at

7  Talkdesk.

8          Ms. Close provides -- provides her declaration to

9  point out which documents that have previously been in the

10 record are the Battlecards, the competitive intelligence --

11 excuse me, "competitive intelligence" is a term of art -- that

12 those documents do not contain information or -- I'm sorry.

13 She does not even attest to the information in the document.

14 She just attests to what they are.

15         And then she also attests as to a new system that

16 came about in mid-2009 -- maybe in early 2019, that is a

17 commercially run, competitive intelligence system called Klue.

18 That is now the Battlecards for competitive intelligence for

19 Talkdesk, and, again, points to those documents to show the

20 information that has been complained about by Plaintiff is not

21 in them.  Again, she does not attest to the -- whether the

22 documents contain the information, but, as a matter of fact,

23 they don't.

24         If Plaintiffs -- excuse me.  If Defendants do not

25 provide that evidence, then Plaintiffs would now be saying --

1  or would be saying that there's a potential for harm because

2  there's an e-mail that says that this information is going to

3  be added to the competitive playbook.  And, oh, where is the

4  competitive playbook?  We don't know.

5          So this is, again, in direct response to the brief

6  that was filed by Genesys.  It is intended to show, again,

7  that there's no harm as alleged.  And it's timely in the sense

8  that the briefing yet again came after the witness disclosures

9  and exhibit disclosures, which were done on, I believe, the

10 1st of November.  We, obviously, had a lot of additional

11 discovery after that point.

12         THE COURT:  Okay.  I'm going to take your objection

13 under advisement.

14         MR. MALEY:  Thank you, Your Honor.

15         In rebuttal, we will call Yaniv Schiff.

16         THE COURT:  Schiff?

17         If you'd come right up here.  And if you would

18 remain standing and raise your right hand.

19         (The witness is sworn.)

20         THE COURT:  You may have a seat.

21         And we'll start the clock once he asks his question.

22         MR. MALEY:  Thank you, Your Honor.

23

24

25

1    **YANIV SCHIFF, PLAINTIFF'S WITNESS, SWORN**

2              <u>**DIRECT EXAMINATION**</u>

3   BY MR. MALEY:

4   Q.  Mr. Schiff, could you tell the Court your full name, what

5   you do professionally, and where you are employed.

6   A.  Yaniv Schiff, Y-A-N-I-V, S-C-H-I-F-F.  I'm currently the

7   director of forensics at QDiscovery.

8   Q.  And do you work in technology forensics professionally?

9   A.  I do.

10  Q.  How long have you been in that field?

11  A.  Fifteen years.

12  Q.  Have you testified in other state and federal court

13  matters on forensic technology issues?

14  A.  I have.

15  Q.  Do you consider yourself to be an expert on the topic?

16  A.  I do.

17  Q.  And have you been so qualified and allowed to testify in

18  state and federal courts?

19  A.  I have.

20  Q.  Okay.  Have you, in your role on behalf of Genesys as a

21  retained forensic technology expert in this case, had an

22  opportunity to review Mr. Leavitt's declaration regarding

23  technology and USB drives?

24  A.  I have.

25  Q.  And do you understand his declaration to address a USB

1  drive of Ms. Morales and of Mr. Hertel?

2  A.  Yes.

3  Q.  And have you reviewed copies of those two USB drives?

4  A.  I have.

5  Q.  And have you done so as a forensic technologist?

6  A.  Correct.

7  Q.  Did you find Genesys data on each of those drives?

8  A.  I did.

9  Q.  Did you undertake generally accepted methodologies to

10 ascertain whether those USB drives had been connected to a

11 computer or computer device anytime after September 30th of

12 2018?

13 A.  Yes, I did.

14 Q.  And what did you find as to Mr. Hertel's USB flash drive?

15 A.  Based on my analysis of Mr. Hertel's USB drive, I

16 determined that that specific drive had been connected to a

17 computer no less than three times, I believe, since October of

18 2018.

19 Q.  And how about as to Ms. Morales' USB drive?

20 A.  That device was connected, I believe, no less than eight

21 times since October of 2018.

22 Q.  And do you know, or does Mr. Leavitt express in a

23 declaration, what might have happened each time one of those

24 devices was plugged into a computer device?

25 A.  I don't believe Mr. Leavitt offered any opinion as to

*SCHIFF – DIRECT/MALEY*                    62

1   that.

2   Q.  Did you find that Ms. Morales' drive had been attached to

3   computer devices into the year 2019?

4   A.  Yes.  I believe there was at least one connection,

5   possibly more, in February of 2019.

