UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GENESYS TELECOMMUNICATIONS LABORATORIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) | Case No.: 1:19-CV-00695-TWP-DML |
| TALKDESK, INC., RALPH MANNO, MICHAEL STRAHAN, MARK HERTEL, and DANIELLE MORALES, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## THIRD AMENDED COMPLAINT

Genesys Telecommunications Laboratories, Inc. ("Genesys"), for its Third Amended Complaint against Talkdesk, Inc. ("Talkdesk"), Ralph Manno, Michael Strahan, Mark Hertel, and Danielle Morales (collectively "Defendants"), states as follows.

## TABLE OF CONTENTS[1]

                                                                                        **Page**

INTRODUCTION AND NATURE OF THE CASE ........................................................................ 2

THE PARTIES ............................................................................................................................. 5

JURISDICTION AND VENUE .................................................................................................... 5

FACTUAL BACKGROUND ........................................................................................................ 8

SPECIFIC COUNTS AGAINST DEFENDANT RALPH MANNO .......................................... 54

SPECIFIC COUNTS AGAINST DEFENDANT MICHAEL STRAHAN ................................. 67

SPECIFIC COUNTS AGAINST DEFENDANT MARK HERTEL ........................................... 79

SPECIFIC COUNTS AGAINST DEFENDANT TALKDESK .................................................. 86

SPECIFIC COUNTS AGAINST DEFENDANT DANIELLE MORALES ................................ 93

[1] In light of the five Defendants and thirty-nine alleged legal claims, Genesys is providing a table of contents to aid the parties and Court in analyzing the Third Amended Complaint.

## INTRODUCTION AND NATURE OF THE CASE

1.     This is a case of corporate raiding of the heart of a competitor's mid-market sales team, involving blatant breaches of fiduciary duty, willful misappropriation of trade secrets, breach of contract, and interference with contract.   The Defendants' unlawful conduct is extraordinary, pervasive, and egregious.

2.     Since the early 1990s, Genesys has been a longstanding and market-leading provider of cloud and on-premises customer experience and contact center solutions.  Genesys has made massive investments in its technology, its trade secrets, and its sales teams.  Genesys offers customer-experience platforms that enable enterprises to orchestrate and monitor multimodal omnichannel journeys and interactions.

3.     Talkdesk is an upstart competitor in the market and competes with Genesys.  On October 3, 2018, Talkdesk announced that it had raised $100 million in Series B funding, which it claims is "the largest round ever raised for a private company in the contact center industry." *See* Talkdesk Raises $100 Million to Power the Contact Center of the Future, https://www.talkdesk.com/news-and-press/press-releases/talkdesk-raises-100-million-to-power-the-contact-center-of-the-future/.

4.     Flush with capital and eager to make a splash in the market, rather than invest in its own development of talent and trade secrets, Talkdesk began an aggressive raiding strategy aimed at its competitor, Genesys.   In particular, Talkdesk aggressively targeted and raided Genesys sales employees in the Genesys mid-market segment.

5.     In a short time span starting in September 2018, at least 14 Genesys employees aggressively recruited by Talkdesk left the company for Talkdesk. These Genesys employees were strategically targeted by Talkdesk and its Founder, Chairman of the Board & CEO Paiva, with

Talkdesk's behavior described in an email by one of the Genesys employees it poached as the "harvesting" of Genesys employees.

6.      Talkdesk aimed high, targeting 100% of the Genesys mid-market Vice Presidents, 100% of the mid-market Area Directors, and most of the Genesys mid-market personnel.   Talkdesk succeeded in its raid, capturing with aggressive and above-market offers 50% of the Genesys mid-market Vice Presidents, 66% of the Genesys mid-market Area Directors, approximately 25% of the Genesys mid-market sales executives across the country, as well as a Technical Sales Consultant.

7.      The Genesys mid-market Vice President raided by Talkdesk was responsible for 100% of Genesys mid-market business.  The two Area Directors poached by Talkdesk were responsible for a substantial portion of mid-market revenue in 2018.

8.      On behalf of and for the benefit of Talkdesk while still employed by Genesys but having committed to joining Talkdesk, Manno, Hertel, and Strahan recruited other Genesys personnel, utilizing their trade secret knowledge of the Genesys team's performance, compensation, level of job satisfaction, and account relationships learned by Manno in his role as Vice President and Hertel and Strahan in their Area Director roles at Genesys.

9.      With multiple former Genesys mid-market managers and sales executives in its corner, Talkdesk suddenly began aggressively targeting customers and prospects that those former Genesys employees were familiar with.  Talkdesk utilized Genesys trade secrets in doing so.  This conduct began while Manno, Strahan, and Hertel were still employed with Genesys.

10.      Within weeks of the employees leaving, Talkdesk targeted and underbid Genesys on multiple key opportunities for Genesys customers, including opportunities where Talkdesk was able to win the business over Genesys.

11.      Manno, Strahan, and Hertel were highly compensated, trusted executives of Genesys. Along with Morales, these former high level sales employees were entrusted by Genesys with

substantial trade secrets of Genesys to perform their duties. Within weeks of each other, and after conspiring internally amongst each other and with other Genesys employees, these Defendants all abruptly resigned their employment with Genesys to work for Talkdesk. In the process of doing so, they submitted a trail of phony resignation communications, breached their fiduciary duties owed to Genesys, and misappropriated Genesys trade secrets.

12.    In addition, while still employed with Genesys, the individual Defendants conspired with Talkdesk and its Board Chair & CEO Tiago Paiva and breached contractual agreements with Genesys in disclosing confidential information, soliciting Genesys employees and both preparing to compete and actually competing against Genesys on behalf of Talkdesk.

13.    Morales, one of Talkdesk's targeted recruits, secretly downloaded more than 700 confidential and proprietary Genesys documents, data, and materials on her way out of Genesys after Talkdesk's recruitment; these constitute trade secrets.

14.    Hertel likewise downloaded over 24,000 Genesys documents, many of which include confidential and proprietary Genesys data and materials; these constitute trade secrets.

15.    Strahan and Manno likewise left employment with Genesys while failing to return Genesys confidential trade secret information.

16.    Morales, Hertel, Manno, and Strahan all failed to return and account for such Genesys property and trade secrets upon separating from Genesys, and in fact represented falsely otherwise.

17.    After joining Talkdesk, the individual Defendants, as employees of Talkdesk accessed and further misappropriated the stolen Genesys confidential trade secret information.

18.    Manno, Strahan, and Hertel all transmitted Genesys confidential trade secret information to Talkdesk, including Board Chair & CEO Paiva, while still employed by Genesys. After leaving for Talkdesk, Manno, Strahan, Hertel, and Board Chair & CEO Paiva all continued to misappropriate Genesys confidential trade secret information.

19.     This lawsuit, based on federal question jurisdiction and supplemental jurisdiction, seeks redress from the Defendants.

## THE PARTIES

20.     Genesys is a corporation which has a significant presence in Indiana and is successor to a former Indiana company, Interactive Intelligence.  Specifically, Genesys has corporate offices in Indianapolis and employs more than 800 employees in Indiana at its Indianapolis campus.

21.     Strahan is a citizen of Indiana who executed an agreement with an Indiana forum-selection clause, Morales is a citizen of California, Hertel is a citizen of California who executed an agreement with an Indiana forum-selection clause, and Manno is a citizen of Missouri who executed an agreement with an Indiana forum-selection clause.

22.     Talkdesk is a competitor of Genesys that does business across the United States, including in Indiana, and employs personnel in Indiana.

## JURISDICTION AND VENUE

23.     Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1367, as this action arises in part under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and pursuant to 28 U.S.C. § 1367 because all supplemental state law claims arise out of the same case or controversy as the federal claims over which this Court has original jurisdiction.

24.     This Court has already ruled that it has personal jurisdiction over Strahan. Strahan is domiciled within this District, Strahan consented to this Court's jurisdiction through a forum-selection clause, and this action arises from Strahan's knowing and intentional breach of certain contractual, common law, and statutory obligations owed to Genesys while acting within and causing injury within this State and District.  For example, Strahan misappropriated documents created in Indiana, solicited Genesys employees based in Indiana to come work for Talkdesk, and also solicited other Genesys

employees while he was living and working in Indiana. For example, while living and working in Indiana, Strahan solicited Mark Hertel to leave Genesys and work for Talkdesk.

25.     This Court has already ruled that it has personal jurisdiction over Hertel. Hertel consented to this Court's jurisdiction through an Indiana forum selection clause and also because this action arises from Hertel's knowing and intentional breach of certain contractual, common law, and statutory obligations owed to Genesys while acting within and causing injury within this State and District. For example, Hertel solicited Indiana resident Michael Strahan to leave Genesys and work for Talkdesk. Further, Hertel misappropriated over 24,000 documents from Genesys, many of which were created in Indiana and by Indiana employees. *See* ECF 63, Ex. Q.

26.     This Court has already ruled that it has personal jurisdiction over Morales. Morales misappropriated over 200 pages of documents that were created in Indiana by Indiana employees. *See* ECF 63, Ex. R. Further, Morales was paid by Indiana-based Interactive Intelligence for a period of time, worked for Genesys with its significant presence in Indiana, spent 10 days in Indiana for job-related travel, and interacted so frequently with Genesys staff from Indiana that the documents and communications between Morales and Indiana-based Genesys employees total over 1,300 pages. *See* ECF 63, Ex. S. Lastly, this action arises from Morales' knowing and intentional breach of certain contractual, common law, and statutory obligations owed to Genesys causing injury within this State and District.

27.     This Court has already ruled that it has personal jurisdiction over Manno. Manno consented to this Court's jurisdiction through an Indiana forum-selection clause and also because this action arises from Manno's knowing and intentional breach of certain contractual, common law, and statutory obligations owed to Genesys while acting within and causing injury within this State and District. For example, Manno solicited Indiana resident Michael Strahan to leave Genesys and work for Talkdesk.

6

28.     This Court has already ruled that it has personal jurisdiction over Talkdesk. This action arises from Talkdesk's knowing and intentional violations of statutory law and interference with contracts entered into in Indiana with Indiana forum-selection and Indiana choice-of-law clauses, and while acting within and causing injury within this State and District. Notably, Talkdesk Board Chair & CEO Paiva, on behalf of Talkdesk, personally targeted and recruited Michael Strahan, an Indiana citizen with a contractual agreement with Genesys containing an Indiana forum-selection and choice-of-law provision. Board Chair & CEO Paiva also personally recruited and conspired with Genesys executives Ralph Manno and Mark Hertel, both of whom have Genesys contracts with Indiana forum-selection clauses and Indiana choice-of-law provisions. Further, Talkdesk employs personnel in Indiana, has earned over $35,000 in revenue from 23 transactions with Indiana businesses, has targeted at least 13 other Indiana prospects, pays Indiana payroll taxes, and has shipped computer equipment to Indiana.

29.     This Court also has personal jurisdiction over Talkdesk because, as an employee and agent of Talkdesk, Strahan – an Indiana resident – breached contractual and fiduciary obligations owed to Genesys when he solicited Genesys employees to come work for Talkdesk.

30.     This Court also has personal jurisdiction over Talkdesk because Talkdesk has misappropriated Genesys documents and trade secrets that were created in Indiana.

31.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this District because a substantial part of the events giving rise to this action occurred in this District. Further, trade secrets and other documents misappropriated by Defendants were created in this District. Additionally, Defendants Strahan, Hertel, and Manno agreed to litigation in Indiana and this District pursuant to Indiana forum selection clauses requiring them to litigate in this District. Furthermore, Talkdesk does significant business in and employs personnel in Indiana, and this action arises from Talkdesk's knowing and intentional violations of statutory law and interference with contracts entered into in

Indiana with Indiana forum-selection and Indiana choice-of-law clauses, and while acting within and causing injury within this State and District. Lastly, a substantial portion of the witnesses involved in this litigation are located in Indiana.

## FACTUAL BACKGROUND

**FACTUAL ALLEGATIONS REGARDING THE INDIVIDUAL DEFENDANTS' CONTRACTUAL OBLIGATIONS OWED TO GENESYS AND TALKDESK'S KNOWLEDGE OF THE SAME.**

32.   Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

### Ralph Manno

33.   Ralph Manno was initially hired by Interactive Intelligence, now part of Genesys, as a Director of Channel Sales in August 2004.

34.   Immediately prior to working for Talkdesk, Manno was a Vice President of Sales at Genesys. In that high-ranking executive position, Manno oversaw all sales activity in Genesys' mid-market segment and managed a team of Area Directors and those Directors' Account Executives.

35.   As a condition of employment, Manno entered into several contractual agreements with Interactive Intelligence that survive his employment and are binding on him and inure to the benefit of Genesys as Interactive Intelligence's successor and assign.

36.   These contractual agreements include an employment agreement in which Manno agreed: a) not to "use" Genesys' Confidential Information for "any purpose other than the benefit" of Genesys or to "communicate, deliver, exhibit or provide" Genesys Confidential Information to anyone other than employees or agents of Genesys as required in the normal course of his duties at Genesys (Sec. 8(c)), b) not to "become employed by or serve as an agent...or representative" of a competitor while he was still employed by Genesys (Sec. 7(a)), c) not to "prepare in any manner to compete with" Genesys while he was still employed by Genesys (Sec. 7(a)), d) not to "solicit the

employment" of any Genesys employees or "encourage" those employees to terminate their employment with Genesys, while he was still employed by Genesys (Sec. 7(a)), e) to "devote substantially all" of his "business time, attention, energy, and skill" to Genesys and to "perform such services in a faithful, competent, and diligent manner" while he was still employed by Genesys (Sec. 3(b)), and f) to "immediately surrender" records "which pertain to the business" of Genesys, "upon termination". (Sec. 11). GEN500012114-21. Manno agreed it was reasonable to contractually require an employee to perform faithful service while employed. *Ralph Manno Deposition*, November 5, 2020, p. 19.

37.     Manno's employment agreement defines "Confidential Information" in part as "any and all software programs, customer lists, trade secrets and information, know-how, skills, knowledge, ideas, knowledge of customer's commercial requirements, pricing methods, sales and marketing techniques, dealer relationships and agreements, financial information, intellectual property, codes, algorithms, research, development, research and development programs, processes, documentation, inventions…." GEN500012114-21.

38.     Manno's employment agreement explains that Genesys shall be entitled to reasonable attorneys' fees and expenses incurred for a successful enforcement of Sections 7 and 8 of the agreement. GEN500012114-21.

39.     In his job as a Vice President of Sales, Manno had access to Genesys Confidential Information as that term is defined by his employment agreement and also including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee salary data, and employee level of job satisfaction.

40.     In his job as a Vice Present of Sales, Manno had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

41.     Manno resigned from his employment with Genesys effective September 30, 2018.

42.     Manno began employment with Talkdesk on October 1, 2018, serving as its Vice President of Sales. *Ralph Manno Deposition*, November 5, 2020, pp. 76-77.

**Michael Strahan**

43.     Michael Strahan was initially hired by Interactive Intelligence, now part of Genesys, as a Test Engineer in September 2000.

44.     Immediately prior to working for Talkdesk, Strahan was an Area Director of Sales at Genesys. In that position, Strahan oversaw all sales activity in Genesys' Central Region and managed a team of Account Executives.

45.     As a condition of his employment, Strahan entered into several contractual agreements with Interactive Intelligence that survive his employment and are binding on him and inure to the benefit of Genesys as Interactive Intelligence's successor and assign.

46.     These contractual agreements include an employment agreement in which Strahan agreed: a) not to "use" Genesys' Confidential Information for "any purpose other than the benefit" of Genesys or to "communicate, deliver, exhibit or provide" Genesys Confidential Information to anyone other than employees or agents of Genesys as required in the normal course of his duties at Genesys (Sec. 8(c)), b) not to "become employed by or serve as an agent…or representative" of a competitor while he was still employed by Genesys (Sec. 7(a)), c) not to "prepare in any manner to compete with" Genesys while he was still employed by Genesys (Sec. 7(a)), d) not to "solicit the employment" of any Genesys employees or "encourage" those employees to terminate their employment with Genesys, while he was still employed by Genesys (Sec. 7(a)), e) to "devote

substantially all" of his "business time, attention, energy, and skill" to Genesys and to "perform such services in a faithful, competent, and diligent manner" while he was still employed by Genesys (Sec. 3(b)), and f) to "immediately surrender" records "which pertain to the business" of Genesys, "upon termination". (Sec. 11). GEN500052502-09. Strahan agreed these were reasonable provisions to put in an employment agreement. *Michael Strahan Deposition*, October 21, 2020, pp. 105-06.

47.     Strahan's employment agreement defines "Confidential Information" in part as "any and all software programs, customer lists, trade secrets and information, know-how, skills, knowledge, ideas, knowledge of customer's commercial requirements, pricing methods, sales and marketing techniques, dealer relationships and agreements, financial information, intellectual property, codes, algorithms, research, development, research and development programs, processes, documentation, inventions…." GEN500052502-09.

48.     Strahan's employment agreement explains that Genesys shall be entitled to reasonable attorneys' fees and expenses incurred for a successful enforcement of Sections 7 and 8 of the agreement. GEN500052502-09.

49.     In his job as an Area Director of Sales, Strahan had access to Genesys Confidential Information as that term is defined by his employment agreement and also including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee compensation, performance, level of job satisfaction, and salary data.

50.     In his job as an Area Director of Sales, Strahan had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

51.     Strahan began employment with Talkdesk on September 17, 2018, serving as a Regional Vice President of Sales. *Michael Strahan Deposition*, October 21, 2020, p. 122; *Def. Michael Strahan's First Supplemental Objections And Resp. To Pl.'s Interrogs.*, 2.

52.     Strahan resigned from his employment with Genesys effective September 30, 2018. *Michael Strahan Deposition*, October 21, 2020, p. 76.

**<u>Mark Hertel</u>**

53.     Hertel was initially hired by Interactive Intelligence, now part of Genesys, as West Area Director in November 2013.

54.     Immediately prior to working for Talkdesk, Hertel was an Area Director of Sales at Genesys. In that position, Hertel oversaw all sales activity in Genesys West Region and managed a team of Account Executives.

