**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| GENESYS CLOUD SERVICES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Case No. 1:19-CV-695-TWP-DML |
| | ) |
| TALKDESK, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY**
**JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

I.  INTRODUCTION ......................................................................................................... 1

II. STATEMENT OF MATERIAL FACTS IN DISPUTE PRECLUDING GENESYS'S
     MOTION FOR SUMMARY JUDGMENT ................................................................. 2

 A. The Parties Are Competitors In The Call Center As a Service (CCaaS) Industry. ......... 2

 B. Manno, Strahan, and Hertel are Former Genesys Sales Leaders. .................................... 3

 C. Manno and Strahan Execute Employment Agreements That Inure to Genesys. ............. 3

 D. In Summer of 2018 Talkdesk Chairman & CEO Paiva and Genesys' Vice President of
  Sales Ralph Manno Plot Manno's Takeover of Talkdesk's Sales Organization. ............ 4

 E. While Still Employed As A Genesys Vice President Of Sales, Manno Recruits Genesys
  Area Directors Strahan And Hertel To Join Him At Talkdesk. ....................................... 5

 F. While Still Genesys Leaders, Manno, Strahan, and Hertel Served as Talkdesk's
  Recruiters, Using Genesys Personnel Information to Recruit Genesys Employees. ........ 5

 G. While Still Employed As Genesys Sales Leaders, Manno, Strahan, And Hertel
  Undertook Other Activities For Talkdesk's Benefit In Competition With Genesys. ...... 7

 H. Manno Informed Talkdesk's Head Of Talent He Had An Employment Agreement With
  Genesys And Needed To Be "Very Careful" As It Was "Pretty Clear On Doing Work
  For Anyone Else While Employed." .............................................................................. 9

 I. While Still Employed As Genesys Sales Leaders, Manno, Strahan, And Hertel Provided
  Talkdesk With Genesys Confidential Information Used To Compete With Genesys..... 9

 J. While Still Employed As Genesys Sales Leaders, Manno, Strahan, And Hertel
  Conducted Their Talkdesk Activities In Secret. ........................................................... 11

 K. In The Fall Of 2018 Talkdesk Hired Many From Genesys' Mid-Market Sales Team.. 12

 L. After Leaving Genesys, Strahan Provided And Talkdesk Used A Highly Confidential
  Genesys List Of PureCloud Customer Data To Target Genesys Customers................. 13

 M. After This Lawsuit Began, Talkdesk Expands Its Investment In Lead Generation But Is
  Still Unable To Replicate The PureCloud List With Publicly Available Data.............. 14

N.    After Leaving Genesys, Manno And Strahan Provided Talkdesk With Genesys Pricing And Discounting Information That Talkdesk Used To Compete With Genesys. ......... 15

O.    After Leaving Genesys, Manno, Strahan, And Hertel Provided Talkdesk With Additional Genesys Information That Talkdesk Used To Compete With Genesys. ..... 16

P.    Genesys Protects Its Confidential Information. .............................................. 17

Q.    Genesys Suffered Damages As A Result Of Defendants' Wrongdoing....................... 18

III.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE CONFIRMING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ............................................. 19

IV. ARGUMENT AND CITATION OF AUTHORITIES......................................... 22

A.    Claims of Tortious Interference with Contract against Manno and Talkdesk (Counts 1 and 34) ................................................................................................ 22

    1.    Claim of Tortious Interference with Contract against Manno (Count 1)................... 22

    2.    Claim of Tortious Interference with Contract against Talkdesk (Count 34) ............. 23

B.    Claims of Breach of Contract against Manno and Strahan (Counts 2, 3, 4, 5, 6, 7, 14, 18, 19, 20, 21, 22) ....................................................................................... 24

    1.    Claim of Breach of Contract – Non-solicitation of Employees While Still Employed against Manno (Count 2) and Strahan (Count 14)....................................... 24

    2.    Claim of Breach of Contract – Confidentiality against Manno (Count 3) and Strahan (Count 18) ....................................................................................... 27

    3.    Claim of Breach of Contract – Preparing to Compete During Employment against Manno (Count 5) and Strahan (Count 20) .................................................. 27

    4.    Claim of Breach of Contract – Competing During Employment against Manno (Count 4) and Strahan (Count 19)............................................................ 28

    5.    Claim of Breach of Contract – Failure to Surrender Records against Manno (Count 6) and Strahan (Count 21) ....................................................................... 29

    6.    Claims of Breach of Contract – Failure to Devote Substantial Time and Provide Faithful Service (Counts 7 and 22) ............................................................ 30

C.    Claims of Breach of Fiduciary Duty of Loyalty against Manno, Strahan, and Hertel (Counts 8, 15, and 28)................................................................................. 32

    1.    Claim of Breach of Fiduciary Duty of Loyalty against Manno (Count 8)................. 34

   2.   Claim of Breach of Fiduciary Duty of Loyalty against Strahan (Count 15)............... 34

   3.   Claim of Breach of Fiduciary Duty of Loyalty against Hertel (Count 28)................ 35

   D.   Claims of Misappropriation of Trade Secrets under the Defend Trade Secrets Act (Counts 9, 16, 26, and 32) and the Indiana Uniform Trade Secrets Act (Counts 10, 17, 27, and 33) against Manno, Strahan, Hertel, and Talkdesk ........................................... 36

   1.   Claims of Misappropriation of Trade Secrets against Manno (Counts 9 and 10) ...... 38

   2.   Claims of Misappropriation of Trade Secrets against Strahan (Counts 16 and 17).... 47

   3.   Claims of Misappropriation of Trade Secrets against Hertel (Counts 26 and 27)...... 49

   4.   Claims of Misappropriation of Trade Secrets against Talkdesk (Counts 32 and 33) . 51

   E.   Claims of Constructive Fraud against Manno, Strahan, and Hertel (Counts 11, 23, and 29) ......................................................................................................................... 52

   F.   Claims of Conspiracy against Manno, Strahan, Hertel, and Talkdesk (Counts 12, 24, 30, and 36) ................................................................................................................... 55

   G.   Claims of Aiding and Abetting Breach of Fiduciary Duty against Manno, Strahan, Hertel, and Talkdesk (Counts 13, 25, 31, and 37) ........................................ 57

   H.   Claim of Raiding against Talkdesk (Count 35) ........................................................ 58

   V. CONCLUSION ................................................................................................................ 59

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                              <u>Page(s)</u>

*Abrams v. McGuireWoods, LLP*,
    518 B.R. 491 (N.D. Ind. 2014) ......................................................................................58

*Ackerman v. Kimball Int'l, Inc.*,
    634 N.E.2d 778 (Ind. Ct. App. 1994) ...........................................................................41

*Amoco Product. Co. v. Laird*,
    622 N.E.2d 912 (Ind. 1993) .....................................................................................40–41

*Applied Indus. Materials Corp. v. Brantjes*,
    891 F. Supp. 432 (N.D. Ill. 1994) ...........................................................................42, 51

*Bilimoria Computer Sys., LLC v. Am. Online, Inc.*,
    829 N.E.2d 150 (Ind. Ct. App. 2005) ......................................................................23–24

*Buffkin v. Glacier Grp.*,
    997 N.E.2d 1 (Ind. Ct. App. 2013) ...................................................................28, 30–31

*C & S Mgmt., LLC v. Superior Canopy Corp.*,
    No. 1:08-CV-29PS, 2008 WL 5215994 (N.D. Ind. Dec. 12, 2008) ...............52–54, 56–57

*Central Ind. Podiatry, P.C. v. Krueger*,
    882 N.E.2d 723 (Ind. 2008) .....................................................................................27, 30

*Cmty. Ties of Ameria, Inc. v. NDT Care Srvs., LLC*,
    No. 3:12-CV-00429-CRS, 2015 WL 520960 (Feb. 9, 2015) ..........................................44

*Coates v. Heat Wagons, Inc.*,
    942 N.E.2d 905 (Ind. Ct. App. 2011) . .....................................................................27, 29

*Comsys Inc. v. City of Kenosha, Wisconsin*,
    No. 16-CV-655-JPS, 2017 WL 1906750 (E.D. Wis. May 9, 2017)................................45

*Crystal Valley Sales, Inc. v. Anderson*,
    22 N.E.3d 646 (Ind. Ct. App. 2014) .......................................................................56–58

*Darst v. Illinois Farmers Ins. Co.*,
    716 N.E.2d 579 (Ind. Ct. App. 1999) ...........................................................................54

*Deutchland Enterprises, Ltd. v. Burger King Corp.*,
    957 F.2d 449 (7th Cir. 1992) .......................................................................................25

iv

*Economation, Inc. v. Automated Conveyor Sys., Inc.*,
  694 F. Supp. 553 (S.D. Ind. 1988)................................................................36, 45–46, 49–50

*Harrison v. Glucose Sugar Ref. Co.*,
  116 F. 304 (7th Cir. 1902) ........................................................................................25

*Harvest Life Ins. Co. v. Getche*,
  701 N.E. 2d 871 ........................................................................................................38, 40

*Heckler & Koch, Inc. v. German Sport Guns GmbH*,
  No. 111CV01108SEBTAB, 2013 WL 12291720 (S.D. Ind. Sept. 27, 2013) .............58–59

*Heraeus Med., LLC v. Zimmer, Inc.*,
  123 N.E.3d 158 (Ind. Ct. App.) ................................................................................25

*Heraeus Med., LLC v. Zimmer, Inc.*,
  135 N.E.3d 150 (Ind. 2019) ......................................................................................24–25

*Huong Que, Inc. v. Luu*,
  150 Cal. App. 4th 400, 58 Cal. Rptr. 3d 527 (2007) ........................................................35

*IDX Systems Corp. v. Epic Systems Corp.*,
  285 F.3d 581 (7th Cir. 2002) ................................................................................36, 44, 50

*Intertek USA Inc. v. AmSpec, LLC*,
  No. 14 CV 6160, 2014 WL 4477933 (N.D. Ill. Sept. 11, 2014)............................37, 45, 48

*Konecranes, Inc. v. Davis*,
  No. 1:12-CV-01700-JMS, 2013 WL 1566326 (S.D. Ind. Apr. 12, 2013).............22, 24, 59

*Kopka, Landau & Pinkus v. Hansen*,
  874 N.E.2d 1065 (Ind. Ct. App. 2007) ................................................26, 31–32, 34–36, 53

*McGlothen v. Heritage Envtl. Servs., L.L.C.*,
  705 N.E.2d 1069 (Ind. Ct. App. 1999) ........................................................................43

*Metals & Additives Corp. v. Hornedo*,
  No. 49A02–1011–PL–1213, 2011 WL 3211119 (Ind. Ct. App. July 28, 2011) ........37, 40,
  ................................................................................................................................42–44, 48–49

*Mickey's Linen v. Fischer*,
  No. 17-C-2154, 2017 WL 3970593 (N.D. Ill. Sept. 8, 2017)...........................................41

*Miller v. Central Indiana*,
  11 N.E. 3d 944 (Ind. Ct. App. 2014) ...............................................................................55

v

*Morgan Asset Holding Corp. v. CoBank*, ACB,
    736 N.E.2d 1268 (Ind. Ct. App. 2000) ......................................................23–24

*Potts v. Review Bd. Of Indiana*,
    475 N.E.2d 708 (Ind. App. 2005) ...................................................................32

*Seach v. Richards, Dieterle & Co.*,
    439 N.E.2d 208 (Ind. Ct. App. 1982) ......................................................27–30

*Sharvelle v. Magnate*,
    836 N.E.2d 432 (Ind. Ct. App. 2005) ...........................................................28

*Shriner v. Sheehan*,
    773 N.E.2d 833 (Ind. Ct. App. 2002) ...........................................................54

*SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*,
    952 N.E.2d 758 (Ind. Ct. App. 2011) ......................................................28, 32

*Standard Register Co. v. Cleaver*,
    30 F. Supp. 2d 1084 (N.D. Ind. 1998) ...........................................36, 47, 49, 51

*Steenhoven v. College Life Ins. Co. of Amer.*,
    460 N.E. 2d 973 (Ind. Ct. App. 1984). ......................................................40, 42

*The Finish Line, Inc. v. Foot Locker, Inc.*,
    No. 1:04CV877RLYWTL, 2006 WL 146633 (S.D. Ind. Jan. 18, 2006) ........59

*Think Tank Software Dev. Corp. v. Chester, Inc.*,
    30 N.E.3d 738 (Ind. Ct. App. 2015) ..........................................38, 40, 47, 51

*Titus v. Rheitone, Inc.*,
    758 N.E.2d 85 (Ind. Ct. App. 2001) .............................................................41

*U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*,
    826 N.E.2d 49 ...............................................................................................41

*Vukovich v. Coleman*,
    789 N.E.2d 520 (Ind. Ct. App. 2003) ....................................................26, 28–29

*Whyte v. Schlage Lock Co.*,
    101 Cal. App. 4th 1443 (2002) ..................................................36, 46, 49, 51

*Xpert Automation Sys., Corp. v. Vibromatic Co.*, Inc.,
    569 N.E.2d 351 (Ind. Ct. App. 1991) ...........................................................40

STATUTES                                                                        Page(s)

Ind. Code § 24-2-3-1(c) ...........................................................................................57


RULES                                                                           Page(s)

Fed. R. Civ. P. 9(b) ............................................................................52–53, 56–57

Fed. R. Civ. P. 56(a) .................................................................................22

## I.    INTRODUCTION

Over a year-and-a-half ago, this Court expressed its "doubt that the information Genesys seeks to protect as trade secrets is indeed secret and not public." D.I. 199 at 14. The Court likewise held that the non-solicitation provisions at issue in this case were "overbroad and unenforceable under Indiana law." *Id.* at 10. Despite these findings, Genesys has stubbornly maintained and expanded this case, causing Defendants to expend significant time and resources defending Genesys's meritless claims. Genesys is the 5,000+ pound gorilla in the contact-center market, having been a long-standing provider of "on-premise" solutions with a recent emphasis on "cloud" products. DEX252 ¶ 19.[1] Talkdesk, on the other hand, is an "upstart" and growing competitor—who in 2017 drew the ire of Genesys by establishing itself as a Magic Quadrant visionary in the "CCaaS" product category.[2] This case thus appears to be driven by Genesys's desire to prevent Talkdesk from legitimately competing for customers and employees.

Whatever the motive, Defendants ask the Court to put an end to this case. Genesys alleges it was harmed by the departure of roughly fifteen sales employees in 2018. The departure of these at-will employees, however, was not out of the ordinary for Genesys—a company with over 400 sales associates—nor was it caused by any undue solicitation or confidential knowledge by Defendants. Moreover, the fact that fifteen individuals moved from Genesys to Talkdesk in 2018 is a representation of Talkdesk's <u>business growth at that time</u>—not alleged corporate "raiding." It is undisputed that Talkdesk sought to and did hire sales

---

[1] Genesys has sought to morph its brand by recently changing its name from "Genesys Telecommunications Laboratories, Inc." to "Genesys Cloud Services, Inc." *See* D.I. 252.
[2] *See* CX Today, *Look Who Made The North America CCaaS Magic Quadrant for 2017* (Nov. 8, 2017), https://www.cxtoday.com/contact-centre/look-made-north-america-ccaas-magic-quadrant-2017/.

1

employees from many different competitors during the relevant period in 2018. But even if Genesys had been the only company from which Talkdesk hired in 2018 and 2019, Talkdesk's <u>primary purpose</u> was to hire qualified employees—not to "destroy" Genesys's business. For this and the reasons explored below, Defendants request that the Court <u>deny</u> Genesys's motion for summary judgment and <u>grant</u> Defendants' request for the same on all claims.

