**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| GENESYS CLOUD SERVICES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Case No. 1:19-CV-695-TWP-DML |
| | ) |
| TALKDESK, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OBJECTIONS**
**AND MOTION TO EXCLUDE PLAINTIFF'S EXPERTS' OPINIONS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

I.  INTRODUCTION ................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................. 2

III.          LEGAL STANDARD ..................................................................................... 3

   A.   *Daubert* and Federal Rules of Evidence 702 and 703 ..................................... 3

   B.   Rebuttal Reports and Sanctions under Federal Rules of Civil Procedure 26 and 37 ....... 4

IV.          ARGUMENT ................................................................................................... 4

   A.   The present motion is moot if the Court grants summary judgment dismissing Genesys's "raiding" and "trade secret" claims. ............................................. 5

   B.   Dineen's opinions should be excluded in their entirety. .................................. 5

      1.   Dineen's opinions are unreliable because they improperly assume that all the employees in question would have remained at Genesys. ........................................... 6

      2.   Dineen's opinions are unreliable because they are based on improper assumptions about "required hours," "ramp times," "productivity," and "training." ...................... 7

      3.   Dineen's opinions are unreliable because they are based on industries other than the CCaaS industry and do not account for the differences with the CCaaS industry. .... 12

   C.   Green and York's opinions should be excluded in their entirety. ................................. 13

      1.   Green and York are not qualified to opine on the protection of confidential and trade secret information in the Contact Center as a Service (CCaaS) industry. .................. 14

      2.   Even if Green and York were qualified, their opinions are not reliable as they make improper assumptions and rely on their layperson definitions of legal terms. ........... 17

   D.   Distler's opinions should be excluded in their entirety. ................................................. 23

      1.   Distler's failure to apportion renders her opinions unreliable. ................................... 23

   E.   Dineen and Distler's "rebuttal" reports should be excluded. .......................................... 27

      1.   Both Dineen and Distler's "rebuttal" reports extend beyond proper rebuttal. ............. 27

2.   Dineen and Distler's improper rebuttal reports are neither substantially justified or harmless. ........................................................................................................ 29

3.   Exclusion of the reports in their entirety is appropriate. ............................................ 32

F.   Genesys's Non-Retained Expert Witnesses Provide Irrelevant and Improper Testimony Disguised as "Expert Witnesses." ..................................................................... 32

1.   Ball, Coburn, and Sanders are Unqualified to Testify as Experts Relating to the Disclosed Subject Matter ............................................................................................. 32

V. CONCLUSION ................................................................................................................. 35

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                                    <u>Page(s)</u>

*Ajaxo, Inc. v. E-Trade Fin. Corp.*,
    48 Cal. App. 5th 129 (Cal. Ct. App. 2020) ..................................................................25

*Astro Tech., Inc. v. Alliant Techsystems, Inc.*,
    No. H-03-0745, 2005 WL 6061803 (S.D. Tex. Sept. 28, 2005) ...........................16, 18, 19

*Blake v. Securitas Sec. Servs., Inc.*,
    292 F.R.D. 15 (D.D.C. 2013) .......................................................................................32

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n*,
    178 F.3d 1035 (8th Cir. 1999) ..................................................................................6, 24

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) .....................................................................................6, 21, 24

*Bowman v. Int'l Bus. Mach. Corp.*,
    No. 1:11-CV-0593-RLY-TAB, 2012 WL 6596933 (S.D. Ind. Dec. 18, 2012) .....27, 30, 32

*Cage v. City of Chicago*,
    No. 09–C–3078, 2012 WL 5557410 (N.D. Ill. Nov.14, 2012) ........................................27

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .......................................................................................................3

*David v. Caterpillar, Inc.*,
    324 F.3d 851 (7th Cir. 2003) ....................................................................................4, 29

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000) ...........................................................................................5

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010) .........................................................................13

*Garretson v. Clark*,
    111 U.S. 120 (1884) ....................................................................................................25

*Gayton v. McCoy*,
    593 F.3d 610 (7th Cir. 2010) ........................................................................................14

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................................................7-8

*Haddad v. RAV Bahamas, Ltd.*,
    589 F. Supp. 2d 1302 (S.D. Fla. 2008) ...................................................................18, 20

*Hall v. Flannery*,
    840 F.3d 922 (7th Cir. 2016) ...............................................................................14

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) ......................................................................... 17-18, 19

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ..........................................................................9, 15, 18, 22

*Kirk v. Clark Equipment Co.*,
    991 F.3d 865 (7th Cir. 2021) ......................................................................3, 4, 17

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ...............................................................................3-4, 7, 8

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) .........................................................................9

*Lyman v. St. Jude Med. S.C., Inc.*,
    580 F. Supp. 2d 719 (E.D. Wis. 2008) ..............................................................22

*Madej v. Maiden*,
    951 F.3d 364 (6th Cir. 2020) ...............................................................................11

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2005) ............................................................................6, 26

*Montgomery Cty. v. Microvote Corp.*,
    320 F.3d 440 (3d Cir. 2003) ...............................................................................5

*Nordetek Env't, Inc. v. RDP Techs., Inc.*,
    862 F. Supp. 2d 406 (E.D. Pa. 2012) ..............................................................10, 11, 21

*Oracle Oil, LLC v. EPI Consultants*,
    391 F. Supp. 3d 634 (E.D. La. 2019) ............................................................................7

*Peals v. Terre Haute Police Dep't*,
    535 F.3d 621 (7th Cir. 2008) ...............................................................................27

*People v. Kinder Morgan Energy Partners, L.P.*,
    159 F. Supp. 3d 1182 (S.D. Cal. 2016) ............................................................................32

*ResQNet.com, Inc. v. Lansa*,
    594 F.3d 860 (Fed. Cir. 2010) ...............................................................................26

iv

*Salgado by Salgado v. Gen. Motors Corp.*,
  150 F.3d 735 (7th Cir. 1998) ..............................................................................4, 32

*Tucker v. SmithKline Beecham Corp.*,
  701 F. Supp. 2d 1040 (S.D. Ind. 2010) ...............................................................5

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ..........................................................................25


<u>RULES</u>                                                                               <u>Page(s)</u>

Fed. R. Civ. P. 26 ..................................................................................................30

Fed. R. Civ. P. 37 ....................................................................................................4

Fed. R. Evid. 702 ...................................................................................3, 5, 9, 22, 33

Fed. R. Evid. 703 ....................................................................................3, 4, 5, 9, 22

## I.    INTRODUCTION

Defendants Talkdesk, Inc. ("Talkdesk"), Michael Strahan ("Strahan"), Mark Hertel ("Hertel"), and Ralph Manno ("Manno") (collectively "Defendants"), respectfully move to exclude and strike the opinions and testimony offered by Plaintiff Genesys Cloud Services, Inc.'s ("Genesys") proposed liability experts Ms. Rebecca Green and Mr. Jeremy C. York; employees Jessica Coburn, Alex Ball, and Cory Sanders; and damages experts Dr. Brian R. Dineen and Ms. Carrie L. Distler. The proposed opinions are fundamentally flawed, improper, and prejudicial.

As to liability experts Green and York, the opinions regurgitate allegations in this case as fact and rely on such allegations to reach unsupported and improper legal conclusions. Neither Green nor York are legal scholars, and their attempt to find that certain information is "confidential" or "trade secret" is based on assumptions and unsupported conclusions. These purported experts do not have "specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue," as required by Federal Rules of Evidence 702. Nor is their testimony based on sufficient facts or data or the product of reliable principles and methods. Likewise, non-retained experts Coburn, Ball, and Sanders lack any "specialized knowledge" relevant to this case and should not be allowed to present factual testimony or conclusory legal assertions disguised as "expert opinions."

As to damages expert Dineen, the entire premise of the purported damages opinion regarding "raiding" is faulty and unsupportable. Instead of providing a damages assessment tied to provable or reliable facts, Dineen's theory is propped up by impermissible speculation, unreliable information, and conclusory assertions. Similarly, Distler's opinion, while attempting to assess a "reasonable royalty" for the asserted PureCloud customer list, fails to apportion from her damages calculation irrelevant information that cannot form the basis of a "trade secret"

1

royalty calculation. Such failure to apportion has repeatedly been held by federal courts to be fatal to a proposed damages calculation.

