UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GENESYS CLOUD SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 1:19-CV-00695-TWP-DML |
| | ) | |
| TALKDESK, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' OBJECTIONS AND
MOTION TO EXCLUDE PLAINTIFF'S EXPERTS' OPINIONS**

Counsel for Genesys Cloud Services, Inc.

John R. Maley (14300-89)
Thomas C. Payne (34727-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:     (317) 236-1313
Email:           jmaley@btlaw.com
                   tpayne@btlaw.com

## <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ........................................................................................................1

II.     LEGAL STANDARD.................................................................................................2

III.    ARGUMENT ..............................................................................................................2

      A.   Genesys' Expert Opinions Are Applicable To The Defendants' Overall
            Misconduct And Each Of Genesys' Claims ...................................................2

      B.   The Rebuttal Reports are Proper.....................................................................3

      C.   Professor Brian Dineen Is A Qualified Expert And His Testimony Is
            Reliable And Will Assist The Trier Of Fact In Understanding Genesys'
            Human Resources Related Damages .................................................................8

      D.   Economist Distler Is A Qualified Expert And Her Testimony Is Reliable
            And Will Assist The Trier Of Fact In Understanding Genesys' Trade Secret
            Royalty Damages ............................................................................................15

      E.   Forensic Technologist Rebecca Green Is A Qualified Expert And Her
            Testimony Is Reliable And Will Assist The Trier Of Fact In Understanding
            Genesys' Protection Of Its Trade Secrets ......................................................24

      F.   Human Resources Professional Jeremy York Is A Qualified Expert And His
            Testimony Is Reliable And Will Assist The Trier Of Fact In Understanding
            Genesys' Human Resources Trade Secrets......................................................27

      G.   Genesys' Non-Retained Expert Witnesses Were Properly Disclosed To
            Give Expert Testimony That Is Reliable And Will Assist The Trier Of Fact
            In Understanding Genesys' Trade Secrets Claim ...........................................30

IV.     CONCLUSION.........................................................................................................32

# I.      INTRODUCTION

Genesys recruited deeply experienced, extremely well qualified experts to deploy reliable methodologies to support Genesys' claims and assist the trier of fact in understanding and determining facts at issue. The expert team includes a distinguished Purdue Professor of Labor and Human Resources with 28 years of experience, a forensic technologist with over 30 years of experience, a distinguished economist from a leading global business advisory firm with 15 years of experience in damages and royalty calculations in litigation including intellectual property matters, and a Human Resources professional with over 20 years of experience and the prior president of the Indianapolis chapter of the Society of Human Resource Management.  Genesys additionally disclosed opinions of several internal Genesys personnel with expertise, skill, and training in several topics at issue in this case.

Each retained expert provided a detailed, comprehensive expert report in compliance with Rule 26(a)(2) that disclosed  complete statements of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; and, all exhibits that will be used to summarize or support them.   Each expert's opinions conform with the requirements of Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).  Defendants cannot challenge the experts' qualifications and reliable methodologies, and instead their arguments are for cross-examination before the jury going to weight, not admissibility.

After Defendants disclosed a damages expert and report, Genesys' two damages experts timely and properly provided rebuttal reports within 30 days pursuant to Rule 26(a)(2)(D)(ii) (report intended solely to contradict or rebut evidence on the same subject matter identified by another party's expert due 30 days from that expert's disclosure).  Defendants mistakenly assert that portions of those reports go beyond rebuttal and contradiction of the defense damages expert; not so.  Each narrowly focuses on rebutting the defense opinions.

Defendants' motion to exclude Genesys' expert opinions should be denied accordingly.

## II.    LEGAL STANDARDS

Expert witness testimony is admissible so long as (1) the expert is qualified, (2) the expert's methodology is scientifically reliable, and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining the fact in issue. *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). The Court is given latitude to determine "not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). In doing so, the Court should "consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion." *Id.*   Genesys' disclosed expert opinions meet these standards.

## III.    ARGUMENT

### A.    Genesys' Expert Opinions Are Applicable To The Defendants' Overall Misconduct And Each Of Genesys' Claims.

Defendants' opening argument that Genesys' expert opinions relate only to the trade secret and raiding claims is not true. Specifically, the expert testimony of Prof. Brian Dineen relates to the damages associated with Genesys' loss of personnel. Genesys' loss of personnel stemmed not only from the unlawful raiding of its employees by Talkdesk, but also the wrongdoing of the Manno, Strahan, and Hertel. Indeed, those former Genesys employees' breach of fiduciary duties, breach of contract, aiding and abetting, conspiracy, and constructive fraud all relate to the Defendants' unlawful scheme which culminated in the loss of personnel.

Defendants attempt to artificially limit the applicability of Dineen's opinion is therefore not supported. Further, the testimony cited by Defendants does not support this proposition and in fact directly contradicts it. Dineen testified that the scope of his damages opinion was related to "the raid", he did not testify that his opinion was limited only to Genesys raiding claim; he specifically testified that Genesys' other claims, such as breach of fiduciary duty, "would be related" to the raid and were

"part of this overall damages assessment." [Dkt. 323 at 21:24–22:11, 24:22-25:6]. Dineen further testified that "[t]he raid would comprise" other actions, such as "aiding and abetting" and his belief was that such claims "would all fall under the process of the raid." [*Id.* at 25:7-16]. The attempt to limit this to one claim is improper. Dineen's opinion is widely applicable and relevant to the Defendants' overall misconduct that led to the loss of valuable personnel. Further, Distler, Green, York, Ball, Coburn, and Sanders' opinions relate not only to Genesys' trade secret claims but also relate to the breach of contract claims regarding confidential information.

Thus, in the unlikely event that the Court were to grant the defense motion for summary judgment as to two of the 37 claims – trade secrets and raiding – the expert opinions remain relevant and important to all other Genesys claims.

## B.     The Rebuttal Reports Are Proper.

Rule 26(a)(2)(D)(ii) allows for rebuttal expert reports.  After receipt of Mr. Maness's defense damages report and his deposition, Genesys exercised its procedural right to have its retained economist, Ms. Distler, and its retained human resources damages expert, Professor Dineen, provide rebuttal reports addressing deficiencies in Maness' defense report.  Defendants now mischaracterize portions of the rebuttal reports as somehow improper as offering "new arguments or new evidence." [Br. at 27]  The argument fails.

*First*, inherently a rebuttal report offers new opinions and material as it is rebutting something – here a defense expert report – that did not exist at the time of the opening Plaintiff expert's reports. By Defendants' position no rebuttal reports would ever be allowed.

*Second*, the Seventh Circuit authority cited by Defendants does not even address rebuttal expert reports.  To the contrary, *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008), involved – after the case-in-chief evidence was concluded by both sides – the plaintiff seeking to call a new fact witness on rebuttal, which the trial court precluded.

*Third*, the decision in *Bowman v. Int'l Bus. Mach. Corp.*, 2012 WL 6596933, at *5 (S.D. Ind. Dec. 18, 2012), is inapposite in that the rebuttal reports were untimely, and as to improper rebuttal those reports improperly provided additional support "and at times completely change their methodology." *Bowman,* 2012 WL 6596933, at *5. Not so in this case, in which the rebuttal reports were timely, they respond and rebut directly the opinions offered by the new defense report, and they do *not* change their methodology.