6   Q.  And did you prepare an expert report, preliminary report,

7   regarding these two drives?

8   A.  Yes.

9           MR. MALEY:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. MALEY:

12  Q.  I hand you Exhibit 161.

13          MR. MALEY:  May I approach, Your Honor?

14  BY MR. MALEY:

15  Q.  Is this the report that you prepared and that was

16  disclosed to defense counsel in this case?

17  A.  It is.

18  Q.  And does this contain your -- a summary of your opinions,

19  methodologies, and conclusions?

20  A.  It does.

21          MR. MALEY:  Move to admit Exhibit 161 as a rebuttal

22  exhibit, Your Honor.

23          THE COURT:  Any objection to 161?

24          MR. MORELAND:  Your Honor, we have the witness on

25  the stand here, who's testifying about this document.  I'm not

*SCHIFF - DIRECT/MALEY*                63

1  sure that the submission of the document as an exhibit is

2  necessary.

3          MR. MALEY:  Your Honor, I think it's a --

4          THE COURT:  I'll let it in.  It may be helpful to

5  the Court.  So 161 is in evidence over objection.

6                        *(Plaintiff's Exhibit 161 was*

7                        *received in evidence.)*

8          MR. MALEY:  Thank you, Your Honor.  No further

9  questions of Mr. Schiff.

10          THE COURT:  Okay.  I have one question for you,

11  Mr. Maley.

12          MR. MALEY:  Yes, Your Honor.

13          THE COURT:  Since Ms. Morales -- her only claims

14  were the federal and trade secret claims, and in your -- in

15  the reply, it says that she's no longer working for Talkdesk,

16  isn't the preliminary injunction against her now moot?

17          MR. MALEY:  Respectfully, it is not, Your Honor.  So

18  the record is established that she misappropriated, downloaded

19  extensive information of Genesys.  She apparently recently

20  separated from Talkdesk and may well at any day now land in

21  a -- with a competitor.  She still at least has knowledge in

22  her mind of that data, and we don't know presently,

23  forensically, whether that data might be someplace else.

24  We've only been into initial discovery on this point.  There's

25  no harm to her from an injunction complying with federal and

*SCHIFF - CROSS/MORELAND*          64

1  state trade secret laws, so it is not mooted, Your Honor,

2  respectfully.

3          THE COURT:  All right.  Okay.

4          Counsel?

5                    **CROSS EXAMINATION**

6  BY MR. MORELAND:

7  Q.  Mr. Schiff, can you tell me, as to Hertel, Mr. Hertel's

8  USB, in your report, you provide that it was connected to one

9  or more computers on the following dates.  What is the most

10 recent date?

11 A.  That was for Mr. Hertel?

12 Q.  Hertel.

13 A.  That was October 25th, 2018.

14 Q.  Okay.  And can you tell from your analysis as to what

15 computer that information was connected to -- or, excuse me,

16 what type of device the USB drive was connected to?

17 A.  Based on my analysis, it appeared that the connections

18 were to Mac computers.

19 Q.  Okay.  Are you aware of Eide Bailly preserving and keeping

20 McIntosh computers received from the defendants in this case;

21 are you aware of that?

22 A.  Yes, I am.

23 Q.  Okay.  Are you aware of Eide Bailly also isolating,

24 collecting USB devices from the defendants in this case?

25 A.  Only insofar as the two USB devices that I report on.

1  Q.  Sure.  Okay.  As to Ms. Morales, are -- were you able to

2  identify any -- whether any information at all was removed

3  from the USB device?

4  A.  Removed as in deleted?

5  Q.  Not deleted, I'm sorry.  Let me clarify that question.

6  Was moved to another location, another device.  The McIntosh,

7  for example.

8  A.  Based on my analysis, I wasn't able to draw that

9  conclusion.  I was only able to show that files and

10 information was being accessed on certain days.

11             MR. MORELAND:  Okay.  No further questions.

12             THE COURT:  Okay.  Thank you.

13             Anything else for the witness?

14             MR. MALEY:  No, Your Honor.

15             THE COURT:  All right.  Sir, you may step down.

16 Thank you.

17             (Witness excused.)

18             MR. MALEY:  And then, Your Honor, I simply have,

19 then, three rebuttal exhibits to offer to the Court.  The

20 first -- may I approach, Your Honor?

21             THE COURT:  You may.

22             MR. MALEY:  Exhibit 162, which is the November 15,

23 2018, cease-and-desist letter from our office to Ms. Morales.

24             THE COURT:  Any objection to 162?

25             MR. MORELAND:  No, Your Honor.

1          THE COURT:  All right.  162 is admitted into

2 evidence without objection.