55.     As a condition of his employment, Hertel entered into several contractual agreements with Interactive Intelligence that survive his employment and are binding on him and inure to the benefit of Genesys as Interactive Intelligence's successor and assign. Those contractual agreements including a prohibition on disclosing Genesys' confidential information.

56.     In his job as Area Director of Sales in the West Region, Hertel had access to Genesys' confidential trade secret information including but not limited to Genesys intellectual property, account and sales plans, pricing, sales strategy, territory information, customer documents, product information, and employee performance, employee compensation, level of job satisfaction, and accounts assigned to employees.

57.     In his job as an Area Director of Sales, Hertel had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

58.     Hertel's resigned from his employment with Genesys effective September 30, 2018.

59.     Hertel began employment with Talkdesk on October 1, 2018, serving as a Regional Vice President of Sales.

**Danielle Morales**

60.     Danielle Morales was an Account Executive employed by Genesys. In that position, Morales was responsible for making sales to Genesys customers and potential customers and managing customer accounts and relationships.

61.     As a condition of her employment, Morales entered into a contract with Genesys that prohibited her from disclosing Genesys' confidential information.

62.     In her job as Account Executive, Morales had access to Genesys' confidential trade secret information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, and product information.

63.     Morales resigned her employment with Genesys effective September 28, 2018.

64.     Morales began working as an Enterprise Account Executive with Talkdesk on October 1, 2018.

65.     Talkdesk had knowledge or should have had knowledge of Manno, Strahan, Hertel, Morales, and other Genesys employees' employment agreements.

66.     Geraghty asked Strahan if he had an employment agreement with Genesys. *Michael Strahan Deposition*, April 22, 2019, pp. 30-33.

67.     Geraghty was the head of Talkdesk's Talent team and was intimately involved in hiring every former Genesys employee.

68.     Manno, Strahan, Hertel, Morales, and all other former Genesys employees hired by Talkdesk are subject to similar employment agreements with Talkdesk. *Tiago Paiva Deposition*, November 24, 2020, p. 18.

69.     Indeed, Manno, Strahan, Hertel, and Morales' agreements all prohibit them from disclosing Talkdesk's proprietary information, from soliciting Talkdesk employees until one year after employment, and from engaging in any competitive activity during their employment with Talkdesk. TD 000752-54; STRAHAN0755-60; HERTEL0153-55; TD 000755-60.

70.     Talkdesk has sued its former employees to enforce its employment agreements, including employee solicitation and confidentiality provisions. *See* Pl. Talkdesk, Inc.'s Compl. For Breach Of Contract And Misappropriation Of Trade Secrets; Demand For Injunctive Relief, And Damages And Jury Trial, par. 52, *Talkdesk, Inc. v. Rapp, et al.*, CGC-19-580458 (Sup. Ct. Cnty. Of San Francisco, Cal.).

71.     Geraghty knew of the risk that Genesys would sue to enforce its employment agreements, as she advised Board Chair & CEO Paiva that a public announcement about Talkdesk's raid should shield the account executives raided from Genesys, so that Genesys would not come after them. TD 0108631-32.

72.     Employment agreements such as those used by Genesys and Talkdesk are common in the industry. *Mark Hertel Deposition*, October 26, 2020, p. 145; *Danielle Morales Deposition*, November 2, 2020, pp. 15-16.

73.     Despite this common practice, a practice employed by Talkdesk as well, Talkdesk did not ask the former Genesys employees for a copy of their Genesys employment agreements, did not inquire into what was contained in those agreements, and did not instruct them to follow those agreements.

**FACTUAL ALLEGATIONS REGARDING TALKDESK'S RAID OF GENESYS' MID-MARKET SALES EMPLOYEES.**

74.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

75.     Genesys is a leading provider of both cloud and on-premises customer experience solutions. Genesys conducts substantial business in the state of Indiana.

76.     Talkdesk is a direct competitor of Genesys in the cloud-based call center software business, and conducts substantial business in Indiana.

77.     Since September 2018, 15 Genesys employees targeted by Talkdesk left their employment with Genesys and accepted employment with Talkdesk, representing a large portion of Genesys' mid-market sales group.

78.     Four of these former Genesys employees are Defendants Morales, Strahan, Hertel, and Manno.

79.     Talkdesk Board Chair & CEO Paiva, on a four-way conference call on August 9, 2018, personally recruited Defendants Strahan, Hertel and Manno.

80.     Talkdesk Board Chair & CEO Paiva personally encouraged those Genesys executives to come to Talkdesk and build up Talkdesk's sales organization, in violation of their contractual obligations with Genesys.

81.     Talkdesk relied on Manno, Strahan, and Hertel to recruit other Genesys employees, in violation of their contractual obligations with Genesys, so that Talkdesk could build its salesforce at the expense of Genesys.

82.     Talkdesk Board Chair & CEO Paiva had to approve every sales hire. *Ralph Manno Deposition*, November 5, 2020, pp. 120-21; *Michael Strahan Deposition*, October 21, 2020, p. 58.

83.     One of Talkdesk's goals in raiding Genesys' mid-market sales group was to cause financial damage to that market segment, thereby improving its own competitive position.

84.     On September 20, 2018, Talkdesk's head of product marketing asked Talkdesk Board Chair & CEO Paiva "how long until we can dance on genesys' grave?!" Board Chair & CEO Paiva

responded that she could do it already, as Talkdesk had about 18 people starting on October 1, with the most coming from Genesys. TD 0168389.

85.     At the time of the raid, Talkdesk had no general counsel, no chief legal officer, no compliance officer, and no ethics committee. *Tiago Paiva Deposition*, November 24, 2020, p. 8.

86.     Board Chair & CEO Paiva, both at the time of the raid and today, did not consult with legal counsel regarding the raid of Genesys personnel. *Tiago Paiva Deposition*, November 24, 2020, p. 9.

87.     Board Chair & CEO Paiva told Talkdesk's primary investor that they had solved their "main issue" in hiring a "batch of 13" sales employees, which were "most from genesys." TD 0170516; *Tiago Paiva Deposition*, November 24, 2020, pp. 62-64.

88.     Genesys incurred significant costs in recruiting and training replacements for the raided employees.

89.     Genesys incurred significant damages as a result of the raid, including loss sales and productivity of its mid-market sales group.

90.     Talkdesk benefited from the raid, both in increasing its sales revenue and also in building a sales team without the cost of external headhunters. *Tiago Paiva Deposition*, November 24, 2020, pp. 16-17, p. 42; TD 0160144.

**WHILE STILL EMPLOYED BY GENESYS, MANNO, STRAHAN, AND HERTEL CONSPIRED WITH BOARD CHAIR & CEO PAIVA AND TALKDESK'S RECRUITING TEAM TO RECRUIT GENESYS EMPLOYEES AND BUILD TALKDESK'S SALES TEAM.**

91.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

92.     While still employed by Genesys, Manno, Strahan, and Hertel recruited on behalf of Talkdesk, to fill its sales team. *Ralph Manno Deposition*, November 5, 2020, p. 128.

93.     In July 2018, Manno and Board Chair & CEO Paiva agreed on a framework for Manno to lead Talkdesk's sales team.

94.     During the workday on July 11, 2018, Manno, at the request of Talkdesk Board Chair & CEO Paiva laid out Manno's "plan" on how to build Talkdesk's sales organization, including how he would staff the organization. TD 0151507-08.  *Ralph Manno Deposition*,  November 5, 2020, pp. 54-60.

95.     Manno carried out these duties at the request of Talkdesk's CEO in secret. *Ralph Manno Deposition*,  November 5, 2020, p. 58.

96.     Board Chair & CEO Paiva knew at this time that Manno was employed by Genesys. *Tiago Paiva Deposition*,  November 24, 2020, pp. 29-30.

97.     This work carried out by Manno was for the benefit of Talkdesk and not for the benefit of Manno's employer at the time, Genesys. *Tiago Paiva Deposition*,  November 24, 2020, p. 31.

98.     Board Chair & CEO Paiva approved of Manno's plan and told Manno to work on his job profile so they could move forward with hiring. TD 0151507-08.  *Ralph Manno Deposition*, November 5, 2020, p. 60.

99.     On July 12, 2018, Manno told Board Chair & CEO Paiva that he wanted to get the RVPs, Strahan and Hertel, offers so that they could then "recruit the worthwhile Genesys players and I can have Shauna and team start calling." TD 0151489.

100.    Talkdesk's Board Chair & CEO Paiva knew that Manno was a VP of Sales for Genesys at this time, and did not know who the "worthwhile Genesys players" were, at that point in time. *Tiago Paiva Deposition*,  November 24, 2020, p. 35.

101.    On August 9, 2018, Manno, Strahan, and Hertel were involved in a four-way conference call with Talkdesk Board Chair & CEO Paiva, in which Paiva encouraged the trio of Genesys mid-market sales leaders to leave Genesys and build Talkdesk's sales organization. HERTEL0143; *Ralph Manno Deposition*,  November 5, 2020, pp. 71-72.

102.     The four-way conversation between Manno, Strahan, Hertel, and Board Chair & CEO Paiva was conducted in secret and was not disclosed to Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 111.

103.     Hertel and Strahan had between 6 and 10 conversations with each other during this time, and the two influenced each other to leave Genesys for Talkdesk.

104.     Hertel had between 10 and 15 discussions with Ralph Manno during which Manno influenced Hertel to leave Genesys and build Talkdesk's sales organization. Manno also notified Hertel that he was recruiting others, including Strahan.

105.     Hertel, on behalf of and for the benefit of Talkdesk, while still employed by Genesys, solicited and recruited Michael Strahan to work for Talkdesk.

106.     Strahan, on behalf of and for the benefit of Talkdesk, while still employed by Genesys, solicited and recruited Hertel to work for Talkdesk. *Michael Strahan Deposition*, October 21, 2020, p. 77.

107.     On August 9, 2018, Strahan communicated on behalf of himself and Hertel, explaining to Manno that they were both excited for the Talkdesk opportunity and thought they could get 8-10 productive AEs in place in 3-4 months. TD 002226.

108.     On August 10, 2018, Manno forwarded this communication to Board Chair & CEO Paiva, explaining what Hertel and Strahan would need in a compensation package to join Talkdesk and also explaining that the trio of Genesys sales leaders would begin building the Talkdesk sales team once they signed, and specifically that the trio would begin recruiting for Talkdesk and applying efforts to Talkdesk before they started on October 1, so that they could hit the ground running. Board Chair & CEO Paiva agreed to the offers and thereafter Strahan and Hertel agreed to join Talkdesk. TD 002224-25. *Michael Strahan Deposition*, October 21, 2020, p. 128-29; *Ralph Manno Deposition*, November 5, 2020, pp. 77-78; *Tiago Paiva Deposition*, November 24, 2020, p. 43.

109.   While he was employed by Genesys in August and September 2018, Manno assisted Talkdesk's recruiting team in recruiting Strahan, Hertel, and Krogman to come work at Talkdesk, including coordinating their interview process and negotiating their financial demands. *Ralph Manno Deposition*, November 5, 2020, pp. 23-24, 70-71, 75-76, 89-94; *Tiago Paiva Deposition*, November 24, 2020, p. 42-43.

110.   While he was employed by Genesys in August and September 2018, Manno, along with Talkdesk Board Chair & CEO Paiva, was a part-decision maker in Strahan, Hertel, and Krogman's offer of employment from Talkdesk. *Ralph Manno Deposition*, November 5, 2020, pp. 26-27, 70-71, 80-82, 89, 93-94.

111.   Having secured the commitments of Manno, Strahan, and Hertel, the trio of Genesys sales leaders did as Manno had promised Board Chair & CEO Paiva and began communicating regularly with Talkdesk's recruiting team, mainly Head of Talent Shauna Geraghty and recruiter Taylor Knudson, with the goal of building Talkdesk's sales team so they could hit the ground running once they left Genesys for Talkdesk.

112.   Manno encouraged Strahan and Hertel to be involved in recruiting account executives for Talkdesk. *Ralph Manno Deposition*, November 5, 2020, p. 74.

113.   Strahan worked on Talkdesk's recruiting activities while still employed by Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 152.

114.   Manno, Strahan, and Hertel did not inform Genesys or its leadership that while being paid by Genesys they were moonlighting as Talkdesk's outside recruiting team. *Ralph Manno Deposition*, November 5, 2020, p. 87.

115.   On August 12, 2018, Manno provided Geraghty with three Genesys employees for Talkdesk to target, including Douglas Cahhal, who it later hired, and Kyle Kuntz, emphasizing that

Talkdesk should be "discrete" when targeting these Genesys employees. TD 0128444-7. *Ralph Manno Deposition*, November 5, 2020, pp. 84-87.

116.    On August 14, 2018, Manno expressed his desire that he, Strahan, and Hertel all sit in on Chuck Krogman's interview presentation.  TD 0151217-18.

117.    Manno informed Board Chair & CEO Paiva that Genesys did not have good account executives in the East. TD 0151217-18.

118.    Hertel gave his blessing to Talkdesk, in support of the candidates. *Mark Hertel Deposition*, October 26, 2020, pp. 33-34.

119.    Between August 17 and August 21, 2018, Geraghty and Manno discussed compensation packages for Chuck Krogman, the third RVP to work under Manno, along with Hertel and Strahan. Manno carried out the negotiation with Krogman on behalf of Talkdesk, negotiating a salary with him and Geraghty. Manno also had Hertel speak to Chuck and help recruit him to Talkdesk. TD 0151076-84. While still employed by Genesys, Hertel encouraged Krogman to join Talkdesk. *Mark Hertel Deposition*, October 26, 2020, p. 30.

120.    While employed as Genesys' VP of Sales, Manno recruited Chuck Krogman to work for him at Talkdesk. *Ralph Manno Deposition*, November 5, 2020, pp. 63-64, 80-82.

121.    On August 20, 2018, following interviews with Douglas Cahhal and Kyle Kuntz, Manno was asked to review recruiter Taylor Knudson's notes. Manno provided feedback on the Genesys employees given his experience and knowledge of their performance at Genesys, noting both were solid. TD 0128444-7.

122.    On August 22, 2018, during the workday, Strahan emailed Talkdesk's recruiting team, including Geraghty and recruiter Taylor Knudson and explained that he had an idea for Talkdesk hiring presales engineering resources. Strahan then recommended that Talkdesk adopt Genesys's same model of utilizing a demo engineers and recommended six Genesys employees for this role. This

included David Ham, whom Talkdesk later hired. Manno also chimed in, supporting this hiring and staffing strategy. TD 002287-89.

123.    Strahan agreed this was information he should not have been sharing with Talkdesk. *Michael Strahan Deposition*, October 21, 2020, p. 135.

124.    On August 22, 2018 during the workday, Strahan emailed Geraghty to tell her that he had lunch with Craig Holloway, a Genesys employee at that time who reported to Strahan, and that he would be a good fit for an AE position at Talkdesk, reporting to Strahan. TD 0107688-89.

125.    Holloway was later hired by Talkdesk and reported to Strahan.

126.    Also on August 22, 2018, Hertel emailed Geraghty and informed her that he had multiple candidates he would like to get "queued up" for a September/October start date with Talkdesk. HERTEL0137.

127.    The candidates recommended by Hertel included Genesys employees Morales and Douglas Cahhal, as well as Jeff DeVries, Terry McDonald, Ben Barnwell, and Troy Cooper. All were hired by Talkdesk and approved by Manno. *Mark Hertel Deposition*, October 26, 2020, pp. 27-30, 33.

128.    Hertel knew that Morales had an employment agreement with Genesys because such agreements were commonplace at Genesys and in the industry. *Mark Hertel Deposition*, October 26, 2020, p. 145.

129.    Between August 23 and 27, 2018, Talkdesk VP of Operations Lisa Kelly discussed with Manno how Manno and his RVPs would split up the sales territories, included in that communication was Talkdesk's preferred list of candidates it was hoping to hire for its sales positions, including Genesys employees like Danielle Morales and Craig Holloway, all of whom it eventually hired. In passing along that information to Strahan and Hertel, Manno solicited their input noting that while they were all still working for Genesys – and not Talkdesk – he wanted to "get a jump on things" for Talkdesk. Lisa Kelly also followed up with Manno wanting his thoughts on Talkdesk's Presidents

Club plan. HERTEL0133; TD 0221509-13. *Mark Hertel Deposition*, October 26, 2020, pp. 42-43; *Ralph Manno Deposition*, November 5, 2020, p. 101.

130.    Manno spent so much time recruiting for Talkdesk in August 2018 that he expressed to Kelly that he was busy recruiting (for Talkdesk) while also trying to close a quarter (for Genesys). TD 002704. *Ralph Manno Deposition*, November 5, 2020, p. 109.

131.    On August 27, 2018, Strahan emailed Geraghty and recommended Genesys employee Mike Tews for Talkdesk's new sales team being built by Talkdesk and its Genesys-employed hiring team. Manno followed up with additional recommendations, including Morales and Holloway. Manno also emphasized to Geraghty that the recruitment needed to be secret because no one at Genesys was aware of his pending departure and the ongoing conspiracy between the defendants. TD 002209-11.

132.    Also on August 27, 2018, Manno asked Board Chair & CEO Paiva about Talkdesk account executive Bret Pughe's performance, noting that one of Genesys's best account executives is in that territory (West), and Manno wanted to bring her (Jennifer Flannery) along. Manno further opined on the other Talkdesk AEs and how they would fit into his sales organization at Talkdesk. Manno remarked that he and Talkdesk's recruiting team, along with Strahan and Hertel, had already built the West coast team for Talkdesk. Board Chair & CEO Paiva then forwarded to Geraghty noting Manno's strong performance over the past month in building Talkdesk's sales team while still working for Genesys. Manno also remarked that it was exciting how fast his new team was being built at Talkdesk. TD 0092259; TD 000117530-31.

133.    On August 28, 2018, Manno reached out to Knudson asking if she had any candidates in Chicago, because that was one area where they would not want Genesys reps. TD 002579-80. Strahan testified that this was because there were not any "good" Genesys reps in Chicago. *Michael Strahan Deposition*, October 21, 2020, p. 142. Strahan responded to the email and recommended they reach out to another non-Genesys sales rep. TD 002579.