## II. STATEMENT OF MATERIAL FACTS IN DISPUTE PRECLUDING GENESYS'S MOTION FOR SUMMARY JUDGMENT

Genesys's "Statement of Material Facts" (D.I. 266 at 1–15) comprises alleged facts that are neither material nor relevant to the resolution of this case. Many are not facts at all but assertions or arguments. Nonetheless, Defendants respond to each section of Genesys's alleged grouping of "facts" as follows:

### A. The Parties Are Competitors In The Call Center As a Service (CCaaS) Industry.

Genesys and Talkdesk are two of many competitors in the CCaaS industry. DEX252 ¶ 58. Other major players include Five9, 8x8, Ring Central, and LiveAgent. DEX252 ¶ 61. Genesys is a large established player in this market, with over 11,000 customers and about 5,000 employees. DEX253 at 2; DEX254 at 23:10–13. Despite the trumped-up allegations made by Genesys in this case, Genesys has bragged in industry publications that it has continued to have exploding growth in its cloud products, including Genesys Cloud (formerly PureCloud). DEX253 at 1; DEX255 at 2.

Talkdesk is a relative newcomer to the CCaaS industry. DEX252 ¶ 55. Despite this, it has grown quickly to establish itself as a respected player in the industry—as well as a threat to Genesys. *See* DEX252 ¶¶ 55, 58. The present lawsuit is borne of that competitive threat—not of any improprieties by Defendants.

2

### B.  Manno, Strahan, and Hertel are Former Genesys Sales Leaders.

Manno, Strahan, and Hertel were employees of Interactive Intelligence ("InIn"), a

company acquired by Genesys in 2016.  D.I. 183-6 ¶¶ 1, 3; D.I. 183-8 ¶¶ 1, 4; D.I. 183-5 ¶¶ 1,

3.  Concerned with the culture at Genesys after InIn was acquired, each began exploring

potential opportunities in 2018.  *See* D.I. 183-8 ¶ 18; DEX254 at 138:15–139:5; DEX256 at

16:9–24; DEX257 at 150:11–25.  Defendants dispute that Manno, Strahan, and Hertel used any

"confidential" information.  The fact that some information was at some point of time stored on

Genesys's system does not mean that the information is "confidential."  DEX258 at 17:18–22.

Nor does a conclusory marking on a document.  *See*, *e.g.*, D.I. 182-20 (example of a document

*marked* as confidential but publicly available); *see also* D.I. 199 at 13.

### C.  Manno and Strahan Execute Employment Agreements That Inure to Genesys.

Manno executed an employment agreement with InIn in 2004, and Strahan executed such

an agreement in 2000.  D.I. 183-6 ¶ 1; D.I. 183-8 ¶ 1.  Strahan was told by InIn in 2005 that InIn

did not enforce employment agreements.  D.I. 183-8 ¶ 3.  Neither Manno nor Strahan recall

seeing their InIn agreements again until November 2018, when counsel for Genesys threatened

this lawsuit.  D.I. 183-6 ¶ 1; D.I. 183-8 ¶ 2.  Genesys did not notify either Strahan or Manno that

the InIn agreements existed or inured to Genesys's benefit.  D.I. 183-6 ¶ 3; D.I. 183-8 ¶¶ 2–3;

*see also* DEX254 at 17:11–18:17, 63:9–11.  Indeed, the agreements were only located by

Genesys after the pair of former employees left.  *See* DEX254 at 15:9–16, 16:6–12.  The

agreements were found in a locked room not accessible to Strahan and Manno.  DEX254 at

16:3–5; DEX260 at 22:16–23:2.

**D. In Summer of 2018 Talkdesk Chairman & CEO Paiva and Genesys' Vice President of Sales Ralph Manno Plot Manno's Takeover of Talkdesk's Sales Organization.**

Defendants dispute Genesys's alleged material facts. With an eye toward growing enterprise sales, Talkdesk's recruiting department began contacting potential sales leaders. DEX261 at 24:5, 26:1–12. In 2018, Talkdesk did a deep dive for potential candidates across the CCaaS industry, including those at Genesys and many other organizations. DEX262 at 20:10–12, 22:9–11, 36:11–14; DEX267 at 73:18–74:13. Mr. Manno was contacted to assess his interest around summer 2018. DEX262 at 25:9–12. Determining the opportunity was the right fit for him, Mr. Manno signed an offer letter in August 2018.

Talkdesk's recruiting staff interviewed Mr. Hertel and Mr. Strahan, as well as another potential candidate, Chuck Krogman, who was employed by Five9. *See* DEX262 at 12:20–23; DEX288 at 81:7–82:7. Strahan and Hertel individually decided that the Talkdesk opportunities were the right opportunities for their careers. D.I. 183-6 ¶ 15; D.I. 183-5 ¶ 13; DEX269 at 259:15—260:1; *see* D.I. 183-8 ¶ 13. Mr. Krogman also was offered and ultimately hired by Talkdesk. DEX288 at 81:7–82:7.

Manno, Strahan, and Hertel provided names of possible candidates across the CCaaS industry, whom Talkdesk considered for positions. *See* D.I. 257-7 at 2–3. Talkdesk had prior knowledge of many, if not all, of these potential candidates in the industry based on its recruiting team's investigations. DEX262 at 46:8–12; DEX267 at 66:20–68:4, 73:22–74:13. For example, Morales had been contacted via LinkedIn by Talkdesk prior to Hertel's involvement. DEX267 at 45:21–46:15; DEX270 at 42:16–24.

Talkdesk conducted standard recruiting efforts and decided whether to extend offers to potential candidates. *See* DEX262 at 11:4–11. As part of this process, Talkdesk recruiters

gathered information from the candidates regarding their work performance, salary requirements, and other personnel information. *See id.* at 22:25–23:4. Talkdesk also interviewed many more candidates than it hired. *Id.* at 12:8–19. Talkdesk was not looking for candidates from any specific company but rather wanted to find the best fit. *Id.* at 10:14–18, 12:2–3, 36:11–15.

### E. While Still Employed As A Genesys Vice President Of Sales, Manno Recruits Genesys Area Directors Strahan And Hertel To Join Him At Talkdesk.

Defendants dispute Genesys's alleged material facts. Manno did not "recruit" or "solicit" Strahan and Hertel to join him at Talkdesk. D.I. 183-06 ¶¶ 25–26; DEX268 at 36:10–37:16. He provided information to the individuals from which they could make a decision. D.I. 183-06 ¶ 25. Talkdesk's CEO made the ultimate hiring decisions for Talkdesk during this period. DEX271 at 14:22; DEX288 at 25:21–24. Manno had no authority to offer or hire Strahan or Hertel. *See* DEX271 at 14:22; DEX288 at 25:21–24. He could only recommend that Talkdesk consider the employees for future employment. *See* DEX262 at 44:16–25; DEX288 at 25:21–24.

### F. While Still Genesys Leaders, Manno, Strahan, and Hertel Served as Talkdesk's Recruiters, Using Genesys Personnel Information to Recruit Genesys Employees.

Defendants dispute Genesys's alleged material facts. Manno did not "negotiate[]"Hertel and Strahan's Talkdesk offers. D.I. 183-06 ¶ 25; *see* D.I. 257-3 at 2–4. Manno simply passed along information from Hertel and Strahan regarding their compensation requirements. *See* D.I. 257-3 at 2–4. Manno, Strahan, and Hertel provided names across the CCaaS industry for Talkdesk to consider for employment. *See* D.I. 257-7 at 2–3. Talkdesk already had deep knowledge of potential candidates in the industry based on its recruiting team's investigations.

*See* DEX262 at 22:4–16; DEX267 at 66:20–68:4, 73:22–74:13.  Manno, Strahan, and Hertel had

no authority to make hires on Talkdesk's behalf.  *See* DEX262 at 21:19–24; DEX271 at

14:22.  They did not interview candidates or make final hiring decisions.  *See* DEX262 at 21:19–

24; DEX271 at 14:22; *see* D.I. 257-3 at 2–4.  The hiring decision was solely Talkdesk's.  *See*

DEX262 at 44:21–24.

Additional assertions made by Genesys on pages 4–5 are incorrect and immaterial:

- Doug Cahhal was not solicited by Manno and only became an employee of Talkdesk in 2019 after he was terminated by Genesys.  Cahhal Dep. at 8:20–9:3, 14:17, Feb. 10, 2021.  Krogman was an employee of Five9, which is a competitor to Genesys.  DEX288 at 81:7–82:7, Nov. 5, 2020.  Manno provided LinkedIn profiles for Cahhal and Kuntz from which Talkdesk could assess for itself if it wanted to interview the individuals for any positions.  *See* D.I. 258-5 at 4.  Manno did not recruit Morales, Tews, or Holloway.  DEX268 at 37:10–17, Nov. 15, 2019.

- Strahan likewise did not solicit anyone.  D.I. 183-8 ¶ 18.  He let Holloway know he was leaving; Holloway expressed interest in learning more.  DEX259 at 137:2–12, October 21, 2020.  Strahan thus provided a link to a LinkedIn profile or Holloway to Talkdesk's recruiting team so that Talkdesk could determine if it wanted to hire him.  *See* D.I. 257-4 at 2.  Strahan also provided links for LinkedIn profiles of Tews and Mann from which Talkdesk could assess the candidates.  *See* D.I. 258-31 at 2, 4.  Strahan did not "solicit" Tews or Mann or Sparks.  *See* DEX259 at 114:19–115:8; D.I. 183-8 ¶ 18.  While Strahan also passed information to/from Tews regarding the Talkdesk offer, he did not make the decision to hire Mr. Tews—nor could he have done so.  *See* DEX259 160:1–161:12; *see* D.I. 257-10 at 2; DEX262 at 44:21–24.  Strahan likewise passed along sales engineer's LinkedIn profiles as referrals for Talkdesk's consideration. *See* D.I. 261-2 at 2.

- Hertel spoke to only two Genesys employees (both friends) about his decision to move to Talkdesk prior to leaving Genesys: Morales and Flannery.  D.I. 259-6 at 27:14–19.  Hertel had no hiring authority at Talkdesk.  DEX271 at 14:22.  Morales was not recruited by Hertel; she had been sourced previously by Talkdesk through LinkedIn.  DEX270 at 42:16–24; DEX267 at 45:21–46:15.  Flannery (now Combs) chose not to leave after interviewing with Talkdesk.  DEX256 at 73:15–74:8.  Hertel spoke to other individuals who were not employed by Genesys in August–September 2018.  D.I. 259-6 at 27:20–30:25.  He did not "solicit" them to Talkdesk.  *Id.* at 29:6–9.  His "involvement was giving them to the talent team."  *Id.*  Some of those non-Genesys individuals were eventually hired by Genesys.  *See id.* at 28:5–17.

Candidates offered by Talkdesk in August and September 2018 were interviewed and approved by Talkdesk's recruiting team.  DEX262 at 19:5–21:2, 26:4–13, 44:12–46:15; DEX271 at 14:22; D.I. 259-6 at 29:6–9.  This was an extensive process with which Manno, Strahan, and Hertel had no direct involvement other than providing recommendations for Talkdesk's consideration.  D.I. 259-6 at 29:6–9; DEX262 at 19:5–21:2 ("sourcing team would have engaged on sourcing"), 26:4–13, 44:12–46:15; DEX267 at 31:14–32:25; D.I. 183-8 ¶ 18; D.I. 183-6 ¶¶ 25–26; DEX288 25:21–24.

### G.   While Still Employed As Genesys Sales Leaders, Manno, Strahan, And Hertel Undertook Other Activities For Talkdesk's Benefit In Competition With Genesys.

Defendants dispute Genesys's alleged material facts.  Manno, Strahan, and Hertel each provided notices of separation and cooperated with Genesys leadership in order to close out remaining tasks and smoothly exit the organization.  DEX273 at 169:11, 171:9–172:18, 178:25–179:4, 181:2–184:5, 246:22–24; D.I. 183-8 ¶¶ 13–14; D.I. 183-5 ¶ 13.  Manno, Strahan, and Hertel were not agents of Talkdesk or compensated by Talkdesk during their recruitment.  *See* DEX288 at 58:7–21; *see also* D.I. 257-2 at 4; D.I. 257-21 at 4.  Despite giving notice in mid-September, Manno was requested to stay until the end of the third-quarter—which he did.  DEX273 at 179:14–180:16; D.I. 183-6 ¶ 15.  Manno and Hertel completed their third-quarter activities for Genesys.  D.I. 183-6 ¶ 15; D.I. 183-5 ¶ 13.  Each began working for Talkdesk on October 1st.  *Id.*  Strahan officially became an employee of Talkdesk on September 17th, only after having completed all tasks for Genesys and informing Genesys that he was taking his earned paid two-week leave.  D.I. 183-8 ¶¶ 13–15.  He performed no further work for Genesys during his two-week leave.  *Id.*  He likewise did not speak to any Talkdesk customers or compete with Genesys during his two-week leave.  *Id.*

7

Manno did <u>not</u> have a Talkdesk laptop or access to Talkdesk email while still working for Genesys.  DEX288 at 79:6–19.  Manno, Strahan, and Hertel each signed non-binding offers of intent, which is standard in the industry.  *See* DEX254 at 63:16–18.  Genesys does the same.  *Id.*; *see also* DEX273 at 123:19–124:18.  During Manno's interview process, he provided his thoughts on a high-level structure for the sales organization at Talkdesk.  *See* D.I. 257-29 at 2–3; DEX288 at 58:22–61:11.  He was not compensated for this activity.  *See* DEX288.  Providing this type of information is typical in the recruiting process, especially for a prospective sales leader.  *See* DEX273 at 31:24–32:12.

Neither Manno nor Strahan had any direct involvement in the Bank of Hawaii ("BoH") deal while at Genesys.  DEX268 at 81:19–21; DEX259 at 81:9–20; DEX269 at 244:17–19.  Strahan did not comment on the BOH sales proposal while he was on his two-week leave with Genesys.  D.I. 183-08 ¶ 14; *see* DEX259 at 157:9–21, 164:21–167:21.  Strahan also never attended any in-person meetings with BoH (at any point of time).  *Id.*  He attended a videoconference with BOH as a training exercise, but did not speak or provide any input to Talkdesk or BOH on the videoconference. D.I. 183-8 ¶ 15; DEX259 at 157:9–21.  On Saturday, September 29, 2018—after his two-week leave had ended with Genesys—Strahan provided information readily available in the industry to Talkdesk regarding Talkdesk's approach to BoH.  DEX259 at 164:5–167:21; *see* D.I. 261-5; D.I. 183-8 ¶¶ 21–30.

BOH considered Talkdesk and other CCaaS providers in the 2018 timeframe to replace the system that Genesys sold to BOH in 2016.  DEX269 at 183:6–9, 189:7–12.  BOH decided to stay with Genesys because of the sunk costs it had already put into the system Genesys sold it in 2016.  *See* DEX269 at 201:6–22.  Any reduction in price for the system sold by Genesys in 2018 to BOH was not due to competing offers from Talkdesk or other CCaaS competitors.  *Id.*

8

Instead, any discount was done in order to compensate BoH for the system Genesys sold to BoH in 2016 that did not perform as expected.  *See* DEX269 at 201:6–15, 204:4–18.

### H.  Manno Informed Talkdesk's Head Of Talent He Had An Employment Agreement With Genesys And Needed To Be "Very Careful" As It Was "Pretty Clear On Doing Work For Anyone Else While Employed."

Defendants dispute Genesys's alleged material facts.  Manno was not aware that he had any specific employment agreement with Genesys or that his nearly two-decade-old agreement with InIn applied to him at Genesys.  D.I. 183-6 ¶¶ 1–4.   Manno did not recall any terms of his 2004 agreement with InIn in 2018.  *See* D.I. 183-6 ¶¶ 1–4.  Manno never provided any employment agreement to Talkdesk.  DEX262 at 13:12–14:1; DEX263 ¶¶ 3–4.  Manno's passing reference to an "employment agreement" in an email in June 2018 was based on his general understanding that he could not "work for anyone else while employed" by Genesys.  *Id.* ¶¶ 5–6. Manno was not aware of any written employment agreement or applicable restrictive covenants. *Id.* ¶¶ 4–6; *see also* D.I. 258-29 at 2.  Likewise, Strahan did not provide any employment agreement to Talkdesk.  D.I. 183-08 ¶¶ 2–3; DEX259 at 83:8–85:10; DEX262 at 13:12–14:1. Strahan was not aware that his 2000 InIn agreement applied to his employment with Genesys, and he did not have a copy of the agreement in 2018.  D.I. 183-08 ¶¶ 2–3.