Finally, to the extent the opinions of damages experts Dineen and Distler are not excluded (or otherwise rendered moot through summary judgment), their improper "rebuttal" reports should be excluded. Indeed, after this Court's deadline for expert disclosures had passed—and only after Genesys's damages witnesses had been deposed—Genesys served two additional "rebuttal" expert reports for its damages witnesses. These "rebuttal" reports are roughly the same length as each opening report and extend far beyond mere "rebuttal"—to the extent are allowed under Rule 26 at all. And Genesys cannot show that the late disclosure of new theories raised therein is substantially justified or harmless. Accordingly, regardless of whether the initial opinions of these experts are excluded, the Court should strike the improper rebuttal portions of Dineen and Distler.

## II.   FACTUAL BACKGROUND

The Court is familiar with the facts of this case. Genesys presses thirty-seven (37) far-flung and hyperbolic counts against the Defendants, ranging from "raiding" to "trade secret misappropriation," to "conspiracy." Genesys's expert reports, however, relate to only its assertions of "confidential trade secret misappropriation" and "raiding."[1] The disclosures were served by Genesys during the liability and damages phases of this case. For liability, the opinions of employees Ball, Coburn, and Sanders were served, along with the purported expert opinions for Greene and York, all of which purport to provide support for Genesys's trade secret claims.

---

[1] Dineen's report relates solely to the "raiding" claim. Exh. 1 at 21:24–22:11. Should the Court grant Defendants' summary judgment finding that Genesys's "raiding" and "trade secret misappropriation" claims fail as a matter of law, this motion will be rendered moot.

For damages, Genesys served the opinions of Dineen (relating to alleged damages stemming from the "raiding claim") and Distler (positing a purported reasonable royalty for the PureCloud customer list).[2]

Genesys and Defendants negotiated a case management schedule almost two-years-ago that included opening and responsive expert reports—but no rebuttal reports. Dkt. 205 at 4. At no time prior to filing its "rebuttal reports" did Genesys indicate that it intended to unilaterally alter the case schedule to provide itself with an opportunity to file rebuttal reports. For this reason, Defendants proceeded through expert discovery under the assumption that Genesys did not intend to file any such reports. However, *immediately after* the Defendants completed taking Genesys's damages expert witness depositions (and with little over a week left of expert discovery), Genesys served two new damages expert reports from Dineen and Distler under the guise of Rule 26 "rebuttal reports." To the extent allowed at all in view of the discovery scheduling order, these reports exceed the bounds of "rebuttal" and are improper under Rule 26.

### III.    LEGAL STANDARD

#### A.  *Daubert* and Federal Rules of Evidence 702 and 703

The admissibility of expert testimony (retained and non-retained) is governed by Federal Rule of Evidence 702 ("Rule 702") and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *Kirk v. Clark Equipment Co.*, 991 F.3d 865, 871 (7th Cir. 2021). The district court acts as a gatekeeper to ensure that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 137

---

[2] Distler's opinion makes passing referencing to NPS information, but she does not set forth any alleged measure of damages or opinions relating to the NPS information.

(1999). In the Seventh Circuit, this involves "engag[ing] in a three-step analysis, evaluating: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Kirk*, 991 F.3d at 872 (internal quotation omitted). Under Federal Rule of Evidence 703, "expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Daubert*, 509 U.S. at 595 (internal quotation omitted).

### B. Rebuttal Reports and Sanctions under Federal Rules of Civil Procedure 26 and 37

Federal Rule of Civil Procedure 26(a) provides that expert rebuttal disclosures are "solely to contradict or rebut evidence on the same subject matter identified by another party." Sanctions are available for violations of Rule 26(a). Exclusion is "automatic and mandatory" sanction for violating Rule 26, unless the party violating Rule 26 can show that the violation was "justified or harmless." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998); Fed. R. Civ. P. 37(a)(3). In the Seventh Circuit, four factors govern the court's discretion to exclude testimony: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

### IV.   ARGUMENT

As explained in detail below, the proposed expert opinions of Green, York, Ball, Coburn, Sanders, Dineen, and Distler are not reliable and/or relevant under Rule 702 and *Daubert*, and therefore should be excluded in their entirety. In addition, to the extent the opinions are allowed,

4

Dineen and Distler's improper rebuttal reports violate Rule 26 and should be excluded on that basis.

### A.  The present motion is moot if the Court grants summary judgment dismissing Genesys's "raiding" and "trade secret" claims.

Each of Genesys's proposed expert witness opinions and testimony relates to Genesys's claims of alleged "raiding" or "trade secret misappropriation."  Defendants's pending cross-motion for summary judgment shows that the "raiding" and "trade secret misappropriation" claims fail as a matter of law.  *See* Dkt. 271. Accordingly, if judgment is entered for Defendants on these counts, the expert opinions at issue in this motion will be irrelevant, mooting the need to resolve the following objections.

### B.  Dineen's opinions should be excluded in their entirety.

Dineen's opinions fail to account for significant factors, make unjustified assumptions, and otherwise fail to link the limited evidence he provides to his conclusions. These failures render his damages opinions speculative and unreliable. *Tucker v. SmithKline Beecham Corp.*, 701 F. Supp. 2d 1040, 1055 (S.D. Ind. 2010) ("an opinion becomes speculative when too wide an analytical gap exists between the data and the opinion provided."). Dineen also bases his opinions on unsupported assumptions, statements from counsel and Genesys employees, and decades-old sources from a scattering of different industries. But these sources cannot be the basis for reliable expert testimony. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000); *Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 449 (3d Cir. 2003). The below points illustrate how these failures of proof and methodology render all of Dineen's opinions inadmissible. Accordingly, Dineen's opinions in his opening and rebuttal reports should be excluded under Rules 702 and 703.

5

1.      **Dineen's opinions are unreliable because they improperly assume that all the employees in question would have remained at Genesys.**

Dineen's opinion should be excluded because it assumes, without support, that the employees at issue would never have left Genesys. Dineen's opening report assumes that no turnover would have occurred without the alleged "raid." But Dineen's rebuttal report acknowledges that, in the relevant Genesys group, there were "an average of 1.78 employees leaving during any other given four-month period." Exh. 3 at 6 (Dineen Rebuttal Report). And Dineen quotes evidence that "the team's morale is very low, they are overworked, underappreciated, and are at an odd location in the company's hierarchy." Exh. 2 at 15 (Dineen Report). The contradiction between Dineen's evidence and his assumption renders his opinions unreliable. Dineen's assumption of zero turnover would be a "complete break" from his own data showing regular turnover at Genesys, and this assumption contradicting the evidence renders Dineen's opinions unreliable. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996).

Dineen's rebuttal report doubles down on the "zero turnover" assumption and insists that "but for" causation is not a relevant concept to his analysis. *See* Exh. 3 at 5 (Dineen Rebuttal Report). However, courts routinely exclude expert opinions that ignore independent variables (like normal turnover) or fail to account for causation. *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999) *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1354 (Fed. Cir. 2005) (excluding a report that ignored other significant factors that could have caused the alleged losses). Therefore, Dineen's opinions are inadmissible and should be excluded.

All of Dineen's damages opinions are based on the zero turnover assumption because of Dineen's damages are calculated on a per-employee basis and are not discounted by any expected turnover rate. *See* Exh. 4 (Dineen Op. Rpt. Ex. 11). Therefore Dineen's "zero turnover" assumption renders all of his damages opinions in his opening and rebuttal reports unreliable, and these reports should be excluded in their entireties.

> **2.      Dineen's opinions are unreliable because they are based on improper assumptions about "required hours," "ramp times," "productivity," and "training."**

Dineen's opinions about employee turnover are alone sufficient to render his opinions unreliable. But Dineen compounds his failure with numerous additional assumptions and methodological errors. Taken together, the "numerous assumptions" render Dineen's damages opinions speculative and inadmissible. *Oracle Oil, LLC v. EPI Consultants*, 391 F. Supp. 3d 634, 640 (E.D. La. 2019).