*Fourth*, the defense citation to *Cage v. City of Chicago*, 2012 WL 5557410 (N.D. Ill. Nov. 14, 2012), actually undercuts the defense position. In *Cage* – as here – plaintiff timely disclosed rebuttal expert reports. In *Cage* – as here – plaintiff's rebuttal reports contradicted, impeached, and defused the defense reports. Defendants in *Cage* – as here – sought to exclude the multiple rebuttal reports, but each attempt was denied. As Judge Kendall wrote in *Cage*:

> However, 'the mere fact that opinions offered in a rebuttal report touch upon the same subjects covered in an initial expert report does not require that the rebuttal be stricken.' *Green v. Kubota Tractor Corp.,* No. 09 CV 7290, 2012 WL 1416465, at *5 (N.D. Ill. Apr.24, 2012). The 'focus is not on the similarity between the initial and rebuttal reports, but rather on whether the opinions expressed in a rebuttal report rebut the same subject matter identified in the other party's expert report.' *Kubota,* 2012 WL 1416465 at *5 (internal quotations omitted).

*Cage,* 2012 WL 5557410 *5.

*Fifth* the several attacks the defense makes on the Distler and Dineen rebuttals fail. As to economist Distler, for instance, Defendants complain about her having and citing to additional discussions with Genesys personnel regarding the PureCloud list. But even Defendants admit this relates to the same subject covered in her initial report. And, additional discussions were necessary to respond to the opinions of Maness, whose opinions were not known at the time of the Distler Report. Providing additional information through a response report is an acceptable and reasonable practice for experts when responding to opinions being put forth by opposing experts. Their gripe with her Table 1 and Schedule 1 fails as well as it likewise responds directly to the Maness opinions. Rebuttal

4

simply means to refute or contradict, and that is what Distler's Rebuttal Report properly and exclusively does.

Likewise for Professor Dineen, consistent with Rule 26(a)(2), his Rebuttal Report responds directly to and rebuts Maness' opinions. Every topic and every opinion in his Rebuttal Report directly responds to the Maness report, which did not exist at the time of the Professor's initial opening Report. And no new damages opinions are offered by Professor Dineen. To the contrary, everything in his Rebuttal Report responds directly to Maness criticism of the underling damages opinions offered by Professor Dineen.

To highlight just a few examples, Defendants take issue with Dineen's analysis of "LinkedIn profiles" and a graph of "voluntarily departing mid-market salespeople" but this turnover analysis was provided in direct response to Maness' unfounded opinion that Genesys' mid-market turnover was the same in 2018 as other years. The analysis Defendants take issue with at pages 5 and 6 of Dineen's rebuttal report directly contradicts Maness' opinion – a proper use of rebuttal reports. [*Compare* Dkt. 322-2 at 6-7 *with* Dkt. 314-1 at 38]. Similarly, Dineen's opinion that employees being vested in stock means they would be less inclined to leave Genesys directly rebuts Maness' unsupported opinion that the raided employees would have imminently left Genesys. [*See* Dkt. 314-1 at 38].

Also, Maness criticized Dineen's productivity ramp calculations. [*Id.* at 47]. Maness took issue with Dineen's opinion that Talkdesk was unjustly enriched by the decreased ramp up period for Manno, Hertel, and Strahan, because they were performing unpaid services for Talkdesk while still working for Genesys and being paid by Genesys. Defendants take issue with Dineen rebutting this argument. Specifically, Maness said there was "no basis to think that the rate of productivity gains or losses from working full time, on site and in person, at one organization [as they were at Genesys] apply to working part time for another organization, offsite, and ***without full access to company resources or personnel*** [as they were at Talkdesk], all while still working for most of that time at a

different organization." *Id.* (emphasis added). In direct response, Dineen notes that the Manno, Strahan, and Hertel covered the same territories at Talkdesk and that Manno had direct access to Talkdesk's CEO – factors that would contribute to a decreased ramp up time even despite Maness' criticism. Indeed, Dineen's reference to Manno having access to the CEO directly contradicts Maness' statement about not having "full access to company resources or personnel." *Id.* These proper rebuttal points cover the same subject matter in Dineen's original opinion and directly rebut claims raised in Maness' report.

*Finally,* the defense proclaims "surprise" at the rebuttal reports, but Rule 26(a)(2)(D)(ii) addressing expert rebuttal reports has existed since 1993 when the overall expert disclosure rules took effect. Moreover, defense counsel chose to depose both Professor Dineen and economist Distler in the 30-day period after the Maness defense report, but never asked either expert about their views and critiques of the Maness report or whether they were doing rebuttal reports. Defendants, remarkably, go so far as to accuse the undersigned of "bad faith" [Br. at 31], while defense counsel presumably was (or at least should have been) well aware of Rule 26(a)(2)(D)(ii) and the concept of rebuttal expert reports, and cannot blame others for failing to ask routine questions of opposing experts and their views on the defense expert and opinions.

Defendants also protest that the case management plan does not address rebuttal reports. That is true, but legally of no moment. The Court's Uniform Case Management Plan does not address rebuttal reports, but neither such plans nor even a Local Rule can override the Federal Rules. Rule 26(a)(2)(D)(ii) expressly provides that "Absent a stipulation or court order" expert disclosures must be made at least 90 days before trial, or "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C) within 30 days after the other party's disclosure."

The "absent a court order" recognizes that rebuttal reports are possible and might not have a court deadline (such as through a case management plan). Rebuttal expert reports are common in this Court and elsewhere, and need not be addressed in scheduling orders or case management plans. Thus, in *Vill. of Sauk Vill. v. Roadway Express, Inc.,* 2017 WL 378424, at *1 (N.D. Ill. Jan. 25, 2017), motion to exclude a rebuttal report was denied. The court discussed Rule 26(a)(2)(D)(ii) and noted that the Court's scheduling order did not specifically contemplate rebuttal reports but yet the rebuttal report was allowed.

Similarly, in *Ahad v. Bd. of Trustees of S. Illinois Univ.*, 2018 WL 1173003, at *2 (C.D. Ill. Mar. 6, 2018), the court denied the motion to exclude a rebuttal report when not addressed in the scheduling order. The court wrote:

> Plaintiff contends that Defendants' Expert's Rebuttal Report must be struck for two reasons. First, Plaintiff argues that because the Rebuttal Report was not specifically authorized in the scheduling order, Defendants were required to seek leave of court before they could serve and rely on it. Defendants argue that because the scheduling order did not include a deadline for a rebuttal report for Defendants' expert, Federal Rule of Civil Procedure 26(a)(2)(D)(ii) applied and created a 30-day deadline for Defendants to produce a rebuttal report. Defendants argue that their report was "intended solely to contradict or rebut evidence" included in Plaintiff's expert's reply report and, therefore, was timely produced within 30 days of the reply report. The Court agrees that Rule 26(a)(2)(D)(ii) applies and Defendants were subject to a 30-day deadline to submit their rebuttal report, which they met. *Id.*

This Court has held the same. In *Brown Cty. Water Util., Inc. v. Town of Nashville, Indiana*, 2019 WL 2123461, at *5 (S.D. Ind. May 15, 2019) (Pratt, J.), a rebuttal expert report was challenged, and

this Court found it "permissible under Rule 26(a)(2)(D)(ii)." A review of the docket in that case confirms that the Court-approved case management plan did not address rebuttal expert reports. *See* 1:17-cv-02134-TWP-TAB, ECF 48, 54.