3                         (Plaintiff's Exhibit 162 was

4                         received in evidence.)

5          MR. MALEY:  Next, Your Honor, is Exhibit 163,

6 Ms. Morales' response e-mail on November 26, 2018, wherein she

7 states, in part, "Additionally, I have not misappropriated any

8 Genesys trade secrets or other confidential information and

9 have no such information or Genesys property in my

10 possession."

11          THE COURT:  Any objection to 163?

12          MR. MORELAND:  No, Your Honor.

13          THE COURT:  163 is admitted into evidence without

14 objection.

15                         (Plaintiff's Exhibit 163 was

16                         received in evidence.)

17 BY MR. MORELAND:

18 Q.  And then, lastly, Your Honor, excerpts from Ms. Morales'

19 discovery responses marked as Exhibit 164, and specifically

20 answer to interrogatory number 20, which asks about

21 downloading.  And at number two, she states the files were

22 downloaded in September of 2018.  In number three, she says

23 they were downloaded so as to retain anything she believed

24 would be helpful to her Genesys colleagues for closing any

25 final deals that were in Morales' pipeline after Morales had

1 left her employment with Genesys.  I offer Exhibit 164 in

2 rebuttal.

3          MR. MORELAND:  No objection.

4          THE COURT:  Exhibit 164 is admitted without

5 objection.

6                         *(Plaintiff's Exhibit 164 was*

7                          *received in evidence.)*

8          MR. MALEY:  Thank you, Your Honor.  We conclude our

9 evidence with that, and I'll take my one minute and five

10 seconds, if I could, to just make a few final closing argument

11 points.

12          First, in terms of what is before the Court, and the

13 Court just heard a preview of some of this evidence today, the

14 deposition designations and the exhibits are extensive.  And,

15 as the Court is aware, discovery has only started.  We have

16 only done a three-hour merits deposition of one of the

17 defendants.  The other depositions were just jurisdictional.

18 With the Court having ruled, denying most of the dismissal

19 motion, the case is just now starting.

20          And what we have discovered, though, already is

21 extensive evidence of misappropriation, both flash drives,

22 e-mails, forwarding information to Gmail accounts, and then

23 forwarding them internally to the CEO of Talkdesk.

24          With respect to then probability of success,

25 respectfully, it's more than just a reasonable probability, a

68

1   high probability of success on the merits of trade secrets and

2   breach of recruitment and solicitation.  We also have an

3   adverse inference with the defendants choosing not to be here

4   today to be subject to cross-examination.

5           The calculation of damages is challenging in these

6   trade secret cases, where particularly you have employees who

7   have been rated.  How do we value that?  How do we account for

8   that, the intangibles of the employee's experience and the

9   intangible value of the trade secrets?

10          And, ultimately, though, Your Honor, we get to

11  balance of harms.  The -- and Mr. Manno, you see in his

12  deposition, admitted to this.  There is no harm to a defendant

13  from complying with federal and state law; there is no harm to

14  a defendant from complying with -- for only four more months

15  is all we're talking, that's left on the 18-month covenants,

16  through March of 2020 -- complying with the agreement not to

17  solicit employees, as they grotesquely did while still on the

18  Genesys payroll and thereafter; nor any harm, and they

19  acknowledged this, to continuing for four months not to

20  solicit employees -- or customers, Your Honor.

21          So, respectfully, all the elements are satisfied

22  here, and for this brief period of time, on the contracts and

23  then applying the federal and state Trade Secrets Act on the

24  trade secrets, we respectfully request that the injunction be

25  issued.

1          Thank you for hearing us so promptly, Your Honor,

2   and I appreciate your time.

3          THE COURT:  Thank you, Counsel.

4          MR. MORELAND:  Your Honor, I do have one -- at least

5   one --

6          THE COURT:  One --

7          MR. MORELAND:  -- issue.

8          THE COURT:  You may.

9          MR. MORELAND:  Sorry.  If I can get it out.

10         THE COURT:  Go ahead.  What is your issue, Counsel?

11         MR. MORELAND:  We -- you just heard my opposing

12  counsel say that there's an adverse inference as to the

13  defendants' --

14         THE COURT:  Nonappearance?

15         MR. MORELAND:  Yes.

16         THE REPORTER:  I'm sorry?

17         MR. MORELAND:  To the defendants not appearing

18  today.  Two points:  One, Judge Lynch did very strongly

19  recommend that we had limited time and actually asked whether

20  we would be presenting witnesses on November 7th when we

21  talked to her, and I informed her at that time that, given the

22  time constraints of this proceeding, that that was very

23  doubtful.