134.    On August 28, 2018, Strahan responded to a prior recruiting email chain between Strahan, Talkdesk's recruiting team, Manno, and Hertel, and recommended that Talkdesk recruit Genesys employee Jeremy Mann, who Strahan disclosed as being the #1 mid-market sales employee at Genesys. Strahan then cautioned that it would have to be a "cold approach" because Mann did not know about the impending departures of Manno, Hertel, Strahan, and others. Knudson noted that in reaching out to Genesys employees, she was keeping everything confidential. TD 002209-11.

135.    On August 29, 2018, Strahan recommended additional candidates for Talkdesk to call upon to fill sales positions on his new Talkdesk central region sales team. TD 002579.

136.    A September 5, 2018 recruitment email chain regarding Danielle Morales demonstrated that Manno and Hertel were the liaisons communicating information about the Talkdesk offer to Danielle Morales, with Mark being the main communicator with Morales. TD 0189647.

137.    Hertel, on behalf of and for the benefit of Talkdesk, while still employed by Genesys, solicited and recruited Danielle Morales to work for Talkdesk. *Danielle Morales Deposition*, November 2, 2020, p. 45.

138.    The decision, in early September 2018, to hire Morales to work at Talkdesk was "Mark's call." *Ralph Manno Deposition*, November 5, 2020, p. 118.

139.    Notably, Hertel, who was Morales' superior and had influence over her compensation and evaluations, had at least six in-person discussions with Morales – at Genesys office – about how she was the best and he wanted her working for him at Talkdesk.

140.    On September 7, 2018, Strahan emailed Geraghty regarding his thoughts on Mike Tews' demo and interview video, which Strahan says he watched despite still being employed by Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 79. Strahan defended Tews' performance, based on his experience supervising Tews at Genesys. Strahan also disclosed Genesys' confidential

trade secret information regarding Tews' performance in his sales territory at Genesys, disclosing how much revenue he had generated, where he ranked amongst his peers, and what big deals he was responsible for closing at Genesys and closed by telling Geraghty that getting Tews would be a "win" for Talkdesk and a "loss" for Genesys. Manno also responded, supporting the decision to hire Mike Tews. TD 002528-32.

141.   On September 10, 2018, Strahan and Manno discussed Mike Tews' offer for employment with Talkdesk, opining on his salary and equity structure and providing Manno and Strahan with Talkdesk's offer process for hiring managers – of which they were for Talkdesk. Strahan and Manno then opined on what they believed Tews' salary and compensation structure should be, and Strahan noted that he would submit a request for Tews' Talkdesk employment offer through Talkdesk's hiring process that afternoon. That process identified Ralph as a necessary recipient and approver of each sales hire for Talkdesk, though he was still employed by Genesys. TD 002528-32; TD 002552-55.

142.   Later in the day on September 10, 2018, during business hours, Strahan submitted the employment offer request for Mike Tews and was approved by, among other Talkdesk leaders, Ralph Manno, who was still employed by Genesys at that time and in fact was still 3 weeks away from "officially" joining Talkdesk. Geraghty then authorized Strahan, a Genesys employee at the time who supervised Tews, to extend Talkdesk's offer of employment to Tews. Manno then forwarded this chain to Board Chair & CEO Paiva, commenting on how great Talkdesk' recruiting team had been and how much progress they – and Genesys employees Manno, Strahan, and Hertel – had made in building the sales team. TD 0110918-19; TD 0116736-38. Strahan later came back to Shauna for approval to increase the compensation being offered to Tews, before again confirming that he had the authority to make the offer, which Tews accepted. TD 0111954-57.

143.    Strahan and Manno wanted Tews to receive an offer of employment from Talkdesk, and Strahan thought it would be beneficial to Talkdesk and not beneficial to Genesys. *Michael Strahan Deposition*, October 21, 2020, pp. 150-51.

144.    Strahan valued Tews and wanted Tews to work for him at Talkdesk. *Michael Strahan Deposition*, October 21, 2020, p. 162.

145.    While serving as Genesys' VP of Sales, Manno approved Talkdesk's hire of Mike Tews, as well as Craig Holloway, Terry McDonald, and Jeff DeVries. *Ralph Manno Deposition*, November 5, 2020, pp. 120-25.

146.    While serving as Genesys' VP of Sales, Manno was the "hiring manager" for all sales positions, listed in Talkdesk's hiring process. *Ralph Manno Deposition*, November 5, 2020, p. 122-23.

147.    On September 11, 2018, after securing his first Talkdesk hire just the day before, Strahan continued his hiring binge on September 11, recommending that Talkdesk hire Genesys employee Craig Holloway, noting he thought he could get Holloway to commit and that he would submit the offer request through Talkdesk's hiring process. TD 002519-21.

148.    Also on September 11, 2018, Talkdesk recruiter Taylor Knudson shared a recruiting update with Talkdesk's sales recruiting "team" which included Genesys VP of Sales Manno, and Genesys sales Area Directors Strahan and Hertel. Manno, referring to Genesys employees Jeremy Mann and Jennavieve Johnson, noted that he, Strahan, and Hertel would put a hard push on them to come to Talkdesk. TD 004719-22; TD 004391-92.

149.    On September 14, 2018, Knudson shared another recruiting update with the Talkdesk sales recruiting "team" which includes Manno. TD 004719-22.

150.    On September 17, 2018, Board Chair & CEO Paiva reached out to Manno to get his recommendation on Commercial sales managers, who would report to Doug Baudler. Board Chair & CEO Paiva also asked whether Ralph thought one or two managers were needed for a sales group of

roughly 14 account executives. Manno provided his insight based on his experience at Genesys and gave recommendations on how many sales positions should be within the commercial market. TD 0170162.

151.    On September 21, 2018, following up on Strahan's August 22, 2018 suggestion to target Genesys's solution consultants/sales engineers, Geraghty solicited Manno's feedback regarding Genesys employee Jason Carter. Manno reported that Carter was awesome and that Geraghty should let him or Strahan know if they could help recruit Carter. TD 004354.

152.    On September 24, 2018, Manno asked Jennavieve Johnson, who he later hired for Talkdesk, if she had any feedback on another potential sales candidate for him to hire at Talkdesk. MANNO0026.

153.    On September 25, 2018, Strahan submitted an offer request for Genesys employee Diane Sparks, who reported to him at Genesys and later at Talkdesk. Strahan presented Sparks the offer and she accepted same day. TD 0109680-82.

154.    On September 28, 2018, Strahan recommended another Genesys employee for Talkdesk to hire. TD 002503-04; TD 006973.

155.    Manno approved all of Talkdesk's hires that began on October 1, 2018. *Ralph Manno Deposition*, November 5, 2020, p. 34.

156.    Board Chair & CEO Paiva and Talkdesk encouraged the Genesys sales leaders to assist in recruitment, in violation of those Genesys employees' employment agreements.

157.    Genesys incurred significant costs in recruiting and training replacements for the employees recruited and raided by the defendants, in violation of contractual and fiduciary obligations.

158.    Genesys incurred significant damages as a result of this misconduct, including loss sales and productivity of its mid-market sales group.

**WHILE STILL EMPLOYED BY GENESYS, MANNO, STRAHAN, AND HERTEL MISAPPROPRIATED GENESYS' CONFIDENTIAL TRADE SECRET INFORMATION AND USED THAT INFORMATION FOR THE BENEFIT OF TALKDESK AND IN COMPETITION WITH GENESYS.**

159.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

160.    Following the recruitment of Manno, Strahan, and Hertel, Talkdesk and its CEO conspired with Manno, Strahan, and Hertel, and encouraged them to disclose Genesys confidential trade secret employee personnel information, for the benefit of Talkdesk, which the Defendants then used to recruit other successful and high performing Genesys sales account executives.

161.    This confidential Genesys trade secret information relating to Genesys employee personnel information included but is not limited to employee performance, satisfaction, compensation, evaluation, and employee sales responsibility information.

162.    Manno, Strahan, and Hertel had access to this Genesys confidential trade secret employee personnel information by virtue of their positions overseeing sales employees at Genesys. *Mark Hertel Deposition*, October 26, 2020, pp. 72-74; *Michael Strahan Deposition*, October 21, 2020, pp. 36-37.

163.    Genesys' confidential trade secret information related to employee personnel information was kept secret by Genesys and not shared outside of Genesys. *Mark Hertel Deposition*, October 26, 2020, pp. 65, 74-75.

164.    Hertel and Strahan acknowledged that it was not within their job duties at Genesys to share personnel information with a competitor, which is valuable information. *Mark Hertel Deposition*, October 26, 2020, p. 75; *Michael Strahan Deposition*, October 21, 2020, pp. 37-38.

165.    In one instance, Talkdesk used Genesys confidential trade secret information about Genesys employee Mike Tews in recruiting Tews to come work for Talkdesk. Strahan, Tews' manager

at Genesys, disclosed Tews performance against quota, specific large deals closed by Tews, and other performance and job satisfaction related information. Talkdesk used this information to hire Mike Tews. TD 002197-99; TD 002528-32; TD 2552-54; TD 002205-08. TD 002209-11.

166.     While still working for Genesys, Strahan also disclosed to Talkdesk that Genesys' presales engineering team was valuable but had low morale and all would likely be receptive to a conversation with Talkdesk. Talkdesk used this job performance and job satisfaction information to target, recruit, and hire Genesys' presales engineering employees. TD 002287-89.

167.     Strahan learned this information about Genesys' presales engineering team while employed as a Director at Genesys and he shared the information with Talkdesk because he believed Talkdesk did not have knowledge of the information and he believed it would be valuable to Talkdesk, his future employer. *Michael Strahan Deposition*, October 21, 2020, pp. 134-35.

168.     Strahan agreed this was information he should not have been sharing with Talkdesk. *Michael Strahan Deposition*, October 21, 2020, p. 135.

169.     Talkdesk also utilized Genesys confidential trade secret information about employees' job performance and satisfaction that was misappropriated by Manno and Hertel.

170.     Manno advised Board Chair & CEO Paiva on the performance of Genesys employee Jennifer Flannery, who was then recruited by Talkdesk. TD 0092259; TD 000117530-31.

171.     Manno informed Board Chair & CEO Paiva that Genesys did not have good account executives in the East, information he learned while serving as Genesys' VP of Sales. TD 0151217-18; *Ralph Manno Deposition*, November 5, 2020, pp. 82-83.

172.     Manno utilized Genesys' confidential trade secret information about Doug Cahhal and Kyle Kuntz's job performance in recommending them for employment at Talkdesk. Cahhal later joined Talkdesk. TD 0128444-47; *Ralph Manno Deposition*, November 5, 2020, pp. 87-88.

173.    Manno advised Talkdesk that the presales engineers recommended by him and Strahan were good at their jobs, Genesys' confidential trade secret information he learned as VP of Sales for Genesys. TD 002287-89; *Ralph Manno Deposition*, November 5, 2020, pp. 96-97.

174.    Hertel testified that he recruited Morales and DeVries and based his approval of them to Talkdesk on his experience with their job performance while he was a Director at Genesys and Morales and DeVries were Genesys employees. *Mark Hertel Deposition*, October 26, 2020, pp. 37-38.

175.    On September 11, 2018, while still employed as Genesys Vice President of Sales, Manno forwarded Talkdesk Board Chair & CEO Paiva a Genesys win report with a bold red heading reading "Confidential! FOR INTERNAL USE ONLY!" TD 0150887-88. That email detailed a recently closed deal between Genesys and a high profile customer. The report details the value of the contract, the reasons Genesys won, and the reasons the customer chose Genesys over another competitor. *Ralph Manno Deposition*, November 5, 2020, pp. 50-53.

176.    Manno was not authorized by Genesys to share this information with Talkdesk's CEO, and the win report was not available publicly. *Ralph Manno Deposition*, November 5, 2020, pp. 126-27.

177.    Board Chair & CEO Paiva further misappropriated this trade secret by sharing it with others, including Talkdesk Senior Vice President Gillian Heltai and Brian Rose at Viking Global Investors. TD 0167419; *Tiago Paiva Deposition*, November 24, 2020, pp. 57-58.

178.    Board Chair & CEO Paiva was not aware of this information and forwarded it to Rose and Heltai because he believed they did not know of the information either. *Tiago Paiva Deposition*, November 24, 2020, pp. 57-58.

179.    Board Chair & CEO Paiva also forwarded part of this confidential win report to Craig Klemp, a Talkdesk business development employee. *Tiago Paiva Deposition*, November 24, 2020, p. 58-59; TD 0169272.

180. Also while Manno, Strahan, and Hertel were still employed by Genesys, Talkdesk and its CEO conspired with those Genesys sales leaders and encouraged them to disclose Genesys confidential trade secret information for the benefit of Talkdesk, which Talkdesk used to compete against Genesys in ongoing sales deals.

181. That misappropriated information included pricing, quote information, and product roadmap information.

182. For example, Board Chair & CEO Paiva solicited Genesys confidential trade secret information about an ongoing deal between Genesys and a customer located in Hawaii, a deal in which Talkdesk and Genesys were competing.

183. Hertel had intimate knowledge of the Hawaii-based deal, as it was being ran by Jennifer Flannery, a west coast Genesys account executive that reported to Hertel at Genesys. *Mark Hertel Deposition*, October 26, 2020, p. 45.

184. Hertel had knowledge of the prices Genesys quoted in those bids, the proprietary information used in those bids, and the proprietary information used by the Account Executive in pursuing the business on behalf of Genesys. *Mark Hertel Deposition*, October 26, 2020, pp. 46-51.

185. Hertel participated in "game plan" meetings with the Account Executive and other Genesys sales employees, related to the Hawaii-based deal.

186. Hertel further exchanged several communications about strategy on the deal, including issue of prices and other credits and discounts that Genesys could give to the customer so that the customer would remain a customer of Genesys.

187. Hertel further accompanied Flannery at an onsite meeting with the customer in Hawaii just weeks before announcing his resignation – indeed well after he knew he was leaving for Talkdesk.

188. With this intimate knowledge of the Hawaii-based Genesys customer in tow, Hertel emailed Board Chair & CEO Paiva on September 11, 2018, listing "talking points" for the ongoing

Hawaii-based deal in which Talkdesk and Genesys were competing. The talking points included specific Genesys trade secret information, such as specific price information relating to what the Genesys customer had already paid Genesys in a prior deal, details regarding the current proposal from Genesys at that time, Genesys's fully discounted price, Genesys's implementation time, and information about the PureConnect Premise infrastructure and design. Hertel aptly ended his email with "Hope this helps!" TD 002046; *Mark Hertel Deposition*, October 26, 2020, pp. 46-51.

189. While he was still employed by Genesys, Hertel helped Talkdesk compete against Genesys for the Hawaii-based customer. *Mark Hertel Deposition*, October 26, 2020, pp. 44-45.

190. Hertel gave Board Chair & CEO Paiva the Genesys information about the Hawaii-based deal because he thought it would be valuable for Board Chair & CEO Paiva to know. *Mark Hertel Deposition*, October 26, 2020, p. 53.

191. Hertel agreed that as a Genesys employee on September 11, 2018, he should not have sent Board Chair & CEO Paiva the information on the Hawaii-based deal. *Mark Hertel Deposition*, October 26, 2020, p. 53

192. Hertel believed he violated his duty of loyalty to Genesys by sending Board Chair & CEO Paiva the information on the Hawaii-based deal. *Mark Hertel Deposition*, October 26, 2020, p. 54.

193. At no point while the individual Defendants were still employed by Genesys, did Talkdesk's Board Chair & CEO Paiva tell them not to send him Genesys confidential information. *Tiago Paiva Deposition*, November 24, 2020, p. 62.

194. On September 22, 2018, Talkdesk Account Executive Bret Pughe, the account executive running the Hawaii-based deal for Talkdesk, emailed Strahan attaching Talkdesk's proposal for that deal in an attempt to get Strahan up to speed on recent conversations between Talkdesk and that Hawaii-based Genesys customer. Pughe sought Strahan's feedback on aspects of the ongoing deal

and invited Strahan to the next meeting. Strahan was still employed by Genesys at the time he began helping Talkdesk compete against Genesys on the Hawaii-based deal. TD 0124776-850.

195.     One week later, On September 29, 2018, Strahan sent Pughe and Board Chair & CEO Paiva an email about PureConnect Cloud's "areas of weakness" to "focus on" in Talkdesk's pursuit of the Hawaii-based deal. This included information about the platform's design, performance, its strengths, customer "anti-references," and Genesys's weaknesses. Strahan noted "as an absolute bullet I have 3 customers that will provide anti references…" He then listed several Q&As of "what will they say" and "the reality." TD 0148769-70. Board Chair & CEO Paiva responded, "Mike, this is gold!" and then asked if Talkdesk could use the misappropriated information in its competitive playbook and also asked who the anti-references are. Strahan provided the names of those Genesys customers and Board Chair & CEO Paiva instructed Pughe to include the information in a response to the Hawaii-based Genesys customer. TD 002036-39.

196.     Board Chair & CEO Paiva followed up with Strahan wanting more information about Genesys' infrastructure and architectural design. Strahan responded and disclosed additional Genesys trade secret information. TD 002036-39; TD 001906-08. Included in this communication was Hertel, Manno, Board Chair & CEO Paiva, and other Talkdesk employees including Blake Fleck, Bret Pughe, John Kepp, and Shep Maher. Next, Board Chair & CEO Paiva forwarded Strahan's Q&A "areas of weakness" email to Charanya Kannan, further misappropriating the Genesys confidential trade secret information and further distributing it through Talkdesk's ranks. TD 0148777-78; TD 0148773-74. *Tiago Paiva Deposition*, November 24, 2020, pp. 72-76.

197.     Talkdesk used the "areas of weakness" email from Strahan in its pitch to the Hawaii-based Genesys customer. TD 0167495-96; TD 0237750-53. *Tiago Paiva Deposition*, November 24, 2020, p. 73.

198.    Next, Board Chair & CEO Paiva sent Pughe's email to Talkdesk employee Taylor Johnson to put in Talkdesk's competitive playbook, so that Talkdesk could use the Genesys trade secret information in all future deals in which Talkdesk competed against Genesys. TD 0238040-44; TD 0238087-89; *Tiago Paiva Deposition*, November 24, 2020, p. 77.