Genesys never told Manno or Strahan that their prior employment agreements applied at Genesys.  DEX254 at 18:7–17.  Genesys instead purposefully stored that agreement in a locked room inaccessible to Manno and Strahan.  *Id.* at 15:17–16:5.  Genesys did not provide the agreements at issue in this case until after Manno and Strahan ended their employment with Genesys.  *Id.* at 15:9–16, 16:6–12, 16:19–4.

### I.  While Still Employed As Genesys Sales Leaders, Manno, Strahan, And Hertel Provided Talkdesk With Genesys Confidential Information Used To Compete With Genesys.

Defendants dispute Genesys's alleged material facts.  Genesys's Senior Vice President of Sales and Field Operations for North America admits that just because a Genesys document has the terms "confidential" or "internal use only" markings on it does not mean that the information has not been provided to the industry.  DEX273 at 66:22–70:8; DEX274.  Storing information on the Genesys system likewise does not make it "confidential."  DEX292 at 17:18–22

Genesys touts Uber as a customer, and Uber employees have spoken at Genesys industry events about why Uber chose Genesys over Genesys's competitors.  DEX273 at 43:16–45:8, 125:14–128:4 (Uber spoke at a public facing event); DEX275.  Uber is free to share any details about its relationship with Genesys, including its contract terms, with anyone it sees fit.  *See* DEX273 at 125:14–128:4, 132:15–23.  Talkdesk had also competed with Twilio (with whom Genesys competed for the Uber deal) and was aware that certain technology was helpful when competing against Twilio.  DEX271 at 60:24–61:11; *see* D.I. 258-21 at 2.

Talkdesk started discussions with BoH in March 2018.  DEX264.  BoH provided information to Talkdesk throughout the sales cycle in an effort to get the best possible deal.  *See* DEX271 at 38:23–39:1, 62:22–63:5.  The information provided by Hertel on September 11, 2018 was available to Talkdesk directly from BoH.  *See* DEX265; DEX266; DEX271 at 38:18–39:1, 53:3–19, 62:4–63:5 ("Teik was sharing all this information with me").  There is no evidence that Talkdesk did anything with the readily ascertainable information that Hertel provided to Talkdesk on September 11, 2018.  *See* DEX271 at 62:19–63:5.  Further, while Genesys and BoH entered into a BoH-written non-disclosure in 2016 relating to the preceding sales cycle, there is no evidence that the 2016 NDA applied to the new 2018 sales cycle.  *See* D.I. 168-02 at 134–35.  Indeed, BOH was forthcoming with information to get the best deal from the CCaaS vendors that it was considering in 2018.  *See id.* at 38:23–39:1, 62:22–63:5; DEX269 at 192:12–21.

**J.   While Still Employed As Genesys Sales Leaders, Manno, Strahan, And Hertel Conducted Their Talkdesk Activities In Secret.**

Defendants dispute Genesys's alleged material facts.  Manno, Strahan, and Hertel were under no obligation to provide information about their (or other's) future job ambitions to Genesys.  *See* DEX288 at 149:15–18.  Manno, Strahan, and Hertel each provided timely notice and sought to leave Genesys under good terms.  DEX273 at 169:11, 171:9–172:18, 178:25–179:4, 181:2–184:5, 246:22–24; D.I. 183-8 ¶¶ 13–14; D.I. 183-5 ¶ 13.  Following notice to Genesys, Genesys human resources did <u>not</u> ask where the employees would be employed next. DEX254 at 56:11–57:2.  Instead, Genesys was only interested in retaining the employees long enough to close out the third quarter, and accordingly requested that the employees remain employed with Genesys through the end of September.  DEX273 at 171:9–172:18; DEX288 at 158:1–2.  Manno and Hertel both worked diligently to close out the third quarter.  DEX273 at 180:17–184:5.  Genesys did not care where these employees would be employed following their departure from Genesys.  *See* DEX254 57:16–25.  As stated by Genesys's North American Human Resources professional, she did not ask sale employees for this information because it was "irrelevant."  *Id.*

Strahan resigned from Genesys on September 14, 2018 and took his two-weeks paid time off that he was entitled based on his 18-years of service with InIn/Genesys.  D.I. 183-08 ¶ 13. Strahan assigned his responsibilities to others within Genesys and turned in his Genesys equipment.  *See id.* ¶¶ 13–14; DEX259 at 102:20–103:10.  He did not interface with any Genesys customers after this point of time.  D.I. 183-08 ¶¶ 13–14; DEX259 102:25–103:4.

### K.  In The Fall Of 2018 Talkdesk Hired Many From Genesys' Mid-Market Sales Team.

Defendants dispute Genesys's alleged material facts.  Employees in the CCaaS industry move around relatively frequently to other companies within the industry.  *See* DEX262 at 36:11–13; DEX254 at 40:15–23.  Genesys itself routinely hires employees from its industry competitors.  DEX254 at 40:20–23.  Genesys also routinely loses sales employees to other jobs. *Id.* at 55:22–56:3.  The year 2018 was not an unusual year in terms of total number of employees who decided to leave their employment from Genesys.  *See id.* at 30:5–23.  Genesys does not track where those employees end up working.  *See id.* at 56:8–57:25.

Genesys is a legacy competitor in the CCaaS space with over 5,000 employees.  *Id.* at 23:10–13; DEX273 at 33:1–6 ("north of over 6,000 employees").  In 2018, Genesys had over 400 North American sales professionals.  DEX254 32:19–22; DEX273 at 10:8–17.  Between 30 to 40 of those worked specifically for the mid-market sales team that Genesys accuses of being "raided" in this case.  DEX254 33:23–34:2.

In 2018, Talkdesk was a relatively small company, but growing rapidly.  EX252 ¶ 55; DEX267 at 16:3–9.  This success was propelled, at least in part, by Talkdesk' recognition in the marketplace as a visionary leader in the Gartner Magic Quadrant in 2017. Talkdesk did not use headhunters, but instead had a dedicated recruiting team for sourcing, interviewing, and hiring potential candidates.  *See* DEX262 at 20:25–21:2.  The Talkdesk recruiting team was well aware in 2018 of its competitor employees through sources such as LinkedIn.  *See id.* at 43:25–44:7; DEX267 at 73:18–74:13.

In November 2018, Talkdesk announced that it had made 53 industry hires in 2018— twenty (20) from Genesys; seventeen (17) from NICE-InContact; four (4) from Five9; four (4)

from 8x8; and eight (8) other hires from competitors.  DEX289.  Of the fifteen former Genesys employees hired by Talkdesk from September 2018 to February 2019, only nine of those employees worked for the North American mid-market sales team at Genesys.  DEX290; DEX286 at 21:5-22.  Only five of the fifteen employees hired between September 2018 to February 2019 remain currently employed by Talkdesk. DEX290.  Hertel and Strahan are not currently employed by Talkdesk.  *Id.*

> **L.  After Leaving Genesys, Strahan Provided And Talkdesk Used A Highly Confidential Genesys List Of PureCloud Customer Data To Target Genesys Customers.**

Defendants dispute Genesys's alleged material facts.  The identity of Genesys's customers is readily ascertainable from the Genesys's own public materials, the customer's themselves, or through third-party sources.  DEX252 ¶¶ 21, 25, 29, 52, 54.  Genesys's "PureCloud Customer Data" was a snapshot of PureCloud customers as of sometime in 2018, which includes only customer names, initial contract dates, and seat counts.  *See* D.I. 257-28 at 3–25.  It does <u>not</u> contain any customer contacts, pricing information, or agreement length.  *Id.*  The list was widely circulated within Genesys, and Genesys does not know who created it or to whom it was distributed within Genesys.  DEX280 at 5–6.  The list does not contain confidentiality markings.  DEX286 at 65:19–23; *see* D.I. 257-28 at 3–25.  The 2018 list does not contain renewal dates; thus, someone looking at the list cannot determine when the contract will renew or whether it has already expired.  *See* DEX273 at 131:17–134:22; DEX276 at 18:2–19:9.  Indeed, there are customers on the list that are no longer Genesys customers.  DEX273 at 134:20–24; DEX276 at 13:7–14:6.

Genesys touts its customers on its website, including why the customer chose Genesys, the number of agents the customer has, and details regarding the Genesys product architecture.

DEX252 ¶¶ 25–26, 52. Genesys invites its customers to share their experience with the public on its website and at industry events. DEX273 at 80:9–82:20 (discussing Ticketmaster customer story), 43:16–45:8, 125:14–128:4 (Uber customer presenting); DEX275; DEX281; DEX252 ¶¶ 25–30. Customer information is ubiquitous in the CCaaS industry. DEX252 ¶ 25; *see also* D.I. 199 at 13.

There is no evidence that Talkdesk utilized the list or "'uploaded' it to the Talkdesk CRM database. DEX282 ¶ 10. Indeed, Talkdesk's CRM software has a name entry within the system for less than 12% of the customers on the PureCloud list. *Id.* Of those, the vast majority were added to the Talkdesk system <u>before</u> October 2018. *Id.* Moreover, despite years of extensive and burdensome discovery, Genesys cites to no evidence that any information on the list was ever used to approach a single Genesys customer. Nor does Genesys attempt to identify a *single customer* from the list that has moved from Genesys to Talkdesk. This is not surprising. Only two of the customers on the list have ever been Talkdesk customers—and Talkdesk's relationship with each such customer <u>predates</u> the 2018 list. *Id.* ¶ 11.

### M. After This Lawsuit Began, Talkdesk Expands Its Investment In Lead Generation But Is Still Unable To Replicate The PureCloud List With Publicly Available Data.

Defendants dispute Genesys's alleged material facts. Talkdesk has never attempted to "replicate" the 2018 PureCloud list. Indeed, Talkdesk's lead generation program is focused on identifying and marketing to viable potential leads—not leads who are currently committed to other competitors. *Id.* ¶ 5. Talkdesk has run general reports of Genesys customers from its third-party databases. *Id.* Alamgir ran a promotional search in late 2019 on one of the software platforms sourced by Talkdesk. *Id.* ¶ 6. This was not an attempt to "replicate" anything but was simply a rudimentary search to gather contact information for a marketing promotion. *Id.* The

search was limited to larger customers in certain regions and resulted in information for over 250 Genesys PureCloud customers.  *Id.*; *see* D.I. 261-33 at 2–5.  Another basic search from another database provided customer names, contact information, enterprise size, and other specific information for over 3,400 Genesys customers.  DEX282 ¶ 5; DEX283; DEX284.  From enterprise size, a salesperson can readily ascertain the agent size ("seat count") of the organization. *See* DEX273 at 111:16–112:19.

Salaries and marketing budgets for Talkdesk's demand-generation team are directed to marketing efforts toward potential, viable customers; identifying competitor's customers is not a focus of the team's efforts.  DEX282 ¶¶ 7–8.  Further, the commercial software from which detailed information regarding over 3,400 Genesys customers can be accessed is a fraction of Genesys's demand-generation software budget.  *Id.* ¶¶ 5–6.  And beyond such software, it is undisputed that customer information can be gathered from many readily available sources. DEX252 ¶¶ 25–30, 52–54; *see also* D.I. 199 at 12–13.

### N.  After Leaving Genesys, Manno And Strahan Provided Talkdesk With Genesys Pricing And Discounting Information That Talkdesk Used To Compete With Genesys.

Defendants dispute Genesys's alleged material facts.  Discounting policies are generally known and available in the industry.  DEX252 ¶¶ 21, 29, 51; *see also* DEX256 at 117:4–10.  It is not unusual for a potential customer to disclose offers among competitors to seek a better deal. DEX256 at 117:4-10.  While Manno was not aware of a specific discount policy at Genesys, he knew generally that Genesys publicly offered a free month, which equated to an approximate percentage discount.  *See* D.I. 257-17 at 2.  Genesys advertises its pricing publicly, including its free month and trial offers.  DEX252 ¶¶ 21, 29; DEX259 45:25–46:4; DEX278; DEX279. Genesys does not provide specific training to alert its sales employees as to what specific type of

15

technical or pricing information, if any, is "confidential."  *See* DEX273 at 57:15–58:7 (not sure if

employees know what information is confidential); DEX254 at 79:14–80:9, 82:4–83:12;

DEX286 at 119:2–120:8.

Any competitor in the industry could gain insight into Genesys's discounting policies

based on experience competing for business.  DEX252 ¶ 51.  Information as to specific discounts

is provided to customers, who then use that information to secure the best deal.  *Id.* ¶ 29;

DEX256 at 117:4-10.  BoH provided discount information to Talkdesk in order to get the best

deal.  *See* DEX265; DEX266; DEX271 at 38:18–39:1, 53:3–19, 62:4–63:5 ("Teik was sharing all

this information with me"); *see also* D.I. 261-6 at 1.  Strahan did not work on the BoH deal while

at Genesys and was not aware of any specific terms of that deal.  *See* DEX259 at 81:13–17.

### O. After Leaving Genesys, Manno, Strahan, And Hertel Provided Talkdesk With Additional Genesys Information That Talkdesk Used To Compete With Genesys.

Defendants dispute Genesys's alleged material facts.  Genesys's predecessor company,

InIn, provided public disclosure of its finances and customers.  DEX273 at 114:23–118:22.

Sales employees, in presentations in 2015 or 2016, provided public disclosure of Genesys and

Interactive Intelligence customers and financial information.  *See id.* at 117:23–119:25; DEX85.

Genesys provides a "comfort letter" to prospective customers.  DEX276 at 33:21–34:24.

"Comfort letters" are not unique to Genesys.  DEX276 at 35:19–36:25.  Genesys finds value in

the letters because they are *shared* with prospective customers to comfort them regarding

Genesys's financial condition.  *Id.* at 34:5–24.  Genesys enters NDAs only in limited

circumstances.  DEX286 at 150:20–151:10 ("40 to 50 percent of the opportunities"), 155:6–14.

Talkdesk did not use any of Geneys's information from the Genesys "comfort letter"; Manno

16

only provided a copy of the letter as an example of other such letters in the industry that are provided to prospective customers.  *See id* at 35:9–38:15; D.I. 257-16 at 3.

Hertel downloaded his Genesys .pst email file to ensure he was paid commission.  *See* D.I. 183-05 ¶ 16.  The downloaded .pst file was not used by Hertel or Talkdesk.  *See id.* ¶ 17. The .pst file was gathered and isolated by an independent third-party forensic data expert in 2019 (overseen by Genesys and Talkdesk).  *Id.* ¶¶ 18–19.

NPS data is information that comes from customers.  DEX252 ¶ 66.  This type of data is readily available in the CCaaS industry from websites and third-party sources.  DEX252 ¶¶ 66–69; *see* D.I. 182-13 at 2; D.I. 182-14 at 2–3.  NPS information becomes outdated quickly and is re-collected from customers on an annual basis.  DEX252 ¶ 68; DEX276 at 22:21–23:17; DEX273 at 98:20–101:23.  The NPS data at issue in this case is from 2017 and is outdated. DEX273 at 98:20–101:23.  Further, there is no evidence that the NPS data at issue in this case was ever seen or used by anyone at Talkdesk for any purpose.  DEX276 at 24:6-21; DEX271 at 81:3–82:1.

### P.  Genesys Protects Its Confidential Information.

Defendants dispute Genesys's alleged material facts.  The storage of information on Genesys's system does not make it "confidential" or "trade secret."  DEX258 at 17:18–22. Genesys publicizes its pricing, customers, architecture, and discounting (*e.g.*, free month) on its website.  DEX252 ¶ 20; DEX259 at 45:25–46:4; D.I. 182-4; D.I. 182-6.  Genesys does not prohibit its employees from sharing their own personnel information.  DEX260 at 18:4–21, 19:7–12.  Indeed, Genesys does not know what type of information its employees provide to prospective employers via their resume or LinkedIn profiles or during interviews.  *Id.* at 18:22–19:12.