First, Dineen assumes that a salaried employee at Genesys would perform 1,920 hours of work each year. Dineen calculates the alleged human resources (HR) costs by estimating the time incurred, and then multiplying the time estimates by hourly rates based on a 1,920-hour work year. Exh. 2 at 5–8. Since the employees were salaried, Dineen estimated that a salaried position at Genesys would require 1,920 hours of work each year.[3] *But he did not actually check if anyone at Genesys worked or was even required to work those hours*. Exh. 1 at 19:15–20, 74:7–25. An expert's opinions must be based on reliable information and connected to the facts of the case. *See Kumho Tire Co.*, 526 U.S. at 154; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143

---

[3] For example, a comparison of Dineen's Report, listing employee salaries, to Exhibit 9 to Dineen's Report, accounting informal training costs, shows that the proposed hourly cost is the salary divided by 1,920.

(1997). Since Dineen did not verify that the 1,920 hour assumption applied to the facts of this case, Dineen's opinions based on a 1,920-hour work year are unreliable and cannot be the basis for an admissible damages opinion.

Second, Dineen's damages opinions related to "informal training" are similarly unreliable because they ignore that the employees at issue are salaried—not hourly. As described above, Dineen divides the employee salaries by the unverified 1,920-hour work year to get hourly costs. Then Dineen multiplies the hourly pay rate by the alleged number of hours of informal training to get the cost of the informal training for each employee. Exh. 5 (Dineen Exh. 9). Again, the "informal training" provided by Genesys was performed by salaried employees—not by hourly employees. Since the employees were salaried, Genesys's incremental costs of its employees working more is not based on the employee salary. Instead, Genesys's labor costs remain the same no matter how much its employees work. And Dineen "presume[d]" that the responsibilities of at least employees included "informally training employees[.]" *See* Dineen Dep. 45:12–16. But again, Dineen did not account for that in his analysis. So, Dineen's "informal training" opinions based on the "hourly" rate of salaried employees is not based on the facts of the case and should not be admitted. *See Kumho Tire Co.*, 526 U.S. at 154; *Joiner*, 522 U.S. at 146.

Third, Dineen improperly assumes that the "ramp time" estimates provided by Genesys are correct. A Genesys Vice President provided Dineen estimates of the time that employees took to reach full productivity (the "ramp time") and estimates of the productivity of the employee during the "ramp time." Dineen then calculated the damages of the "ramp up" period by multiplying the employee's monthly salary by the estimated productivity and then subtracting that number from the employee's monthly salary. So, Dineen's damages opinion for the ramp up

8

period is only based on the Genesys Vice President's information. Since Dineen's ramp time estimate is simply based on the unverified opinion of his client's employee, it is not reliable and is therefore inadmissible.[4] *See Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 807–809 (N.D. Ill. 2005), *amended*, No. 01-C-9389, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005).

Fourth, Dineen's "lost time" assumptions are unreliable because they are based on the unverified say-so of Genesys' attorneys. Dineen could not remember at his deposition what the source of the information was, and he did not cite the source in his report. Exh. 1 at 17:7–13. Unsourced and unverified information from attorneys cannot form the basis for reliable expert opinion. *In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999), *amended,* 199 F.3d 158 (3d Cir. 2000). Therefore, Dineen's opinions based on "lost time" should be excluded under Rules 702 and 703.

Fifth, Dineen's "productivity" analysis is similarly flawed. Dineen simply assumes that the former employees had lower productivity during their final months without verifying that those employees actually had lower productivity. Dineen's evidence of "decreased productivity' is a list of allegations from Genesys's motion for summary judgment. Exh. 2 at 19–21. Again, expert opinions cannot be based on attorney summaries. *In re TMI Litig.*, 193 F.3d at 705. But, even if Dineen had tried to verify the allegations in Genesys's motion for summary judgment, Dineen does not show that these activities actually resulted in lower productivity. An expert's

---

[4] Opinions of "ramp time" would need to be qualified as expert opinions. However, Genesys provided no expert opinion or report regarding how the alleged ramp times were arrived at, as would be required under Rule 26. Thus, the "ramp times" are wholly impermissible evidence, as is Dineen's conclusory assertions based on those wholly unsupported opinions.

analysis must bridge the gap between the evidence provided and opinions offered. *Joiner,* 522

U.S. at 146. The only connection between Dineen's data (from Genesys's motion for summary

judgment) and what Dineen opines (that over $500,000 in productivity losses occurred) is

Dineen's opinion—not a reliable methodology. Accordingly, Dineen's lost productivity opinion

should be excluded.

 Dineen's lost productivity opinions should also be excluded because they are based on a

misreading of his source, an article titled *The Cost of Turnover*. Timothy R. Hinkin & J. Bruce

Tracey, *The Cost of Turnover*, Cornell Hotel and Rest. Admin. Q. 14 (June 2000), *available at*

https://ecommons.cornell.edu/bitstream/handle/1813/71741/Hinkin23_The_cost_of_turnover.pdf

?sequence=1&isAllowed=y (hereinafter "*The Cost of Turnover*"). The article states that,

regarding "lost productivity due to a steep learning curve," "productivity is lost when someone

unfamiliar with the tasks replaces a seasoned employee." *Id.* at 19. In other words, the article's

"lost productivity" is the reduced productivity of *new employees* when they start a new job. But

Dineen uses "lost productivity" in his report to reduced productivity of *existing employees* before

they leave the job. Exh. 2 at 19–20. This alone is fatal to the admissibility of Dineen's analysis.

An expert's opinion must be based on reliable application, and applying a methodology

incorrectly renders that the expert's opinion unreliable and therefore inadmissible. *Nordetek*

*Env't, Inc. v. RDP Techs., Inc.*, 862 F. Supp. 2d 406, 419 (E.D. Pa. 2012).[5]

---

[5] Dineen, elsewhere in his report, describes productivity when a new employee starts as "ramp up" time and inexplicably uses a different methodology to calculate it, ignoring this source.

Worse still, Dineen misreads the study's calculation of "turnover costs," and his opinions based on this study double count productivity losses. Dineen's source is an empirical study of four hotels in the year 2000. The data from Dineen's source is shown below.

*The Cost of Turnover* at 19:

**Exhibit 2**
*Comparison of four hotels' turnover costs for a front-desk associate*

|  | ———— Miami ———— | | ———— New York ———— | |
|  | **Hotel A** | **Hotel B** | **Hotel C** | **Hotel D** |
| Separation costs | $25.88 | $25.63 | $21.01 | $21.01 |
| Recruiting costs | $25.00 | $25.00 | $64.90 | $64.90 |
| Selection costs | $165.00 | $123.50 | $1,098.40 | $1,224.80 |
| Hiring costs | $1,608.53 | $2,118.25 | $3,460.90 | $4,425.95 |
| Productivity costs | $4,140.65 | $3,395.65 | $6,963.49 | $7,144.99 |
| *Total* | *$5,965.06* | *$5,688.03* | *$11,609.46* | *$12,881.82* |

The study calculated a "total" turnover cost that included "productivity costs," as shown in the table above. Then the study calculated that the fraction of the total turnover cost that was due to productivity costs was 55–69% at the four hotels. *The Cost of Turnover* at 19. So the study's "productivity costs" are *part of the total turnover cost*.

Instead of following the methodology of his source and calculating productivity costs as part of turnover costs, Dineen calculates productivity costs as *additional costs*. Dineen calculated a total turnover cost in Section II.B of his report by multiplying the salaries of employees by 90–200%. Exh. 2 at 13. Then Dineen calculated the productivity costs by multiplying his total turnover costs by 55%, as another source of damages *in addition to* turnover costs. *Id.* at 18–19. So, Dineen's opinions inexplicably ignore the methodology of his source and double count productivity costs. A methodology that is incorrectly applied, or based on a misunderstanding of the facts, is not reliable. *See Nordetek Env't, Inc.*, 862 F. Supp. 2d at 419; *Madej v. Maiden*, 951

11

F.3d 364, 376–77 (6th Cir. 2020), *cert. denied*, 208 L. Ed. 2d 202 (2020). Therefore, Dineen's

opinions on productivity costs are unreliable and should be excluded under Rule 702.