The two rebuttal reports are timely and properly limited to rebutting the Maness defense report. The defense motion fails on this point accordingly.[1]

## C.   Professor Brian Dineen Is A Qualified Expert And His Testimony Is Reliable And Will Assist The Trier Of Fact In Understanding Genesys' Human Resources Related Damages.

Professor Brian Dineen is a full tenured Professor of Management at Purdue University. [Dkt. 322-1 at 32]. Dineen has a Masters degree and Ph.D. in Labor and Human Resources, has taught as a professor of Management for nearly twenty years, and has been published no less than 24 times and presented dozens of times on issues related to human resources, turnover, job search, recruitment, etc. *Id.* at 32-42].

Defendants do not dispute that Dineen is qualified, but instead dispute the reliability of Dineen's opinions. But Defendants' arguments jump the gun. These arguments do not point to methodological errors or other reliability issues that relate to admissibility, but rather question issues that are ripe for cross-examination and relate to the credibility and weight that Dineen's opinions should be given by the fact finder. Because Dineen's opinions are reliable, he should not be excluded and the fact finder should be permitted to determine credibility and the weight of Dineen's opinions at trial.

---

[1] Notably – and as advocated in Genesys' motion to exclude Maness [ECF 313], Maness' opinions should be excluded as unreliable and contrary to Rule 702 and *Daubert*. If so excluded then the rebuttal issue is mooted with Maness out of the case.

**1.     Dineen's Opinion Is Reliable and Is Based On Costs Incurred As a Result Of Employees Who Genesys Alleges Were Unlawfully Raided.**

Defendants argue that Dineen's opinions are unreliable because they improperly assume that all the employees in question would have remained at Genesys, referring to this as a "zero turnover" assumption. [Dkt. 321 at 12-13]. Defendants' argument is not factually accurate and further, is best suited for cross-examination.

First, Dineen does not argue that Genesys would have had zero turnover. Indeed, every organization has turnover, and Dineen acknowledged that Genesys had normal turnover of roughly 1.78 employees at the time in question. Dineen's analysis and opinion is focused only on the turnover associated with the departure of Genesys' mid-market sales employees to Talkdesk in the fourth quarter of 2018, which Genesys alleges was unlawful. Thus, Dineen's damages calculation accurately excludes Genesys' "normal turnover" and focuses only on the turnover stemming from the alleged unlawful acts. For example, Dineen acknowledged that Genesys had 13 mid-market departures from August to November 2018. [Dkt. 314-5 at 6]. But only 9 of these are the subject of his damages opinion because only those 9 were the employees that Genesys alleges were unlawfully recruited and raided by the Defendants.

Defendants' argument that Dineen ignored other independent variables that could have caused Genesys' alleged damages is also not true.[2] As noted, Dineen accounted for normal turnover and opined only on the unexpected turnover that resulted from the alleged unlawful acts. At most, Dineen's opinion assumes that the 9 raided employees would not have imminently left Genesys, and Defendants do not have any evidence that conclusively establishes that the opposite is true. On the

---

[2] The case cited by Defendants for this general proposition, *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999), is not applicable here. That case dealt with an economist who used a before-and-after modeling approach to support conclusions on the *causation* of market fluctuation. In this case, Dineen is not using a before-and-after model to address causation. Rather, this case is more akin to *Craftsman Limousine, Inc. v. Ford Motor Co.*, 2002 WL 34448786, at *5 (W.D. Mo. Aug. 28, 2002) that distinguished *Blue Dane*. In *Craftsman*, the expert relied on the before and after method to calculate *damages* (as opposed to causation) and the court found the methodology reliable.

other hand, Dineen's opinion on this point is reasonable given that the key personnel involved, Defendants Manno, Strahan, and Hertel, had worked for Genesys and its predecessor for 14, 14, and 6 years, respectively. [Dkt. 314-5 at 10]. And further, the variables that Defendants argue Dineen did not take into account are not facts but rather hypothetical variables of what might have happened to the employment of each of the 9 raided employees, had they not been raided. In this regard, this is not the same as in *MicroStrategy Inc. v. Bus. Objects, S.A.,* 429 F.3d 1344 (Fed. Cir. 2005), where the expert failed to take into account known *facts* that may have caused damages, and further, that case instructs that "an expert need not consider every possible factor in rendering an opinion." *Id.* at 1355.[3]

Second, while factually untrue, the Defendants' "zero turnover" argument goes to the weight of the evidence and is better suited for cross-examination, not exclusion of Dineen's testimony. The Seventh Circuit has made clear that "failure to include variables will affect the analysis' probativeness, not its admissibility." *Adams v. Ameritech Servs., Inc.,* 231 F.3d 414, 423 (7th Cir. 2000) (quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986)). This is because "it is the jury's role to determine the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *United States Sec. & Exch. Comm'n v. Ustian,* 2020 WL 416289, at *10 (N.D. Ill. Jan. 26, 2020) (rejecting argument that expert testimony was inadmissible because expert made certain assumptions) (quoting *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000)); *See also Ford v. State Farm Fire & Cas. Co.,* No. CV 17-1767-JWD-RLB, 2019 WL 8752340, at *3 (M.D. La. July 9, 2019) ("Matters left for the jury's consideration include the alleged miscalculations, erroneous assumptions and inconsistencies that plaintiff objects to.").

---

[3] *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18 (2d. Cir. 1996) is similarly inapposite. In that case, the facts relied upon by the expert were plainly contradicted by the evidence. Dineen does not assume zero turnover and his analysis focuses only on the raided employees, Defendants cite no evidence plainly contradicting this fact. *See Boyar v. Korean Air Lines Co.,* 954 F. Supp. 4, 9 (D.D.C. 1996) (distinguishing *Boucher* and finding expert testimony admissible where challenging party failed to present facts that plainly contradicted the factual basis for the expert's assumption).

Indeed, "[experts are not the ultimate fact-finders in a case; they are allowed to make assumptions, such as assuming Plaintiff's version of events is true….To the extent the jury find the underlying facts are not as [the expert] assumed them, again, that would go to the weight to be afforded his opinions not their admissibility." *Clark v. Lard Oil Co., Inc.*, No. 2:18-CV-00109-KS-MTP, 2019 WL 4346553, at *3 (S.D. Miss. Sept. 12, 2019). Defendants' argument that Dineen relied on improper assumptions, even if true, are best suited for cross-examination and should not be grounds for excluding his testimony.

### 2. Dineen's Methodologies Used To Calculate Required Hours, Ramp Times, Productivity, and Training Are Reliable.

Again, Defendants argue that Dineen has relied on "improper assumptions" to formulate his damages calculations. While without merit, this argument is again better suited for cross-examination. *United States Sec. & Exch. Comm'n v. Ustian*, 2020 WL 416289, at *10 (N.D. Ill. Jan. 26, 2020) (rejecting argument that expert testimony was inadmissible because expert made certain assumptions).