24         But, also, the case law that's been cited, we

25  would -- Defendants would like an opportunity to respond to

1   that.  The case law is related to a Fifth Amendment privilege,

2   which is not at play at all in this case, so there is no

3   adverse inference.  But, obviously, we've not had a chance to

4   respond.

5           The reply was not -- I'll just point this out for

6   the record, as well.  The reply was not a part of the

7   agreed-upon briefing process in this case.  Again, in our

8   November 7th communication with Judge Lynch, we were asked, is

9   there a reply brief allowed under the -- under your order, and

10  we told Judge Lynch no.  And, certainly, her docket entry that

11  followed only provided the two, the brief and the response.

12  Now we have a reply that has new arguments in it that were

13  never presented in the opening brief.  Defendants would just

14  request just a very, very limited opportunity to respond to

15  that.

16          THE COURT:  Okay.  I'll -- so that we don't have to

17  look it up, you can do a two-page sur-reply on that one issue,

18  Counsel --

19          MR. MORELAND:  Okay.  Thank you.

20          THE COURT:  -- on those cases; okay?  When can you

21  get that to me?

22          MR. MORELAND:  By tomorrow?  Is that --

23          THE COURT:  That would be perfect.

24          MR. MORELAND:  Okay.

25          THE COURT:  We're going to try to get you guys a

1 ruling before the week is out.

2          MR. MALEY:  Thank you, Your Honor.  And if -- we'll

3 file these electronically.  We have proposed findings and

4 conclusions to tender to the Court.

5          THE COURT:  That would be wonderful.

6          MR. MALEY:  And we'll file those as soon as we're

7 back to the office, as well.

8          THE COURT:  Do you have proposed findings for me?

9          MR. MORELAND:  I do not, not at this moment.  We

10 will get you -- we will get you some.

11          THE COURT:  Okay.  Can you -- when can you do that?

12 I know you probably worked during Thanksgiving.

13          MR. MORELAND:  Would Friday be possible?  Today

14 is -- I'm losing track of my days.  What is it?  Is it Monday?

15          THE COURT:  Can you get it before Friday?

16          MR. MORELAND:  I can.  Just tell me --

17          THE COURT:  Can you get it on -- can you get it on

18 Wednesday?  Today is Monday.

19          MR. MORELAND:  Can we do it Wednesday afternoon,

20 because --

21          THE COURT:  Wednesday afternoon.

22          MR. MORELAND:  Okay.

23          THE COURT:  You docket it by the end of the -- you

24 can do it at 11:59 on Wednesday.

25          MR. MORELAND:  Thank you, Your Honor.

1          THE COURT:  Only because I'm going to be out of town

2    the following week, and I would like to get you guys a

3    ruling --

4          MR. MORELAND:  Understood.

5          THE COURT:  -- before I go on vacation; okay?

6          MR. MORELAND:  Okay.

7          MR. MALEY:  May I approach, your Honor?  Here's a

8    copy of those.  We'll e-file that, as well.

9          THE COURT:  Okay.

10          MR. MALEY:  Thank you, Your Honor.

11          THE COURT:  So you can have until 11:59 p.m. on

12    Wednesday to get a brief.  We'll see how long Mr. Maley's

13    proposed -- 15 pages.

14          MR. MORELAND:  Okay.

15          THE COURT:  Okay?  All right.  Okay, we're

16    adjourned, and we'll get you a ruling as soon as we get all of

17    your documentation in and -- so we can get a decision on that

18    issue for you guys.

19          MR. MALEY:  Thank you, Your Honor.

20          THE COURT:  You're very welcome.  And it was good to

21    see everyone and meet some of the people for the first time.

22    And you both did a great job.  And forgive us for our sloppy

23    computer system, our presentation.  We are adjourned.

24          MR. MORELAND:  Thank you, Judge.

25          MR. MALEY:  Thank you, Judge.

1        THE COURTROOM DEPUTY:  All rise.

2            (Proceedings adjourned at 4:23 p.m.)

3

4    ---------------------------------------------------------------

5

6                  CERTIFICATE OF COURT REPORTER

7

8        I, David W. Moxley, hereby certify that the

9    foregoing is a true and correct transcript from

10   reported proceedings in the above-entitled matter.

11

12

13

14   /S/ David W. Moxley_____    December 3, 2020
     DAVID W. MOXLEY, RMR/CRR/CMRS
15   Official Court Reporter
     Southern District of Indiana
16   Indianapolis Division

17

18

19

20

21

22

23

24

25