199.    Board Chair & CEO Paiva and Talkdesk encouraged the Genesys sales leaders to provide Genesys' confidential trade secret information, in violation of those Genesys employees' employment agreements.

200.    On September 28, 2018, Talkdesk Board Chair & CEO Paiva asked Strahan – still employed by Genesys – to provide Genesys confidential information in response to an inquiry from Talkdesk employee Tiffany Milligan. TD 0307943.

201.    Genesys' confidential trade secret information was valuable to Talkdesk.

202.    Talkdesk used Genesys' confidential trade secret employee personnel information to save time, cost, and uncertainty in building its salesforce. Thanks to the insider information from Manno, Strahan, and Hertel, Talkdesk was able to identify top performers and make competitive offers based on knowledge of their sales performance history, job satisfaction, compensation, and other personnel information.

203.    Talkdesk used Genesys' confidential trade secret customer, prospect, and architectural information to compete on the Hawaii-based deal and other deals.

204.    Genesys takes reasonable steps to maintain the secrecy of its confidential trade secret information. Genesys does not publicize this information, it requires its employees to sign confidentiality agreements, it restricts access to its Salesforce database and other IT systems to employees with username and password access, and Genesys marks its information confidential, among other protections. The Defendants testified in depositions that Genesys took steps to secure

its information. *Mark Hertel Deposition*, October 26, 2020, pp. 71-72; *Michael Strahan Deposition*, October 21, 2020, p. 32; *Danielle Morales Deposition*, November 2, 2020, p. 57.

205.    Genesys incurred significant costs in recruiting and training replacements for the employees that were recruited with the use of Genesys confidential trade secret information.

206.    Genesys incurred significant damages as a result of this misconduct, including loss sales and productivity of its mid-market sales group.

207.    Genesys will continue to suffer damages as a result of the Defendants' misappropriation of Genesys' confidential trade secret information, which has been added to Talkdesk's competitive playbook.

## WHILE STILL EMPLOYED BY GENESYS, STRAHAN BEGAN FORMAL EMPLOYMENT WITH TALKDESK AND WORKED FOR TALKDESK FOR TWO WEEKS BEFORE FORMALLY LEAVING GENESYS.

208.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

209.    On September 17, 2018, Strahan began formal employment with Talkdesk. TD 067536-37. TD 002190-92; *Michael Strahan Deposition*, October 21, 2020, p. 122; *Def. Michael Strahan's First Supplemental Objections And Resp. To Pl.'s Interrogs.*, 2.

210.    On September 19, 2018, Strahan received an agenda and presentation link from one of his Talkdesk direct reports, Jacki Folta, so that Strahan could join a sales call with Folta on behalf of Talkdesk. TD 078181-88.

211.    Indeed, during his final two weeks of employment with Genesys, and without Genesys' knowledge, Strahan was onboarded by Talkdesk, received training, attended a conference on behalf of Talkdesk, took a business trip to New Jersey on behalf of Talkdesk, and participated in several sales calls on behalf of Talkdesk, all while being paid by Genesys through September 30, 2018.

*Michael Strahan Deposition*, April 22, 2019, pp. 9-19, 46; *Michael Strahan Deposition*, October 21, 2020, p. 104.

212.    During this time, Strahan took part in a videoconference between Talkdesk and the Hawaii-based customer. *Michael Strahan Deposition*, October 21, 2020, p. 157.

213.    Manno, Board Chair & CEO Paiva, and Talkdesk encouraged Strahan to begin working for Talkdesk while still employed by Genesys, in violation of his Genesys employment agreement.

214.    Genesys incurred significant damages as a result of Strahan's moonlighting, including in wages paid while he was not performing services for Genesys, but rather for a competitor of Genesys.

**WHILE STILL EMPLOYED BY GENESYS, MANNO, STRAHAN, HERTEL, AND MORALES FAILED TO FAITHFULLY PERFORM THEIR GENESYS DUTIES, INSTEAD OPTING TO WORK FOR TALKDESK, PREPARE FOR THEIR NEW POSITIONS, AND MISLEAD GENESYS AS TO THE EXTENT OF THEIR CONSPIRACY.**

215.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

216.    While employed by Genesys, Hertel undertook activities that benefitted Talkdesk. *Mark Hertel Deposition*, October 26, 2020, p. 26.

217.    While employed by Genesys, Strahan undertook activities that benefitted Talkdesk. *Michael Strahan Deposition*, October 21, 2020, p. 104.

218.    While employed by Genesys, Manno undertook activities that benefitted Talkdesk. *Ralph Manno Deposition*, November 5, 2020, p. 32.

219.    While he was employed by Genesys, Strahan prepared to compete with Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 111.

220.    While he was employed by Genesys, Manno prepared to compete with Genesys. *Ralph Manno Deposition*, November 5, 2020, p. 27.

221.    On August 14, 2018, Manno asked Board Chair & CEO Paiva to set him up with a Talkdesk laptop and email, noting that it would be easier since they had "a bit going on" before his actual Talkdesk start date on October 1. TD 0151217-18.

222.    On August 21, 2018, Manno and Knudson secretly organized Talkdesk meeting for 11:00am CDT on August 23. Indeed, Manno and the other individual Defendants often worked on Talkdesk matters during the workday, while being employed and paid by Genesys. TD 0153897-98.

223.    On August 28, 2018, Manno advised Talkdesk VP of Operations Lisa Kelly on Talkdesk's enterprise region map and also Talkdesk's President's Club Plan. TD 0221509. *Ralph Manno Deposition*, November 5, 2020, p. 104.

224.    Between August 29 and 30, 2018, Talkdesk VP of Operations Lisa Kelly discussed with Manno how Manno and his RVPs would split up the sales territories and how they would staff those territories. TD 002704-07.

225.    By August 30, 2018, Manno was using a Talkdesk email account for Talkdesk business. TD 0221509. *Ralph Manno Deposition*, November 5, 2020, pp. 103-04.

226.    While a VP of Sales for Genesys, Manno kept his, Strahan, and Hertel's Talkdesk recruiting activities secret from his boss and upper management at Genesys. *Ralph Manno Deposition*, November 5, 2020, pp. 114-15.

227.    On September 4, 2018, Strahan secretly emailed Hertel and Manno on personal email accounts and informed his co-conspirators that he would be "exporting" his inbox and deleting his emails off of the Genesys exchange that same day. HERTEL0180; HERTEL0200.

228.     On September 5, 2018, Morales signed an offer letter with Talkdesk. Over the next two days, Morales secretly downloaded hundreds of files of Genesys confidential information from her Genesys computer drive. *Danielle Morales Deposition*, November 2, 2020, p. 31.

229.     Among these downloaded files include 21 files from a folder titled "Pricing," 19 files from a folder titled "QBR," nearly 50 files from a folder titled "Competition," a folder titled "RFP Information," nearly 100 files from a folder titled "Campaigns & Prospecting," nearly 100 files from a folder titled "Sales," nearly 50 files from a folder titled "Accounts" and over 150 files from a folder titled "Product Information."

230.     The confidential information downloaded by Morales includes Genesys intellectual property, account and sales plans, pricing information, territory information, marketing information, customer account information and documentation, product information, and presentations.

231.     On September 25, 2018, Morales secretly forwarded two emails from a Genesys customer to her personal email account, both dealing with challenges the customer was facing with Genesys product. *Danielle Morales Deposition*, November 2, 2020, p. 60.

232.     After leaving Genesys for Talkdesk, Morales uploaded the Genesys documents to Talkdesk's Google Drive Account. *Danielle Morales Deposition*, November 2, 2020, p. 33.

233.     Before leaving his employment with Genesys, Hertel exported his entire Outlook account, a download of over 24,000 Genesys confidential, proprietary documents constituting trade secrets, and failed to return this Genesys property upon separation, even after he received a cease-and-desist letter from Genesys.

234.     Board Chair & CEO Paiva and Talkdesk encouraged the Genesys sales employees to assist Talkdesk in competing with Genesys, while still employed by Genesys, in violation of those Genesys employees' employment agreements.

235.     On September 27, 2018, Hertel received, from Doug Cahhal, two confidential customer and prospect lists, which he then sent to his Talkdesk account on October 9, 2018. TD 0202768-84. Then, Hertel sent the lists to Kent Venook on October 12, 2018. TD 0205546-62.

236.     Despite knowing of the impending mass exodus of Genesys' mid-market sales employees for more than a month, Manno, with the help of Strahan and Hertel, concocted a web of phony resignation emails intended to conceal the trio's plans with Talkdesk. *Ralph Manno Deposition*, November 5, 2020, p. 144.

237.     For example, on September 14, 2018, Strahan sent Manno a phony resignation letter, which did not mention his plans with Talkdesk.  Manno then forwarded the resignation to his boss, Rick Brown, and HR, Jessica Coburn. GEN500051103; *Ralph Manno Deposition*, November 5, 2020, p. 128.

238.     At this time, Manno did not inform Brown or Coburn that he, Strahan, Hertel, and many others, were all leaving for Talkdesk. GEN500051103; GEN500051100; *Ralph Manno Deposition*, November 5, 2020, pp. 129-31, 140-41.

239.     Similarly, on September 14, 2018 Manno informed Jim Whatton at Genesys that Morales had relayed to Hertel that she was leaving Genesys "to pursue other interest." GEN50005118; *Ralph Manno Deposition*, November 5, 2020, p. 139.

240.     At this time, Manno did not inform Whatton or anyone else in Genesys upper management that he, Strahan, or Hertel were all leaving for Talkdesk.

241.     On September 17, 2018, Manno sent an email to the entire mid-market and velocity teams at Genesys, informing them of Strahan's resignation.  GEN500050943.

242.     In that email, Manno said "I/we wish Mike the very best in whatever he pursues" – but did not disclose at this time that he, Strahan, Hertel, and several others were all leaving Genesys to start at Talkdesk on October 1, 2018.

243.     On September 18, 2018, Manno received a phony resignation email from Mike Tews. GEN500052393. Manno responded "sorry to hear you are leaving" despite being responsible for his recruitment to Genesys. *Ralph Manno Deposition*, November 5, 2020, p. 144.

244.     On September 21, 2018, Manno received a phony resignation email from Mark Hertel. GEN500051019.

245.     Manno then forwarded Hertel's resignation email to Rick Brown and Jessica Brown and, despite recruiting Hertel to work at Talkdesk nearly two months earlier, exclaimed "Jessica, wow!" GEN500051248.

246.     Manno's feigned "wow!" was intended to deceive Brown and Coburn. *Ralph Manno Deposition*, November 5, 2020, p. 147.

247.     On September 24, 2018, Manno submitted his resignation to Rick Brown, saying he decided to resign "after a long week and weekend." GEN500051646.

248.     Manno's resignation email was deceptive because he had actually decided to resign on August 11, 2018 when he signed his offer letter with Talkdesk. *Ralph Manno Deposition*, November 5, 2020, p. 148.

249.     On September 25, 2018, Manno told Brown that he could not work into October because he was "committed to some family time, which is long overdue." GEN500051643.

250.     Manno's email to Brown was a lie. *Ralph Manno Deposition*, November 5, 2020, p. 149.

251.     On September 25, 2018 Manno received a phony resignation email from Diane Sparks. GEN500052380.

252.     Manno, as VP of Sales for Genesys, failed on numerous occasions to disclose to Genesys management the actual facts as he knew them, related to the resignations in September 2018. *Ralph Manno Deposition*, November 5, 2020, pp. 142, 143, 145, 147.

253.     Specifically, Manno did not tell his boss, Rick Brown, the truth: that for months he had been planning to join Talkdesk. *Ralph Manno Deposition*, November 5, 2020, p. 150.

254.     Instead, Manno passed along phony resignation emails and failed to inform Genesys of the mass exodus of mid-market employees who were to start at Talkdesk on October 1, 2018. *Ralph Manno Deposition*, November 5, 2020, p. 144.

255.     Genesys incurred significant damages as a result of the Defendants' unfaithful service to Genesys, including in wages paid while the Defendants were actually performing services for Talkdesk.

**AFTER LEAVING GENESYS FOR TALKDESK, MANNO, STRAHAN, HERTEL, AND MORALES CONTINUED TO CONSPIRE WITH BOARD CHAIR & CEO PAIVA TO MISAPPROPRIATE GENESYS' CONFIDENTIAL TRADE SECRET INFORMATION AND TO USE THAT INFORMATION IN ONGOING SALES DEALS AGAINST GENESYS.**

256.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

257.     Strahan misappropriated additional Genesys confidential information related to that Hawaii-based deal. On October 10, 2018 Strahan shared Genesys' trade secret information about Genesys's pricing and how low Genesys could discount its products. TD 002080-81.

258.     On October 19, 2018 Strahan shared a Genesys trade secret report on PureCloud's infrastructure with Talkdesk Board Chair & CEO Paiva, as well as SVP Sales Shep Maher, Bret Pughe, and Senior Director of Product Management Kevin Pierson. In his email, Strahan explained the nuances of PureCloud's architectural design, a key issue in the Hawaii-based deal. TD 001980; TD 236823. Strahan's email shared a Genesys PureCloud SOC report on PureCloud's controls, design, and operating effectiveness, marked with a "proprietary & confidential" disclaimer. TD 1981-2029; TD 0236824-72.

40

259.     Talkdesk's Senior Vice President of Sales, Shep Maher, then shared this document and Strahan's insider email with Katherine Lovelace, Hertel, and John Kepp. TD 001852-53; TD 001854-1902.

260.     In an October 31, 2018 email thread between Manno, Pughe, Tiago, Hertel, and others, Manno disclosed trade secret information about Genesys' product capabilities and limitations. TD 002060-62.

261.     Talkdesk underbid Genesys on that Hawaii-based deal, a deal in which Hertel was intimately involved while working for Genesys, and with which Strahan and Manno had access to as an Area Director and Vice President, respectively.  Talkdesk utilized Genesys trade secret information in competing on that deal. Talkdesk Board Chair & CEO Paiva was directly involved in the pursuit of the Genesys customer in Hawaii.

262.     Talkdesk utilized Genesys confidential trade secret information in competing against Genesys for the business of a Genesys prospect based in California, a prospect that Hertel was involved in while working for Genesys, and of which Strahan and Manno had access to as an Area Director and Vice President, respectively.

263.     Mark Hertel supplied Talkdesk with Genesys confidential trade secret information in the form of negative Genesys customer reviews curated and collected by Genesys, and Talkdesk used that information to win the business over Genesys. GEN500051650-51.

264.     Manno supplied Talkdesk with Genesys confidential trade secret information in the form of information on Genesys' architecture and ability to support domestic calling internationally. TD 0182186-87. This information was solicited by Talkdesk account executive Bret Pughe.

265.     Hertel also supplied Talkdesk with Genesys' confidential architectural information in an email to Shep Maher. TD 0158791-92.

266.     Talkdesk used Genesys' confidential trade secret customer, prospect, and architectural information to compete on the Hawaii-based deal and other deals, including the California-based deal that Talkdesk won over Genesys.

267.     At no point after the individual Defendants began working for Talkdesk, did Talkdesk's Board Chair & CEO Paiva tell them not to send him Genesys confidential information. *Tiago Paiva Deposition*, November 24, 2020, p. 62.

268.     Genesys takes reasonable steps to maintain the secrecy of its confidential trade secret information. Genesys does not publicize this information, it requires its employees to sign confidentiality agreements, it restricts access to its Salesforce database and other IT systems to employees with username and password access, and Genesys marks its information confidential, among other protections. The Defendants testified in depositions that Genesys took steps to secure its information. *Mark Hertel Deposition*, October 26, 2020, pp. 71-72; *Michael Strahan Deposition*, October 21, 2020, p. 32; *Danielle Morales Deposition*, November 2, 2020, p. 57.

269.     Genesys suffered significant damages as a result of the Defendants' misappropriation of trade secrets used in the sales deals against Genesys.

270.     Genesys will continue to suffer harm as a result of the misappropriation of those trade secrets, which can be used against Genesys in future deals.

**AFTER LEAVING GENESYS FOR TALKDESK, MANNO, STRAHAN, HERTEL, AND MORALES CONSPIRED WITH BOARD CHAIR & CEO PAIVA AND FURTHER MISAPPROPRIATED GENESYS' CONFIDENTIAL TRADE SECRET INFORMATION RELATED TO GENESYS CUSTOMER AND PROSPECTS AND USED THAT INFORMATION FOR THE BENEFIT OF TALKDESK AND IN COMPETITION WITH GENESYS.**

271.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

272.     Following the recruitment of Manno, Strahan, and Hertel, Talkdesk and its CEO conspired with Manno, Strahan, and Hertel, and encouraged them to disclose Genesys confidential

trade secret information regarding Genesys customers and prospects, for the benefit of Talkdesk, which the Defendants then used to compete against Genesys.

273.   This confidential Genesys trade secret information relating to Genesys customer and prospects included but is not limited to detailed customer and prospect lists, forecast documents, closed deals, and customer NPS survey information detailing customer satisfaction.

274.   Manno, Strahan, and Hertel had access to this Genesys confidential trade secret customer and prospect information by virtue of their positions as sales leaders at Genesys. *Mark Hertel Deposition*, October 26, 2020, pp. 77-79; *Michael Strahan Deposition*, October 21, 2020, pp. 39-40.

275.   Genesys' confidential trade secret information related to customer and prospect information was confidential information that should not be shared with competitors and should be kept confidential within Genesys. *Mark Hertel Deposition*, October 26, 2020, p. 82; *Michael Strahan Deposition*, October 21, 2020, p. 41.

276.   Strahan misappropriated a list of PureCloud customers with usage information, renewal dates, and seat count. Strahan sent this Genesys confidential trade secret information to Talkdesk Vice President of Operations Lisa Kelly, and Manno, on October 17, 2018. The list is 32 pages long and contains roughly 1400 PureCloud customers, along with their renewal date and the number of seats they have purchased from Genesys. TD 002387-88; TD 002389-2420; TD 0236039; TD 0236040-71; TD 0282071. *Michael Strahan Deposition*, October 21, 2020, p. 170; *Mark Hertel Deposition*, October 26, 2020, pp. 97-98.