Genesys provides no separate training for its sales employees describing what information is considered as "confidential" or "trade secret." DEX254 at 79:14–80:9, 82:4–83:12, 89:9–90:7.  Genesys enters into NDAs with less than 50% of prospective customers.  DEX286 at 150:20–151:10.  Genesys provides pricing and discounts to most customers without NDAs in place.  DEX273 at 71:8–72:3.  Genesys publicizes its pricing information online, and discounting practices are generally known in the industry.  DEX252 ¶¶ 49–51; *see also* DEX269 at 249:14–251:17.

## Q. Genesys Suffered Damages As A Result Of Defendants' Wrongdoing.

Defendants dispute Genesys's alleged material facts.  The turnover at Genesys in 2018 was not abnormal from other years.  *See* DEX254 at 27:24–28:15, 28:24–30:22.  Genesys has a 15-person, full-time internal recruiting team in place that handles finding replacement employees.  *Id.* at 30:23–31:18.  Genesys's recruiting team replaced Manno, Strahan, and Hertel with experienced employees within Genesys.  DEX286 at 53:3–57:12.  Genesys leadership "half expected" Hertel to leave and had candidates in mind to replace him.  DEX287.  Genesys was considering terminating Strahan.  DEX273 at 169:22–170:21; DEX268 at 36:10–19.  Others feared being terminated, and Cahhal was not employed by Genesys when was hired by Talkdesk.  DEX269 at 258:17–259:5; DEX272 at 14:1–15:1.

Most employees who left Genesys were replaced with experienced Genesys employees.  DEX286 at 53:3—57:12.  Genesys also re-assigned prospective customers to new sales associates when others left in 2018.  *Id.* at 159:12–160:2.  All but two of those who left Genesys had not made "numbers" the prior year.  *See* DEX289 at 2.  Indeed, Genesys has seen increasing sales since the employees alleged to have been "raided" in this case left its employment.  *Id.* at 121:1–122:23, 161:18–162:16; DEX253; DEX291.

18

Besides PowerSchool, Genesys does not point to a single customer it alleges it has lost due to the alleged wrongdoings in this case. *See* DEX286 at 157:11–158:16. Genesys's assertion that "confidential" information was used by Talkdesk to win the PowerSchool deal is based solely on a sales employee's assumption (*i.e.*, "educated guess"). DEX269 at 216:5–217:9. In contrast, the master agent working the deal testified that PowerSchool chose Talkdesk because they offered the better product—not because of any alleged misappropriation of information. DEX292 at 27:23–30:18, 33:4–8. Hertel had no involvement in the PowerSchool deal aside from attending a single lunch meeting where he did not provide any confidential information to PowerSchool. D.I. 183-05 ¶¶ 22–23.

BoH was retained by Genesys as a customer in 2018. DEX269 at 192:22–193:18, 199:9–201:22. Genesys did not change any terms of its deal with BoH based on competition with Talkdesk. *Id*.

### III.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE CONFIRMING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The following undisputed facts are material and resolve this case in favor of Defendants:

- **Material Undisputed Fact ("MSF") #1:** Talkdesk recruited sales employees from across the CCaaS industry in 2018, hiring employees from NICE-InContact, 8x8, Five9, and other competitors. DEX262 at 20:10–12, 22:9–11, 36:11–15; DEX289; DEX273 at 224:14–225:4; *see also* D.I. 257-7 at 2–3.

- **MSF #2:** Talkdesk already had deep knowledge of potential candidates in the industry in early 2018 based on its recruiting team's internal investigations. *See* DEX262 22:4–16; DEX267 at 66:20–68:4, 73:22–74:13.

- **MSF #3:** Genesys's annual employee turnover for North American sales associates in 2018 was not different from other years. DEX254 at 27:24–28:15, 28:24–30:22.

- **MSF #4:** Genesys has a fully-staffed internal recruiting team that handled interviewing and finding replacements for its North American sales team in 2018. *Id.* at 30:23–31:18.

- **MSF #5:** Genesys hires from competitors, as do other companies within the CCaaS industry.  DEX273 at 220:4–25; DEX289.

- **MSF #6:** The majority of the employees who left Genesys in 2018 to work for Talkdesk were replaced with experienced Genesys employees. DEX286 at 53:3–57:12.

- **MSF #7:**  Genesys re-assigned customer leads to other Genesys sales employees upon the departure of employees from Genesys in 2018.  *Id.* at 159:12–160:2.

- **MSF #8:** Manno, Strahan, and Hertel were not paid by Talkdesk for any activities prior to beginning work with Talkdesk. *See* DEX288 at 58:7–21; *see also* D.I. 257-2 at 4; D.I. 257-21 at 4.

- **MSF #9:** Manno, Strahan, and Hertel did not have hiring authority prior to being employed by Talkdesk.  *See* DEX271 at 14:22.

- **MSF #10:** The Talkdesk internal recruiting team vetted and decided on who it would make offers to in 2018, and such offers had to be approved by Talkdesk's CEO.  *See id.*; DEX262 at 19:5–21:2, 26:4–13, 44:12–46:15; DEX267 at 31:14–32:25; D.I. 183-8 ¶ 18; D.I. 183-6 ¶¶ 25–26; D.I. 259-6 at 29:6–9; DEX271 at 18:6–14.

- **MSF #11:** BoH provided Talkdesk information about Genesys's proposed services and pricing in 2018. *See* DEX265; DEX266; DEX271 at 38:18–39:1, 53:3–19, 62:4–63:5; *see also* D.I. 261-6 at 2.

- **MSF #12:** Genesys did not alter its pricing for BoH based on any competition from Talkdesk; the pricing in the 2018 proposal was discounted because of the prior product sold to BoH in 2016.  DEX269 at 193:12–194:4, 200:18–201:9.

- **MSF #13:** Manno, Strahan, and Hertel did not have a copy of their InIn agreements to provide to Talkdesk when they were recruited by Talkdesk.  *See* D.I. 183-05 ¶ 1; D.I. 183-06 ¶¶ 1–4; D.I. 183-08 ¶¶ 2–3.

- **MSF #14:** Manno, Strahan, and Hertel did not know the terms of their prior InIn agreements or that they applied to their employment with Genesys.  D.I. 183-05 ¶¶ 1, 7; D.I. 183-06 ¶ 2; D.I. 183-08 ¶¶ 2–3.

- **MSF #15:** Genesys kept the old InIn agreements in a locked room inaccessible to Hertel, Manno, and Strahan.  DEX254 at 16:3–5, Feb. 4, 2021; DEX260 at 22:16–23:2.

- **MSF #16:** Genesys did not notify either Strahan or Manno that the InIn agreements existed or inured to Genesys's benefit.  D.I. 186-06 ¶ 3; D.I. 186-08 ¶¶ 2–3; *see also* DEX254 at 17:11–18:17, 63:9–11, Feb. 4, 2021.

- **MSF #17:** Manno, Strahan, and Hertel were never asked by human resources at Genesys where they were going to be employed after leaving Genesys. DEX254 56:11–57:2.

- **MSF #18:** Genesys touts information about its customers and products on its website, in prospective customer pitches, and at industry events to promote and encourage other customers to utilize its products.  DEX252 ¶¶ 25–31; DEX273 at 80:13–82:20; DEX293.

- **MSF #19:** Genesys's customer stories provide detailed information about Genesys's customers, when they became a customer, and the customer's seat count/size.  DEX252 ¶ 25; DEX273 at 80:9–82:20 (discussing Ticketmaster customer story); DEX293.

- **MSF #20:** Information in the contact center industry is public with abundant trade publications and product literature available to the public.  D.I. 199 at 13; DEX252 ¶¶ 21–27.

- **MSF #21:** Genesys' cloud architecture and infrastructure are known in the contact center industry and are available to the public on Genesys' website.  D.I. 182-6; D.I. 182-7; D.I. 182-8 to 182-12; D.I. 182-16; D.I. 182-19; D.I. 199 at 13; DEX252 ¶¶ 21–24, 42–45; DEX277.

- **MSF #22:** Genesys does <u>not</u> enter NDAs with all of its customers; it enters them in limited circumstances.  DEX286 at 150:20–151:10 ("40 to 50 percent of the opportunities").

- **MSF #23:**  Genesys routinely provides prospective customers price and proposed discount information when the prospective customer is <u>not</u> under an NDA.  DEX273 at 71:8–72:3.

- **MSF #24:** Prospective customers do <u>not</u> choose between competitors solely based on price.  DEX269 at 181:9–12.

- **MSF #25:** Genesys's customers are free to provide information about their relationship with Genesys to anyone in the industry.  DEX273 at 43:16–45:8, 80:9–82:20, 125:14–128:4, 132:15–23; DEX275; *see* D.I. 182-8 to 182-12.

- **MSF #26:** Genesys' pricing and outage information is available on its website. D.I. 199 at 13; DEX252 ¶¶ 45, 49–51; D.I. 182-4; D.I. 182-6; DEX259 at 45:21–46:12.

- **MSF #27:** Genesys has offered a free month "discount" on its website.  DEX273 at 104:12–19; DEX278; DEX279; DEX259 at 45:21–46:12.

- **MSF #28:** General discounting rates for CCaaS competitors are known in the industry. *See* DEX259 at 45:25–46:4, Oct. 21, 2020; DEX252 ¶¶ 49–51; DEX269 at 249:14–251:17.

- **MSF #29:** Genesys customers have published reviews online discussing Genesys' products, architecture, pricing, and outages.  D.I. 199 at 13; *see* D.I. 182-8 to 182-12; DEX252 ¶¶ 27–30, 53.

- **MSF #30:** Documents detailing information on Genesys's product architecture, buyer personas, roadmaps, and positioning and messaging is available for public download online.  D.I. 199 at 13; D.I. 182-20; DEX294; DEX295.

- **MSF #31:** InIn distributed information regarding the PureCloud architecture to the public in a 2015 white paper.  D.I. 182-16; D.I. 199 at 13.  This document included sections on Genesys's use of AWS, overall architecture, reliability, scalability, onboarding, and technical features of PureCloud.  D.I. 182-16.

- **MSF #32:**  Genesys has publicly touted increased sales in the mid-market division and for cloud products since the employees departed in 2018.  DEX286 at 121:1–122:23, 161:18–162:16, Feb. 16, 2021; DEX253; DEX291.

## IV.   ARGUMENT AND CITATION OF AUTHORITIES

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Genesys has not shown that it is entitled to summary judgment.  In contrast, as set forth herein, Defendants are entitled to summary judgment on all claims.

### A.   Claims of Tortious Interference with Contract against Manno and Talkdesk (Counts 1 and 34)

Tortious interference requires knowledge of an enforceable contract and intentional conduct to cause the breach without justification.  *See Konecranes, Inc. v. Davis*, No. 1:12-CV-01700-JMS, 2013 WL 1566326, at *2 (S.D. Ind. Apr. 12, 2013).  Because Genesys cannot prove these elements, Genesys's interference claims fail as a matter of law.

#### 1.   Claim of Tortious Interference with Contract against Manno (Count 1)

Genesys bases its claim of tortious interference as to Manno on alleged knowledge of Strahan's employment agreement (D.I. 266 at 40).[3]  However, there is no evidence that Manno

---

[3] Genesys does not plead breach of contract in this case by anyone other than Strahan and Manno.  Thus, any claims of tortious interference as to Hertel or other former Genesys employees necessarily fail.

22

knew of any enforceable provisions of the InIn agreement asserted against Strahan in this case. *See* MSF #14.[4]  Indeed, evidence shows that Strahan himself was not aware of the terms of the InIn agreement—or that the agreement still applied during his time at Genesys.  MSF #13–16. Accordingly, even if Strahan breached his InIn agreement (which he did not, as explored in Section IV.B below), it is factually impossible that Manno could have intentionally encouraged Strahan to violate provisions of an agreement unknown to both of them.  *See id*.

Genesys further does not attempt to support that Manno's actions as to Strahan were directed "exclusively to the injury and damage of another," as required under Indiana case law. *See Bilimoria Computer Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156–57 (Ind. Ct. App. 2005); *Morgan Asset Holding Corp. v. CoBank*, ACB, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000) (collecting cases).  Indeed, Manno did not "commandeer" Strahan to do anything, there is no evidence that Manno provided information to Strahan based on any desire to "damage" Genesys, and Strahan's actions were of his own volition.  *See* DEX263 ¶ 25.

## 2.      Claim of Tortious Interference with Contract against Talkdesk (Count 34)

Genesys likewise cannot show tortious interference as to Talkdesk.  Talkdesk was not aware of Manno's and Strahan's agreements, nor could it have been aware of any specific provisions of such agreements asserted in this case.  *See* MSF #14–16.  This confirms that the required "knowledge" condition for tortious interference is not met.

Moreover, Genesys cannot prove Talkdesk "acted intentionally, without a legitimate business purpose" or "malicious and exclusively directed to the injury and damage of another."

---

[4] Citations to "MSF" throughout Section IV are to the undisputed material facts outlined in Section III.

*Bilimoria Computer Sys.*, 829 N.E.2d at 156–57.  Talkdesk is a competitor of Genesys who in 2018 was investing in talent from across the industry.  MSF #1; D.I. 266 at 1.  Hiring to compete provides substantial justification under the law.  *See, e.g.*, *Konecranes*, 2013 WL 1566326, at *3.  Indeed, that Talkdesk was motivated by its growing business needs—not "exclusively directed to the injury and damage" of Genesys—is determinative.  *Id.*; *Morgan Asset Holding Corp*, 736 N.E.2d at 1272 (collecting cases).

**B.    Claims of Breach of Contract against Manno and Strahan (Counts 2, 3, 4, 5, 6, 7, 14, 18, 19, 20, 21, 22)**

Genesys pleads twelve (12) grounds of breach of contract as to Manno and Strahan.  Each claim fails as a matter of law and should be dismissed.

**1.    Claim of Breach of Contract – Non-solicitation of Employees While Still Employed against Manno (Count 2) and Strahan (Count 14)**

Genesys's non-solicitation of employees claims were resolved <u>*over a year-and-a-half ago*</u> by this Court in view of binding Indiana Supreme Court precedent.  D.I. 199 at 10 ("The contracts … similarly contain language … which has been held to be overbroad and unenforceable under Indiana law.").  No subsequent decision has overturned that binding precedent, and there is no basis to do so here.  The Manno and Strahan non-solicitation covenants remain overbroad <u>because they apply to all employees</u>.  *See Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 153 (Ind. 2019) ("[N]onsolicitation covenant is overbroad ***because it applies to all Zimmer employees***.") (emphasis added).  And the Indiana Supreme Court has made clear that this type of overbreadth (extending to any employees) "cannot be blue-penciled" in a way that would render the provision reasonable under Indiana law.  *Id*.

Despite this, Genesys asks this Court to "blue-pencil" the provisions to apply to only "pre-employment" activity.  D.I. 266 at 17 n.4.  However, doing so would leave the offending

24

"any employee" language in the case—ignoring the very reason the Indiana Supreme Court held

the restrictions to be overbroad.  Further, Genesys's passing argument that restrictions during

employment have been found to be "more reasonable" is irrelevant.[5]  The court in *Heraeus* found

the "all employee" language to be problematic *because* it prohibited the freedom of movement of

any employees of the plaintiff without limiting to a legitimate protectable interest.  *Heraeus*, 135

N.E.3d at 153; *see also Heraeus Med., LLC v. Zimmer, Inc.*, 123 N.E.3d 158, 167 (Ind. Ct.