> **3.      Dineen's opinions are unreliable because they are based on industries other than the CCaaS industry and do not account for the differences with the CCaaS industry.**

Dineen acknowledges that the employees in this case worked in the CCaaS industry. But

instead of using sources from the CCaaS industry in this time period, Dineen bases his opinion

on sources from other industries across a wide range of time periods. Dineen's opinions rely on

sources from the hospitality industry, government contracting, and high-tech software

development. But Dineen fails to use any consistent methodology to reconcile the wide range of

sources that he applies. For example, Dineen relies on a twenty-year-old Cornell Hotel and

Restaurant Administration Quarterly to support his measure of lost productivity.[6]  This study

proposes that the "turnover costs" for an employee would be between $5,965.06 and $12,881.82.

The article notes that, of these total, the measured "productivity costs" were about 55–69%. *The*

*Cost of Turnover* at 19. But Dineen doesn't rely on this article for both the productivity costs

number and the turnover costs. Instead, Dineen cherry picks the productivity costs ratio from the

article and uses a different literature review to calculate turnover costs. And Dineen provides no

justification for this decision to apply the productivity ratio from this article but ignores the

turnover cost estimate in this article.

As another example, to support his top-end estimate of "headhunting" costs, Dineen

relies on an article copyrighted 1996–2005 about the "the cost of hunting heads" for "high tech

---

[6] Dineen's reliance on this source is also fatally undercut by the text of the article itself, see section IV.A.2 above.

firms." Joseph G. Hadzima, Jr., MIT Sloan Sch. of Mgmt., *The Costs of Hunting Heads* (1995–2005), *available at* http://web.mit.edu/e-club/hadzima/the-costs-of-hunting-heads.html. The article states that "President/CEO or VP level searches" can cost one-third of the employee's compensation. But only one of the of the employees at issue here were at the VP level. And Dineen also ignores the suggestions of this source that contract recruiters can be hired for $35–$70 per hour. Again, Dineen cherry picks a number from a source while ignoring evidence within that source that undercuts his position. Dineen does not apply any methodology that (1) justifies ignoring the estimate of recruiting costs from this source; (2) accounts for the fact that the headhunting at issue is non-VP headhunting; (3) accounts for the two-decade time gap between this article and the present day; or (4) accounts for the difference in industries.

Other articles cited by Dineen exhibit these same deficiencies—they either relate to entirely different industries, different time periods, or both. The result is a damages opinion that is based on cherry-picked numbers from sources that are related to one another only by Dineen's say-so. This is not a reliable expert methodology. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 893 (E.D. Wis. 2010). Accordingly, Dineen's damages opinions must be excluded under Rule 702.

**C.  Green and York's opinions should be excluded in their entirety.**

In reaching the conclusions within their expert reports, Green and York have improperly opined on matters for which they are not qualified and have made analytical assumptions that render their opinions unreliable. For the reasons explained in detail below, these opinions should be excluded entirely.

13

1.      **Green and York are not qualified to opine on the protection of confidential and trade secret information in the Contact Center as a Service (CCaaS) industry.**

Step one of the *Daubert* analysis is to determine whether an expert witness is qualified by knowledge, skill, experience, training, or education. *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). The proper question is whether the expert witness's qualifications provide a foundation to answer specific questions. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). Thus, the witness's general qualifications are not relevant to the analysis. *Hall*, 840 F.3d at 926.

Green states that she was hired on behalf of Genesys "to opine on the systems, technology, processes, policies, and protocols of Genesys as they pertain to protecting the confidential and trade secret information of Genesys." Exh. 6 at 4. In her expert report, she offers her opinions that Manno, Strahan, and Hertel violated Genesys's Information Technology Policies and breached their Genesys employment agreements by sharing Genesys's alleged confidential trade secret information with Talkdesk and allegedly recruiting Genesys employees in violation of their employment agreements. *Id.* at 33. However, neither her education nor experience provide her with the qualifications to draw such conclusions regarding confidential or trade secret status and protection of information within the CCaaS industry.

Green is pursuing her PhD in Cyber Forensics, but she has not yet completed the program or obtained such a degree. *Id.* at 3. At present, she holds a B.A. and an M.S. in Management from Indiana Wesleyan University. Exh. 7 at 2. This education does not relate at all to the status or protection of confidential or trade secret information in the CCaaS industry. Green further claims that she has been working, broadly, in "all aspects of" information technology (IT) for over thirty years—the last 18 of which she spent serving as an alleged expert in Electronically Stored Information ("ESI"). Exh. 6 at 3. In fact, most of her work (and recent courtroom

14

experience) relates to the e-discovery of ESI, which she estimates currently comprises 80% of her job. Exh. 13 at 18:2–12, 21:17–29:12. By her own admission, she has no experience working for telecommunications companies (and therefore CCaaS companies) and has never sold telecommunications products to third-party customers. *Id.* at 15:18–16:17. Although she was responsible for the automation of a call center for an insurance company about twenty-five years ago, Green herself describes this experience as "dated." *Id.* at 13:21–14:2, 15:3–4.

This lack of experience in the appropriate field is evident in Green's total reliance on the factual and legal *allegations* she pulled verbatim from the Third Amended Complaint with no verification. *See id.* at 36:10–14, 113:20–114:4; Exh. 6 at 20–21, 23–24, 26–32. For example, Green admits that she is unable to opine on the legal definitions of "confidential" or "trade secret" information, so she did not even attempt to confirm any specific piece of Genesys information as such. Exh. 13 at 31:7–32:5, 32:12–16, 33:7–18. She further admits she has no basis for deeming the employment agreements enforceable and violated by Defendants. *Id.* at 69:6–8. Despite this, Green purports to reach conclusions stating that certain information is "confidential" or "trade secret." Yet, having no legal expertise or experience within the relevant industry, Ms. Green's report is based totally on her assumption that the *allegations* of Genesys and its counsel are accurate. *See In re TMI Litig.*, 193 F.3d at 705.

Likewise, York was hired "to provide [his] expert, professional opinion … on whether Genesys treats its employee personnel information … as confidential trade secret information. Exh. 8 at 3. In his report, he offers his opinions that Genesys takes reasonable steps to protect the secrecy of its employee personnel information and that the secrecy of such information provides an economic value to Genesys. *Id.* at 21–27. However, as with Green, York's education and

experience do not provide him with the qualifications to draw such conclusions in the CCaaS industry.

York has an M.S. in Management, a B.A. in Organizational Leadership, and a Human Resource Management certificate. *Id.* at 5. York admits that he has no experience in a consulting or employment role with any company providing contact center products and is "not an expert in the contact center industry." Exh. 9 at 17:13–18:14. Thus, he has no expertise as to what "reasonable steps" to protect alleged trade secret information in the CCaaS industry would be. He further cannot opine on what is publicly available information within the industry and admits that he did no such analysis on Genesys's information here. *Id.* at 27:16–21. York is not an economist or accountant, and therefore has no expertise to opine on the value of alleged trade secret information. *See id.* at 13:14–18; Exh. 8 at 5.

Further, like Green, York admits that he is not an attorney and cannot interpret the terms "confidential" and "trade secret" in a legal sense; instead, his report improperly relies on his lay understanding of the terms along with outside, non-legal materials. Exh. 9 at 19:18–21:23. York purports to give his expert opinion as to what these legal terms mean, but he admits that he does not know the legal basis of the definitions he took from these third-party sources. *Id.* at 21:24– 22:9. As such, York has no relevant education, legal expertise, or technical experience within the relevant industry. *See, e.g.*, *Astro Tech., Inc. v. Alliant Techsystems, Inc.*, No. H-03-0745, 2005 WL 6061803, at *7–9 (S.D. Tex. Sept. 28, 2005) (finding that an expert lacked the necessary qualifications to testify as an expert on trade secrets and their alleged misappropriation because his expertise did not give him an ability to recognize and appreciate the complexities and importance of the technological issues). He is not an expert, and his opinions rely on the baseless assumption that the purported "trade secret" information is not public. Therefore, York's

opinions are not based on a testable expert methodology and must be excluded under *Daubert*. *See Joiner*, 522 U.S. at 146.

Neither Green nor York has the proper qualifications to opine on the specific questions they purport to address. Therefore, the Green and York expert reports should be excluded in their entirety.