Dineen's assumption that a full-time employee works 1,920 hours is reasonable given his experience and expertise in this field, and it is not an assumption that should exclude his testimony.[4] *See Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 807 (7th Cir. 2013) ("… the reliability of the data itself is not the object of the *Daubert* inquiry. The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury…."); *Aetna Inc. v. Express Scripts, Inc.*, 261 F.R.D. 72, 80 (E.D. Pa. 2009) ("Federal courts … have permitted damages experts to make the assumptions of fact necessary to render a sound

---

[4] Further, Dineen's assumption of 1,920 is actually conservative. [*See* Dkt. 322-1 at 8 (citing academic sources for support that 1,920 hours is a conservative estimate and that other sources call for a lower hours requirement, which would increase the average hourly rate and thereby increase incurred damages)].

opinion, as long as such assumptions have a reasonable basis in the available record and are disclosed to the finder of fact.").

Defendants also attack Dineen's methodology of using an hours-based approach for salaried employees who undertook additional duties in response to the raid. This is a reasonable approach and Defendants' argument simply states facts that they dispute, not actual errors with Dineen's methodology. *See Clark v. Lard Oil Co., Inc.*, No. 2:18-CV-00109-KS-MTP, 2019 WL 5802504, at *2 (S.D. Miss. Sept. 12, 2019) ("Defendants also argue that the methodology Brister used in the 2019 report is flawed. However, Defendants do not discuss any methodology, only facts.").

Salaried employees are still paid for the time they perform services for their employer. When they spend more time performing a training task that they would not have had to do, but for the raid, this represents an opportunity cost incurred by Genesys because it is spent away from other duties. This is basic opportunity cost that is proper to be accounted for in a damages calculation. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4254608, at *1 (N.D. Ohio Sept. 9, 2019) (finding damages expert's measure of "opportunity cost" was admissible as expert opinion).

Defendants take issue with Dineen's estimates of ramp time and lost time, which were based on data and observations provided by Genesys employees. Dineen's ramp time analysis was based on a Genesys Vice President of Sales, who personally oversees new hires, and advised Dineen on how long it normally takes a new employee to get fully up to speed at Genesys. This is not an expert opinion, it is merely an observed fact based on a Genesys' employee's firsthand knowledge of the employees working under him, and it is thus admissible under Fed.R.Evid. 602. Further, Dineen's lost time calculations are not based on the "unverified say-so of Genesys' attorneys" as Defendants baldly claim, but rather came from a Genesys human resources employee, a fact Dineen specifically testified to in the deposition testimony cited by Defendants. [Dkt. 323 at 17:7-13]. Dineen's reliance on these data points is proper. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 2796,

125 L. Ed. 2d 469 (1993) ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observations."); *Williams v. Illinois*, 567 U.S. 50, 69 (2012) ("Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge."); *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (finding reliance on data provided by company and company counsel proper where methodology used was "well within the competence" of the expert's profession). Again, Defendant's disagreement with Dineen's *data* is best left to the adversarial process and cross-examination. *See Manpower, Inc.,* 732 F.3d 796 at 807.

Defendants take issue with Dineen's productivity analysis, but again they simply state facts they do not agree with, not errors with Dineen's methodology or application of that methodology. Dineen basis this productivity analysis on a reasonable assumption that if employees are undertaking tasks for a competitor while still employed by the company (as Genesys alleges), they are not being as productive as they would be if they were not undertaking such activities. This is a reasonable assumption based on Dineen's experience and expertise in this field and Dineen stated in his report that this is an accepted and recognized source of turnover costs. [Dkt. 322-1 at 12-23]. Defendants' disagreement over this opinion should be left for cross-examination, it does not make Dineen's opinion unreliable. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d at 423; *Manpower, Inc.,* 732 F.3d 796 at 807.

Defendants' critiques of Dineen's application of his source, "The Cost of Turnover" are misguided and ultimately irrelevant for this *Daubert* analysis. Defendants note the article states that with respect to "lost productivity due to a steep learning curve…productivity is lost when someone unfamiliar with the tasks replaces a seasoned employee." *Id.* at 19. Defendants read this to mean that the person "unfamiliar with the tasks" *must* be a *new* employee. The article does not say this. Indeed, an internally transferred employee who is unfamiliar with the tasks of the new position also faces a

steep learning curve and Dineen cites additional sources, ignored by Defendants, which indicate diminished productivity of *existing* employees is non-trivial. [Dkt. 322-1 at 8, n. 3 and 4].

Ultimately, these disputes do not relate to Dineen's methodology or reliability, they relate to the credibility and weight of Dineen's opinion – issues that the Seventh Circuit instructs must be left to the fact finder. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d at 423.

### 3. Dineen's Methodologies Are Reliably Applied To the CCaaS Industry.

Lastly, Defendants argue that Dineen's opinion is unreliable because it relies on sources and scholarship from other industries that are dated (twenty years old). Defendants cite no authority for why this is legitimate grounds for excluding an expert witness' testimony.

Dineen's opinion relates to the costs that companies incur when they lose employees. As such, it is not a damages opinion that is specifically tied to the nature of the CCaaS industry and Dineen's reliance on sources from other industries does not render his opinion unreliable. To the extent Defendants believe this makes Dineen's opinion less credible – that is an issue for the jury. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d at 423.[5] Defendants argue that Dineen "cherry picked" data points from different sources to round out his analysis and opinion, but any dispute over his calculations or assumptions stemming from those sources is best left to the jury. *Ford*, 2019 WL 8752340 at *3 ("Matters left for the jury's consideration include the alleged miscalculations, erroneous assumptions and inconsistencies that plaintiff objects to.")

Finally, Defendants additional attempts to critique the data points used by Dineen and the sources he relied upon are not relevant to this *Daubert* analysis. Defendants misread the sources Dineen relies on for headhunting costs, as no source states that headhunters providing the degree of assistance provided by Defendants in this case can be procured for $35-70/hour. That article states: "For about

---

[5] Defendants' argument that the age of a source makes an opinion less reliable has no support. Indeed, it is possible that a dated resource represents the professionally accepted gold standard on an issue that has now become a well understood and accepted maxim, leading experts in that field to research other, less settled issues.

$35 to $70 per hour contract recruiters will assist you in running an in-house recruiting operation. They might come in one day a week and work with your staff in defining position specs and organizing the process." This is not a headhunter providing the services that Genesys alleges were provided to Talkdesk by Manno, Strahan, and Hertel while they were still be paid by Genesys. Any dispute of this point is a factual issue to be tested by the adversarial process in front of the fact finder. *See Manpower, Inc.,* 732 F.3d 796 at 807.

**D.      Economist Distler Is A Qualified Expert And Her Testimony Is Reliable And Will Assist The Trier Of Fact In Understanding Genesys' Trade Secret Royalty Damages.**

Without challenging her credentials or methodology, Defendants make a single argument to prevent Genesys from presenting its economist's opinion on royalty damages from their blatant misappropriation of the Genesys PureCloud List. The defense "apportionment" argument fails.[6]

**1.  Economist Distler Is Well Qualified And Experienced To Offer Royalty Opinions.**

At the outset, although not challenged by Defendants, Economist Distler's impressive professional background and the extensive analysis she performed in this case are both notable and support admissibility of her opinions.