277.   The PureCloud list was produced by Genesys and came from a business intelligence tool that Strahan does not have access to. *Michael Strahan Deposition*, October 21, 2020, pp. 169-70.

278.   Talkdesk used this list to target Genesys' PureCloud customers. Indeed, Talkdesk's sales operations team, led by Vice President of Global Sales Development Kent Venook, converted the list into excel, enriched it with additional information, and then uploaded it to Talkdesk's

Salesforce database so that Talkdesk sales account executives could use the information to call on Genesys customers. TD 0236103-137.

279.    Manno informed Venook of the list in an October 18, 2018 Slack message, in which he offered to send it to Venook if Venook and his team were "ready to strike" against Genesys. TD 0309815.

280.    Talkdesk referred to this list as "Ralph's Magic List" and also "PureCloud List." TD 0282071; TD 0282074; TD 0282089.

281.    Talkdesk implemented a sales incentive program – "Competitive Replacement Program" that provided 125% quota credit for any deal in which the Talkdesk sales account executive was able to replace a Genesys PureCloud customer with Talkdesk. Talkdesk, through its head of sales Ralph Manno, encouraged employees to use the list of PureCloud customers. TD 0236103-137; TD 0309815; TD 000207-08. *Tiago Paiva Deposition*, November 24, 2020, p. 81.

282.    The Competitive Replacement Program for PureCloud customers was part of Talkdesk's plan to go after Genesys "hard." TD 0309766-67.

283.    Manno encouraged former Genesys employees Diane Sparks and Jennavieve Johnson, after all received cease and desist letters from Genesys, to sell hard against Genesys. TD 0310011.

284.    Genesys' PureCloud product is the product most competitive with Talkdesk's product. *Danielle Morales Deposition*, November 2, 2020, pp. 77-78.

285.    In all, the PureCloud list of customers was widely misappropriated by Talkdesk's sales organization. In all, it was misappropriated by at least Talkdesk's top four sales leaders: Manno, Strahan, Hertel, and East Regional Vice President of sales Chuck Krogman, in addition to Lisa Kelly, Kent Venook, Director of Global Revenue Operations & Enablement Joi Pentin, and others.

286.    Talkdesk used the list to call into Genesys customers. *Danielle Morales Deposition*, November 2, 2020, pp. 83-84, 87.

287.     Manno shared a number of Genesys customers with Talkdesk SDR Eric Danner that he thought were in "trouble," – so that Talkdesk could call on those customers using the PureCloud list information. Danner asked Manno for this information based on his review of the PureCloud list. TD 0309917.

288.     Talkdesk's use of the PureCloud list continued after receiving cease and desist letters from Genesys and indeed continued after this lawsuit began. TD 0255248-80; TD 0255281-317.

289.     Hertel and Morales testified in their depositions that the PureCloud List came from Genesys' Salesforce database and constituted Genesys confidential information that could be valuable to Talkdesk. *Mark Hertel Deposition*, October 26, 2020, pp. 97-98, 102; *Danielle Morales Deposition*, November 2, 2020, pp. 78-82.

290.     On November 10, 2018, Hertel sent Board Chair & CEO Paiva Genesys' 2018 customer NPS data. TD 001965-69; TD 001970-78; TD 001979; TD 067468-85; *Mark Hertel Deposition*, October 26, 2020, p. 84; *Tiago Paiva Deposition*, November 24, 2020, pp. 82-83.

291.     Hertel shared Genesys' confidential NPS data with Talkdesk Board Chair & CEO Paiva because he thought it would be valuable information for the CEO to have. *Mark Hertel Deposition*, October 26, 2020, p. 88.

292.     Genesys' customer NPS data is collected by an internal NPS team that distributes, collects, and synthesizes an NPS survey to Genesys customers. *Mark Hertel Deposition*, October 26, 2020, pp. 85-86; *Michael Strahan Deposition*, October 21, 2020, p. 174.

293.     The NPS data is based on a numbered scale, and provides an option for the customer to give a narrative explanation of their satisfaction or dissatisfaction with Genesys.

294.     Knowing about a Genesys customer that is unhappy is valuable information to Talkdesk. *Mark Hertel Deposition*, October 26, 2020, p. 107.

295.     Genesys' NPS team maintains the secrecy of that information as the raw data is provided only to high level employees. While customers are free to leave reviews on public-facing websites, Genesys' internal NPS data solicited via customer survey is different from these public-facing review sites. *Danielle Morales Deposition*, November 2, 2020, p. 91.

296.     Talkdesk received numerous other pieces of Genesys confidential trade secret information on customers and prospects, including customer and prospects lists shared by Hertel with Kent Venook. TD 0205546-62. *Mark Hertel Deposition*, October 26, 2020, pp. 91-92, 94.

297.     The customer and prospect lists shared with Kent Venook by Mark Hertel were "confidential or proprietary" and Hertel would not have shared them with a competitor while working at Genesys. *Mark Hertel Deposition*, October 26, 2020, pp. 92, 94.

298.     Hertel sent Venook the Genesys lists because he thought they would be valuable for Venook to use at Talkdesk. *Mark Hertel Deposition*, October 26, 2020, p. 95.

299.     In an attempt to investigate an opportunity Talkdesk was competing with Genesys on, Manno told Board Chair & CEO Paiva and others he would dig through some old files he had, to try and learn more about who at Genesys was handling the deal. TD 0182364-65.

300.     Talkdesk used Genesys' confidential trade secret customer, prospect, and architectural information to compete against Genesys in the marketplace, including but not limited to uploading this Genesys confidential trade secret information into its own Salesforce database to be used by Talkdesk sales employees calling on Genesys customers.

301.     Genesys takes reasonable steps to maintain the secrecy of its confidential trade secret information. Genesys does not publicize this information, it requires its employees to sign confidentiality agreements, it restricts access to its Salesforce database and other IT systems to employees with username and password access, and Genesys marks its information confidential, among other protections. The Defendants testified in depositions that Genesys took steps to secure

its information. *Mark Hertel Deposition*, October 26, 2020, pp. 71-72; *Michael Strahan Deposition*, October 21, 2020, p. 32; *Danielle Morales Deposition*, November 2, 2020, p. 57.

302. Strahan, Hertel, and Morales all testified under oath that this type of customer information should be kept confidential within Genesys. *Mark Hertel Deposition*, October 26, 2020, pp. 92, 94; *Danielle Morales Deposition*, November 2, 2020, pp. 59, 82.

303. Board Chair & CEO Paiva and Talkdesk encouraged the Genesys sales employees to provide Genesys' confidential trade secret information so that Talkdesk could use it to compete against Genesys, in violation of those Genesys employees' employment agreements.

304. Genesys suffered significant damages as a result of the Defendants' misappropriation of confidential trade secret customer and prospect information, including loss in sales.

305. Genesys will continue to suffer harm as a result of this misappropriation because Talkdesk will use the information against Genesys in deals in the future.

306. Indeed, Talkdesk's employees have used this information since this lawsuit began.

**AFTER LEAVING GENESYS FOR TALKDESK, MANNO, STRAHAN, HERTEL, AND MORALES CONSPIRED WITH BOARD CHAIR & CEO PAIVA AND FURTHER MISAPPROPRIATED GENESYS' CONFIDENTIAL TRADE SECRET INFORMATION RELATED TO GENESYS PRICING AND DISCOUNTING INFORMATION AND USED THAT INFORMATION FOR THE BENEFIT OF TALKDESK AND IN COMPETITION WITH GENESYS.**

307. Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

308. Talkdesk also misappropriated Genesys' confidential trade secret information on its discounting and pricing practices. *Mark Hertel Deposition*, October 26, 2020, p. 116.

309. This confidential Genesys trade secret information relating to Genesys pricing and discount information included but is not limited to product pricing, discounting practices and policies, add-on product prices. *Michael Strahan Deposition*, October 21, 2020, pp. 44-45.

310.     Manno, Strahan, and Hertel had access to this Genesys confidential trade secret pricing information by virtue of their positions as sales leaders at Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 44

311.     Pricing and discount information is valuable because some customers make purchasing decisions based on price or discounts. *Michael Strahan Deposition*, October 21, 2020, p. 47.

312.     Manno misappropriated key trade secret information about Genesys' discounting strategy, telling Board Chair & CEO Paiva and Lisa Kelly that Genesys would only discount down to a specific and defined percentage. TD 0164066-69.

313.     Similarly, Manno disclosed this trade secret to Talkdesk's RVP Chuck Krogman, who asked Manno what Genesys's discounting policy was. TD 0157353-55. *Mark Hertel Deposition*, October 26, 2020, p. 116.

314.     Manno was asked by Charanya Kannan, in an email with Talkdesk employee Marco Costa, how much Genesys charged for 1) PCI Compliance and Speech to text / Speech Recognition. Manno provided this information after being assisted by former Genesys employee Morales. TD 0163743; TD 0166890. This information is not available publicly and is Genesys' confidential trade secret information.

315.     Talkdesk used this information to put together its own pricing and make it "competitive." TD 0163743; TD 0166890.

316.     In addition, further Talkdesk employees sought this type of information from Strahan and Hertel, so that Talkdesk could use it to put together Talkdesk's own competitive pricing plans. TD 0138354; TD 0163907; TD 0163887; TD 0158140-41.

317.     In carrying out his duties as Talkdesk's new Vice President of Sales, Manno disclosed Genesys' discounting practices on several other occasions, including when surveying his team about what they had experienced while working at Genesys so Talkdesk could use the information to

formulate its own pricing, and in advising Board Chair & CEO Paiva on an ongoing deal. TD 0094763-65; TD 0189767.

318.     Strahan misappropriated Genesys' confidential trade secret pricing and discounting information in relation to advising Talkdesk on the Hawaii-based deal and how low Genesys could discount its offer. TD 0170471.

319.     Genesys takes reasonable steps to maintain the secrecy of its confidential trade secret information. Genesys does not publicize this information, it requires its employees to sign confidentiality agreements, it restricts access to its Salesforce database and other IT systems to employees with username and password access, and Genesys marks its information confidential, among other protections. The Defendants testified in depositions that Genesys took steps to secure its information. *Mark Hertel Deposition*, October 26, 2020, pp. 71-72; *Michael Strahan Deposition*, October 21, 2020, p. 32; *Danielle Morales Deposition*, November 2, 2020, p. 57.

320.     While Genesys publicizes its *list* price, it does not publicize its *discount* practices or add-on prices. A majority of Genesys' sales deals sell below list price, making its secret discount practices valuable to competitors like Talkdesk. *Mark Hertel Deposition*, October 26, 2020, p. 116; *Danielle Morales Deposition*, November 2, 2020, p. 95.

321.     Hertel agreed that Genesys' discounting policy is confidential. *Mark Hertel Deposition*, October 26, 2020, p. 116.

322.     Board Chair & CEO Paiva and Talkdesk encouraged the Genesys sales employees to provide Genesys' confidential trade secret information so that Talkdesk could use it to compete against Genesys, in violation of those Genesys employees' employment agreements.

323.     Genesys suffered significant damages as a result of the Defendants' misappropriation of confidential trade secret pricing and discount information, demonstrated by its loss of sales and

competitive positioning against Talkdesk, who was able to create its own pricing and discounting practices based on Genesys' policy and practices.

324.     Genesys will continue to suffer harm as a result of this misappropriation because Talkdesk will use this pricing and discount information against Genesys in deals in the future.

**AFTER LEAVING GENESYS FOR TALKDESK, MANNO, STRAHAN, HERTEL, AND MORALES CONSPIRED WITH BOARD CHAIR & CEO PAIVA AND FURTHER MISAPPROPRIATED ADDITIONAL GENESYS' CONFIDENTIAL TRADE SECRET INFORMATION AND USED THAT INFORMATION FOR THE BENEFIT OF TALKDESK AND IN COMPETITION WITH GENESYS.**

325.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

326.     As Genesys employees, Manno, Strahan, Hertel, and Morales all had access to Genesys' sales marketing information such as vision videos and competitive intelligence playbooks or battlecards. *Mark Hertel Deposition*, October 26, 2020, p. 119.

327.     Hertel and Morales misappropriated Genesys confidential trade secret "vision videos."

328.     Genesys' vision videos are password protected videos created for Genesys customers by Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 177-78.

329.     Morales sent these to Hertel's personal email account on September 28, 2018, days before she and Hertel started working for Talkdesk. *Danielle Morales Deposition*, November 2, 2020, pp. 107-08.

330.     Hertel then forwarded the videos to Talkdesk Director of Customer Marketing Liz Pedro because he thought they would be valuable for Talkdesk to use in creating its own marketing materials. TD 0286715. *Mark Hertel Deposition*, October 26, 2020, p. 130.

331.     Hertel then forwarded the same videos throughout Talkdesk, including to Manno, Strahan, Krogman, Talkdesk Senior Director of Sales Doug Baudler, and other Talkdesk employees including Troy Buck and Scott Trichon. HERTEL0206; HERTEL0207.

332.    Manno misappropriated Genesys confidential sales and marketing information when he disclosed a confidential letter regarding Genesys financial information. TD 0236035-36.

333.    Genesys uses this information to confirm to prospects that it is financially stable. Manno used this letter to encourage Talkdesk to adopt the same strategy modeled off of Genesys's letter. TD 0236262-63; STRAHAN0309.

334.    Hertel misappropriated Genesys' sales marketing information by receiving such information form Doug Cahhal and sharing it with others at Talkdesk, this included battlecards and competitive intelligence from Genesys deals. *Mark Hertel Deposition*, October 26, 2020, pp. 120-24.

335.    Hertel shared this information with his Talkdesk colleagues because he thought it would be valuable. *Mark Hertel Deposition*, October 26, 2020, pp. 123, 127.

336.    Genesys takes reasonable steps to maintain the secrecy of its trade secret information. Genesys does not publicize this information, it requires its employees to sign confidentiality agreements, it restricts access to its Salesforce database and other IT systems to employees with username and password access, and Genesys marks its information confidential, among other protections. The Defendants testified in depositions that Genesys took steps to secure its information. *Mark Hertel Deposition*, October 26, 2020, pp. 71-72; *Danielle Morales Deposition*, November 2, 2020, p. 57.

337.    Board Chair & CEO Paiva and Talkdesk encouraged the Genesys sales employees to provide Genesys' confidential trade secret information so that Talkdesk could use it to compete against Genesys, in violation of those Genesys employees' employment agreements.

338.    Genesys suffered significant damages as a result of the Defendants' misappropriation of confidential trade sales and marketing information, demonstrated by its loss of sales and competitive positioning against Talkdesk, who was able to create its own marketing information, such as vision videos and CFO letters, based on Genesys' policy and practices.

339.     Genesys will continue to suffer harm as a result of this misappropriation because Talkdesk will use this information against Genesys in deals in the future.

## GENESYS ASKED THE DEFENDANTS TO CEASE AND DESIST BUT HARM CONTINUES.

340.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

341.     Genesys demanded by written letter dated November 16, 2018, that Manno cease and desist his conduct. Manno responded on November 21, 2018 and denied any wrongdoing while also requesting a copy of his Genesys agreement, which was provided the same day.

342.     Since joining Talkdesk, Hertel used the confidential, trade secret information he stole and failed to return form Genesys, and in fact shared some of this Genesys trade secret information with others within Talkdesk, including Board Chair & CEO Paiva.

343.     Genesys demanded by written letter dated November 15, 2018, that Strahan cease and desist his conduct; Strahan did not respond.

344.     Since joining Talkdesk, Strahan used the confidential, trade secret information he stole and failed to return form Genesys, and in fact shared some of this Genesys trade secret information with others within Talkdesk, including Board Chair & CEO Paiva.

345.     Genesys demanded by written letter dated November 14, 2018, that Hertel cease and desist his conduct; Hertel did not respond but instead continued to illegally possess and utilize Genesys trade secrets

346.     Since joining Talkdesk, Hertel used the confidential, trade secret information he stole and failed to return form Genesys, and in fact shared some of this Genesys trade secret information with others within Talkdesk, including Board Chair & CEO Paiva.

347.     Genesys demanded by written letters to Talkdesk Board Chair & CEO Tiago Paiva dated November 9, 2018 and November 16, 2018 that Talkdesk cease and desist its conduct; Talkdesk responded November 26, 2018 and denied wrongdoing.

348.     Genesys demanded by written letter dated November 15, 2018, that Morales cease and desist her conduct; Morales responded and failed to disclose her downloading and continued possession of Genesys confidential, proprietary data and materials.

349.     Since joining Talkdesk and while working for and on behalf of Talkdesk, Morales has used on multiple occasions the stolen confidential, proprietary, and trade secret information she secretly stole from Genesys by downloading it to a flash drive. This continued conduct occurred even after Genesys wrote Morales demanding that she cease and desist any further illegal activity and return all property.

350.     Genesys has been irreparably damaged and continues to be irreparably damaged by Manno, Hertel, Strahan, Morales, and Talkdesk's illegal conduct.

351.     Genesys has invested significant money in attorneys' fees to investigate and seek to stop the illegal conduct of the Defendants.

352.     Genesys seeks permanent injunctive relief against Manno, Strahan, Hertel, and Talkdesk, as well as damages, royalties, liquidated damages, treble damages, punitive damages, costs, and attorneys' fees.

353.     Genesys seeks permanent injunctive relief against Morales, as well as recovery of attorneys' fees and costs, and other damages.

## SPECIFIC COUNTS AGAINST DEFENDANT RALPH MANNO

### Count One – Tortious Interference With Contract.

354.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

355.     Genesys and its employees have contractual agreements.

356.     Serving as Genesys' VP of Sales, who hired nearly all of those in Genesys' mid-market segment, Manno knew or should have known about the contractual relationship between the Genesys employees he solicited on behalf of Talkdesk, and their employer Genesys.

357.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno intentionally solicited Genesys employees to breach their contracts with Genesys by encouraging them to solicit other Genesys employees while still employed by Genesys, to provide Talkdesk with Genesys' confidential trade secret information both while still employed by Genesys and after, and to provide less than faithful services to Genesys by actually competing against Genesys while still employed, all in violation of their employment agreements.

358.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno interfered with the employment agreements of Strahan, Hertel, and others.