App.), *transfer granted*, *opinion vacated*, 132 N.E.3d 382 (Ind. 2019), and *opinion aff'd in part,*

*vacated in part*, 135 N.E.3d 150 (Ind. 2019) (balancing "the interests of the individual employees

in being able to compete freely in the employment marketplace.").  That problem would remain

in Genesys's proposed work-around—and Genesys does not attempt to address the applicable

balance of interests.[6]  Because *Heraeus* remains the law, this Court should affirm its December

---

[5] Genesys cites inapposite and non-precedential cases.  None of the cases cited involved "nonsolicitation provisions" or the specific policy considerations present in *Heraeus* (*i.e.*, the presence of language extending to "all employees").  *Harrison*, applying Illinois law, involved whether a non-compete expressly "limited to the period of service engaged for" was overbroad because it did not have a geographical limitation; it did not involve the public policy consideration at issue in *Heraeus* (*i.e.*, other employee's mobility).  *Harrison v. Glucose Sugar Ref. Co.*, 116 F. 304, 310 (7th Cir. 1902).  *Deutchland* dealt with a Wisconsin franchise restriction that was expressly differentiated from those restrictions "which apply to employees during their employment and after their employment has terminated" because it applied "only during the term of the agreement." *Deutchland Enterprises, Ltd. v. Burger King Corp.*, 957 F.2d 449, 452 (7th Cir. 1992).  Thus, these cases dealt with other states' laws on different facts and without regard to the specific policy considerations addressed by the Indiana Court of Appeals and Indiana Supreme Court in *Heraeus*.

[6] The provision at issue in *Heraeus* also prohibited solicitation during employment.  *See Heraeus*, 123 N.E.3d at 162.  The Indiana Supreme Court nonetheless found the provision as a whole unenforceable because of the broad restriction on employee movement.

2019 decision and hold the non-solicitation restrictions that extend to "any employees" unenforceable.[7]

Separately, even if this Court were to "blue-pencil" the provisions, the activity accused of Manno and Strahan does not rise to the level of "solicitation."  Talkdesk undertook an industry-wide search for new sales employees in 2018 and vetted each prospective employee through its normal recruiting channels.  MSF #1, 10.  Talkdesk already had deep knowledge of potential candidates in the industry based on its recruiting team's investigations.  *See* MSF #2.  And Manno and Strahan had no authority to make hires on Talkdesk's behalf.  MSF #9.  While there are instances where the Defendants provided recommendations and minimal insight into prospective employees, the involvement of the individual Defendants did not amount to solicitation or competition.  Indeed, cases in Indiana establish that providing information about a new employer and facilitating introductions is <u>not</u> improper.  *See, e.g.*, *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070–71 (Ind. Ct. App. 2007) (balancing the concern for the "integrity of the employment relationship" against the "privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty" and finding that discussing employment and providing information was not actionable).  Moreover, Genesys does not cite to any authority that providing a "recommendation" regarding or a "referral" for a potential recruit is tantamount to "solicitation."  As such, and as further supported in the factual discussion in Sections II.E.—II.F. above, Genesys's attempt to show that Manno or Strahan "solicited" anyone at Genesys also fails.

---

[7] The provision likewise fails because it is not limited in geographic scope.  *See, e.g.*, *Vukovich v. Coleman*, 789 N.E.2d 520, 525 (Ind. Ct. App. 2003) ("A covenant not to compete that contains no geographic limitation is presumptively void.").

2. **Claim of Breach of Contract – Confidentiality against Manno (Count 3) and Strahan (Count 18)**

Genesys does not distinguish its breach of confidentiality claims against Manno (Count 3) and Strahan (Count 18) from its trade secret claims.  D.I. 266 at 17 n.3.  Thus, as discussed with regard to Genesys's "trade secret" claims in Section IV.D. below, Genesys's breach of confidentiality claims likewise fail.  Each of Strahan and Manno's agreements make clear that confidential information does <u>not</u> extend to information that is "generally known in the Company's trade or industry…."  D.I. 266 at 2 (citing Section 8[c]).  As set forth in Section IV.D. below, Genesys cannot rebut the weight of evidence showing that the "information" claimed as "confidential" or "trade secret" is indeed information known and readily ascertainable in Genesys's "trade or industry" through customers, industry analysts, lead-generation software, or other third-party sources in the contact center industry.  The breach of confidentiality claims likewise fail.

3. **Claim of Breach of Contract – Preparing to Compete During Employment against Manno (Count 5) and Strahan (Count 20)**

Genesys also seeks to enforce provisions in Manno and Strahan's InIn agreements that restricts the employee from "prepar[ing] in any manner to compete with the Company."  (D.I. 266 at 18).  Such provisions are overbroad and unenforceable.  *Central Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728–29 (Ind. 2008) ("[N]oncompetition covenants in employment contracts are in restraint of trade and disfavored by the law.").  More specifically, the provision improperly implicates activities that are harmless and allowed under the law.  *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 916 (Ind. Ct. App. 2011) ("Provisions in a covenant not to compete are invalid if they prohibit … activities that are seemingly harmless in relation to the protected interest."); *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 214 (Ind. Ct. App.

27

1982).  Indeed, "prepar[ing] in any manner to compete" ensnares a flood of permissible activities

of at-will employees, including the right to interview and accept employment in a position with

another company in any position—regardless of whether that company is currently or may

possibly be a competitor in the future.  As such, the provision is overbroad and unenforceable as

a matter of law.  *See, e.g.*, *Sharvelle v. Magnate*, 836 N.E.2d 432, 437–39 (Ind. Ct. App. 2005).

Further, the overbroad provision is inconsistent with Indiana public policy.  Employees

have a "privilege … to prepare to compete against their employers without fear of breaching

their fiduciary duty of loyalty."  *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952

N.E.2d 758, 768 (Ind. Ct. App. 2011).  Thus, because Indiana courts protect an employee's right

to "prepare to compete," a provision that seeks to prohibit such privileged activity is not

reasonably related to a protectible interest and is likewise void.[8]  *Buffkin v. Glacier Grp.*, 997

N.E.2d 1, 11 (Ind. Ct. App. 2013) (Indiana courts "strike down any such restrictive covenants

which are the least bit overly broad.").

4.     **Claim of Breach of Contract – Competing During Employment against Manno (Count 4) and Strahan (Count 19)**

Genesys alternatively seeks to enforce provisions in Manno and Strahan's InIn

agreements restricting each from "becom[ing] employed by or serv[ing] as an agent, independent

contractor or representative of any business which competes with the Company."  D.I. 266 at 18.

This provisions likewise is overbroad and unenforceable.  Indeed, it prohibits employment in any

manner with "any business that competes" with Genesys—regardless of the employees past or

future position within the new company.  Again, such overbroad "non-compete" covenants that

---

[8] The provision likewise has no geographic restriction, confirming it is unenforceable.  *See Vukovich*, 789 N.E.2d at 525.

do not narrowly focus on restrictions tied to a protectable interest and instead restrict <u>any</u> <u>employment</u> within a competing company have been held to be unenforceable in Indiana.  *See*, *e.g.*, *Coates*, 942 N.E.2d at 916 ("Provisions in a covenant … are invalid if they prohibit competition with portions of a business with which an employee had no association or activities."); *Seach*, 439 N.E.2d at 214.  Further, the provision is "presumptively void" because it has "no geographic limitation."  *See, e.g.*, *Vukovich*, 789 N.E.2d at 525.

Separately, there is no evidence that Manno or Strahan "serve[d] as an agent, independent contractor or representative" of Talkdesk while employed with Genesys.  Neither Manno nor Strahan were paid for any activities while they were being recruited by Talkdesk.  MSF #8.  Manno completed the third quarter with Genesys and began employment with Talkdesk on October 1, 2018.  D.I. 183-6 ¶ 15.  Strahan similarly ended active employment with Genesys around September 15, 2018 and took two-weeks of earned vacation time.  D.I. 183-8 ¶¶ 13–14.  While Strahan's employment technically began with Talkdesk on September 17, 2018, for the last two weeks of September Strahan was not actively working for Genesys or Talkdesk.  *Id*. at 13–15.[9]

### 5.   Claim of Breach of Contract – Failure to Surrender Records against Manno (Count 6) and Strahan (Count 21)

Genesys asserts that Manno and Strahan failed to comply with a contractual provision requiring that they "surrender records."  D.I. 235 at 59, 74.  Genesys does not attempt to prove this claim.  Nor can it.  Manno and Strahan each returned all information known to them (aside

---

[9] Genesys further raises issue with Strahan sending an email regarding BoH talking points on Saturday, September 28, 2018.  This information was sent after his two-week leave ended with Genesys on Friday, September 27, 2018.  Further, as explored in Section IV.D.2. below, this information was generally known in the industry—it was not "secret" or "confidential."

from their own personnel information) at the end of their employments with Genesys.  D.I. 183-8 ¶ 17; D.I. 183-6 ¶ 17.  But even if the employees had not done so, the provision is too broad to be enforceable.  Indeed, the restriction applies to "any and all" information that "pertains to the business of the Company," without limitation.  As such, the provision would require an employee to return their own personal human resource documents that they are entitled by law to retain, as well as all information that indisputably can be received from third-parties or through public sources, including Genesys's own website.[10]  Such an overbroad provision cannot be enforced in Indiana.  *See, e.g.*, *Buffkin*, 997 N.E.2d at 11 (noting that Indiana courts "strike down any such restrictive covenants which are the least bit overly broad.").

### 6.    Claims of Breach of Contract – Failure to Devote Substantial Time and Provide Faithful Service (Counts 7 and 22)

Genesys alleges as to Manno (Count 7) and Strahan (Count 22) that each failed to comply with a provision in their InIn agreements requiring them to "devote substantially all of the Employees' business time, attention, energy and skill to the business of the Company." (D.I. 266 at 20).  This provision too is overbroad and unenforceable.  The agreement does not define what is meant by the phrase "substantially all."  However, if construed strictly against Genesys (as required), then the provision impermissibly implicates activity that is indisputably harmless and allowed under the law, making this provision also unenforceable as a matter of Indiana law. *Central Ind. Podiatry*, 882 N.E.2d at 729 ("We construe these covenants strictly against the employer and will not enforce an unreasonable restriction.").  Indeed, Genesys asserts that

---

[10] This is problematic because the employee "could easily violate the terms … without knowing he was doing so." *Seach*, 439 N.E.2d at 214.  Indeed, Strahan received the PureCloud list from a website, yet Genesys asserts that constituted a "failure to surrender."  *See* DEX259 at 170:3–9, 171:6–16, Oct. 21, 2020.

Manno and Strahan violated the "substantially all" provision by making efforts to gain new employment or prepare for such new employment.  *See* D.I. 266 at 20.  Such a restriction is not reasonable and is void in Indiana.  *Buffkin*, 997 N.E.2d at 11.

Separately, there are no facts to support a breach.  As discussed in Section II.G. above, Manno and Strahan completed their work duties for Genesys without incident—and Manno extend his employment with Genesys to ensure the third quarter was fully closed.  That Genesys in hindsight now asserts that Manno and Strahan were not faithful in their work duties—or did not exert best efforts in such work—is unsupportable.  As previously noted, an employee has a privilege in Indiana to prepare to compete.  *See Kopka*, 874 N.E.2d at 1070–71.  As at-will employees, Manno and Strahan both had the right to interview for and seek different employment, including the right to communicate with a prospective employer.

Moreover, Genesys ignores Manno's fourteen-year career and Strahan's eighteen-year career with Genesys—during which each employee faithfully and diligently worked for the company.  Genesys ignores the entire service and instead points to discrete facts in an attempt to assert breach.  This is improper, and Genesys's attempt should fail.  Interviewing for a new job or spending a few minutes to type non-work e-mails does not show that Manno and Strahan failed to devote "substantially all" of their time on Genesys matters while working there. Further, Genesys's observation that Strahan gave notice and took earned vacation time is irrelevant.  He did not compete with Genesys during this time[11] and instead ensured that any

_____

[11] Genesys alleges that Strahan competed by sending an email regarding BoH talking points on Saturday, September 28, 2018.  This information was sent after his vacation time ended with Genesys.  Further, as this Court has already assessed during the preliminary injunction phase, the information in Strahan's September 28, 2018 letter was well-known in the industry—it was not

remaining duties at Genesys were passed to others.  D.I. 183-8 ¶¶ 13–15.  And, of course, Genesys cites to no authority—nor can it—that taking earned vacation time violates Strahan's agreement.

**C.**     **Claims of Breach of Fiduciary Duty of Loyalty against Manno, Strahan, and Hertel (Counts 8, 15, and 28)**

Genesys alleges that Strahan, Hertel, and Manno breached their duties of loyalty.  *See* D.I. 266 at 35.  However, in Indiana, an employee may prepare to compete "without breaching his fiduciary duty of loyalty."  *SJS Refractory*, 952 N.E.2d at 768.  Indeed, the types of activities alleged here—"questioning [] employees about their desire, if any, to leave" and "gathering information about [] salary requirement[s] [and] willingness to quit"—have been found by Indiana courts <u>not</u> to rise to the level of a breach of fiduciary duty of loyalty.  *See Kopka*, 874 N.E.2d at 1071–72.

Further, Genesys's conclusory assertion that Strahan, Manno, or Hertel breached their duty by failing to act "solely" for Genesys's benefit is unsupportable.  The privilege of preparing to compete anticipates the occurrence of actions relating to future employment.  *See id.* at 1071–72.  Such actions (which may not solely be to the benefit of the current employer), however, do <u>not</u> cause the employee to breach any fiduciary duty.  *Id*.  Genesys's citation of *Potts* for this proposition is inapposite.  That case dealt with whether "just cause" existed for firing an employee, and it acknowledged the general rule that an employee should continue to "carry out [their] work to the best interest of the employer."  *Potts v. Review Bd. Of Indiana*, 475 N.E.2d 708, 711 (Ind. App. 2005).  Thus, evidence of "preparing to compete" is irrelevant to an inquiry

_____

"secret" or "confidential."  D.I. 199 at 10.  Genesys does not argue otherwise in its motion for summary judgment, implicitly acknowledging that the information was known in the industry.

of whether an employee carries out *their work* in the best interests of the employer.  And as noted in Sections II.E.–II.G. above, while Manno, Strahan, and Hertel may have taken steps to prepare to compete while working for Genesys, there are no facts to support that Manno, Strahan, or Hertel did not also exert best efforts in finishing out their work for Genesys.

Additionally, Genesys's claims that it "suffered harm" from the alleged "breaches of fiduciary duties" are also without merit.  As set forth previously in Section II.Q., only a limited number of the departing Genesys associates were "top performers," the turnover in 2018 was not abnormal for Genesys, many employees were unhappy and already exploring other opportunities in 2018,[12] and some employees feared being terminated.  Genesys quickly replaced each of the employees it lost using its internal recruiting team and without expending additional resources.  MSF #4, 6.  Genesys has also publicly touted exploding sales in the mid-market and cloud products since the employees departed in 2018.  MSF #32.  While Genesys makes passing reference to "losses in the fourth quarter of 2018 and 2019 brought on by the individual Defendants' breaches," this argument is inconsistent with public statements it has made regarding increased sales from 2018 to 2019.  *See* MSF #32.

Genesys also lacks a causal basis for any claim of harm.  Each of the accounts for the departing employees were immediately assigned to one or more of the remaining sales associates at Genesys in 2018, and Genesys makes no attempt whatsoever (nor could it) to attribute any specific lost sale or diminished revenue to an allegedly "solicited" employee.  *See* MSF #7.  Genesys's broad-brush allegations that it "suffered harm" as to the alleged recruiting activities of

---

[12] The Genesys sales team in 2018 was suffering from internal divisions, and many employees, especially former InIn employees, were looking for other opportunities during this time. *See* DEX269 at 256:9–257:6, Feb. 11, 2021; DEX273 at 173:24–174:14.

Manno, Strahan, and Hertel thus cannot be substantiated.  Similarly, no lost sales can be attributed to Defendants.  Assertions relating to PowerSchool are based on unsupportable "presumptions."  DEX269 at 216:5–217:9.  And the individual responsible for closing the BoH deal at Genesys in 2018 has testified repeatedly that any discounts offered by Genesys on the deal were <u>not</u> the result of competition by Talkdesk.  MSF #12.  Instead, Genesys's discounting was a concession for a prior unsuccessful product sold by Genesys to BoH in 2016.  *Id*.  Thus, Genesys's lack of any provable harm also justifies dismissal of the breach of fiduciary duty claims.

### 1. Claim of Breach of Fiduciary Duty of Loyalty against Manno (Count 8)

Genesys alleges that Manno breached his "duty of loyalty" by allegedly "soliciting Genesys employees while still employed by Genesys, by disclosing Genesys Confidential Information to Talkdesk, by directly competing with Genesys for Talkdesk's benefit, and by failing to exert his best efforts on behalf of Genesys."  D.I. 266 at 36.  Each assertion fails:

- Manno did not breach his 2004 InIn agreement, as discussed in Sections V.B.1.–V.B.6.