> **2.      Even if Green and York were qualified, their opinions are not reliable as they make improper assumptions and rely on their layperson definitions of legal terms.**

Step two of the *Daubert* analysis asks whether the reasoning or methodology used by an expert is scientifically valid. *Kirk*, 991 F.3d at 872 (quoting *Daubert*, 509 U.S. at 592–93). Factors that may be used in this determination include, but are not limited to, whether a scientific theory has been tested, peer-reviewed and published, analyzed for a known or potential rate of error, and is generally accepted within the particular field. *Kirk*, 991 F.3d at 873. The Green and York reports should be excluded because they are founded on reasoning that is so flawed that it renders the reports unreliable and irrelevant to the issues in this case.

Green's opinion concludes that Manno, Strahan, and Hertel violated Genesys's Information Technology Policies and their employment agreements by allegedly sharing Genesys Information Assets with Talkdesk and that Talkdesk used such information. Exh. 6 at 33. Green's reasoning is circular: it begins with the improper assumption that the information alleged to be confidential or trade secret information by Genesys and its counsel in the Third Amended Complaint is actually confidential or trade secret information. *See id.* at 24, 26–28, 30 (adopting Genesys and its counsel's allegations of trade secret misappropriation from the Third Amended Complaint as her own); *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) ("If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that

the party's lawyer told him, the lawyer cannot in closing argument tell the jury, 'See, we proved X through our expert witness, A.'"). She did not verify where, if anywhere, the alleged trade secret or confidential information resides within a Genesys system, and she did zero investigation as to whether such information "originated as public information that now Genesys might consider to be private information." Exh. 13 at 59:15–24; 71:10–20. She further assumed that, since Genesys and its counsel deemed such information to be confidential or trade secret information in the Third Amended Complaint, it must have been treated as Genesys private information and thus is a Genesys Information Asset (according to her own interpretation of the term Genesys Information Asset). *Id.* at 104:22–106:24. Green claims that Genesys addressed key components found withing the ISO27001 and GDPR security frameworks but does not explain *how* Genesys addressed the key components. *Compare id.* at 90:24–91:13 *with* Exh. 6 at 16–18. She did not verify whether Genesys has *ever* enforced its Information Technology Policies regarding exposure of Genesys Information Assets. Exh. 13 at 107:5–22. In sum, Green's opinions about the "Information Technology Policies" are based on *ipse dixit* and unverified assumptions, and they must be excluded. *Joiner,* 522 U.S. at 146; *In re TMI Litig.*, 193 F.3d at 705.

Green also assumed, relying entirely on the Third Amended Complaint's allegations and her own definition of legal terms, that Manno, Strahan, and Hertel breached enforceable employment agreements. This is improper. *See, e.g.*, *Haddad v. RAV Bahamas, Ltd.*, 589 F. Supp. 2d 1302, 1307 (S.D. Fla. 2008) (excluding expert testimony that ignored relevant contract terms); *Astro Tech., Inc.*, 2005 WL 6061803, at *8 (finding that a plaintiff's expert's opinions about the existence of trade secrets were neither reliable nor relevant where the expert "relied heavily, if not exclusively, on the representations of [the plaintiff's president and its] counsel").

18

Her report claims that Manno, Strahan, and Hertel failed to notify Genesys of their Changed Business Role, which she states would have resulted in the revocation of their access to Genesys systems. Exh. 6 at 33. However, she did not define Change of Business Role or verify what systems Manno, Strahan, and Hertel were even entitled to access or the hierarchy of access at Genesys generally. Exh. 13 at 55:15–22, 55:25–57:12, 99:4–10. She further used her own definition of "actively working" to assume that Manno, Strahan, and Hertel were "actively working" for Talkdesk while employed by Genesys, and—again using her own definition—assumed that allegedly "actively working" for Talkdesk would have been considered a Changed Business Role. *Id.* at 95:9–12, 99:22–100:10. At bottom, Green's opinions amount to simply her own lay opinions and assumptions about the law. These conclusions are irrelevant, highly prejudicial, and not the result of any reliable methodology. *Joiner*, 522 U.S. at 146. Genesys should be precluded from touting Ms. Green as a qualified expert and having her parrot assertions and conclusions that she has not verified nor has the qualifications on which to testify. *See Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *9 (E.D. Tex. Apr. 10, 2017) (collecting cases).

York's reasoning is also fatally flawed. He provides two main conclusions in his expert report: that Genesys takes reasonable steps to protect the secrecy of its employee personnel information, and that Genesys's employee personnel information has economic value by virtue of it being secret. Exh. 8 at 21, 25. Neither of these conclusions is properly supported by his report, which relies on improper speculation, his own definitions of legal terms, and the allegations contained in documents provided to him by Genesys counsel. *See In re James Wilson Assocs.*, 965 F.2d at 173; *Astro Tech., Inc.*, 2005 WL 6061803, at *8.

In regard to his first conclusion, York provides no identification or analysis of any specific Genesys "personnel information" and applies an improper lay understanding of the term trade secret. *See* Exh. 8 at 15 (discussing "trade secrets relating to Genesys employee personnel information" broadly). York admits that his definition of "personnel information" is broad (Exh. 9 at 30:13–22) and encompasses several categories of information, including employee sales performance, employee compensation information, employee sales data (Exh. 8 at 21), and anything else related to a person's employment information with Genesys (Exh. 9 at 31:19–25). York's report claims that Genesys employee personnel information is not generally known to the public or available by publicly accessible means (Exh. 8 at 21), but York admits he conducted no analysis on specific pieces of Genesys employee personnel information at issue in this case (Exh. 9 at 94:7–25). He further admits that whether information is trade secret (under his non-legal interpretation) is not an "all or nothing" determination based on a broad category of information, but his own report fails to dissect any pieces of alleged trade secret information. Exh. 9 at 96:7–97:18. Further, York agrees that, in making a finding as to whether information is a trade secret, it is pertinent for someone to look at the case law—but he states that this is not within the scope of his assignment as he is not an attorney. *Id.* at 104:7–15.

As such, York explained that his report is based on the definition of trade secret "from an expert in the human resource field of understanding of a trade secret[,]" or what scholarly articles define as a trade secret from an HR standpoint, rather than a review of Indiana case law relating to trade secrets. *Id.* at 104:3–6, 105:16–23. Such opinions are irrelevant to any issue in this case. *See Haddad*, 589 F. Supp. 2d at 1307. Whether something is a trade secret is a legal analysis—not a question of the "human resource field of understanding." So, York does not rely on the accepted legal standard for a trade secret to formulate any views expressed in his report. Further,

his report cites no scholarly articles that support his assertion that employee sales performance information, employee compensation information, or employee sales data is considered a trade secret in the HR context. Exh. 9 at 107:5–108:4, 111:7–12. The sources cited within his report point to the opposite conclusion that bonuses (employee compensation information) and the bid price of a contract (employee sales data) is generally not considered an intellectual property asset in the HR context. *Id.* at 109:11–110:16, 117:13–18. Additionally, York equates "proprietary information" as used in the Genesys Employee Handbook with "trade secret information" despite one of his cited sources explaining that not all proprietary information is trade secret information. *Id.* at 57:4–8, 30:22–61:10. Thus, York's opinions about trade secret information apply reasoning that contradicts what his own sources provide as the proper reasoning and are therefore unreliable. *See Boucher*, 73 F.3d at 21; *Nordetek Env't, Inc.*, 862 F. Supp. 2d at 419.

York did not verify whether any Genesys employee personnel information was generally known to the public or readily accessible through legal means. Exh. 9 at 27:16–21. Specifically, regarding Genesys's systems, York is not an expert in Okta, Callidus, or Oracle, but he improperly assumed that access to such systems is limited and the information contained therein is not public knowledge. *Id.* at 61:17–63:25, 65:5–20. But, by York's own admission, employees generally know their own compensation and sales numbers, and York did not verify whether Genesys employees were not allowed to share their own information with others. *Id.* at 66:25–67:20. York did not identify any specific pieces of Genesys personnel information relating to Michael Tews, Jeremy Mann, Jeff DeVries, Danielle Morales, Manno, Strahan, or Hertel. *Id.* at 68:3–71:6, 73:10–18. In fact, to the extent that York reached *any* determination as to whether something could or could not be a trade secret, he admits it was not based on an analysis of whether it was known to a third party. *Id.* at 117:8–13.