*First*, as evident from her Report and C.V. [ECF 323-5], Ms. Distler has deep experience and credentials in damages analysis. She is a Senior Manager Director for FTI Consulting, a multi-disciplinary, global business advisory firm. At FTI, she is a member of FTI's Forensic and Litigation Consulting Practice and serves on the leadership team for the National Intellectual Property Practice. She has been identified for the last six years as a leading patent litigation expert witness by Intellectual Asset Management Magazine's Patent 1000 – The World's Leading Patent Professionals guide. She has analyzed economic and financial issues in numerous commercial and intellectual property disputes and has conducted complex studies of damages; and she has worked on over 100 projects related to

---

[6] Defendants otherwise offer improper attacks on Ms. Distler, for instance saying "Distler buries her head in the sand . . . ."  Disagreement with an expert is proper; cute rhetoric is not.

the calculation of damages in matters involving breaches of contract, destruction of business claims, interference with economic relationships, intellectual property infringements or misappropriations, and personal injury / employment termination / wrongful death claims. In calculating damages, she has performed numerous lost profits and lost wages calculations that have entailed forecasting future earnings streams, analyzing costs and cost structures, discounting future earnings streams, and analyzing relevant markets and competitive influences. She has opined on reasonable royalties for use of assets subject to infringement or misappropriation.

In addition, she has assisted Fortune 500 corporations and smaller companies to create, acquire, manage, protect, and extract value from intellectual property assets; and she has provided guidance to clients related to intellectual property transactions (e.g., licensing, due diligence, and valuation) and performed services related to improvement and creation of intellectual property-related business processes (e.g., licensing-in technologies). She graduated *Magna Cum Laude* from the University of Missouri with a Bachelor of Arts degree in Economics and subsequently received a Master of Arts degree in Economics from the University of Missouri. She is also a member of the Licensing Executives Society.

*Second*, as is evident from her 40-page Report with almost 200 pages of Exhibits, her work in this matter has been intense and comprehensive. Her methodology is set forth at length in her Report [ECF 323-5, pp.20 – 23], and utilizes the well accepted "hypothetical negotiation seeks to determine the terms of the license agreement the parties would have reached had they negotiated at arm's length when infringement began." *Id.* at 20. As her Report describes, this methodology is embraced by federal courts across the nation and has been commonly deployed since the seminal *University Computing* case in 1974. *Id.* at 21-22. She carefully followed this methodology through a lengthy analysis to reach her opinion on a reasonably royalty of approximately $2 million for the misappropriation of the PureCloud List. *Id.* at 23-40.

2.     **Defendant Does Not Challenge Economist Distler's Methodology, Instead Raising An Argument For The Jury On Weight.**

Notably, Defendants do *not* challenge Economist Distler's selected methodology of the "hypothetical negotiation" to assess a reasonable trade secret royalty. Indeed, the defense expert Maness attempts to use the same methodology. [ECF 315] Instead, the defense advocates for adjustments they believe should be made to the analysis, but that is a "weight" issue for the trier of fact, not an admissibility issue.

The defense position can be broken down to five sub-points, with Genesys response following.

a.     **Reliance on Genesys Information**

Ms. Distler uses the factors identified in *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 539 (5th Cir. 1974) to determine a reasonable royalty for the trade secret.  As described in her Report, these factors have been considered by federal courts in determining a reasonable royalty for trade secrets.   Under the factor "The total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business," Ms. Distler considers the cost to Genesys of generating a marketing qualified lead (MQL).  As discussed in paragraph 57 of the Distler Report, Genesys tracks the cost of generating MQLs and Opportunities "as part of its normal activity (i.e., not for litigation)."  It is an accepted practice for experts to rely on documents created in the ordinary course of business when forming opinions.  The defense argument fails.

b.     **Consideration of Risk of Losing Customers**

Defendants mistakenly accuse Ms. Distler, in computing the present value of the Customer Profits at risk from a competing license, of assuming there is no "risk" of losing that customer's profits but for Genesys providing the information during a hypothetical negotiation.  This is incorrect.

Defendant's statements are based upon a false premise and mischaracterize the analysis performed in the Distler Report.

First, Distler's analysis does not assume that there is no "risk" of losing that customer's profits but for Genesys providing the information during a hypothetical negotiation. In fact, Distler's projections of Genesys PureCloud customers revenue and profit account for normal and ordinary course customer attrition. In other words, Ms. Distler's potential at-risk profits analysis absolutely incorporates an adjustment to reflect that customers may leave absent the misappropriation of the PureCloud List.

Second, Defendants mischaracterize the confidential information that is contained within the PureCloud List as simply a list of customers. As Distler explained in her deposition testimony:

> Q: If Talkdesk were aware of these prospective customers prior to October 1, 2018, then why is it appropriate to include them as being at risk for purposes of the customer list?
>
> A: Well, a couple of things. I am valuing the asset as the compilation and consolidation of the list of customers and the corresponding business information that is associated with those customers. So, in doing so, I do, I look to the revenues that are generated by the totality of this list. *And then I do risk-adjust it* in light of the ability to move the companies on the Genesys customer list into opportunities that would pass to the sales execs. So, I risk-adjusted in that regard.

[Distler Dep., Ex. A, pp.:113-114, attached] (emphasis added).

Distler's analysis looks at risk based on the potential revenue that could be lost by Genesys by providing the entire Genesys Customer List to a direct competitor, in this case Talkdesk. The information contains more than just the customer name. It also has information that would be not available to a competitor from third-party sources (as demonstrated by Distler's analysis in both reports.)

Defendants, as shown by their questioning of Distler, are using this alleged inherent assumption to suggest that if a customer was known to Talkdesk then the customer should have been

eliminated from the analysis because the "risk" of losing the customer would be the same whether or not they had access to the Genesys Customer List. This is an opinion, not fact testimony, and like Distler's testimony should be presented to the jury or trier of fact. There is no basis for exclusion. Further, Defendants have not put forth any argument regarding the *methodology* used by Distler for purposes of excluding her analysis. Defendants are simply arguing their "opinion" that Ms. Distler's analysis should be adjusted. A difference in opinion is not a basis for exclusion.

c.    **Case Law**

Defendants' references to cases do not support their argument for exclusion. *First,* Defendants cite *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) to argue that "opinions that ignore and contradict the facts of this case should be excluded." In *Boucher*, the Court of Appeals found that the trial court abused its discretion in allowing an expert witness for the mechanic to testify because the worker's past and future lost earnings capacity and value of fringe benefits lost as testimony was based on speculative and unfounded assumptions. Specifically, the court found that the analysis "was without factual basis and was improperly admitted in personal injury where no testimony or documentary evidence of any kind was offered showing that worker had received benefits of any kind in the two years he had held the job at which he was working when the accident occurred or at jobs he had held in prior years.

Here, by contrast, Defendants are improperly assuming that their opinion that Distler should adjust her at-risk analysis is a "fact" rather than an "opinion". There is no fact that has been contradicted or ignored but a question about how information considered was incorporated into an analysis of damages.