359.     Manno's interference was not justified.

360.     Manno's interference caused harm to Genesys.

**Count Two – Breach Of Contract (Non-Solicitation Of Employees While Still Employed).[2]**

361.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

362.    Manno entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

363.    That agreement, including the restrictive covenants contained therein, is binding on Manno and all of Interactive Intelligence's successors and assigns – including Genesys.

364.    While still employed by Genesys, Manno solicited Genesys employees in violation of that agreement.

365.    As explained more fully in the fact sections above, which are incorporated here by reference, Manno solicited Genesys employees Strahan, Hertel, Kyle Kuntz, Jeremy Mann, Jennifer Flannery, and Jennavieve Johnson, among others, to come work at Talkdesk.

---

[2] In light of the Indiana Supreme Court's ruling in *Heraeus Medical, LLC v. Zimmer, Inc.*, 135 N.E.3d 150 (Ind. 2019), Genesys is not pursuing a breach of contract claim related to post-employment solicitation of Genesys employees. Rather, Genesys' non-solicitation breach of contract claims against Defendants Manno and Strahan are limited to solicitation of Genesys employees while Manno and Strahan were still employed, a situation not present in *Heraeus Medical, LLC*. Courts have acknowledged a legal distinction between post-employment and in-term restrictive covenants, finding the latter more reasonable and routinely enforceable. *See e.g., Harrison v. Glucose Sugar Ref. Co.*, 116 F. 304, 310 (7th Cir. 1902) (holding "no public policy could be violated" in upholding a covenant applying during the "period of service engaged for"); *Deutchland Enterprises, Ltd. v. Burger King Corp.*, 957 F.2d 449, 452 (7th Cir. 1992) (differentiating between restrictive covenant that applied only during the term of the agreement and holding greater restrictions during the term of a contract permissible); *Orthopedic Equip. Co. v. Streetman & Assocs., Inc.*, 390 So. 2d 134, 136 (Fla. Dist. Ct. App. 1980) (a restrictive covenant that "coincides with the term of employment… does not create the evils which made a post-term restraint invalid at common law."); *Major v. Orthopedic Equip. Co.*, 496 F. Supp. 604, 615 (E.D. Va. 1980) ("a restriction during the term of the employment, not after, [] should be given greater latitude than a restraint in the latter case."); *Good v. Modern Globe, Inc.*, 78 N.W.2d 199, 204 (Mich. 1956) (In-term non-compete is "a provision which any employer would certainly have a right to contract for from any employee for the duration of his employment."); *Vendo Co. v. Stoner*, 245 N.E.2d 263, 281-86 (Ill. App. Ct. 1969) (recognizing an "exception" to otherwise overly broad covenants "where the restraint lasts during the contractual relationship of the parties" and holding it was irrelevant "that the post-term aspects of the covenant might, if standing alone, be unnecessarily broad" because the issue in that case involved conduct during employment and the restrictive covenant was therefore valid and enforceable); *AlterG, Inc. v. Boost Treadmills LLC*, No. 18-CV-07568-EMC, 2019 WL 4221599, at *10 (N.D. Cal. Sept. 5, 2019) ("Defendants are correct that *post*-employment non-compete provisions are generally unenforceable under California law… But that rule has no relevance here, because [plaintiff] alleges only that employment agreement barred Allen and Bean from competing with [plaintiff] *during* their employment with [plaintiff]."); *Loughlin v. Ventraq, Inc.*, No. 10-CV-2624-IEG BGS, 2011 WL 1303641, at *4 (S.D. Cal. Apr. 5, 2011) (California's fundamental state policy of prohibiting post-employment noncompete agreements not implicated where agreement applied to conduct during the course of employment).

366.     Genesys has been damaged as a result of Manno's breach of said agreement.

367.     Genesys is entitled to reasonable attorneys' fees and expenses incurred for Manno's violation of this contractual provision.

**Count Three – Breach Of Contract (Confidentiality).**

368.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

369.     Manno entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

370.     That agreement, including the confidentiality provisions contained therein, is binding on Manno and all of Interactive Intelligence's successors and assigns – including Genesys.

371.     While still employed by Genesys and thereafter, Manno used Genesys' Confidential Information and further provided that information to Talkdesk in violation of that agreement.

372.     As explained more fully in the fact sections above, which are incorporated here by reference, the Confidential Information used and provided to Talkdesk, by Manno, includes but is not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans and detailed customer and prospect lists, pricing and discount information, product and architectural information.

373.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno used this Confidential Information for the benefit of Talkdesk, both in recruiting for Talkdesk and in pursuing sales deals for Talkdesk. Further, Manno distributed this Genesys Confidential Information widely throughout Talkdesk's organization.

374.     As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its Confidential Information.

375.     Genesys has been damaged as a result of Manno's breach of said agreement.

376.     Genesys is entitled to reasonable attorneys' fees and expenses incurred for Manno's violation of this contractual provision.

**Count Four – Breach Of Contract (Competing During Employment).**

377.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

378.     Manno entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

379.     That agreement, including the restrictive covenants contained therein, is binding on Manno and all of Interactive Intelligence's successors and assigns – including Genesys.

380.     While still employed by Genesys, Manno became "employed by" and/or served as an "agent…or representative of" Talkdesk, in violation of that agreement.

381.     Talkdesk competes with Genesys.

382.     Manno's service to Talkdesk while employed by Genesys violated his employment agreement with Genesys.

383.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno actively recruited for Talkdesk and served as a key decision maker in Talkdesk's sales hires at the time he was employed by Genesys, Manno advised Talkdesk on sales deals in which Genesys and Talkdesk were competing, Manno disclosed Genesys' confidential trade secret information to Talkdesk Board Chair & CEO Paiva, strategized with Talkdesk on sales plans and its territory alignment and staffing strategy, opined on other Talkdesk documents like job descriptions and President's Club policies, evaluated the performance of other Talkdesk sales employees in contemplating his own staffing decisions for Talkdesk, and did this Talkdesk business while transmitting email on a Talkdesk email account.

384.     Genesys has been damaged as a result of Manno's breach of said agreement.

385.    Genesys is entitled to reasonable attorneys' fees and expenses for this contractual violation.

**Count Five – Breach Of Contract (Preparing to Compete During Employment).**

386.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

387.    Manno entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

388.    That agreement, including the restrictive covenants contained therein, is binding on Manno and all of Interactive Intelligence's successors and assigns – including Genesys.

389.    While still employed by Genesys, Manno prepared to compete with Genesys, in violation of his employment agreement with Genesys.

390.    Indeed, as noted in Count Four, Manno's conduct in August and September 2018 constitutes actual competition, not just preparation to compete.

391.    Further, as explained more fully in the fact sections above, which are incorporated here by reference, Manno prepared to compete (and actually did compete) with Genesys by serving as its recruiter and a key decision maker on recruiting, advising Talkdesk on sales deals in which Genesys and Talkdesk were competing, strategizing with Talkdesk on sales plans, territory staffing, job descriptions, and President's Club policies, evaluating the performance of other Talkdesk sales employees in contemplating his own staffing decisions for Talkdesk, and performing his Talkdesk duties while transmitting email on a Talkdesk email account.

392.    Genesys has been damaged as a result of Manno's breach of said agreement.

393.    Genesys is entitled to reasonable attorneys' fees and expenses for this contractual violation

**Count Six – Breach Of Contract (Failure to Surrender Records).**

394.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

395.    Manno entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

396.    That agreement, including the Surrender of Records provision contained therein, is binding on Manno and all of Interactive Intelligence's successors and assigns – including Genesys.

397.    Upon his voluntary termination from Genesys, Manno failed to "immediately surrender" to Genesys all records pertaining to Genesys' business, in violation of that agreement.

398.    As explained more fully in the fact sections above, which are incorporated here by reference, the Genesys documents that Manno failed to return include but are not limited to customer and prospect lists and other "files" that he used while employed by Talkdesk.

399.    Genesys has been damaged as a result of Manno's breach of said agreement.

**Count Seven – Breach Of Contract (Failure To Devote Substantial Time and Provide Faithful Service).**

400.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

401.    Manno entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

402.    That agreement, including the Title, Services and Duties provision contained therein, is binding on Manno and all of Interactive Intelligence's successors and assigns – including Genesys.

403.    As explained more fully in the fact sections above, and also in support of Genesys' Trade Secret, Breach of Fiduciary Duty, and related Breach of Contract Claims against Manno, while still employed by Genesys, Manno failed to "devote substantially all" of his "business time, attention, energy and skill" to Genesys, in violation of that agreement. Indeed Manno spent much of his business

time recruiting for Talkdesk, preparing to compete with Genesys on behalf of Talkdesk, actually competing against Genesys in advising Talkdesk on sales deals, strategizing with Talkdesk on sales plans, territory staffing, job descriptions, and President's Club policies, evaluating the performance of other Talkdesk sales employees in contemplating his own staffing decisions for Talkdesk, and performing his Talkdesk duties while transmitting email on a Talkdesk email account.

404.    For the same reasons, while still employed by Genesys, Manno failed to perform his services to Genesys "in a faithful, competent and diligent manner," in violation of that agreement.

405.    Genesys has been damaged as a result of Manno's breach of said agreement.

**Count Eight – Breach Of Fiduciary Duty Of Loyalty.**

406.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

407.    Manno owed Genesys, as its employee and Vice President of Sales, a fiduciary duty of loyalty.

408.    Manno breached that duty of loyalty in undertaking activity for the benefit of Talkdesk while still employed by Genesys.

409.    As explained more fully in the fact sections above, which are incorporated here by reference, while still employed by Genesys Manno acted as an outside recruiter for Talkdesk – indeed he was a key decision maker on all Talkdesk sales hires while still employed by Genesys. Manno recruited both Genesys and non-Genesys employees to come work for Talkdesk, including but not limited to Doug Cahhal, Kyle Kuntz, Jeremy Mann, Jennifer Flannery, Jennavieve Johnson, and Chuck Krogman, among others. Manno advised Talkdesk's recruiting team on the qualifications and performance of Genesys employees, he negotiated employment offers between Genesys employees he oversaw at Genesys, and Talkdesk. Manno advised Talkdesk on the Hawaii-based deal in which Genesys was competing, disclosed Genesys' confidential trade secret information to Talkdesk Board

Chair & CEO Paiva, strategized with Talkdesk on sales plans and its territory alignment and staffing strategy, opined on other Talkdesk documents like job descriptions and President's Club policies, and did this Talkdesk business while transmitting email on a Talkdesk email account.

410.    Genesys has been damaged as a result of Manno's breach of said fiduciary duty of loyalty.

## Count Nine – Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

411.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

412.    Genesys developed and maintained substantial trade secrets.

413.    Under DTSA, Manno has a duty not to misappropriate information he knows or has reason to know is trade secret information.

414.    Manno knew or had reason to know that Genesys confidential and proprietary information he misappropriated and provided to Talkdesk was trade secret information.

415.    In his job as a Vice President of Sales, Manno had access to confidential information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee compensation and salary data, and employee level of job satisfaction.

416.    In his job as a Vice President of Sales, Manno had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

417.    As explained more fully in the fact sections above, which are incorporated here by reference, Manno misappropriated trade secrets including but not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and

prospect information such as account and sales plans and detailed customer and prospect lists, pricing and discount information, and product and architectural information.

418.    As explained more fully in the fact sections above, which are incorporated here by reference, Manno used his knowledge of and misappropriation of those trade secrets for the benefit of Talkdesk, both in recruiting other Genesys personnel to come work for Talkdesk and in pursuing sales deals and sales strategies for Talkdesk. Further, Manno distributed those trade secrets widely throughout Talkdesk's organization and formulated sales strategies designed to use the trade secrets to target Genesys customers.

419.    Manno's conduct was willful.

420.    As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

421.    Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

422.    Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Manno's illegal conduct.

**Count Ten – Indiana Uniform Trade Secrets Act, Ind. Code Ann. § 24-2-3-1 *et seq.***

423.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

424.    Genesys developed and maintained substantial trade secrets.

425.    Under IUTSA, Manno has a duty not to misappropriate information he knows or has reason to know is trade secret information.

426.    Manno knew or had reason to know that Genesys confidential and proprietary information he misappropriated and provided to Talkdesk was trade secret information.

427.     In his job as a Vice President of Sales, Manno had access to confidential information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee compensation and salary data, and employee level of job satisfaction.

428.     In his job as a Vice President of Sales, Manno had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

429.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno misappropriated trade secrets including but not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans and detailed customer and prospect lists, pricing and discount information, and product and architectural information.

430.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno used his knowledge of and misappropriation of those trade secrets for the benefit of Talkdesk, both in recruiting other Genesys personnel to come work for Talkdesk and in pursuing sales deals and sales strategies for Talkdesk. Further, Manno distributed those trade secrets widely throughout Talkdesk's organization and formulated sales strategies designed to use the trade secrets to target Genesys customers.

431.     Manno's conduct was willful.

432.     As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

433.     Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

434.     Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Manno's illegal conduct.

**Count Eleven – Constructive Fraud**

435.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

436.     Manno owed Genesys, as its employee and Vice President of Sales, a fiduciary duty of loyalty.

437.     Manno violated that duty by making deceptive material misrepresentations and remaining silent where a duty to speak existed.

438.     Specifically, Manno misrepresented the reason for both his own resignation and the resignations of the Genesys employees he recruited, mainly but not limited to Strahan and Hertel.

439.     Further, Manno failed to disclose to Genesys that he was working for the benefit of Talkdesk while still employed by Genesys, by recruiting for Talkdesk and advising Talkdesk on sales deals. He further failed to disclose that he was orchestrating a conspiracy that would result in a substantial portion of the mid-market sales group leaving Genesys and working for a competitor all at the same time.

440.     On September 14, 17 and 18, 2018 Manno failed to disclose the true reason for Strahan, Morales, and Tews' resignations and failed to inform Genesys leadership of the imminent mass exodus of mid-market sales employees.

441.     On September 21, 2018 Manno failed to disclose to Genesys leadership why Hertel was leaving and expressed phony surprise at Hertel's announcement, as a means to further mislead Genesys of his plans.

442.     On September 24, 2018 Manno resigned and misrepresented the reason for doing so. Manno further misrepresented his future plans in telling Genesys leadership that he could not work into October due to family commitments.

443.     Manno's misrepresentation of his and others' departures from Genesys were intended to mislead Genesys and keep it in the dark as to the imminent mass exodus to Talkdesk.

444.     Manno at no time disclosed to Genesys that he, Strahan, Hertel, and several others were planning on leaving Genesys for a competitor, and were spending substantial amounts of time preparing for that departure and competing against Genesys.

445.     Genesys relied upon Manno's misrepresentations and omissions by allowing him to work for Genesys through September 2018 and not preparing to replace him and the large number of sales employees he took with him.

446.     Genesys has been damaged as a result of Manno's constructive fraud as it suffered losses following his departure, which Genesys could have better prepared for had Manno not fraudulently concealed his activities.

447.     Manno gained an advantage at the expense of Genesys when he failed to disclose his activities for Talkdesk because he was permitted to work for Genesys through September 2018 while at the same time working for Talkdesk and preparing to hit the ground running as a Talkdesk Vice President of Sales, in competition with Genesys.

**Count Twelve – Conspiracy**

448.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

449.     While still employed by Genesys, Manno, Strahan, and Hertel, along with Talkdesk and its Board Chair & CEO Paiva engaged in a concerted attempt to breach fiduciary and contractual duties owed to Genesys, raid Genesys' mid-market sales group, misappropriate Genesys' confidential

trade secret information, and interfere with enforceable employment agreements between Genesys and its employees.

450.     As explained more fully in the fact sections above, this conspiracy included widespread recruitment of Genesys employees while Manno, Strahan, and Hertel were still employed by Genesys, widespread misappropriation of Genesys confidential information and trade secrets, and actual competition against Genesys, while Manno, Strahan, and Hertel were employed by Genesys.

451.     Manno's involvement in this concerted action was intentional.

452.     Manno kept this conspiracy secret and did not inform anyone in Genesys upper management of his, Strahan, or Hertel's plans and activities.

453.     Genesys has been damaged by Manno's involvement in this conspiracy.

**Count Thirteen – Aiding And Abetting Breach of Fiduciary Duty.**

454.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

455.     As employees and Area Directors of Genesys reporting to Manno, Strahan and Hertel owed Genesys a fiduciary duty of loyalty.

456.     As explained more fully in the fact sections above, which are incorporated here by reference, Manno aided and abetted Strahan and Hertel's breach of their fiduciary duty by acting in concert with Strahan and Hertel while plotting their conspiracy, including by encouraging Strahan and Hertel to recruit Genesys employees, in violation of fiduciary and contractual obligations owed to Genesys, by advising Talkdesk on sales deals in concert with Strahan and Hertel, and in concealing from Genesys the extent of Strahan, Hertel, and his own activities on behalf of Talkdesk, including by helping Strahan conceal the fact that he actually began formally working for Talkdesk while still employed by Genesys.

457.     Manno knowingly and intentionally aided and abetted Strahan and Hertel in breaching that duty.

458.     Genesys has been damaged by Manno's conduct.

WHEREFORE, Genesys Telecommunications Laboratories, Inc. prays for judgment against Defendant Ralph Manno and requests the following relief against Manno:

(1)     That the Court issue a permanent injunction enforcing the contract between Manno and Genesys and prohibiting Manno from interfering with the contract;

(2)     That the Court issue a permanent injunction prohibiting Manno from misappropriating Genesys trade secrets;

(3)     That Genesys be awarded actual, compensatory, consequential, liquidated, and special damages in an amount to be determined at trial;

(4)     That Genesys be awarded punitive damages;

(5)     That Genesys be awarded attorneys' fees and costs associated with bringing and prosecuting this action;

(6)     That Genesys be awarded prejudgment interest; and

(7)     That Genesys be awarded such other and further relief as this Court deems just and proper.

## SPECIFIC COUNTS AGAINST DEFENDANT MICHAEL STRAHAN

## Count Fourteen –Breach Of Contract (Non-Solicitation Of Employees While Still Employed).[3]

459.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

---

[3] *See* footnote 1 for further explanation as to the scope of Genesys' non-solicitation claims against Defendants Manno and Strahan.