- Manno did not provide "Confidential Information" to Talkdesk, as discussed in Section IV.D.1.

- Manno did not "compet[e] with Genesys for Talkdesk's benefit," as outlined above in Sections II.E., II.F., II.G, and V.B.4.  Manno did not have hiring authority at Talkdesk while being recruited.  MSF #9.  Hiring was in the hands of Talkdesk's recruiting team and, ultimately, Talkdesk's CEO.  MSF #10.  Manno was not paid for any activities undertaken for Talkdesk while being recruited.  MSF #8.  Thus, his activities taken in 2018 were permissible.  *See Kopka*, 874 N.E.2d at 1071–72.

### 2. Claim of Breach of Fiduciary Duty of Loyalty against Strahan (Count 15)

Genesys alleges that Strahan breached his "duty of loyalty" by allegedly "soliciting Genesys employees while he was still employed by Genesys, by disclosing Genesys Confidential

Information to Talkdesk, by directly competing with Genesys for Talkdesk's benefit, and by failing to exert his best efforts on behalf of Genesys."  D.I. 266 at 37.  Each assertion fails:

- Strahan did not breach his 2000 InIn agreement, as discussed in Sections V.B.1.—V.B.6.

- Strahan did <u>not</u> provide "Confidential Information" to Talkdesk, as discussed in Section IV.D.2.

- Strahan did <u>not</u> "compet[e] with Genesys for Talkdesk's benefit," as outlined in Sections II.F., II.G, and V.B.4.[13]  Strahan did not have hiring authority at Talkdesk.  MSF #9.  He was not paid for any activities undertaken for Talkdesk while being recruited.  MSF #8. The activities complained of by Genesys thus fail to support the claim as a matter of law. *See Kopka*, 874 N.E.2d at 1071–72.

### 3.    Claim of Breach of Fiduciary Duty of Loyalty against Hertel (Count 28)[14]

Genesys also alleges that Hertel breached his "duty of loyalty" by allegedly "soliciting Genesys employees while still employed by Genesys, by disclosing Genesys Confidential Information to Talkdesk, by directly competing with Genesys, and by failing to exert his best efforts on behalf of Genesys."  D.I. 266 at 38.  These likewise fail:

- Genesys does <u>not</u> assert a breach of contract claim against Hertel; nonetheless, Hertel did not "solicit" Genesys employees as explained in Sections II.F. above.

- Hertel did <u>not</u> provide "Confidential Information," as discussed in Section IV.D.3.  Hertel did not have hiring authority at Talkdesk.  MSF #9–10.

---

[13] Genesys takes issue with the timing of Strahan's start date with Talkdesk.  This is a red herring. Strahan took well-earned vacation leave at the end of his long career with Genesys.  D.I. 183-8 ¶¶ 13–15.  During this time, he did <u>not</u> compete with Genesys. *Id*.  Instead, at best, he undertook activities in *preparation to compete*, which he was entitled to do.  *Kopka*, 874 N.E. 2d at 1071–72.

[14] Genesys has acknowledged that Hertel is not subject to the forum selection clause in his agreement.  DEX302 at 2.  Whether Indiana or California law applies, Genesys's "breach of fiduciary duty" claim fails.  *See, e.g.*, *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 417, 58 Cal. Rptr. 3d 527, 540 (2007) ("California law permit[s] an employee to seek other employment and even to make some 'preparations to compete' before resigning....").

- As outlined above in Sections II.F. and II.G, Strahan did <u>not</u> "compet[e] with Genesys for Talkdesk's benefit." Indeed, any actions taken by Hertel were at best in preparation to compete and were proper under Indiana law. *See Kopka*, 874 N.E.2d at 1071–72.

**D.   Claims of Misappropriation of Trade Secrets under the Defend Trade Secrets Act (Counts 9, 16, 26, and 32) and the Indiana Uniform Trade Secrets Act (Counts 10, 17, 27, and 33) against Manno, Strahan, Hertel, and Talkdesk**

Genesys's "confidential trade secret" claims fail. Information provided to prospective customers or known generally in the industry—such as the case here—is <u>not</u> trade secret or confidential. *See, e.g.*, *Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553, 556 (S.D. Ind. 1988) (holding when information is known to or shared with customers, it becomes "readily ascertainable and is not a trade secret"); *Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1094 (N.D. Ind. 1998) ("[C]ustomers are quite willing to 'shop around,' and … will reveal their needs and competing quotes to competitive salesmen."); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1455 (2002) ("[A]ny information (such as price concessions, trade discounts and rebate incentives) disclosed to … customers cannot be considered trade secret or confidential.").

Based on this clear precedent, the Court recognized at the preliminary injunction stage that Genesys's trade secret claims were unfounded and <u>not</u> likely to be successful. *See* D.I. 199 at 12–14. This remains the case. Genesys falters at the gate by not providing required specificity for its assertions. That is, providing broad labels—such as arguing that all Genesys "personnel information" is secret—is insufficient. *See, e.g.*, *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) ("[U]nless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job."). And Genesys "must do more than just identify a kind of [information] and then invite the court to hunt through the details in search of items meeting the statutory definition." *Id*. at 584.

Moreover, Genesys's claims rely on the antithesis of "confidential" or "secret" information. As this Court previously recognized, information in the contact center industry is ubiquitous with trade publications and product literature readily available to the public. D.I. 199 at 12–13; MSF #20. Indeed, Genesys publicizes detailed customer information (MSF #18–19), price lists (MSF #23, 26; D.I. 182-5), product discounts (MSF #27–28), product architecture (MSF #21, 30–31), and product outages (MSF #26). And trade sources readily identify, compile, and categorize customer information, pricing, complaints, and architecture concerning Genesys's products and services—as well as for all others in the industry. *See* MSF #20, 28–29, 30. Such readily available information—whether it be pricing, identity of customers, or other customer information—is not confidential trade secret information. *Metals & Additives Corp., Inc. v. Hornedo*, No. 49A02–1011–PL–1213, 2011 WL 3211119, at *5 (Ind. Ct. App. July 28, 2011) (citations omitted).

Likewise, Genesys's blanket arguments that any "personnel information" constitutes "confidential trade secret" information is without merit. "Information that could be obtained from other persons … does not constitute a trade secret." *Id.* at *5. It follows that information readily provided to prospective employers is not "trade secret" or "confidential." *Intertek USA Inc. v. AmSpec, LLC*, No. 14 CV 6160, 2014 WL 4477933, at *5 n.4 (N.D. Ill. Sept. 11, 2014) (finding that personnel information is not confidential or secret when "employees are willing to share their salary information with competitors in hopes of finding a higher-paying position."). Accordingly, each of Genesys's "trade secret" and "confidential" claims fail as a matter of law as explored further below.

1.      **Claims of Misappropriation of Trade Secrets against Manno (Counts 9 and 10)**

Genesys broadly alleges that the following information was misappropriated by Manno:

- A widely distributed and non-confidential 2018 list of PureCloud customers that included readily ascertainable contract dates and seat counts ("the PureCloud list");

- Non-specific and non-confidential "personnel information" based on unverifiable opinions or information readily shared by employees with prospective employers;

- Non-specific and non-confidential "pricing and discounting information" made known by Genesys to prospective customers and the industry-at-large;

- Non-specific and non-confidential "sales deal information" based on information readily available from customers; and

- Non-specific and non-confidential Genesys "financial information" prepared by Genesys specifically for the purpose of being provided to prospective customers.

Each fails to support a claim for trade secret misappropriation (Counts 9 and 10) or breach of confidentiality (Count 3) as a matter of law:

i.      **The "PureCloud" list contains information that is readily ascertainable from customers, third parties, and Genesys itself**

Genesys asserts that a 2018 list of readily ascertainable and publicly touted customers is a "confidential trade secret."  (D.I. 266 at 23).  As other courts have determined, such a claim "seek[s] to prevent competition by its former agent more than it seeks to protect a trade secret." *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998); *see also Think Tank Software Dev. Corp. v. Chester, Inc.*, 30 N.E.3d 738, 747 (Ind. Ct. App. 2015).

The list complained of is an outdated snapshot of Genesys's PureCloud customers from sometime in 2018.  DEX273 at 134:20–24; DEX276 at 13:7–14:6.  It includes only the customer's initial contract date and seat count.  *See* D.I. 257-28 at 3–25.  None of this information is confidential or trade secret.  Genesys publicly touts its customers on its website (including details and agent seat count) and requests that its customers publicly disclose the

38

same.  MSF #18–19; DEX252 ¶¶ 25–26, 52.  Genesys also asks its customers to present on

Genesys's behalf at public industry events to promote and encourage other prospective

customers to utilize Genesys products.  MSF #18; DEX273 at 80:9–82:20 (discussing

Ticketmaster customer story), 43:16–45:8, 125:14–128:4 (Uber customer presenting); DEX275;

DEX281; DEX252 ¶¶ 25–30.  Such actions are the direct opposite of keeping information

"secret" or "confidential."

      The information in the PureCloud list is also readily ascertainable from the customers

themselves.  Customers using Genesys's PureCloud are known in the industry and can be

identified through a simple visual inspection of the customer's public-facing websites.  *See*

DEX252 ¶¶ 21–29, 52, 54; MSF 20.  Thus, the information on the PureCloud list can easily be

gathered by simply asking the customers for the information.  *See* MSF #25.

      And this information is also readily available from a plethora of other sources in the

industry.  *See* MSF #20–31.  As discussed in Section II.M., third-party databases, for example,

provide detailed information on competitor's customers to anyone in the industry.  DEX282 ¶ 5;

DEX283; DEX284.  Indeed, a search for Genesys's customers on DataFox (a lead-generation

database) provided over 3,400 hits.  DEX284.  This information is much more detailed than the

customer list complained of in this case, and includes the address for the customer, the specific

points of contact at the customer in charge of IT provisioning (including telephone and email

addresses), and the size of the entity.[15]

_____

[15] Agent seat counts can easily be determined from the entities size or by asking the entity
directly.  *See* DEX282 ¶ 9.

Cases in Indiana repeatedly recognize that this type of readily available customer information—even if embodied in a list—is not confidential or trade secret information.  *See, e.g.*, *Metals & Additives*, 2011 WL 3211119, at *5 ("[W]hen customers may be identified through trade publications, contacts with other customers, or other competing businesses, a customer list cannot be a trade secret.") (*citing Xpert Automation Sys., Corp. v. Vibromatic Co., Inc.*, 569 N.E.2d 351 (Ind. Ct. App. 1991).  Indeed, the court in *Steenhoven v. College Life Ins. Co. of America*, held that "policyholder information could not be considered a trade secret pursuant to the act because it was readily ascertainable from the policyholders themselves" and that information in a compilation "could be extracted from the policyholder in a blind replacement attempt."  460 N.E. 2d 973, 974 n.6 (Ind. Ct. App. 1984).  In *Harvest Life Ins.*, the court likewise recognized that policyholder information (similar to customer information) was not secret, finding "the information could be obtained from the policyholder himself, from the policy, or from other materials provided to the policyholder by the insurance company."  701 N.E. 2d at 876 (collecting cases).  Similarly, in *Think Tank Software Dev. Corp. v. Chester, Inc.*, the court analogized to the *Steenhoven* case and held that "knowledge of customers' computer systems and current or future needs was readily ascertainable, as such information belonged to the customers in question…."  30 N.E. 3d at 747.  And in *Xpert Automation Systems, Corp. v. Vibromatic Co., Inc.*, the court of appeals affirmed, noting "the trial court found that customers could be, and in fact were, identifiable by means of the 'Thomas Register', a trade publication, contacts with customers, and contacts with competing parts feeder manufacturers."  569 N.E.2d 351, 356 (Ind. Ct. App. 1991).  These cases are analogous and controlling.

In contrast, the cases relied on by Genesys have wildly divergent facts from this case.  In *Amoco Prod. Co. v. Laird*, for example, the Supreme Court of Indiana noted that prior decisions

addressing "allegedly confidential information embodied in customers lists and related data" were "factually divergent" and offered "limited guidance" on the proprietary survey and oil projections at issue in that case.  622 N.E.2d 912, 916 (Ind. 1993).  The Court reasoned, "[w]hile some tools leading to Amoco's site discoveries were easily accessible within the public domain, such as U.S. Geological Survey data and the existence of microwave radar technology, we find that, taken together, the integration of pertinent site information and resultant projections as to potential oil reserves constitutes a unique compilation of information not previously known in the marketplace." *Id*. at 920.  Thus, the court based its decision on the significant efforts and proprietary methods required by Amoco to prepare the compilation, which involved "proprietary, confidentially-stored information," consultation with "personnel who had previous geological experience with the territory under exploratory consideration," "repeated statistical assessments of extensive areas," and a $150,000 contract "to conduct microwave radar surveys of the 13,000-square-mile area" based on Amoco's proprietary "grid pattern to guide [the] flyover procedure." *Id*.  Such efforts are wholly distinguishable from consulting a third-party database, reviewing websites, or asking a customer for information.[16]  Indeed, the cases cited by Genesys are the

---

[16] Other cases cited by Genesys also present unique facts not present here.  *Ackerman v. Kimball Int'l, Inc.*, involved supplier pricing that could not be gathered by a competitor.  634 N.E.2d 778, 785 (Ind. Ct. App. 1994).  *Titus v. Rheitone, Inc.*, involved "confidential information about customer purchases and preferences, discount levels, pricing, and volume" in a niche and competitive printing industry.  758 N.E.2d 85, 92–93 (Ind. Ct. App. 2001).  *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.,* involved the use of detailed prospect information in misappropriated databases, including surveyor ratings, client histories, as well the Surveyor's proprietary "rating of the prospect's response to marketing efforts," which were not readily available from public sources.  826 N.E.2d 49, 64.  And *Mickey's Linen v. Fischer*, an Illinois case, involved "customer profiles … 'gathered in one place' to reference as the need arises and '*before* they are given to the customer,'" which reference information was held to not be readily ascertainable in the industry.  No. 17-C-2154, 2017 WL 3970593, *9 (N.D. Ill. Sept. 8, 2017).

exception to the rule—which this case is <u>not</u>.  Here, because the information at issue "could be obtained from other persons, directly from customers, from competitors, and from public records," the list cannot as a matter of law constitute a trade secret.  *Metals & Additives*, 2011 WL 3211119, at *5 (citations omitted).

Aside from not being protectible, the list is also not valuable—one court noting that such a list of customers "is effectively worthless."  *Steenhoven*, 460 N.E.2d at 974 ("No [] inherent independent value can be ascribed to this list of policyholders' names and addresses, even if such list is placed in the hands of a rival insurance organization.").  Indeed, to utilize the 2018 Genesys list for any purpose, a competitor would need to gather information directly from the customer (such as contact information, product configuration details, and contract expiration dates).  Likewise, customers of competitors are not valuable prospect sources because they are committed to their current products and unlikely to change providers.  *See* DEX282 ¶¶ 5, 7–9. Further, because the list is outdated, it lacks any possibility of economic value.  *See, e.g.*, *Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 439 (N.D. Ill. 1994) (finding four-year-old profit margin information "too old to have continued economic value").  As noted, the information in the PureCloud list is a snapshot of Genesys's customers as of 2018.  Genesys makes no attempt to establish which, if any, of the companies on the list remain Genesys customers today—or which contracts have expired since its creation in late 2018.  *See* DEX273 at 133:15–134:24.

Finally, Genesys makes a red herring argument about Talkdesk's investment in lead generation personnel and technology to argue that the list cannot be readily duplicated. However, Genesys's argument falls flat.  Lead-generation involves much more than simply identifying a possible company name or prospect.  *See* DEX282 ¶ 7.  Indeed, simply knowing a

42

customer has zero value; the company has to make effort to sell a product.  *See* DEX286 at

134:12–17, Feb. 16, 2021; DEX269 at 178:12–13, Feb. 11, 2021.  Lead generation thus involves

promotions, advertising, and other work to generate a lead for a customer who is actually

interested in Talkdesk's products.  *See* DEX282 ¶¶ 7–8.  The databases that Mr. Alamgir can

assess to search for competitor's customers are a small part of the many marketing tools at the

company's disposal (and comprise a small fraction of the demand-generation budget).  *Id.* ¶ 4.