For the purposes of his report, York also improperly assumed that the documents provided to him by Genesys counsel (including the Third Amended Complaint and Genesys's supplemental responses to Defendants' Interrogatories) and Jessica Coburn's statements are true and accurate. *Id.* at 39:10–40:19; *see also id.* at 81:5–20 (the background information on pages 16–20 of the York report is based entirely on the biased documents provided to him by Genesys counsel). Thus, York admits that his conclusions would be incorrect if the assumptions made as to the underlying facts are not correct. *Id.* at 51:8–12. For example, York did not verify whether anyone identified by Genesys as a top performer was indeed a top performer at Genesys. *Id.* at 121:5–18, 124:4–9. He did not verify whether Manno, Strahan, or Hertel's agreements are enforceable (*id.* at 52:13–18, 55:23–56:4) and did not attempt to provide any definition of the legal terms within the confidentiality provisions of such agreements (*id.* at 53:2–17, 54:15–55:22). York's uncritical reliance on his client's documents selected by counsel requires exclusion under Rules 702 and 703. *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008); *In re TMI Litig.*, 193 F.3d at 705.

Additionally, York's opinion should be excluded because he did not perform any economic valuation of Genesys's employee information to support his second *ipse dixit* conclusion that the "trade secrets" have economic value. Exh. 9 at 28:11–13; *Joiner*, 522 U.S. 136, 146. A source cited as reviewed by York describes three generally accepted approaches to estimating trade secret value, but York did not describe any of these or perform an analysis to derive any sort of value of Genesys information. Exh. 9 at 118:5–119:13. His report states that employee compensation data, employee sales performance data, and employee sales account information have actual or potential value from being kept secret from competitors, but the report provides no explanation as to *why* any of these have value from being kept secret from

competitors. *Id.* at 125:5–127:3. For example, he did not independently verify whether Talkdesk was already aware of the top performers at Genesys. *Id.* at 136:13–18. He further claims that gaining access to Genesys's clients and sales pricing strategies would undercut competition but provides no examples of that occurring and performed no assessment of what type of client and sales pricing strategy information is known in the industry. *Id.* at 125:5–127:3. And although York's report states that the personnel information has economic value by virtue of its secrecy, York admits he did not verify if the information was actually secret. *Id.* at 29:5–16, 144:15–146:7.

Therefore, the Green and York reports are unreliable because they rely entirely on circular reasoning and speculation, layperson definitions of legal terms, and their faith in the factual and legal allegations set forth by Genesys and its counsel without independent verification.

### D.  Distler's opinions should be excluded in their entirety.

#### 1.  Distler's failure to apportion renders her opinions unreliable.

The methodology used by Distler in her valuation of the PureCloud customer list is unreliable as it includes information that is irrelevant to a hypothetical negotiation and artificially seeks to inflate the resulting damages conclusion. Specifically, she attempts to determine the cost of creating a lead (based on Genesys's alleged cost of generating an MQL lead—a conclusory number provided by Genesys without verification) multiplied by the number of PureCloud customers on the PureCloud customer list. Exh. 10 at 44:23–45:16. This results in one amount that she uses as one factor to bolster a reasonable royalty conclusion.

Similarly, Distler assesses "how much [] profits would be at risk if Genesys were to license the Genesys Customer List to a direct competitor." Exh. 14 at 30. The purpose of this, as

reasoned by Distler, is to project how much of "[t]he present value of the Customer Profits at risk from a competing license" from Talkdesk. *Id.* at 39. That is, Distler assumes the profits that Genesys gets from a customer would be at "risk" of being taken by Talkdesk if the identity of the Genesys customer is revealed to Talkdesk. But to make this leap, Distler inherently assumes that there is no "risk" of losing that customer's profits *but for* Genesys providing the information during a hypothetical negotiation.

Of course, this assumption is incorrect. Distler cannot dispute that Talkdesk would have been aware of at least some of Genesys's customers as of the hypothetical negotiation date (including Uber)—meaning Genesys's "risk" of losing those customers known to Talkdesk would have already been present at the time of the hypothetical negotiation.[7] Despite this, Distler ignores this fact and analyzes the present value of profits using a three-year and six-year period for all customers on the list—regardless of whether the customers were already known in the industry to be a Genesys customer. *See* Exh. 14 at 33.

Thus, Distler's "risk" is both unreliable and prejudicially inflated because it includes customers who were indisputably already known to Talkdesk and were already at "risk" of being lost by Genesys to competition with or without the PureCloud customer list. At bottom, Distler's opinions about "risked profits" assumes that every customer was unknown to Talkdesk, even though the facts show the opposite. Such opinions that ignore and contradict the facts of this case should be excluded. *Boucher*, 73 F.3d at 21; *Blue Dane Simmental Corp.* 178 F.3d at 1040.

---

[7] Distler buries her head in the sand on this issue. Distler could have determined from Genesys (or discovery in this case) which customers on the list had been publicly disclosed by Genesys or the customer's themselves as of the hypothetical negotiation date. Documents and testimony in this case further confirm that Talkdesk was well aware of many customers on the PureCloud list prior to the hypothetical negotiation date. Distler's attempt to ignore knowledge in the industry prior to the hypothetical negotiation date does not make her opinion reliable.

Apportionment is essential to determine a reliable reasonable royalty relating to purported trade secret damages. *See, e.g.*, *Ajaxo, Inc. v. E-Trade Fin. Corp.*, 48 Cal. App. 5th 129, 168 (Cal. Ct. App. 2020) ("The court reasoned that to derive a *reasonable* royalty from the available evidence required apportioning the value of the trade secret that E*Trade disclosed to Everypath… [and] that apportionment was required to derive a reasonable royalty[.]"). The purpose of such apportionment, which finds footing in patent law, is to "separate … between the [protected] feature and the [unprotected] features." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Accordingly, "[t]he [trade secret owner] ... must in every case give evidence tending to separate or apportion ... the [trade secret owner]'s damages between the [trade secret] and [other] features, and such evidence must be reliable and tangible, and not conjectural or speculative." *See Ajaxo, Inc.*, 48 Cal. App. 5th at 169 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

Here, Distler fails to remove irrelevant information from her damages calculation. This occurs twice in Distler's report, rendering the calculation unreliable and prejudicial:

**First**, Distler uses the total number of alleged customers on the PureCloud customer list to arrive at a "Cost per MQL." Exh. 14 at 38. In doing so, she asserts that "the Genesys Customer List represents actual customers of PureCloud" and, because of this, equates each name to a MQL entry that would be valuable to Talkdesk. *Id.* at 38. Yet, this assumption is wrong, making Distler's damages calculation unreliable and prejudicial. Indeed, Distler admits that over 200 names on the PureCloud customer list were <u>not</u> customers of Genesys as of the hypothetical negotiation date. Exh. 10 at 68:5–11. Thus, Distler's inclusion of these ~200 irrelevant names as purported "actual customers" in her calculation to arrive at a purported "cost per MQL" is inappropriate. Instead, Distler should have at a minimum reduced her multiplication

25

factor by the ~200 non-customers to account for the irrelevant information in arriving at her "cost per MQL" assessment (*i.e.*, apportion the non-customers from those that she verified were actual customers). Because she has failed to do so, the number is unrelated to her purported calculation of damages and should be excluded. *See MicroStrategy Inc.*, 429 F.3d 1344 at 1354–55.

**Second**, Distler assumes "risk" of all profits from all customers on the PureCloud customer list, despite the fact that many (if not all) customers on the list were already known in the industry—and as such, already at "risk" to be taken from Genesys. On this point, the result of this error is substantial. Indeed, Distler bundles all of the profits together to create the "at-risk" profit number. Yet, the profits are heavily weighted toward customers that were indisputably already known in the industry to be using Genesys's PureCloud product—such as Uber. Thus, the resulting "at-risk" profits are substantially skewed higher given the inclusion of profits from companies that were not "secret" and could not provide any possible value in the hypothetical negotiation. Because of this, the analysis fails to "tie proof of damages to the claimed [trade secret's] footprint in the market place" and should be excluded as unreliable. *See ResQNet.com, Inc. v. Lansa*, 594 F.3d 860, 869 (Fed. Cir. 2010).