*Second,* Defendants also cite *Blue Dane Simmental Corp. v. Am. Simmental Ass'n,,* 178 F.3d 1035 (8th Cir. 1999) in which the court upheld a ruling by the District Court that an expert's methodology employed was unreliable as it was simplistic. The court noted that the expert attributed the entire

difference in market price within the U.S. and Canada to the Ringer fullbloods despite the fact that these animals made up a tiny fraction of the market.  Further, during his deposition the expert admitted that various factors contribute to cattle breeds losing market value and acknowledged that he had neglected to consider any variables other than the introduction of the Ringer fullbloods.  Because the Court found that the research method did not satisfy the four factors and was not a reliable indicator of the results to which the expert would testify, it upheld the exclusion of the testimony.

*Blue Dane* does not support the defense argument.  Defendants' have not pointed to a specific fact that would render Distler's approach to analyzing a reasonable royalty unreasonable.  They have simply offered an "opinion" on how Distler should have considered risk in her analysis.  Defendants cannot point to any factual information on analyzing risk or any Distler testimony acknowledging her risk analysis is flawed to warrant an exclusion of her analysis.

*Third,* Defendants cite *Ajaxo, Inc. v. E-Trade Financial Corp.,* 48 Cal. App 5th 129 (Cal. Ct. App. 2020) ("Ajaxo") and *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292 (Fed. Cir. 2011) asserting that apportionment is required.  In *Ajaxo,* the Court ruled, among other things, that *Ajaxo* did not prove it was entitled to a reasonable royalty.  The trial court's decision was based in part on the court's conclusion that during the course of the litigation, Ajaxo "lost or destroyed" evidence of the trade secret which would have been "relevant to the royalty inquiry and important to a fair evaluation of *Ajaxo*'s trade secret."  The fact pattern doesn't fit in this case.

Here, there is no lost or destroyed evidence that would be useful to evaluating a reasonable royalty. The statements on apportionment contemplate adjusting the analysis for relevant information. The *Ajaxo* decision cited *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 539 (5th Cir. 1974) noting that "the reasonable royalty on a defendant's sales had the effect of "creating an apportionment of profits based on an approximation of the actual value of the infringed device to the

defendant." Distler's analysis is similar in this regard as she has considered several data points in estimating the value of the trade secret thereby, in effect, creating an apportionment.

As for *Uniloc,* the expert analysis was deemed inappropriate considering the entire market value rule because the patented feature did not create the basis for demand. This fact pattern is irrelevant to this analysis where the reasonable royalty for a customer list, not a piece of technology and the entire market value rule is not at issue.

### d. Alleged Irrelevant Information.

Defendants assert that Ms. Distler includes irrelevant information in her damage calculation. Not so.

Here, Defendants appear to be offering opinion testimony as to how they believe Distler's analysis should be adjusted. This is not an appropriate basis for exclusion, as Defendants can present these arguments to the trier of fact for them to decide their merits. Whether the customers were actual customers of Genesys at the time the license for the Genesys Customer List would have been negotiated does not diminish that the Genesys Customer List contained other useful information on these customers (such as seat count, contract date) that would have helped Talkdesk tailor a marketing campaign towards these customers. Again, this appears to be a difference of opinion and Defendants have not provided adequate support for excluding the analysis from being presented to a jury or trier of fact.

Defendants cite *MicroStrategy, Inc v. Business Objects, S.A.,* 429 F.3d 1344 (Fed. Cir. 2005) to support their argument, but that case is inapposite. In *MicroStrategy*, the expert's reports were excluded as they failed to consider reasons for the company's post-2000 losses other than the alleged acts of Defendants, namely the "dot com" bubble burst and the accounting error that caused it to restate its earnings reports. There is no similar fact pattern here. The question is how much value would Talkdesk have put on the "Genesys Customer List" that was taken as a whole and not piecemeal.

### e.      Known Customers

Lastly, Defendants re-assert that some customers on the PureCloud list were known to be Genesys customers.  Although a small minority were, as to those the List still had valuable trade secret information including contract date, seat licenses, and configuration.  Defendants further claim that Ms. Distler's analysis fails to "tie proof of damages to the claimed [trade secret's] footprint in the marketplace" and should be excluded.  This difference of opinion is a matter to be decided upon by the trier of fact and should not be excluded.  Indeed, Talkdesk was unable to recreate customer information on Genesys from its independent efforts, Talkdesk employees thought the customer information in the Genesys Customer List had value and could be used to create a targeted marketing campaign, and the Genesys PureCloud List had information about Genesys customers that was not publicly available and would be valuable to a competitor.

Defendants cite *ResQNet v. Lansa,* 594 F.3d 860 (Fed. Cir. 2010) in support of their argument. In this matter, Lansa challenged the district court's damage award by challenging the expert's damage methodology for determining a reasonable royalty.  The appellate courts stated "Because the district court's award relied on speculative and unreliable evidence divorced from proof of economic harm linked to the claimed invention and is inconsistent with sound damages jurisprudence, this court vacates the damage award and remands."[7]  The Defendants quote the statement "Thus, the trial court must carefully tie proof of damages to the claimed invention's footprint in the marketplace."

But in *ResQNet* the appellate court ruled that the expert used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels.  The court further commented that 5 of the 7 licenses relied upon had no relation to the claimed invention.  This case has no relevance to the pending matter as a basis to exclude the analysis of Ms. Distler.

---

[7] Section III Damages, p. 8.

Defendants attempt to equate this case by asserting that Distler's damages are inflated because they include profits from companies that were not "secret" and could not provide any possible value in the hypothetical negotiation. But Defendants improperly assume a construct of the hypothetical negotiation for which there is no evidence to show the parties would have negotiated in this matter and that the PureCloud List's only value is the identification of a customer name.

Defendants assume that as part of the negotiation, Talkdesk would have been provided access to the customer names on the Genesys Customer List and decided which customers they wished to purchase additional information. This assumption is evident in their questioning of Ms. Distler at her deposition.

> Q: Would they evaluate the risk as being less if they already know that some or maybe even all of the information is in the possession of the competitor as to one of the data points that's being assessed?
>
> A: Well, no. Again you're looking at this compiled list of all Genesys' customer and specific information to them. That is not public. It's confidential. So no, I don't think that there would be a different type of assessment as you're licensing this asset. I mean, think in the hypothetical you're creating, the parties are going through this list one by one and saying, okay, I'll take this customer and I want this customer information. That's not what happened, right, as part of the construct of the hypothetical negotiation. I'm assuming right, that is was misappropriated and taken. And then seeing that it was used from a value perspective, it was distributed through the sales teams at Talkdesk. From a value perspective, that's how the list was used.

[Ex. A, pp. 121-122, attached].

Defendants fail to cite to any basis where the hypothetical negotiation for the PureCloud List would occur on a one-off basis and is contrary to the facts in this matter. Any argument of a piece-meal negotiation to portions of the PureCloud List goes to the weight, not the admissibility, of Ms. Distler's opinions, is no basis for exclusion and should be presented to the jury to determine what is appropriate.