460.     Strahan entered into a valid and binding agreement with Genesys' predecessor Interactive Intelligence during his employment.

461.     That agreement, including the restrictive covenants contained therein, is binding on Strahan and all of Interactive Intelligence's successors and assigns – including Genesys.

462.     While still employed by Genesys, Strahan solicited Genesys employees in violation of that agreement.

463.     As explained more fully in the fact sections above, which are incorporated here by reference, Strahan solicited Genesys employees Hertel, Tews, Holloway, and Mann, among others, to come work at Talkdesk.

464.     Genesys has been damaged as a result of Strahan's breach of said agreement.

465.     Genesys is entitled to reasonable attorneys' fees and expenses incurred for Strahan's violation of this contractual provision.

**Count Fifteen – Breach Of Fiduciary Duty Of Loyalty.**

466.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

467.     Strahan owed Genesys, as its employee and Area Director of Sales, a fiduciary duty of loyalty.

468.     Strahan breached that duty of loyalty in undertaking activity for the benefit of Talkdesk while still employed with Genesys.

469.     As explained more fully in the fact sections above, which are incorporated here by reference, while employed by Genesys Strahan acted as an outside recruiter for Talkdesk, recruiting both Genesys and non-Genesys employees to come work for Talkdesk. Strahan advised Talkdesk's recruiting team on the qualifications and performance of Genesys employees, he negotiated employment offers between Genesys employees he oversaw at Genesys, and Talkdesk. Strahan further

recommended several other employees for employment at Talkdesk, such as Genesys' presales engineering team. Strahan advised Talkdesk on the Hawaii-based deal in which Genesys was competing. Strahan watched interviews of Genesys employees, he advised Manno and Hertel to delete emails so Genesys would not see what they had done, and finally, Strahan began working for Talkdesk two weeks prior to his termination from Genesys.

470.    Genesys has been damaged as a result of Strahan's breach of said fiduciary duty of loyalty.

**Count Sixteen - Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

471.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

472.    Genesys developed and maintained substantial trade secrets.

473.    Under DTSA, Strahan has a duty not to misappropriate information he knows or has reason to know is trade secret information.

474.    Strahan knew or had reason to know that Genesys confidential and proprietary information he retained after his employment ended was trade secret information.

475.    In his job as an Area Director of Sales, Strahan had access to confidential information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee compensation and salary data, and employee level of job satisfaction.

476.    In his job as an Area Director of Sales, Strahan had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

477.    Prior to leaving his employment with Genesys, Strahan deleted several files and documents from his computer drive.

478.    As explained more fully in the fact sections above, which are incorporated here by reference, Strahan misappropriated Genesys trade secrets, including but not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans and detailed customer and prospect lists, pricing and discount information, product and architectural information.

479.    As explained more fully in the fact sections above, which are incorporated here by reference, Strahan used those misappropriated trade secrets for the benefit of Talkdesk, both in recruiting for Talkdesk and in pursuing sales deals for Talkdesk. Further, Strahan distributed those trade secrets widely throughout Talkdesk's organization.

480.    Strahan's conduct was willful.

481.    As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

482.    Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

483.    Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Strahan's illegal conduct.

**Count Seventeen – Indiana Uniform Trade Secrets Act, Ind. Code Ann. § 24-2-3-1 _et seq._**

484.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

485.    Genesys developed and maintained substantial trade secrets.

486.    Under IUTSA, Strahan has a duty not to misappropriate information he knows or has reason to know is trade secret information.

487.    Strahan knew or had reason to know that Genesys confidential and proprietary information he retained after his employment ended was trade secret information.

488.     In his job as an Area Director of Sales, Strahan had access to confidential information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee compensation and salary data, and employee level of job satisfaction.

489.     In his job as an Area Director of Sales, Strahan had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

490.     Prior to leaving his employment with Genesys, Strahan deleted several files and documents from his computer drive.

491.     As explained more fully in the fact sections above, which are incorporated here by reference, Strahan misappropriated Genesys trade secrets, including but not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans and detailed customer and prospect lists, pricing and discount information, product and architectural information.

492.     As explained more fully in the fact sections above, which are incorporated here by reference, Strahan used those misappropriated trade secrets for the benefit of Talkdesk, both in recruiting for Talkdesk and in pursuing sales deals for Talkdesk. Further, Strahan distributed those trade secrets widely throughout Talkdesk's organization.

493.     Strahan's conduct was willful.

494.     As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

495.     Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

496.     Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Strahan's illegal conduct.

## Count Eighteen – Breach Of Contract (Confidentiality).

497.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

498.     Strahan entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

499.     That agreement, including the confidentiality provisions contained therein, is binding on Strahan and all of Interactive Intelligence's successors and assigns – including Genesys.

500.     While still employed by Genesys and thereafter, Strahan used Genesys' Confidential Information and further provided that information to Talkdesk in violation of that agreement.

501.     As explained more fully in the fact sections above, which are incorporated here by reference, the Confidential Information used and provided to Talkdesk, by Strahan, includes but is not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans and detailed customer and prospect lists, pricing and discount information, product and architectural information.

502.     As explained more fully in the fact sections above, which are incorporated here by reference, Strahan used this Confidential Information for the benefit of Talkdesk, both in recruiting for Talkdesk and in pursuing sales deals for Talkdesk. Further, Strahan distributed this Genesys Confidential Information widely throughout Talkdesk's organization.

503.     As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its Confidential Information.

504.     Genesys has been damaged as a result of Strahan's breach of said agreement.

505.     Genesys is entitled to reasonable attorneys' fees and expenses incurred for Strahan's violation of this contractual provision.

**Count Nineteen – Breach Of Contract (Competing During Employment).**

506.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

507.     Strahan entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

508.     That agreement, including the restrictive covenants contained therein, is binding on Strahan and all of Interactive Intelligence's successors and assigns – including Genesys.

509.     While still employed by Genesys, Strahan became "employed by" and served as an "agent…or representative of" Talkdesk, in violation of that agreement.

510.     Talkdesk competes with Genesys.

511.     Strahan's employment with Talkdesk during the final two weeks of his employment with Genesys violated his employment agreement with Genesys.

512.     Further, as explained more fully in the fact sections above, which are incorporated here by reference, Strahan also advised Talkdesk on sales deals in which Genesys and Talkdesk were competing, participated on other Talkdesk sales calls, and actively recruited for Talkdesk, all while employed by Genesys and in violation of his agreement.

513.     Genesys has been damaged as a result of Strahan's breach of said agreement.

514.     Genesys is entitled to reasonable attorneys' fees and expenses for this contractual violation.

**Count Twenty – Breach Of Contract (Preparing to Compete During Employment).**

515.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

516.    Strahan entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

517.    That agreement, including the restrictive covenants contained therein, is binding on Strahan and all of Interactive Intelligence's successors and assigns – including Genesys.

518.    While still employed by Genesys, Strahan prepared to compete with Genesys, in violation of his employment agreement with Genesys.

519.    While employed by Genesys, Strahan prepared to compete with Genesys. *Michael Strahan Deposition*, October 21, 2020, p. 106.

520.    Indeed, as noted in Count Nineteen, Strahan's conduct in August and September 2018 constitutes actual competition, not just preparation to compete.

521.    Strahan's employment with Talkdesk during the final two weeks of his employment with Genesys violated his employment agreement with Genesys.

522.    Further, as explained more fully in the fact sections above, which are incorporated here by reference, Strahan prepared to compete (and actually did compete) with Genesys by advising Talkdesk on sales deals in which Genesys and Talkdesk were competing, participating on other Talkdesk sales calls, and actively recruited for Talkdesk.

523.    Genesys has been damaged as a result of Strahan's breach of said agreement.

524.    Genesys is entitled to reasonable attorneys' fees and expenses for this contractual violation.

**Count Twenty-One – Breach Of Contract (Failure to Surrender Records).**

525.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

526.    Strahan entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

527.    That agreement, including the Surrender of Records provision contained therein, is binding on Strahan and all of Interactive Intelligence's successors and assigns – including Genesys.

528.    Upon his voluntary termination from Genesys, Strahan failed to "immediately surrender" to Genesys all records pertaining to Genesys' business, in violation of that agreement.

529.    As explained more fully in the fact sections above, which are incorporated here by reference, the Genesys documents that Strahan failed to return include but are not limited to the PureCloud List he misappropriated, as well as Genesys documents related to Genesys' architectural information.

530.    Genesys has been damaged as a result of Strahan's breach of said agreement.

**Count Twenty-Two – Breach Of Contract (Failure To Devote Substantial Time and Provide Faithful Service).**

531.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

532.    Strahan entered into a valid and binding agreement with Genesys predecessor Interactive Intelligence during his employment.

533.    That agreement, including the Title, Services and Duties provision contained therein, is binding on Strahan and all of Interactive Intelligence's successors and assigns – including Genesys.

534.    As explained more fully in the fact sections above, and also in support of Genesys' Trade Secret, Breach of Fiduciary Duty, and related Breach of Contract Claims, while still employed by Genesys, Strahan failed to "devote substantially all" of his "business time, attention, energy and skill" to Genesys, in violation of that agreement. Indeed Strahan spent much of his business time recruiting for Talkdesk, preparing to compete with Genesys on behalf of Talkdesk, actually competing against Genesys in advising Talkdesk on the Hawaii-based deal, and then formally working for Talkdesk before his Genesys employment ended.

535.   For the same reasons, while still employed by Genesys, Strahan failed to perform his services to Genesys "in a faithful, competent and diligent manner," in violation of that agreement.

536.   Genesys has been damaged as a result of Strahan's breach of said agreement.

**Count Twenty-Three – Constructive Fraud**

537.   Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

538.   Strahan owed Genesys, as its employee and Area Director of Sales, a fiduciary duty of loyalty.

539.   Strahan violated that duty by making deceptive material misrepresentations and remaining silent where a duty to speak existed.

540.   Specifically, in his September 14, 2018 resignation email to Manno, Strahan misrepresented his reasons for leaving Genesys and failed to disclose to Genesys that for more than a month he had been working for the benefit of Talkdesk while still employed by Genesys.

541.   Strahan further failed to disclose that he actually began formal employment with Talkdesk on September 17, 2018 while still employed by Genesys.

542.   Strahan at no time disclosed to Genesys that he, Manno, Hertel, and several others were planning on leaving Genesys for a competitor, and were spending substantial amounts of time preparing for that departure and competing against Genesys.

543.   Genesys relied upon Strahan's misrepresentations and omissions by allowing him to work for Genesys through September 2018.

544.   Genesys has been damaged as a result of Strahan's constructive fraud as it suffered losses following his departure, which Genesys could have better prepared for had Strahan not fraudulently concealed his activities.

545.     Strahan gained an advantage at the expense of Genesys when he failed to disclose his activities for Talkdesk because he was permitted to work for Genesys through September 2018 while at the same time working for Talkdesk and preparing to hit the ground running as a Talkdesk Regional Vice President of Sales, in competition with Genesys.

**Count Twenty-Four – Conspiracy**

546.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

547.     While still employed by Genesys, Manno, Strahan, and Hertel, along with Talkdesk and its Board Chair & CEO Paiva engaged in a concerted attempt to breach fiduciary and contractual duties owed to Genesys, raid Genesys' mid-market sales group, misappropriate Genesys' confidential trade secret information, and interfere with enforceable employment agreements between Genesys and its employees.

548.     As explained more fully in the fact sections above, this conspiracy included widespread recruitment of Genesys employees while Manno, Strahan, and Hertel were still employed by Genesys, widespread misappropriation of Genesys confidential information and trade secrets, and actual competition against Genesys, while Manno, Strahan, and Hertel were employed by Genesys.

549.     Strahan's involvement in this concerted action was intentional.

550.     Strahan kept this conspiracy secret and did not inform anyone in Genesys upper management of his, Manno, or Hertel's plans and activities.

551.     Genesys has been damaged by Strahan's involvement in this conspiracy.

**Count Twenty-Five – Aiding And Abetting Breach of Fiduciary Duty.**

552.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

553.     As employees and Area Directors and Vice Presidents of Genesys, Manno and Hertel owed Genesys a fiduciary duty of loyalty.

554.     As explained more fully in the fact sections above, Strahan aided and abetted Manno and Hertel's breach of their fiduciary duty by acting in concert with Manno and Hertel while plotting their conspiracy, including by recruiting Genesys employees to work for Talkdesk, in concert with Manno and Hertel, by encouraging Manno and Hertel to delete their Genesys emails, by advising Talkdesk on sales deals in concert with Manno and Hertel, and in concealing from Genesys the extent of Manno, Hertel, and his own activities on behalf of Talkdesk.

555.     Strahan knowingly and intentionally aided and abetted Manno and Hertel in breaching that duty.

556.     Genesys has been damaged by Strahan's conduct.

WHEREFORE, Genesys Telecommunications Laboratories, Inc. prays for judgment against Defendant Michael Strahan and requests the following relief against Strahan:

(1)     That the Court issue a permanent injunction enforcing the contract between Strahan and Genesys and prohibiting Strahan from interfering with the contract;

(2)     That the Court issue a permanent injunction prohibiting Strahan from misappropriating Genesys trade secrets;

(3)     That Genesys be awarded actual, compensatory, consequential, liquidated, and special damages in an amount to be determined at trial;

(4)     That Genesys be awarded punitive damages;

(5)     That Genesys be awarded attorneys' fees and costs associated with bringing and prosecuting this action;

(6)     That Genesys be awarded prejudgment interest; and

(7)     That Genesys be awarded such other and further relief as this Court deems just and proper.

## SPECIFIC COUNTS AGAINST DEFENDANT MARK HERTEL

### Count Twenty-Six – Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

557.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

558.     Genesys developed and maintained substantial trade secrets.

559.     Under DTSA, Hertel has a duty not to misappropriate information he knows or has reason to know is trade secret information.

560.     In his job as Area Director of Sales in the West Region, Hertel had access to confidential information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee compensation and salary data, and employee level of job satisfaction.

561.     In his job as an Area Director of Sales, Hertel had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

562.     While working for Genesys, Hertel oversaw those deals and had personal involvement in those deals.

563.     Upon separation from Genesys, Hertel retained Genesys confidential, proprietary data and materials, and failed to return this Genesys property upon separation.

564.     Hertel knew or had reason to know that Genesys confidential and proprietary information he downloaded was trade secret information.

565.     As explained more fully in the fact sections above, which are incorporated here by reference, Hertel misappropriated Genesys trade secrets, including but not limited to employee

personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans, detailed customer and prospect lists, and customer satisfaction information, pricing and discount information, product and architectural information, and marketing information.

566.    As explained more fully in the fact sections above, which are incorporated here by reference, Hertel used those misappropriated trade secrets for the benefit of Talkdesk, both in recruiting for Talkdesk and in pursuing sales deals for Talkdesk. Further, Hertel distributed those trade secrets widely throughout Talkdesk's organization, including by sending Genesys' NPS data directly to Board Chair & CEO Paiva.

567.    Hertel's conduct was willful.

568.    As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

569.    Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

570.    Genesys lost the California-based deal in which Hertel provided Talkdesk Genesys trade secret information in the form of customer satisfaction information.

571.    Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Hertel's illegal conduct.

**Count Twenty-Seven – Indiana Uniform Trade Secrets Act, Ind. Code Ann. § 24-2-3-1 _et seq._**

572.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

573.    Genesys developed and maintained substantial trade secrets.

574.    Under IUTSA, Hertel has a duty not to misappropriate information he knows or has reason to know is trade secret information.

575.     In his job as Area Director of Sales in the West Region, Hertel had access to confidential information including but not limited to Genesys intellectual property, account and sales plans, pricing, territory information, customer documents, product information, and employee performance, employee compensation and salary data, and employee level of job satisfaction.

576.     In his job as an Area Director of Sales, Hertel had access to confidential information related to Genesys' bid to keep the business of a customer located in Hawaii and also win the business of another customer located in California, including the quote and prices offered to those companies.

577.     While working for Genesys, Hertel oversaw those deals and had personal involvement in those deals.

578.     Upon separation from Genesys, Hertel retained Genesys confidential, proprietary data and materials, and failed to return this Genesys property upon separation.

579.     Hertel knew or had reason to know that Genesys confidential and proprietary information he downloaded was trade secret information.

580.     As explained more fully in the fact sections above, which are incorporated here by reference, Hertel misappropriated Genesys trade secrets, including but not limited to employee personnel information, including compensation details, job satisfaction, and performance, customer and prospect information such as account and sales plans, detailed customer and prospect lists, and customer satisfaction information, pricing and discount information, product and architectural information, and marketing information.

581.     As explained more fully in the fact sections above, which are incorporated here by reference, Hertel used those misappropriated trade secrets for the benefit of Talkdesk, both in recruiting for Talkdesk and in pursuing sales deals for Talkdesk. Further, Hertel distributed those trade secrets widely throughout Talkdesk's organization, including by sending Genesys' NPS data directly to Board Chair & CEO Paiva.

582.   Hertel's conduct was willful.

583.   As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

584.   Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

585.   Genesys lost the California-based deal in which Hertel provided Talkdesk Genesys trade secret information in the form of customer satisfaction information.

586.   Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Hertel's illegal conduct.

**Count Twenty-Eight – Breach Of Fiduciary Duty Of Loyalty.**

587.   Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

588.   Hertel owed Genesys, as its employee and Area Director of Sales, a fiduciary duty of loyalty. *Mark Hertel Deposition*, October 26, 2020, p. 14.

589.   Hertel breached that duty of loyalty in undertaking activity for the benefit of Talkdesk while still employed with Genesys.

590.   As explained more fully in the fact sections above, which are incorporated here by reference, while employed by Genesys Hertel acted as an outside recruiter for Talkdesk, recruiting both Genesys and non-Genesys employees to come work for Talkdesk. Strahan advised Talkdesk's recruiting team on the qualifications and performance of Genesys employees, he negotiated employment offers between Genesys employees he oversaw at Genesys, and Talkdesk. Hertel further recommended several other employees for employment at Talkdesk, advised Talkdesk Board Chair & CEO Paiva on the Hawaii-based deal in which Genesys was competing and in which he was personally involved on Genesys' behalf at the time of his advisement to Board Chair & CEO Paiva. Hertel further

received confidential Genesys customer and prospect lists just days before he left for Talkdesk, which he then distributed throughout Talkdesk after he began employment. Hertel further downloaded thousands of emails prior to his departure from Genesys.