Moreover, Talkdesk has never sought to replicate the PureCloud list.  *Id.* ¶ 6.  Alamgir's search

in 2019 was limited by geographic area and customer size, and was not an attempt to identify all

of Genesys's customers.[17]  *Id.* ¶ 4.

Finally, Genesys's assertion that Manno shared "customers he thought were in 'trouble'"

is unverifiable and non-actionable.  *McGlothen v. Heritage Env't Servs., L.L.C.*, 705 N.E.2d

1069, 1072 (Ind. Ct. App. 1999) ("[A]n employer is not entitled to protection from an

employee's knowledge, skill, or general information acquired through experience or instruction

while in the employment.").  Genesys makes no effort to show that any of the customers were

actually in "trouble," what Manno meant by such statement, or that the information was not

already known in the industry.  Further, there is no evidence that this opinion information was

ever used by anyone at Talkdesk.  But even if this information were accurate and used, because

information regarding the customer's view of Genesys could be gathered directly from the

customers, it still cannot form the basis of a "confidential trade secret" claim.  *Metals &*

---

[17] There is also no evidence that Talkdesk utilized the list or "'uploaded' it to the Talkdesk CRM database…." *Id.* ¶ 10.  Indeed, only names of 137 customers on this list have any data within Talkdesk's CRM software.  *Id.*  The vast majority of those 137 companies were known to Talkdesk before October 2018.  *Id.*

*Additives*, 2011 WL 3211119, at *5 (citations omitted) ("Information that could be obtained from other persons, directly from customers, from competitors, and from public records … does not constitute a trade secret.").

> ii.     **Manno's unverifiable opinions regarding "personnel information" do not entail "confidential trade secret information"**

Genesys broadly alleges that Manno committed trade secret misappropriation by "giving his *opinion* on Genesys' east coast and Chicago-area account executives and *opining* on the performance of Genesys employees Cahhal, Kuntz, and Genesys solutions consultants, including Ham and Carter." (D.I. 266 at 27). Genesys again cites to no authority that Manno's *opinion*— which Genesys does not even attempt to confirm as fact—can form the basis of a trade secret or breach of confidentiality claim. Indeed, Genesys does not attempt to qualify what part of the opinion is kept as "confidential" or "trade secret" at Genesys. *See, e.g.*, *IDX Systems Corp.*, 285 F.3d at 583 ("[U]nless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job.").

This is also not a case where "employee files" were misappropriated, as in the cases cited by Genesys.[18] Indeed, "personnel information" is not trade secret information when it is the type

---

[18] Genesys's citation to *Cmty. Ties of Ameria, Inc. v. NDT Care Srvs., LLC*, No. 3:12-CV-00429-CRS, 2015 WL 520960 (Feb. 9, 2015) is not "instructive." D.I. 266 at 28. That Kentucky case involved the misappropriation of entire "employee files" that "contained, at a minimum, resumes, background checks, Tuberculosis (TB) Assessments, and general employee information employee" used to "facilitate the swift transfer of CTA's Behavior Analysts from CTA to Homeplace" without consent of analysts. *Cmty. Ties of America*, 2015 WL 520960, at *12. There are no facts analogous to this case. Genesys does not and cannot assert that Manno, Strahan, or Hertel took "employee files" from Genesys. This case also does not involve an "unpublished salary list" as mentioned in other cases cited by Genesys. Instead, the broad-brush "personnel information" asserted here includes unverifiable opinions or information that indisputably is provided by prospective employees to prospective employers—including via

of information commonly shared by employees in job searches.  *See Intertek USA Inc.*, 2014 WL

4477933, at *5 n.4; *Comsys Inc. v. City of Kenosha, Wisconsin*, No. 16-CV-655-JPS, 2017 WL

1906750, at *17 (E.D. Wis. May 9, 2017), *rev'd and remanded on other grounds*.  This is the

case here.  Employees in the CCaaS industry move to competitors frequently, and it is

undisputed that potential candidates in the industry (including those in this case) provide

resumes, LinkedIn profiles, and other personnel information to potential employees in an effort

to secure better jobs.  MSF #1–5; DEX260 at 18:22–19:12.  Talkdesk recruiters gather

information regarding work history, performance, salary requirements, and other personnel

information.  DEX262 at 22:25–23:4.  Genesys likewise asks for and receives such personnel

information in interviews.  DEX260 at 18:22–19:17.  As such, Genesys's claim that personnel

information was "confidential" or "trade secret" fails as a matter of law.

> ### iii.  Genesys's "comfort letter" sent to prospective customers was not secret or confidential.

Genesys asserts that a widely distributed "comfort letter" containing high-level Genesys

financial information was misappropriated by Manno.  Not so.  Such a letter is neither secret nor

confidential.  Indeed, its value to Genesys is in the letter being <u>shared with prospective</u>

<u>customers</u>.  DEX276 at 34:5–24.  Because the letter was provided to prospective customers, the

information is not a trade secret.  *Economation*, 694 F. Supp. at 556.   And while Genesys asserts

that the letter was only provided to customers under "NDA," there is no evidence to support that

assertion.  Indeed, Genesys enters NDAs with less than half of its customers.  DEX286 at

---

resumes, LinkedIn profiles, and during interviews.  Further, the former employees at issue
interviewed with Talkdesk.  Thus, any information complained of by Genesys could have been
sourced directly from the employees during the interviews.  DEX262 at 22:22–23:24, 45:1–3;
DEX260 at 18:22–19:17.

150:20–151:10 ("40 to 50 percent of the opportunities"), 155:6–14.  Genesys also makes no

effort to show what specific information within the letter is allegedly "secret."  As noted, this is

insufficient to support a trade secret claim.  Nonetheless, even if the letter itself were not shared

with customers, Genesys sales associates have shared financial information of this type in

presentations to prospective customers.  DEX273 at 117:23–119:25; *see* DEX285.  Such

financial information is therefore neither "confidential" or "trade secret."

      **iv.**        **Genesys's pricing and discounting policies are readily ascertainable.**

     Genesys's argument that "discount" information provided to customers is likewise

without merit.  "[A]ny information (such as price concessions, trade discounts and rebate

incentives) disclosed to … customers cannot be considered trade secret or confidential."  *Whyte*,

101 Cal. App. 4th at 1455; *see also Economation*, 694 F. Supp. at 556.  Even if this were not the

case, Genesys is incorrect when it states that Manno provided a "specific percentage that

Genesys would discount."  D.I. 266 at 31.  In actuality, Manno said the opposite—that he was

not aware of any specific discount at Genesys, but instead only aware of a free month trial that

amounted to an approximate percentage "discount."  *See* D.I. 257-17 at 2–3.  Of course, this free

trial "discount" was touted by Genesys, well-known in the industry, and could be sourced from

any of Genesys's customers.  MSF #27–28; DEX252 ¶¶ 21, 29; DEX259 45:25–46:4; DEX278;

DEX279.  Further, while Genesys does not point to any discount provided by Manno for any

specific Genesys customer, sales associates in the industry will generally know where their

competitors will fall in a sales deal. DEX252 ¶¶ 49–51; *see also* DEX269 at 249:14–251:17.

Further, Genesys provides the majority of its pricing and discounts without being under any

NDA.  MSF #23.  Thus, the evidence here confirms that discounting information is "readily

ascertainable without much investment of time, expense or effort" because "customers are quite

willing to 'shop around,' and [] they will reveal their needs and competing quotes to competitive salesmen." *Standard Register Co.*, 30 F. Supp. 2d at 1094.

> ### v.     Genesys's Uber win report did not contain "confidential trade secret information"

Genesys further argues that Manno misappropriated a "win report" for a "significant customer." Genesys touts this customer, Uber, to prospective customers through marketing and at public events where representatives of Uber provide information to prospective customers about why Uber chose Genesys and details relating to its agreement with Genesys. DEX273 at 43:16–45:8, 125:14–128:4 (Uber spoke at a public facing event); DEX275. While Genesys makes passing reference to NDAs, Genesys does not enter into NDAs with all of its customers, and there is no evidence that Genesys entered into an NDA with Uber. *See* MSF #22–23.

Genesys's claim as to this information also fails because it does not provide specifics as to what information in the "win report" constitutes a trade secret. But the general claims it makes—D.I. 266 at 32 ("the value of the contract, the reasons Genesys won, and the reasons the customer chose Genesys")—are also insufficient. As previously noted, "'knowledge of customers' computer systems and current or future needs was readily ascertainable [and] belonged to the customers in question." *Think Tank Software*, 30 N.E.3d at 747. For these reasons, Genesys's attempt to broadly assert that information in the "win report" is a trade secret fails as a matter of law.

> ## 2.     Claims of Misappropriation of Trade Secrets against Strahan (Counts 16 and 17)

Genesys also alleges that the following information was misappropriated by Strahan: (i) the non-confidential 2018 PureCloud list; (ii) non-specific "personnel information"; and (iii) non-specific "pricing and discounting information." Each likewise fails to support a claim:

i.        **The PureCloud list is not "confidential trade secret information"**

As outlined above in Section IV.D.1.ii., the unmarked PureCloud list contains

information that can readily be sourced from industry sources.  Such a list is not entitled to trade

secret protection as a matter of law.  *Metals & Additives*, 2011 WL 3211119, at *6.  Strahan

further received the document from proper means—from a website that did not require a login or

password.  DEX259 at 170:3–9, 171:6–16.  Thus, even if the information could be considered a

trade secret, the claim would still fail.

ii.       **Employee's work history and salary requirements are shared by**
**employees on resume, through LinkedIn bios, and in interviews; it is**
**not confidential or trade secret information.**

Genesys alleges that Strahan misappropriate "personnel information" by "*opining* on

performance and morale of Genesys' solution consultants; the sales performance history of

Genesys employee Mann; and the sales performance, compensation history, and deals closed by

Genesys employee Tews."  Genesys again does not attempt to show how an unverified opinion

constitutes "confidential" or "trade secret" information.  Moreover, information that "employees

are willing to share … in hopes of dining a higher-paying position" also cannot form the basis of

a trade secret claim.  *Intertek USA Inc.*, 2014 WL 4477933, at *5.  Here, employees in the CCaaS

industry provide the very type of "personnel information" complained of by Genesys on their

resumes, LinkedIn, and to prospective employers during interviews.  DEX260 at 18:4–19:12;

DEX262 at 22:22–23:24.  Genesys recruits from competitors and receives this type of personnel

information about competitors routinely through resumes and interviews.  DEX260 at 18:22–

19:17.  Likewise, Talkdesk's head of recruiting confirmed that each of the employees hired by

Talkdesk would have been asked questions about their employment history, performance, and

salaries during their interviews.  DEX262 at 22:25–23:4.  Thus, Genesys's attempt to paint such

48

general information as "confidential" or "trade secret" fails.   Indeed, "[i]nformation that could

be obtained from other persons … does not constitute a trade secret." *Metals & Additives*, 2011

WL 3211119, at *5 (Ind. Ct. App. July 28, 2011) (citations omitted).[19]

> ### iii. Genesys's "pricing and discounting information" is known and readily ascertainable in the industry.

Genesys alleges that Strahan "provided Genesys' confidential pricing and discounting

information when advising Talkdesk on the BoH deal."  (D.I. 266 at 29).  This fails for the same

reasons the "pricing and discounting" claim against Manno fails (see Section IV.D.1.iii., above).

"[A]ny information (such as price concessions, trade discounts and rebate incentives) disclosed

to … customers cannot be considered trade secret or confidential." *Whyte*, 101 Cal. App. 4th at

1455; *Economation*, 694 F. Supp. at 556; *Standard Register Co.*, 30 F. Supp. 2d at 1094.  Such

cases are determinative here.

> ### 3. Claims of Misappropriation of Trade Secrets against Hertel (Counts 26 and 27)

Genesys also alleges that the following information was misappropriated by Hertel:

- Non-specific and non-confidential "personnel information";

- Non-specific and non-confidential "sales deal information" (specifically information provided by Genesys to BoH); and

- Non-specific and non-confidential "customer satisfaction information" in the form of an NPS report of information from customers in 2017.

---

[19] As noted above in footnote 18 above, Genesys's citation to cases where extensive "employee files" were taken and used by a competitor are inapposite.  Genesys also alleges that Talkdesk "shortcut recruiting costs" by using the alleged "personnel information."  D.I. 266 at 28.  This is another unsupported claim.  Talkdesk conducted a full interview process for each potential candidate it considered.  MSF #10.  There is no support for Genesys's blanket assertion that Talkdesk's recruiting process led to reduced "recruiting costs."

Each fails to support a claim for trade secret misappropriation (Counts 9 and 10) as a matter of law:

### i. Hertel's opinions of Morales are not "confidential" or "trade secret."

Genesys asserts that Hertel misappropriated "personnel information" by basing his approval of Talkdesk hiring Genesys employee Morales on his "experience with her job performance working under him at Genesys." D.I. 266 at 28. This non-specific accusation is insufficient to support a claim for trade secret misappropriation. *See, e.g.*, *IDX Systems Corp.*, 285 F.3d at 583. Talkdesk was aware of Morales and recruited her prior to Hertel. DEX267 at 45:21–46:15; DEX270 at 42:16–24. There is no evidence Hertel misappropriated any confidential or trade secret information relating to Morales.

### ii. Sales information provided to BoH is not confidential or trade secret; BoH readily provided such information to Talkdesk.

Genesys points to information provided by Hertel relating to bid information provided by Genesys to BoH. This information likewise does <u>not</u> support a trade secret claim. "Indiana courts have established that in the sales context, once information is known to the customers, that information is readily ascertainable and is not a trade secret." *Economation*, 694 F. Supp. at 556. Accordingly, Genesys's assertion that price quotes and other information provided to BoH could constitute trade secrets is incorrect.[20] Indeed, BoH freely shared Genesys's bid information with Talkdesk in its effort to obtain the best and lowest bid. D.I. 168-3 at 137–38; D.I. 183-3; D.I.

---

[20] To the extent Genesys alleges that BoH was under an NDA, the facts say otherwise. The NDA produced by Genesys was executed as part of the closed sales deal that occurred in 2016 (D.I. 168-2 at 134–35), and BoH freely provided information relating to Genesys's bids during the new pitch round in 2018 (Dkt. 168-3 at 137–38).

183-4.  Thus, this information was "readily ascertainable without much investment of time, expense or effort."  *Standard Register Co.*, 30 F. Supp. 2d at 1094.

> **iii.      Genesys cannot show that any of the information contained in the NPS data is not readily available from customers themselves.**

Genesys finally waves hands at a Net Promoter Score (NPS) survey sent by Hertel to an email address at Talkdesk.  (D.I. 266 at 34).  This information was never used by anyone at Talkdesk.[21]  But even so, this information is not a trade secret.  NPS is a well-known process, involving easily attainable and replicable feedback from customers.  *See* D.I. 182-13; D.I. 182-14; DEX252 ¶¶ 66–69.  And such knowledge is not "secret," since "'knowledge of customers' computer systems and current or future needs was readily ascertainable [and] belonged to the customers in question."  *Think Tank Software*, 30 N.E.3d at 747; *see also Whyte*, 101 Cal. App. 4th at 1455.  Finally, the information is outdated (*see* DEX273 at 98:20–101:23), further supporting that trade secret protection would not be proper even if the information were not readily available from other sources.  *See Applied Indus.*, 891 F. Supp. at 439.

> **4.     Claims of Misappropriation of Trade Secrets against Talkdesk (Counts 32 and 33)**

Genesys broadly alleges that the following types of information were misappropriated by Talkdesk:

- The non-confidential 2018 PureCloud list;

- Non-specific and non-confidential "personnel information";

- Non-specific and non-confidential "pricing and discounting information";

---

[21] There is no evidence that the NPS report was ever reviewed or distributed to anyone else at Talkdesk.  Indeed, the BoH pitch relied on public Google customer reviews.  D.I. 168-3 at 137–38.