Because Distler fails to apportion, the resulting numbers that Distler arrives at are accordingly purposefully inflated and, as such, should be excluded from consideration by a jury. Genesys bears the burden of proving admissibility of Distler's non-apportioned opinions. *Daubert*, 509 U.S. at 592 n.10. Because it cannot do so, Defendants request that the opinions be excluded as unreliable under Rule 702 and Daubert.

### E.  Dineen and Distler's "rebuttal" reports should be excluded.

#### 1. Both Dineen and Distler's "rebuttal" reports extend beyond proper rebuttal.

Dineen and Distler's rebuttal reports are not proper rebuttal reports because they offer new opinions and arguments. Rebuttal reports are limited to evidence that contradicts, impeaches, or defuses the impact of evidence offered by an adverse party—they cannot offer new arguments or new evidence. *Peals v. Terre Haute Police Dep't,* 535 F.3d 621, 630 (7th Cir. 2008); *Bowman v. Int'l Bus. Mach. Corp.*, No. 1:11-CV-0593-RLY-TAB, 2012 WL 6596933, at *5 (S.D. Ind. Dec. 18, 2012).[8] And a party cannot use rebuttal testimony merely to provide additional support for their case in chief. *See Cage v. City of Chicago,* No. 09–C–3078, 2012 WL 5557410, at *2 (N.D. Ill. Nov. 14, 2012). Here, Both Dineen and Distler's are not proper rebuttal because they offer new arguments and new evidence to improperly bolster their original opinions. The following are examples how the rebuttal reports offer new opinions and information that could have been raised in the initial reports, as well as rely on previously available information to bolster the initial reports

#### New Evidence and Opinions in Dineen's Improper Rebuttal Report:

1. **New Evidence and Opinion:** To bolster his original opinions Dineen prepared a new analysis of LinkedIn profiles and a graph of "voluntarily departing mid-market salespeople" based on information from Genesys. Exh. 3 at 5–6. Dineen then offers opinions about this new information. *Id*.

2. **New Opinion:** Dineen opines that because certain employees were "vested in stock" they were not intent on leaving. Exh. 3 at 6. Dineen's original report does not discuss stock vesting for any employee in this case and does not opine as to what effect vesting schedules in this case.

---

[8] *objections overruled*, No. 1:11-CV-0593-RLY-TAB, 2013 WL 1857192 (S.D. Ind. May 2, 2013)

3. **New Opinion:** Dineen's rebuttal report opines that when an employee is not at Genesys, it "puts more on other AE's plates, which introduces another opportunity cost." Exh. 3 at 12.  Dineen's opening report does not refer to existing employees doing more work as an "opportunity cost." Exh. 2 at 12, 21.

4. **New Opinion:** Dineen's rebuttal report opines that headhunter fees are a proxy for obtaining "headhunter-type selection information." Exh. 3 at 14. But Dineen's opening report merely estimates the total cost of headhunting using certain ratios and does not opine about the value of "headhunter-type selection information." Exh. 11.

5. **New Evidence and New Opinion:** Dineen's rebuttal report opines that Talkdesk "oversampled" LinkedIn candidates from Genesys, and that this "oversampling" was due to superior information Talkdesk had about the candidates. Exh. 3 at 14. Dineen's opening report includes no opinions or information about LinkedIn "oversampling" and instead only refers to the cost of advertising and promotional materials on LinkedIn. Exh. 2 at 25.

6. **New Opinion:** Dineen opines that Manno, had "direct access to Talkdesk's CEO which likely aided" faster ramp up time. Exh. 3 at 14. Dineen's opening report does not discuss this "direct access" as a basis for a shorter ramp time. Exh. 2 at 8, 11, 22.

7. **New Evidence and New Opinion:** Dineen opines that "covering the same sales territories also signifies a faster potential ramp time." Exh. 3 at 17.  This opinion does not appear in Dineen's opening report, which does not analyze the effect of the sales territories on ramp times. Exh. 2 at 8, 11, 22.

8. **New Evidence:** Dineen offers what he describes as "additional information" reciting turnover costs found in different studies to bolster his original estimate. Exh. 3 at 17. This additional information includes a range of turnover cost estimates and sources that were not present in Dineen's Opening report. *See* Exh. 2 at 13–14.

9. **New Evidence and New Opinion:** Dineen recites a paraphrased hearsay statement of a "follow up exchange" with a researcher in order to bolster his original opinions.[9]  Exh. 3 at 17. Dineen also uses this follow up exchange with Allen to bolster his lost productivity opinions Exh. 3 at 19.

10. **New Evidence and New Opinion:** Dineen's rebuttal report offers new opinions and argument related to "working time allowance" as an alternative basis for his opportunity cost opinions. Exh. 3 at § J. Dineen's opening report does not use the phrase "working time allowance" or express any opinion about the "theoretical" "working time allowance" that any individual in this case might have had or been capable of. Dineen's opening

---

[9] This is not proper expert testimony under Rule 702, which prohibits experts from parroting out of court hearsay statements as opinions. *Robroy Indus.-Texas,* LLC, 2017 WL 1319553, at *9. But even if it was proper expert testimony, it is clearly new information and therefore improper rebuttal.

report talks about "opportunity costs" in the context of lost prospects, lost clients, delays, and decreased customer service—not "working time allowance." Exh. 2 at 12, 21.

**New Evidence and Opinions in Distler's Improper Rebuttal Report:**

1. **New Evidence and New Opinion:** Distler cites "discussions" with Genesys to bolster her opinion that the PureCloud customer list could help competitors "displace" existing contact center solutions. Exh. 12 at ¶¶ 12, 23, 25, 26, 30. But Distler's opening report does not refer to any discussion with Mr. Vass or Mr. Ball.

2. **New Evidence and New Opinion:** Distler performs a new analysis of customer lists as of September 8, 2021, creating a new "Table 1" and "Schedule 1" summarizing her results. Exh. 12 at ¶¶ 43–47. This analysis, and opinions based on it, are new information that was not present in Distler's opening report.

In sum, the above examples show that Dineen and Distler's purported rebuttal reports are filled with new opinions and evidence that could have (and should have) been presented in their opening reports.

### 2. Dineen and Distler's improper rebuttal reports are neither substantially justified or harmless.

Genesys cannot satisfy their burden of proof to show that their violations of the case management order and Rule 26 are substantially justified or harmless. *David*, 324 F.3d at 857. The four points below illustrate how each of the four factors set forth in *David v. Caterpillar, Inc.* weighs against finding that Genesys's late reports are substantially justified or harmless. *Id.*

First, the improper rebuttal reports were both prejudicial and surprising to Defendants. As described above, the rebuttal reports are not proper rebuttal, and add new evidence and opinions to the case that were not at issue before they were served. Since Genesys did not ask for a rebuttal report to be included in the scheduling order or even inform Defendants that alleged "rebuttal reports" were forthcoming, much less that they would include new information,

Defendants were justifiably surprised by the service reports that included the late disclosure of new opinions and new evidence.[10]

Genesys's late disclosure of new expert opinions and evidence is also highly prejudicial to Defendants. Without significant effort and expense by Defendants, including new depositions and response reports, Genesys will gain a significant litigation advantage. Specifically, Dineen and Distler will be able to testify at trial without having been deposed on any of the new opinions and evidence described above. And Defendants's experts will not be able to serve rebuttal reports based on the new information. This sidesteps the command of the federal rules and the case management order that Genesys, as the plaintiff, make its opening report first, allowing Defendants to respond to that report in its entirety. Fed. R. Civ. P. 26(a)(2)(B); Dkt. 210 at 1. If allowed, Genesys's late reports would prejudice Defendants by forcing Defendants to reopen previously completed depositions and seek leave of this Court to file its own responsive reports. This will delay the completion of discovery, waste judicial resources, waste Defendants's resources, and likely delay the trial. Therefore, Genesys's rebuttal reports are highly prejudicial and surprising, and the first factor weighs in favor of exclusion.

Second, Defendants's ability to cure the prejudice is "limited and would cause additional delay." *Bowman*, 2012 WL 6596933, at *4. Defendants will not be able to respond without leave of the Court. Responding to Genesys's new evidence and arguments will require, at a minimum, that Defendants prepare new response reports to Genesys's new opinions and depose Genesys's experts on their new opinions. Accordingly, the second factor also weighs in favor of exclusion.