Finally, as analyzed in the Distler Report and Rebuttal Report, Talkdesk was unable to recreate Genesys customer information from its independent efforts, Talkdesk employees thought the

customer information in the Genesys Customer List had value and could be used to create a targeted marketing campaign, and the Genesys PureCloud List had information about Genesys customers that was not publicly available and would be valuable to a competitor.  Contrary to Defendants' claim, Distler did tie proof of damages to the claimed footprint in the marketplace through her analysis that demonstrated the purported alternatives Talkdesk attempted to claim as providing the same or equivalent information as the PureCloud List did no such thing.  Again, such an argument goes to weight, not the admissibility, of Ms. Distler's opinions.

In sum, Economist Distler's opinions are the product of accepted, reliable methodology, and she is well qualified to render her opinions.  The attempt to exclude her should be denied.

E.  **Forensic Technologist Rebecca Green Is A Qualified Expert And Her Testimony Is Reliable And Will Assist The Trier Of Fact In Understanding Genesys' Protection Of Its Trade Secrets.**

Defendants challenge Rebecca Green's expert opinions on information technology security, claiming she is not qualified as an expert and that her methodology is unreliable.  Both arguments fail.

1.  **Rebecca Green's 30+ Years Of Information Technology Experience And Her Education and Training Qualify Her As An Expert**

Remarkably, Defendants contend that IT Expert Rebecca Green is not qualified to render opinions on the systems, technology, processes, policies, and protocols of Genesys as they pertain to protecting Genesys confidential information.  Not so.

As detailed in her Expert Report and C.V. [ECF 322-5], Ms. Green has held major roles in information technology for over 30 years, including with major companies such as General Motors, Conseco, and Great Lakes Chemical Corporation.  She also previously served as Chief Technology Officer for Indiana's largest law firm, and for the last 18 years has owned and managed her own technology firm, serving as an expert in over 600 projects ranging from litigation, corporate investigations, and consulting projects.

She has served as a Special Master in the Northern District of Indiana, served as an officer of the court in multiple jurisdictions, and testified on numerous occasions on technology matters.  She is certified as a digital forensics examiner, has her B.A. and M.S. degrees, and is completing her PhD in CyperForensics.  She has written and presented on numerous technology topics throughout her career, including for the Indianapolis Bar Association, Indiana State Bar Association, Indiana University Robert McKinney School of Law, Indiana Manufacturers Association, Purdue University, Hancock County Bar Association, Defense Trial Counsel of Indiana, Women In Law Conference, IU Kelley School of Business, Indiana Continuing Legal Education Forum, National Association of Women Business Owners, and the Law Firm CIO Forum, to mention several.

Defendants quibble that she has not worked in the CCaaS industry, but her IT expertise cuts across all industries.  The technology infrastructure and tools deployed by Genesys are well known to her and common in U.S. business.  The infrastructure, policies, and processes for protecting confidential data and information are similar to what she has done for all her employers and in her hundreds of expert engagements.

She is, in short, eminently qualified to opine on the systems, technology, processes, policies, and protocols of Genesys as they pertain to protecting Genesys confidential information.  Securing IT information has been part and parcel of her life's work.

### 2.     IT Expert Green Properly Relies In Part On Case Materials.

Defendants next assert Green's opinions are from alleged "total reliance" on Genesys's Third Amended Complaint.  This is both inaccurate and fails legally.

*First*, as evident from her lengthy report and the very inventory of what she considered in doing her work and render her opinions, she reviewed 23 enumerated items, with number 23 being the Third Amended Complaint, plus five separate depositions (of all the Defendants). She also

conducted an interview and she reviewed external resources as identified in her Report. So much for the claimed "total reliance" argument.

Second, Ms. Green's use of the Third Amended Complaint for background and core facts is appropriate. Every single fact pleaded by Genesys in that lengthy Third Amended Complaint is supported by specific citations (in the Amended Complaint itself) to deposition testimony and exhibits *from this case.* [ECF 235] (Third Amended Complaint). It is entirely proper for an expert to rely on such matters. It is up to Defendants before the jury (if they survive liability summary judgment) to try to show that any such facts are not true (a hard task given most come from defense production and testimony).

### 3. IT Expert Green's Methodology Is Reliable.

Defendants try to attack Ms. Green's methodology, in part again critiquing her for relying on factually-supported allegations in the Third Amended Complaint. Again, the defense – if it survives the Genesys' summary judgment motion – can to try to persuade the jury that those facts are inaccurate.

The defense next critiques Ms. Green for opining that Manno, Strahan, and Hertel violated Genesys IT policies and agreements by sharing information technology assets with Talkdesk. Her Report properly demonstrates and defines data within the Genesys' system, walks through the security measures used by Genesys' to protect its confidential and trade secret information, and identifies the Genesys' policies violated, including excerpts from the actual Genesys' policies. Green's Report opines that the policy violations were so egregious that had the shoe been on the other foot, the Talkdesk's CEO would have been obligated to report and terminate the Defendants for the very actions in which he was encouraging the Genesys' employees to engage.

Writing, interpreting, and applying such policies has been part and parcel of her IT work, for instance as a Chief Technology Officer.  If Defendants survive summary judgment they can try to persuade the jury that what they took from Genesys was not confidential

**F.    Human Resources Professional Jeremy York Is A Qualified Expert And His Testimony Is Reliable And Will Assist The Trier Of Fact In Understanding Genesys' Human Resources Trade Secrets.**

Defendants challenge Jeremy York's expert opinions on whether Genesys treats its employee personnel information such as employee sales performance information, employee compensation information, employee sales data, and other non-public employee data as confidential trade secret information, claiming he is not qualified as an expert and that his methodology is unreliable.  Both arguments fail.

**1.    Mr. York's Years Of Human Resources Experience And His Education and Training Qualify Him As An Expert**

Defendants contend that HR Expert Jeremy York is not qualified to render opinions that Genesys treats its personnel information as confidential.  Not so.

As detailed in his Expert Report and C.V. [ECF 322-7], Mr. York has his B.A. from Purdue University in organizational management, his Master's Degree in management from Indiana Wesleyan University, and his Human Resources Certificate from Purdue University.  He is a Senior Certified Professional in Human Resources accredited by the Society for Human Resource Management (SHRM), and a Senior Professional in Human Resources accredited by the Human Resources Certification Institute.

He has worked in the human resources field for over 20 years where he has held various leadership roles. From 2014 to present he has served as the lead consultant and president of InvigorateHR, LLC where he is responsible for developing, leading, guiding, and executing the firm's entire business and operations strategy. He also advise clients, manage staff, and business

opportunities.  From 2010 to 2014 he was the Director of Human Resources at Novia CareClinics, LLC, where he oversaw the entire human resource function.  He was hired by Novia CareClinics to build their human resource department from the ground up.  In the time frame he was there the firm scaled the business from 70 employees to over 300 employees.  From 2006 to 2010 he worked as a consultant for FlashPoint Human Resource Consulting advising various clients on human resource related matters.  He worked across multiple industries and business types in this role.

From 2000 to 2006 he worked for Golden Rule Insurance Company/UnitedHealthcare as a human capital specialist.  In this role he was responsible for all human resource related needs for over 300 employees in various departments (e.g., claims, call center, legal, financial services, etc.).  His experience placed him in industries such as healthcare, insurance, manufacturing, nonprofit, construction and architecture, public sector, and other professional services.  In most of these roles he was responsible for leading a team of human resource professionals or advising a team of corporate managers.