591.    Genesys has been damaged as a result of Hertel's breach of said fiduciary duty of loyalty.

**Count Twenty-Nine – Constructive Fraud**

592.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

593.    Hertel owed Genesys, as its employee and Area Director of Sales, a fiduciary duty of loyalty.

594.    Hertel violated that duty by making deceptive material misrepresentations and remaining silent where a duty to speak existed.

595.    Specifically, in his September 21, 2018 resignation email to Manno, Hertel misrepresented his reasons for leaving Genesys and failed to disclose to Genesys that for more than a month he had been working for the benefit of Talkdesk while still employed by Genesys.

596.    Hertel at no time disclosed to Genesys that he, Manno, Strahan, and several others were planning on leaving Genesys for a competitor, and were spending substantial amounts of time preparing for that departure and competing against Genesys.

597.    Genesys relied upon Hertel's misrepresentations and omissions by allowing him to work for Genesys through September 2018.

598.    Genesys has been damaged as a result of Hertel's constructive fraud as it suffered losses following his departure, which Genesys could have better prepared for had Hertel not fraudulently concealed his activities.

599.    Hertel gained an advantage at the expense of Genesys when he failed to disclose his activities for Talkdesk because he was permitted to work for Genesys through September 2018 while at the same time working for Talkdesk and preparing to hit the ground running as a Talkdesk Regional Vice President of Sales, in competition with Genesys.

## Count Thirty – Conspiracy

600.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

601.    While still employed by Genesys, Manno, Strahan, and Hertel, along with Talkdesk and its Board Chair & CEO Paiva engaged in a concerted attempt to breach fiduciary and contractual duties owed to Genesys, raid Genesys' mid-market sales group, misappropriate Genesys' confidential trade secret information, and interfere with enforceable employment agreements between Genesys and its employees.

602.    As explained more fully in the fact sections above, this conspiracy included widespread recruitment of Genesys employees while Manno, Strahan, and Hertel were still employed by Genesys, widespread misappropriation of Genesys confidential information and trade secrets, and actual competition against Genesys, while Manno, Strahan, and Hertel were employed by Genesys.

603.    Hertel's involvement in this concerted action was intentional.

604.    Hertel kept this conspiracy secret and did not inform anyone in Genesys upper management of his, Manno, or Strahan's plans and activities.

605.    Genesys has been damaged by Hertel's involvement in this conspiracy.

## Count Thirty-One – Aiding And Abetting Breach of Fiduciary Duty.

606.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

607.     As employees and Area Directors and Vice Presidents of Genesys, Manno and Strahan owed Genesys a fiduciary duty of loyalty.

608.     As explained more fully in the fact sections above, Hertel aided and abetted Manno and Strahan's breach of their fiduciary duty by acting in concert with Manno and Strahan while plotting their conspiracy, including by recruiting Genesys employees to work for Talkdesk, in concert with Manno and Strahan, by advising Talkdesk on sales deals in concert with Manno and Strahan, and in concealing from Genesys the extent of Manno, Strahan, and his own activities on behalf of Talkdesk.

609.     Hertel knowingly and intentionally aided and abetted Manno and Strahan in breaching that duty.

610.     Genesys has been damaged by Hertel's conduct.

WHEREFORE, Genesys Telecommunications Laboratories, Inc. prays for judgment against Defendant Mark Hertel and requests the following relief against Hertel:

(1)     That the Court issue a permanent injunction prohibiting Hertel from misappropriating Genesys trade secrets and from possessing converted Genesys property;

(2)     That Genesys be awarded actual, compensatory, consequential, liquidated, treble, and special damages in an amount to be determined at trial;

(3)     That Genesys be awarded punitive damages;

(4)     That Genesys be awarded attorneys' fees and costs associated with bringing and prosecuting this action;

(5)     That Genesys be awarded prejudgment interest; and

(6)     That Genesys be awarded such other and further relief as this Court deems just and proper.

## SPECIFIC COUNTS AGAINST DEFENDANT TALKDESK

**Count Thirty-Two – Defend Trade Secrets Act, 18 U.S.C. § 1836 _et seq._**

611.   Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

612.   Genesys developed and maintained substantial trade secrets, including account and sales plans, pricing, sales strategy, territory information, customer documents, product information, and employee performance, employee compensation, and accounts assigned to employees.

613.   Under DTSA, Talkdesk has a duty not to misappropriate information it knows or has reason to know is trade secret information.

614.   Talkdesk knew or had reason to know that Genesys' confidential and proprietary information was trade secret information.

615.   As explained more fully in the fact sections above, which are incorporated here by reference, Talkdesk misappropriated Genesys' confidential trade secret information by encouraging and supporting the individual Defendants' in their misappropriation of that information and by then using that information against Genesys in the market.

616.   Specifically, Talkdesk misappropriated Genesys' confidential trade secret personnel information, including compensation details, job satisfaction, and performance, by harvesting this information through the raided Genesys personnel, for the purpose of further targeting and recruiting Genesys personnel for recruitment and hiring.

617.   Specifically, Talkdesk misappropriated Genesys' confidential trade secret customer and prospect information such as account and sales plans, detailed customer prospect lists, NPS data, pricing and discount information, to compete against Genesys in bidding for the business of a customer based in Hawaii, a prospect based in California, and thousands of other Genesys customers that were the subject of a Talkdesk sales incentive sales strategy.

618.    Specifically, Talkdesk misappropriated Genesys' confidential trade secret pricing and discount information, product and architectural information, and marketing information, to formulate its own policies and practices, saving costs and development time and allowing it to more effectively compete against Genesys.

619.    Talkdesk's conduct was willful. It included direct involvement of its Board Chair & CEO, Tiago Paiva, in recruiting Genesys personnel based on trade secret information provided by current or former Genesys personnel, and in making extraordinary business proposals to a Genesys customer in Hawaii, and in misappropriating Genesys' NPS data.

620.    Talkdesk's willful conduct also includes direct involvement of its Vice Presidents, Manno, Hertel, and Strahan, and also several executives including but not limited to Shauna Geraghty, Lisa Kelly, Shep Maher, Kent Venook, John Kepp, and Charanya Kannan. These Talkdesk executives used Genesys' misappropriated trade secrets to build Talkdesk's sales organization and to compete against Genesys.

621.    As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets. Indeed, Genesys and Talkdesk take similar steps in protecting their confidential trade secret information.

622.    Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

623.    Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Talkdesk and the other Defendants' illegal conduct.

**Count Thirty-Three – Indiana Uniform Trade Secrets Act, Ind. Code Ann. § 24-2-3-1 *et seq.***

624.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

625.     Genesys developed and maintained substantial trade secrets, including account and sales plans, pricing, sales strategy, territory information, customer documents, product information, and employee performance, employee compensation, and accounts assigned to employees.

626.     Under DTSA, Talkdesk has a duty not to misappropriate information it knows or has reason to know is trade secret information.

627.     Talkdesk knew or had reason to know that Genesys' confidential and proprietary information was trade secret information.

628.     As explained more fully in the fact sections above, which are incorporated here by reference, Talkdesk misappropriated Genesys' confidential trade secret information by encouraging and supporting the individual Defendants' in their misappropriation of that information and by then using that information against Genesys in the market.

629.     Specifically, Talkdesk misappropriated Genesys' confidential trade secret personnel information, including compensation details, job satisfaction, and performance, by harvesting this information through the raided Genesys personnel, for the purpose of further targeting and recruiting Genesys personnel for recruitment and hiring.

630.     Specifically, Talkdesk misappropriated Genesys' confidential trade secret customer and prospect information such as account and sales plans, detailed customer prospect lists, NPS data, pricing and discount information, to compete against Genesys in bidding for the business of a customer based in Hawaii, a prospect based in California, and thousands of other Genesys customers that were the subject of a Talkdesk sales incentive sales strategy.

631.     Specifically, Talkdesk misappropriated Genesys' confidential trade secret pricing and discount information, product and architectural information, and marketing information, to formulate its own policies and practices, saving costs and development time and allowing it to more effectively compete against Genesys.

632.     Talkdesk's conduct was willful. It included direct involvement of its Board Chair & CEO, Tiago Paiva, in recruiting Genesys personnel based on trade secret information provided by current or former Genesys personnel, and in making extraordinary business proposals to a Genesys customer in Hawaii, and in misappropriating Genesys' NPS data.

633.     Talkdesk's willful conduct also includes direct involvement of its Vice Presidents, Manno, Hertel, and Strahan, and also several executives including but not limited to Shauna Geraghty, Lisa Kelly, Shep Maher, Kent Venook, John Kepp, and Charanya Kannan. These Talkdesk executives used Genesys' misappropriated trade secrets to build Talkdesk's sales organization and to compete against Genesys.

634.     As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets. Indeed, Genesys and Talkdesk take similar steps in protecting their confidential trade secret information.

635.     Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

636.     Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Talkdesk and the other Defendants' illegal conduct.

**Count Thirty-Four – Tortious Interference With Contract.**

637.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

638.     Genesys and its employees have contractual agreements.

639.     Talkdesk knew or should have known about the contractual relationship between the former Genesys employees it recruited and hired, and their employer Genesys.

640. As explained more fully in the fact sections above, which are incorporated here by reference, Talkdesk inquired about these agreements, has similar agreements in place with its own employees, and has sought to enforce such agreements.

641. As explained more fully in the fact sections above, which are incorporated here by reference, Talkdesk intentionally recruited Genesys employees and encouraged them to breach their contracts with Genesys by encouraging them to solicit other Genesys employees while still employed by Genesys, by encouraging those Genesys employees to provide Talkdesk with Genesys' confidential trade secret information both while still employed by Genesys and after, and by encouraging those Genesys employees to provide less than faithful services to Genesys by actually competing against Genesys while still employed, all in violation of their employment agreements.

642. As explained more fully in the fact sections above, which are incorporated here by reference, Talkdesk interfered with the employment agreements of Manno, Strahan, Hertel, and others.

643. Talkdesk encouraged and benefitted from Manno, Strahan, and Hertel's breaching of their agreements not to recruit Genesys personnel, not to compete against Genesys, and not to disclose Confidential Information, all while still employed by Genesys.

644. Talkdesk's interference was not justified.

645. Talkdesk's interference caused harm to Genesys.

**Count Thirty-Five – Raiding.**

646. Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

647. Talkdesk targeted and raided 100% of the Genesys mid-market sales management team, including Vice Presidents and Area Directors, as well as most of the mid-market account executives.

648.     Talkdesk utilized Genesys trade secrets misappropriated from Hertel, Morales, Strahan, and Manno regarding employee performance, compensation, job satisfaction and accounts to facilitate this raiding effort.

649.     Manno, Hertel, and Strahan – on behalf of and for the benefit of Talkdesk – recruited Genesys mid-market sales employees while still employed by Genesys, in violation of their contractual obligations and fiduciary duties to Genesys. Talkdesk induced these breaches.

650.     Talkdesk's targeted raid of Genesys mid-market segment, including all of its top leadership, was carried out with the purpose of crippling Genesys mid-market sales organization.

651.     Talkdesk succeeded in its unlawful raiding that involved independent unlawful conduct outlined herein, with 50% of Genesys mid-market Vice Presidents, 66% of Genesys mid-market Area Directors, and approximately 25% of other mid-market personnel joining Talkdesk, and all within a very short period of time causing harm and disruption to Genesys.

652.     Genesys has been damaged by Talkdesk's illegal raiding.

**Count Thirty-Six – Conspiracy**

653.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

654.     While still employed by Genesys, Manno, Strahan, and Hertel, along with Talkdesk and its Board Chair & CEO Paiva engaged in a concerted attempt to breach fiduciary and contractual duties owed to Genesys, raid Genesys' mid-market sales group, misappropriate Genesys' confidential trade secret information, and interfere with enforceable employment agreements between Genesys and its employees.

655.     As explained more fully in the fact sections above, this conspiracy included widespread recruitment of Genesys employees while Manno, Strahan, and Hertel were still employed by Genesys, widespread misappropriation of Genesys confidential information and trade secrets by Talkdesk,

Board Chair & CEO Paiva, Manno, Strahan, and Hertel, and actual competition against Genesys, while Manno, Strahan, and Hertel were employed by Genesys.

656.     Talkdesk encouraged and benefitted from Board Chair & CEO Paiva, Manno, Strahan, and Hertel's involvement in the conspiracy.

657.     Talkdesk's involvement in this concerted action was intentional.

658.     Genesys has been damaged by Talkdesk's involvement in this conspiracy.

**Count Thirty-Seven – Aiding And Abetting Breach of Fiduciary Duty.**

659.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

660.     As employees and Area Directors and Vice Presidents of Genesys, Manno, Strahan and Hertel owed Genesys a fiduciary duty of loyalty.

661.     As explained more fully in the fact sections above, which are incorporated here by reference, Talkdesk aided and abetted Strahan and Hertel's breach of their fiduciary duty by acting in concert with Manno, Strahan, and Hertel, through Board Chair & CEO Paiva and its other executives, while plotting their conspiracy, including by encouraging Manno, Strahan, and Hertel to recruit Genesys employees, in violation of fiduciary and contractual obligations owed to Genesys, by soliciting Manno, Strahan, and Hertel's advice on ongoing sales deals, by keeping Manno, Strahan, and Hertel's activities secret, and by encouraging Manno, Strahan, and Hertel to misappropriate Genesys' confidential trade secret information and by using the same, all while those Genesys sales leaders were still employed by Genesys.

662.     Talkdesk, through its Board Chair & CEO Paiva and other agents, knowingly and intentionally aided and abetted Manno, Strahan, and Hertel in breaching that duty.

663.     Genesys has been damaged by Talkdesk's conduct.

WHEREFORE, Genesys Telecommunications Laboratories, Inc. prays for judgment against Defendant Talkdesk and requests the following relief against Talkdesk:

(1)     That the Court issue a permanent injunction prohibiting Talkdesk from misappropriating Genesys trade secrets and from possessing converted Genesys property;

(2)     That Genesys be awarded actual, compensatory, consequential, liquidated, treble, and special damages in an amount to be determined at trial;

(3)     That Genesys be awarded punitive damages;

(4)     That Genesys be awarded attorneys' fees and costs associated with bringing and prosecuting this action;

(5)     That Genesys be awarded prejudgment interest; and

(6)     That Genesys be awarded such other and further relief as this Court deems just and proper.

## SPECIFIC COUNTS AGAINST DEFENDANT DANIELLE MORALES

### Count Thirty-Eight – Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

664.     Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

665.     Genesys developed and maintained substantial trade secrets.

666.     Under DTSA, Morales has a duty not to misappropriate information she knows or has reason to know is trade secret information.

667.     Morales knew or had reason to know that the Genesys confidential and proprietary information she downloaded or otherwise acquired, and then retained after her employment with Genesys ended, was trade secret information.

668.    Morales misappropriated Genesys trade secrets by downloading this information in the weeks leading up to her departure from Genesys and then retaining that information after her employment ended and further disclosing that information to Talkdesk.

669.    Morales further misappropriated Genesys trade secrets by receiving Genesys customer and prospect lists from Douglas Cahhal, by retaining pricing and discount information after her employment ended, and by sending herself confidential emails in the last days of her employment with Genesys, and then further disclosing that information to Talkdesk.

670.    As explained more fully in the facts above, which are incorporated here by reference, the trade secret information misappropriated by Morales includes but is not limited to Genesys pricing and discount information, customer account information and documentation, product information, and sales and marketing information.

671.    Morales' conduct was willful.

672.    As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

673.    Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

674.    Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Morales' illegal conduct.

**Count Thirty-Nine – Indiana Uniform Trade Secrets Act, Ind. Code Ann. § 24-2-3-1 *et seq.***

675.    Genesys repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

676.    Genesys developed and maintained substantial trade secrets.

677.    Under IUTSA, Morales has a duty not to misappropriate information she knows or has reason to know is trade secret information.

678.    Morales knew or had reason to know that the Genesys confidential and proprietary information she downloaded or otherwise acquired, and then retained after her employment with Genesys ended, was trade secret information.

679.    Morales misappropriated Genesys trade secrets by downloading this information in the weeks leading up to her departure from Genesys and then retaining that information after her employment ended and further disclosing that information to Talkdesk.

680.    Morales further misappropriated Genesys trade secrets by receiving Genesys customer and prospect lists from Douglas Cahhal, by retaining pricing and discount information after her employment ended, and by sending herself confidential emails in the last days of her employment with Genesys, and then further disclosing that information to Talkdesk.

681.    As explained more fully in the facts above, which are incorporated here by reference, the trade secret information misappropriated by Morales includes but is not limited to Genesys pricing and discount information, customer account information and documentation, product information, and sales and marketing information.

682.    Morales' conduct was willful.

683.    As explained more fully in the fact sections above, which are incorporated here by reference, Genesys takes reasonable steps to protect the privacy of its trade secrets.

684.    Genesys has suffered harm as a result of the unlawful misappropriation of its trade secrets, including but not limited to lost sales.

685.    Genesys has investigated significant money in attorneys' fees to investigate and seek to stop Morales' illegal conduct.

WHEREFORE, Genesys Telecommunications Laboratories, Inc. prays for judgment against Defendant Danielle Morales and requests the following relief against Morales:

(1) That the Court issue a permanent injunction prohibiting Morales from misappropriating Genesys trade secrets; and

(2) That Genesys be awarded such other and further relief as this Court deems just and proper.

December 1, 2020                                  Respectfully submitted,

                                                 GENESYS TELECOMMUNICATIONS
                                                 LABORATORIES, INC.

                                                 By its Attorneys,

                                                 _/s/ John R. Maley_____
                                                 John R. Maley (14300-89)
                                                 Thomas C. Payne (34727-49)
                                                 BARNES & THORNBURG LLP
                                                 11 South Meridian Street
                                                 Indianapolis, Indiana 46204
                                                 Telephone:    (317) 236-1313
                                                 Email:        jmaley@btlaw.com
                                                 Email:        tpayne@btlaw.com