- Non-specific and non-confidential "sales deal information";

- Non-specific and non-confidential 2017 "customer satisfaction information"; and

- Non-specific and non-confidential "financial information" provided by Genesys to prospective customers and the industry.

Each fails for the same reasons addressed above in Sections V.D.1., V.D.2., and V.D.3 above. There is no evidence that any of this information was ever used by Talkdesk. The PureCloud list was not uploaded to Talkdesk's customer relations management database. DEX282 ¶ 10. Genesys does <u>not</u> even attempt to show a single instance where a prospective customer from the PureCloud list was approached or converted to Talkdesk. Nor could it. There are only two (2) customers on the enter PureCloud list that have ever been Talkdesk customers— and each was approached <u>prior to the existence of the list</u>. *Id.* ¶ 11. Likewise, Genesys does not attempt to show actual use of any Genesys pricing, sales, financial, or other customer information. For example, Genesys does not show where Talkdesk disclosed the industry-known "free month" price discount to a prospective customer, used any of the industry-known "sales information" in an attempt to convert a prospective customer, or ever looked at the NPS customer data. Thus, even if Genesys could show a cognizable claim based on confidentiality (which it cannot), Genesys's trade secret claim as to Talkdesk would still fail because it cannot prove misappropriation of any of the alleged "confidential trade secret" information.

## E. Claims of Constructive Fraud against Manno, Strahan, and Hertel (Counts 11, 23, and 29)

"A claim for constructive fraud may be based on silence when there is otherwise a duty to speak," but "statements of opinion are not actionable for constructive fraud." *C & S Mgmt., LLC v. Superior Canopy Corp.*, No. 1:08–CV–29PS, 2008 WL 5215994, at *5. Constructive fraud claims also require conformance with the heightened specificity requirements of Rule 9(b). *See*

*id.*  Here, Genesys alleges that it has cited to specific communications to demonstrate misrepresentations and omissions to properly plead constructive fraud.  Not so.  Genesys makes unsupported and conclusory assertions that Manno, Hertel, and Strahan remained "silent where a duty to speak existed" instead of setting out "a specific omission of fact, as well as the circumstances surrounding the omission" as required under Rule 9(b).  *See id.*  While Genesys generally cites dates for the alleged omissions or misrepresentations, it does not provide the specific statements it deems to be a misrepresentation, the specific omissions of fact, or the circumstances surrounding such omissions.

Moreover, Genesys does not identify a *legal duty* regarding the alleged omissions by Hertel, Strahan, and Manno.  Genesys asserts that Defendants committed constructive fraud by failing to disclose their future plans for employment with Talkdesk and/or knowledge of recruiting by Talkdesk of other Genesys employees.  *See* D.I. 220 ¶¶ 438–44, 540–42, 595–96.  However, Genesys cites to no case law to support its assertion that either Manno, Hertel, and Strahan had any duty to provide this information to Genesys.  Indeed, there is no requirement that an employee disclose that they are seeking future employment, the reasons for seeking such employment, the reasons for leaving their current job, or the knowledge that others are seeking future employment.  Indeed, imposing such a duty would run directly counter to "the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty."  *Kopka*, 874 N.E.2d at 1070–71.[22]  Because there is no duty to speak relating to the information complained of by Genesys, the claims are futile.

---

[22] As further set forth in Section II.J above, Genesys human resources did not attempt to determine where Manno, Strahan, or Hertel were going post-employment.  This information was

Even still, "[c]onstructive fraud requires the misrepresentation of past or existing fact; statements of opinion and representations as to the future are not actionable." *Shriner v. Sheehan*, 773 N.E.2d 833, 849 (Ind. Ct. App. 2002). Despite this, Genesys improperly points to "future plans" as alleged misrepresentations:

- Para. 442 – "Manno further misrepresented ***his future plans***…"

- Para. 444 – "Manno at no time disclosed to Genesys that he, Strahan, Hertel, and several others ***were planning on leaving*** Genesys for a competitor…."

- Para. 542 – "Strahan at no time disclosed to Genesys that he, Manno, Hertel, and several others ***were planning on leaving*** Genesys for a competitor…."

- Para. 596 – "Hertel at no time disclosed to Genesys that he, Manno, Strahan, and several others ***were planning on leaving*** Genesys for a competitor…."

These cannot form a claim for constructive fraud. *See, e.g.*, *id.* ("[R]epresentations as to the future are not actionable.").

Likewise, Genesys's hyperbolic legal assertions and statements of opinions cannot form constructive fraud claims. *See, e.g.*, *C & S Mgmt., LLC*, 2008 WL 5215994, at *5 ("The charge that Counterdefendants should have disclosed they were not working in Superior's 'best interest' is a demand that Counterdefendants should have agreed with Plaintiff's own opinion and assessments as to the consequences of those various actions."); *Darst v. Illinois Farmers Ins. Co.*, 716 N.E.2d 579, 581–82 (Ind. Ct. App. 1999) ("[E]xpressions of opinion are not actionable...") (quotations omitted). Thus, the following assertions based "not on a fact but a conclusory legal opinion" cannot support a claim for constructive fraud:

_____

"irrelevant," confirming that none of the Defendants were under an obligation to come forward with their or other employee's future plans.

- Para. 439 – "Manno failed to disclose to Genesys that he was **working for the benefit of Talkdesk while still employed by Genesys**, …. He further failed to disclose that he was **orchestrating a conspiracy** …."

- Para. 440 – "Manno … failed to inform Genesys leadership **of the imminent mass exodus** of mid-market sales employees."

- Para. 441 – "Manno **expressed phony surprise** at Hertel's announcement."

- Para. 444 – "Manno at no time disclosed to Genesys that he, Strahan, Hertel, and several others … were **spending substantial amounts of time preparing for that departure and competing against Genesys**."

- Para. 548 – "Strahan … failed to disclose to Genesys that **for more than a month he had been working for the benefit of Talkdesk** while still employed by Genesys."

- Para. 542 – "Strahan at no time disclosed to Genesys that he, Manno, Hertel, and several others … **were spending substantial amounts of time preparing for that departure and competing against Genesys**."

- Para. 595 – "Hertel misrepresented his reasons for leaving Genesys and failed to disclose to Genesys that **for more than a month he had been working for the benefit of Talkdesk** while still employed by Genesys."

- Para. 596 – "Hertel at no time disclosed to Genesys that he, Manno, Strahan, and several others were planning on leaving Genesys for a competitor, and **were spending substantial amounts of time preparing for that departure and competing against Genesys**."

Accordingly, even if a duty of disclosure existed, each of the statements relied on by

Genesys for its constructive fraud claims are improper and fail as a matter of law.

## F.   Claims of Conspiracy against Manno, Strahan, Hertel, and Talkdesk (Counts 12, 24, 30, and 36)

Genesys's omnibus "conspiracy" count against Manno, Strahan, Hertel, and Talkdesk

also fails. Because Genesys cannot prove impropriety of any of the underlying claims, the

conspiracy claims likewise fail. However, even if the underlying claims could be maintained,

"[i]n Indiana, there is no separate civil cause of action for conspiracy … [only] for damages

resulting from a conspiracy." *Miller v. Central Indiana Cmty. Found., Inc.*, 11 N.E. 3d 944, 962

(Ind. Ct. App. 2014). And "an allegation of civil conspiracy will not survive based only upon impermissible speculation." *Id*. at 963.

Here, Genesys relies solely on speculation to support its alleged intent to conspire. "This kind of generic allegation does not meet the Rule 9(b) standard." *See C & S Mgmt., LLC*, 2008 WL 5215994, at *6. Indeed, "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Id.* Such is the case here: Genesys asserts no specific details outlining what it deems to constitute the conspiracy between the four parties apart from broadly-stated and conclusory assertions. *See* D.I. 220 ¶¶ 450, 548, 602, 655. Indeed, Genesys impermissibly lumps the Defendant's activities together and broadly describes the activity instead of detailing each specific conspiratorial act as required under Rule 9(b).

Additionally, for a properly pled conspiracy claim, the plaintiff "must allege some unlawful act underlying the defendants' *concerted action*." *Crystal Valley Sales v. Anderson*, 22 N.E.3d 646, at 653–54 (Ind. Ct. App. 2014) (emphasis added). "[I]t is not enough that the alleged conspirators acted in concert and that the result amounted to a breach of a contractual or fiduciary duty <u>by one of them</u>; rather … there must be some intentional underlying act of wrongdoing <u>by each of the coconspirators</u>." *Id.* (emphasis added). Here, as noted, Genesys makes sweeping accusations of a conspiracy without identifying the underlying act of each separate coconspirator.

This is for good reason: there is no actionable wrongdoing that could form the basis of an alleged conspiracy as to Talkdesk, Manno, Hertel, and Strahan. It is undisputed that neither Talkdesk nor its CEO had a fiduciary duty or contractual relationship with Genesys—so there can be no joined conspiracy relating to breach of fiduciary duty. To the extent Genesys argues

that "helping" someone breach their fiduciary duty is a tort, this cannot amount to civil conspiracy and would already be subsumed within Genesys's already-pled tortious interference claims.  *See id.* at 654.  Likewise, Genesys has and can only assert its "raiding" claim against Talkdesk; thus, there can be no common conspiracy to commit improper raiding.  To the extent Genesys asserts that the conspiracy is based on misappropriation of trade secrets, the Indiana trade secret act supersedes the assertion.  The Uniform Trade Secret Act "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets"  D.I. 156 at 27 (citing Ind. Code § 24-2-3-1(c)).  And even if not superseded, an alleged conspiracy to misappropriate trade secrets would have to be pled with specificity—which it is not.  Genesys's claims do not set forth details regarding which alleged trade secrets the parties conspired to misappropriate, when such action occurred, and in what context the conspiracy was alleged to have occurred.  Again, such "generic allegation does not meet the Rule 9(b) standard."  *C & S Mgmt., LLC*, 2008 WL 5215994, at *6.  Finally, Genesys also asserts that there was a conspiracy to interfere with Genesys's employee contracts.  Yet, Genesys does not allege breach of contract as to Hertel—or tortious interference as to Hertel or Strahan.  Thus, there is no support for an "interference" common conspiracy as would be required for this claim. Accordingly, each alleged conspiracy claim fails as a matter of law.

### G.     Claims of Aiding and Abetting Breach of Fiduciary Duty against Manno, Strahan, Hertel, and Talkdesk (Counts 13, 25, 31, and 37)

Genesys's "aiding and abetting" claims fail for the same reasons the "breach of fiduciary duty" claims fail as set forth in Section IV.C. above.  Separately, the aiding and abetting claims fail because such a claim is <u>not</u> recognized by Indiana courts.  As expressly found by the Indiana Court of Appeals, "[t]o the extent that the allegation that Appellees 'helped' [Defendant] breach

his fiduciary duties resembles a claim of aiding and abetting a fiduciary in the breach of a

fiduciary duty, we note that Indiana does not recognize such a cause of action." *Crystal Valley*

*Sales*, 22 N.E.3d at 656.[23]  Further, even if such a claim were cognizable, the plaintiff must

"sufficiently allege that [aiding and abetting party] acted with such knowledge or intent

concerning [defendant's] fiduciary duties…." *Id.*  Without sufficiently alleging that the party

was 'aware of [defendant's] fiduciary duties," then the claim still fails.  *Id.*

Here, Genesys makes a conclusory assertion as to each Defendant that the party

"knowingly and intentionally aided and abetted" another party "in breaching that duty…."  D.I.

220 ¶¶ 457, 555, 609, 662.  This fails to sufficiently plead knowledge by the aider and abetter of

the specifics of the alleged fiduciary duty owed by the other party to Genesys.  Indeed, the

statement amounts to nothing more than a statement that the party knowingly and intentionally

acted in a certain manner that caused another party to breach its duty.  This falls well short of

proof that each party "acted with such knowledge or intent concerning [another party's] fiduciary

duties to" Genesys, as required to support the claim.  *See Crystal Valley Sales*, 22 N.E.3d at 656.

**H.  Claim of Raiding against Talkdesk (Count 35)**

As to Genesys's "raiding" claim, there are no facts supporting that Talkdesk hired

Genesys employees for the primary purpose of destroying Genesys's business as is required to

support such a claim.  *See Heckler & Koch, Inc. v. German Sport Guns GmbH*, No.

---

[23] Genesys avers that such a claim would be recognized as a theory of liability but cites no
Indiana state court case for the proposition—instead relying on a district case (that preceded the
Indiana Court of Appeals *Crystal Valley Sales* decision) where the court reasoned that the
Indiana Supreme Court *might* decide to recognize such a claim.  *See Abrams v. McGuireWoods,
LLP*, 518 B.R. 491, 500 (N.D. Ind. 2014)*.*  However, "the decision to adopt a new cause of
action for aiding and abetting in the breach of fiduciary duty is a decision better left to the
legislature or our supreme court."  *Crystal Valley Sales*, 22 N.E.3d at 656.

111CV01108SEBTAB, 2013 WL 12291720, at *12 (S.D. Ind. Sept. 27, 2013) (finding that "the tort [of unfair competition] require[s] a showing that the defendant acted intentionally—'for the primary purpose of destroying a competing business.').  Indeed, as discussed in Section II.D. above, it is undisputed that Talkdesk sought to hire the best people it could find across the industry to fill its sales roles in late 2018.  MSF #1.  Further, Genesys's reference to out-of-context, offhand comments relating to competition between the parties does not support the claim.  *See, e.g.*, *The Finish Line, Inc. v. Foot Locker, Inc.*, No. 1:04CV877RLYWTL, 2006 WL 146633, at *9 (S.D. Ind. Jan. 18, 2006) ("Finish Line cites no authority to support its contention that Foot Locker's hiring plan can be rendered unlawful merely by virtue of offhand statements that in addition to filling open positions, the plan would 'hit the competition where it hurts' or 'destroy' Finish Line's business.").[24]  Instead, the actions of Talkdesk to hire qualified candidates is determinative.  *Id*. at *7.  Because Talkdesk undertook legitimate efforts to hire qualified employees for its business, the claim of "raiding" fails as a matter of law.  *Konecranes, Inc.*, 2013 WL 1566326, at *3 (alteration omitted).

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment and deny Plaintiff's motion for summary judgment.

---

[24] Genesys cites to a former marketing employee's inquiry of when Talkdesk could "dance on Genesys's grave" as its best evidence of targeting.  However, the former employee has testified that she was making statements regarding an industry publication—not about recruiting Genesys individuals.  DEX299 at 12:5–13:1.  Genesys has made similar "competitive banter" remarks about Talkdesk, for example, stating they wanted to put the "proverbial nail in Talkdesk's coffin."  DEX286 at 165:3–20.  Such "competitive banter" is common and not cognizable evidence for a "raiding" claim.  *See The Finish Line*, 2006 WL 146633, at *9.

59

Dated:  July 14, 2021                          Respectfully submitted,

                                               /s/ David S. Moreland
                                               David S. Moreland (*Pro Hac Vice*)
                                               John Harbin (*Pro Hac Vice*)
                                               MEUNIER CARLIN & CURFMAN LLC
                                               999 Peachtree Street NE, Suite 1300
                                               Atlanta, GA 30309
                                               Telephone: (678) 869-7749
                                               Facsimile: (404) 645-7707
                                               Email: dmoreland@mcciplaw.com
                                               jharbin@mcciplaw.com

                                               Jim Strenski
                                               PAGANELLI LAW GROUP
                                               10401 N. Meridian St., Suite 450
                                               Indianapolis, IN 46290
                                               Telephone: (317) 550-1855
                                               Email: jstrenski@paganelligroup.com

                                               *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and/or first-class U.S. Mail:

> John R. Maley
> Thomas C. Payne
> BARNES & THORNBURG, LLP
> 11 South Meridian Street
> Indianapolis, Indiana 46204-3535
> **Counsel for Plaintiff**

*/s/ David S. Moreland*
David S. Moreland