---

[10] Genesys cannot argue that Rule 26 provided notice to Talkdesk that rebuttal reports would be forthcoming, since Rule 26 limits the scope of Rebuttal Reports and, as set forth in section IV.D.1 above, Genesys' reports exceeded the scope of Rule 26.

Third, because of the additional briefing and scheduling requirements that would be required to respond to Genesys's late reports, the delay to the case is likely to be significant and could impact the trial schedule. Here, a trial date been set for less than four months from now. Another round of expert reports and depositions would very likely require the trial to be rescheduled. Therefore, the third factor weighs in favor of exclusion.

Fourth, the Court should find that the late reports are, at a minimum, willful and, at worst, in bad faith. Here, Genesys and its experts knew that they planned to offer additional opinions at least as early as September 8, when Distler's report indicates she was doing additional analysis. Exh. 12 at n.90. But Genesys and its experts declined to mention that they were hard at work with voluminous expert reports that would be served immediately after their depositions.[11] Notably, during Dineen deposition, he testified as to material that eventually became part of his rebuttal report and admitted that it was not in his original report. Exh. 1 at 56:14–57:13, 59:24–60:4. But Dineen never mentioned that he was working on a rebuttal report. Distler similarly noted in her deposition that she was engaged in additional conversations with Genesys, after her report was served. Exh. 10 at 34:2–8. But Distler also did not mention that she was in the middle of preparing a rebuttal report using those new conversations as the basis for new opinions.

This approach to expert reports and depositions is improper. Genesys scheduled expert depositions with knowledge that it was preparing to serve rebuttal reports including new evidence and opinions after the depositions (while timing the depositions to occur before the new reports would be filed). This let Genesys's experts prepare their new reports with the benefit of

---

[11] Genesys did not provide any notice to Talkdesk that it intended to serve its purported rebuttal reports. In any case, however, such notice would not likely have included notice that Genesys intended to violate Rule 26 by serving improper reports including new evidence and arguments.

Defendants's counsel's questioning and gave them a chance to avoid being deposed on the new evidence and opinions. Had Genesys been upfront about its planned (improper) expert reports when working with Defendants to schedule expert depositions, judicial resources could have been conserved. As is, Genesys's late disclosure of new evidence and opinions is prejudicial and not will upend the scheduling order and trial without justification. Therefore, the fourth factor also weighs in favor—making all four factors weigh in favor of exclusion.

### 3. Exclusion of the reports in their entirety is appropriate.

A late report including new arguments and evidence can also be considered an untimely and improperly disclosed initial report. *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 18–19 (D.D.C. 2013) ("Because Garmoe's report cannot be considered a rebuttal report, Plaintiff's belated disclosure is not permitted under Fed.R.Civ.P. 26(a)(2)(D)(ii).")  Alternatively, rebuttal reports that go outside the scope of proper rebuttal can be considered improper rebuttal. *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1192 (S.D. Cal. 2016). Either way, the appropriate remedy is exclusion of the improper rebuttal reports in their entirety. *Bowman*, 2012 WL 6596933, at \*7. Therefore, the sanction of automatic and mandatory exclusion applies in this case because the violation was not substantially justified or harmless. *Salgado by Salgado*, 150 F.3d at 742. Accordingly, the Court should exclude Dineen and Distler's rebuttal reports in their entireties.

### F.   Genesys's Non-Retained Expert Witnesses Provide Irrelevant and Improper Testimony Disguised as "Expert Witnesses."

#### 1.   Ball, Coburn, and Sanders are Unqualified to Testify as Experts Relating to the Disclosed Subject Matter

Genesys filed Rule 26(a)(2)(C) liability disclosures for three non-retained witnesses— Jessica Coburn, Alex Ball, and Cory Sanders—each of which Genesys asserts "may be used at

trial to present evidence under Rules 702, 703, or 705." Each of these witnesses should be precluded from testifying as expert witnesses in this matter.

Regarding Jessica Coburn, Genesys discloses that Coburn is the HR Business Partner at Genesys and discloses proposed expert testimony under two headings: "a. Genesys takes reasonable steps to keep its valuable employee personnel information secret" and "Genesys personnel information disclosed by former Genesys employee is confidential or proprietary Genesys information that is the subject of these protections by Genesys." This subject matter is not proper expert testimony. As to proposed testimony under subpart "a." about steps taken by Genesys to keep personnel information "secret," this is fact testimony—not expert testimony. *See* Fed. R. Evid. 702 (Coburn does not even purport to be an "expert by knowledge, skill, experience, training, or education"). It should thus <u>not</u> be admitted as expert testimony under the guise of Rule 702.

Similarly, Coburn's proposed testimony under "b." as to what information is "confidential" or "proprietary" at Genesys is irrelevant and improper. Indeed, Coburn admitted that she is *not* an expert on what is "confidential" or "trade secret." Exh. 15 at 8:10–9:2. And Coburn does not know what information employees of Genesys disclose on their LinkedIn pages, resumes, or to third parties. *Id.* at 18:22–20:2. Thus, any testimony by Coburn that any certain information in this case is "confidential or proprietary" is not based on any expert knowledge of Coburn. Instead, it would amount to improper *ipse dixit* testimony— about legal conclusions — and would be conclusory allegations phrased as expert witness testimony. *See*, *e.g.*, *In re James Wilson Assocs.*, 965 F.2d at 173. Defendants accordingly object and ask that Coburn be precluded from being introduced as an "expert" relating to the proposed subject matter.

Similarly, Alex Ball, Genesys's Vice President of Sales, seeks to provide unqualified "expert testimony related to liability" falling under the heading "Genesys Trade Secrets have actual or potential value by virtue of being secret." However, Ball testified that he does not value trade secrets in the regular course of his job, had not valued a trade secret before this case, and did not cite any law or experience for how to value a trade secret. Exh. 16 at 9:22–10:10. Any testimony regarding the "value" of the purported trade secrets would thus be a conclusion based on fact testimony—not proper expert testimony; this employee has no qualifications to evaluate the "value" of trade secrets.  This attempt to provide conclusory and unsupported allegations of "value" to the jury in the form of "expert testimony" should be excluded.

Finally, Genesys proposes to have Cory Sanders, Senior Director of IT Operations, provide unqualified "expert testimony related to liability" falling under the heading "Genesys Takes Reasonable Information Technology Means to Protect Its Confidential Data." However, it is irrelevant to any issue in this case the specific measures taken by Genesys to store data on its systems. Indeed, Sanders has admitted that storing information on Genesys's system does <u>not</u> make it confidential. Exh. 17 at 17:18–22. Further, Sanders admitted he has no idea what information at Genesys is confidential, nor does he know who has access to what data at Genesys or what data is provided to third parties. *See id.* at 16:10–23, 17:9–13, 18:5–19:17. Thus, allow the proposed "expert testimony" relating to whether Genesys stores "confidential data" on its system would be improper, irrelevant, and prejudicial at least because Sanders has no such knowledge, either as a fact or expert witness.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant

Defendants' motion to strike and exclude the opinions and testimony of Green, York, Dineen,

Distler, Ball, Coburn, and Sanders.


Dated:  October 22, 2021                                     Respectfully submitted,

                                                            */s/* David S. Moreland
                                                            David S. Moreland (*Pro Hac Vice*)
                                                            John Harbin (*Pro Hac Vice*)
                                                            MEUNIER CARLIN & CURFMAN LLC
                                                            999 Peachtree Street NE, Suite 1300
                                                            Atlanta, GA 30309
                                                            Telephone: (678) 869-7749
                                                            Facsimile: (404) 645-7707
                                                            Email: dmoreland@mcciplaw.com
                                                            jharbin@mcciplaw.com

                                                            Jim Strenski
                                                            PAGANELLI LAW GROUP
                                                            10401 N. Meridian St., Suite 450
                                                            Indianapolis, IN 46290
                                                            Telephone: (317) 550-1855
                                                            Email: jstrenski@paganelligroup.com

                                                            *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2021, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system and/or first-class U.S. Mail:

> John R. Maley
> Thomas C. Payne
> BARNES & THORNBURG, LLP
> 11 South Meridian Street
> Indianapolis, Indiana 46204-3535
> ***Counsel for Plaintiff***

> <u>*/s/ David S. Moreland*</u>
> David S. Moreland