In addition to his role at InvigorateHR, he is also an adjunct faculty member in the Purdue University School of Engineering and Technology at Indiana University Purdue University Indianapolis.  He teaches one to two courses each semester in their organizational leadership program.  These courses include human resource management, personnel/employment law, ethical decision making in leadership, and diversity, equity, and inclusion. He has been an adjunct faculty member there since 2005.

Separately, he has served on professional associations' boards of directors in leadership capacities such as director (HR Indiana SHRM), director-elect (HR Indiana SHRM), certification director (HR Indiana SHRM), president (IndySHRM), president-elect (IndySHRM), and vice-president of programs (IndySHRM).  He currently holds the position of membership advisory council

representative for the Society for Human Resource Management (SHRM).  In this role he is the liaison between 10 states in SHRM's north central region and the SHRM board of directors.  He also serves on the diversity, equity, and inclusion taskforce where they develop resources for the human resource profession and advise organizations on diversity strategies.  He is regularly hired or asked to speak at human resource or leadership conferences both locally and around the country.  Most recently he has spoken at the HR Indiana SHRM conference, the Indiana Chamber HR conference, the North Dakota SHRM leadership conference, and for the SHRM membership webcast.  He also writes regularly on HR issues.

Despite Mr. York's substantial and diverse experience, Defendants quibble that he has not worked in the CCaaS industry, but HR expertise cuts across all industries.  The HR tools deployed by Genesys are well known to him and common in U.S. business.  He is eminently qualified to opine on the these HR issues.

### 2.    HR Expert York Properly Relies In Part On Case Materials.

Defendants next assert York's opinions are flawed from reliance on Genesys's Third Amended Complaint.   As with IT Expert Green, this is both inaccurate and fails legally.

*First*, as evident from his lengthy report and the very inventory of what he considered in doing his work and rendering his opinions, he reviewed multiple enumerated items, with the Third Amended Complaint being one of them, six external resources, and conducted an interview of a Genesys' Human Resources Executive.

Second, his use of the Third Amended Complaint for background and core facts is appropriate.   Again, every single fact pleaded by Genesys in that lengthy Third Amended Complaint is supported by specific citations (in the Amended Complaint itself) to deposition testimony and exhibits *from this case.*  [ECF 235] (Third Amended Complaint).  It is entirely proper for an expert to rely on such matters.  It is up to Defendants before the jury (if they survive liability summary judgment)

to try to show that any such facts are not true (a hard task given most come from defense production and testimony).

### 3.  HR Expert York's Methodology Is Reliable.

Defendants try to attack Mr. York's methodology, in part again critiquing him for relying on factually-supported allegations in the Third Amended Complaint.  Again, the defense – if it survives the Genesys summary judgment motion – can to try to persuade the jury that those facts are inaccurate.

The defense next critiques Mr. York for his understanding of what is a trade secret.  Ultimately if Defendants survive summary judgment the Court will instruct the jury on the statutory definition of what a trade secret is under Indiana and federal law.

As for the critique regarding economic value of employee information, as a long-serving HR professional, Mr. York is well suited to opine that employee information has economic value.  It is for Defendants on cross-examination to try to impugn his opinions before the jury, again if Defendants survive summary judgment.

### G.  Genesys' Non-Retained Expert Witnesses Were Properly Disclosed To Give Expert Testimony That Is Reliable And Will Assist The Trier Of Fact In Understanding Genesys' Trade Secrets Claim.

The advisory notes for Fed.R.Civ.P. 26 state that "a witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert witness testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals **_and employees of a party_** who do not regularly provide expert testimony." (emphasis added). *See also Rawers v. United States*, No. CIV 19-0034 JB\CG, 2020 WL 5658093, at *17 (D.N.M. Sept. 23, 2020)("Non-retained experts may provide both fact witness testimony and expert testimony under rules 702, 703, or 705."). Rule 702 applies to testimony that stems from the witnesses' "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Genesys disclosed three such employee-witnesses whose testimony on issues related to Genesys' trade secret information may

include expert testimony under Rule 702. But, to the extent those witnesses' testimony does not fall under Rule 702, their testimony is still permissible as a fact witness.

Coburn's anticipated testimony regarding the steps Genesys takes to keep its personnel information secret is based on the knowledge she has gained while working for Genesys as an HR Business Representative, it thus is expert testimony because it relies on her knowledge, skill, experience, and training in this Genesys role. Similarly, Coburn's testimony regarding the type of information Genesys considers to be confidential is proper expert testimony because it is based on the knowledge she has gained while working for Genesys as an HR Business Representative and also in working in other HR roles throughout her career. It thus is expert testimony because it relies on her knowledge, skill, experience, and training in this Genesys role.[8]

Similarly, Ball's testimony regarding the value of Genesys' alleged trade secrets is proper Rule 702 evidence because it is based on his knowledge, training, and experience as a Genesys sales leader. Defendants' attempts to discredit Ball as not being an employee who values trade secrets in the regular course of his job is without merit. The focus of Ball's testimony, and the reason his testimony may ultimately fall under Rule 702, is that he has experience and knowledge working with the specific trade secrets at issue, including the PureCloud List, and his knowledge as to how that information is valuable is plainly relevant and proper in this case.

Finally, Sanders is qualified to opine as an expert on the technical aspects of Genesys's security systems and how those systems represent reasonable steps to protect Genesys' confidential information. This is technical information that Sanders has learned in his high-level IT role at Genesys. On this point, Defendants argue facts, such as that simply because something is on Genesys' system

---

[8] this testimony is not improper testimony about legal conclusions, rather it is based on what Genesys considers confidential and what Coburn, as a Genesys HR employee and HR professional, understands Genesys to keep confidential. Defendants' dispute over Coburn not having awareness of what every Genesys employee discloses on LinkedIn is irrelevant to this inquiry and is better suited for cross-examination. *See Manpower, Inc.,* 732 F.3d 796 at 807.

does not mean it is confidential, and that Sanders does not know what Genesys considers confidential. Indeed, these are not only improper at this stage but irrelevant to Sanders' testimony, which revolves around the IT systems that Genesys uses and why those systems reasonably protect Genesys' information. Defendants can argue these facts on cross-examination, but they should not exclude Sanders' testimony, regardless of whether his testimony falls under Rule 702. *See Manpower, Inc.,* 732 F.3d 796 at 807.

In short, employee-witnesses Coburn, Ball, and Sanders all may provide the type of technical and specialized testimony regarding Genesys' trade secrets and steps to protect those trade secrets that ultimately falls under Rule 702. To the extent that is the case, Genesys has properly disclosed those employees as non-retained experts.

## IV.    CONCLUSION

Genesys' expert opinions satisfy Rule 26(a)(2), Rule 702, and *Daubert*.   Certainly none should be limited or excluded prior to trial.   Defendants' motion should be denied.

Respectfully submitted,

GENESYS CLOUD SERVICES, INC.

By its Attorneys,

 s/John R. Maley
John R. Maley (14300-89)
Thomas C. Payne (34727-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:    (317) 236-1313
Email:          jmaley@btlaw.com
                  tpayne@btlaw.com