# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

GENESYS CLOUD SERVICES, INC.,    )
         )
         Plaintiff,    )
         )
         v.    )    Case No. 1:19-cv-00695-TWP-DML
         )
TALKDESK, INC., MICHAEL STRAHAN,    )
RALPH MANNO, and MARK HERTEL,    )
         )
         Defendants.    )

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Cross-Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiff Genesys Cloud Services, Inc. ("Genesys") (Filing No. 253), and Defendants Talkdesk Inc. ("Talkdesk"), Michael Strahan ("Strahan"), Mark Hertel ("Hertel"), and Ralph Manno ("Manno") (collectively, "Defendants") (Filing No. 270). Genesys initiated this lawsuit against the Defendants for misappropriation of trade secrets, breach of contract, and tortious interference with contract, among other things. After Genesys filed its Third Amended Complaint (Filing No. 235), the parties filed their Cross-Motions for Summary Judgment on the thirty-seven counts.[1] For the following reasons, the Court **grants in part and denies in part** the Motions.

## I.     BACKGROUND

This background section is not intended to provide a comprehensive explanation of all the facts of this case, rather, only those relevant to the pending Motions is set forth. Genesys and Talkdesk are competitors in a highly competitive industry referred to as call center as a service or

---

[1] Two additional claims were asserted in the Third Amended Complaint against co-defendant Danielle Morales, but those claims were dismissed by stipulation of the parties before the Cross-Motions for Summary Judgment were filed (*see* Filing No. 251).

"CCaaS".  (Filing No. 259-8 at 16–17.)  Other competitors in the industry include Five9, 8x8, Ring Central, and LiveAgent (Filing No. 273-1 at 33). Genesys is a large, established player in the CCaaS industry with 11,000 customers in more than 100 countries and approximately 5,000 employees (Filing No. 273-2 at 2–3; Filing No. 274-1 at 10). Genesys has had year over year growth with its cloud-based products since 2015 (Filing No. 273-2 at 2). Interactive Intelligence was an Indiana company in the CCaaS industry that was founded in 1994. Interactive Intelligence was acquired by Genesys in late 2016 (Filing No. 273-1 at 7).

Talkdesk is relatively new in the CCaaS industry, first offering its cloud-based services in 2011. It has grown quickly to become an industry leader (Filing No. 273-1 at 31). Talkdesk is valued at more than $3 billion, has secured over $268 million in total funding, and has more than 1,400 employees (Filing No. 259-4 at 13; Filing No. 261-23 at 1).

Defendant Manno began his employment at Interactive Intelligence in August 2004. He signed an employment agreement with Interactive Intelligence at the time that he started his employment. Manno became a Genesys employee when Genesys acquired Interactive Intelligence in 2016 (Filing No. 183-6 at 2; Filing No. 261-10). Defendant Strahan began working for Interactive Intelligence in September 2000. He signed an employment agreement with Interactive Intelligence at that time. Strahan became a Genesys employee when it acquired Interactive Intelligence in 2016 (Filing No. 183-8 at 2–3; Filing No. 261-3). Defendant Hertel began his employment at Interactive Intelligence in 2013. He became a Genesys employee when it acquired Interactive Intelligence in 2016 (Filing No. 183-5 at 2). Before they left their employment with Genesys to join Talkdesk, Manno was Genesys' mid-market vice president of sales, and Strahan and Hertel were area directors who reported to Manno (Filing No. 259-11 at 18–19, 29; Filing No. 261-26 at 5–7, 17–18). In these positions, Manno, Strahan, and Hertel had access to Genesys'

confidential information. They had access to information concerning personnel, sales, customers, discounting, and financials (Filing No. 261-30 at 9–10, 12–13; Filing No. 261-26 at 9–10, 32; Filing No. 259-11 at 36–37, 109–10; Filing No. 259-6 at 47–49, 52–54, 80).

Regarding the Interactive Intelligence employment agreement that Strahan entered into in 2000 and Manno entered into in 2004, neither Manno nor Strahan recall seeing the employment agreement again until November 2018 in connection with this litigation. Genesys did not notify either Strahan or Manno that the Interactive Intelligence agreements were assigned to or assumed by Genesys. Manno and Strahan were not aware that the Interactive Intelligence agreements were applicable to their employment with Genesys (Filing No. 183-6 at 2–3; Filing No. 183-8 at 2). In 2005, Interactive Intelligence informed Strahan that it did not enforce non-compete and non-solicitation provisions, so Strahan believed the provisions did not apply to him (Filing No. 183-8 at 2–3). Nevertheless, the employment agreements expressly inured to the benefit of Genesys as the successor of Interactive Intelligence (*see* Filing No. 261-10 at 6; Filing No. 261-3 at 6).

The employment agreement had various provisions, including the following:

<u>Section 3.</u> . . . (b) During such employment, the Employee shall devote substantially all of the Employee's business time, attention, energy and skill to the business of the Company, and shall perform such services in a faithful, competent and diligent manner . . . .
. . .

<u>Section 7.</u> . . . (a) During the Employee's service hereunder…the Employee will not, directly or indirectly, for the Employee's own benefit or the benefit of any other person or entity:
. . .

   (iii) become employed by or serve as an agent, independent contractor or representative of any business which competes with the Company;
   (iv) solicit the employment of or hire any employee of the Company, or encourage any employee to terminate his or her employment with the Company; or
   (v) prepare in any manner to compete with the Company.
. . .

Section 8. . . . (a) The term "Confidential Information" as used herein shall mean any and all software programs, customer lists, trade secrets and information, know-how, skills, knowledge, ideas, knowledge of customer's commercial requirements, pricing methods, sales and marketing techniques, . . . financial information . . . used in or pertaining to the Company's business (i) which relate in any way to the Company's business, products or processes; or (ii) which are discovered, conceived, developed or reduced to practice by the Employee, either alone or with others either (x) during the term of this Agreement; or (y) at the Company's expense; or (z) on the Company's premises or with the Company's equipment.

. . .

(c) The Employee shall not, directly or indirectly, use any Confidential Information for any purpose other than the benefit of the Company or communicate, deliver, exhibit or provide any Confidential Information to any person, firm, partnership, corporation, organization or entity, except other employees or agents of the Company as required in the normal course of the Employee's service as an employee or except as the President or any authorized officer of the Company may direct in writing. The covenant contained in this Section 8 shall be binding upon the Employee during the term of this Agreement and following the termination hereof, for the shorter of the period until either (i) until such Confidential Information becomes obsolete; or (ii) until such Confidential Information becomes generally known in the Company's trade or industry by means other than a breach of this covenant.

. . .

Section 11. . . . Upon termination of the Employee's employment for any reason, the Employee shall immediately surrender to the Company any and all records, notes, documents, forms, manuals, photographs, instructions, lists, drawings, blueprints, programs, diagrams or other written, printed or electronic material (including any and all copies made at any time whatsoever) in his or her possession or control which pertain to the business of the Company.

(Filing No. 261-10 at 1, 3, 4, 6; Filing No. 261-3 at 1, 3, 4, 6.)

In 2018, Talkdesk wanted to grow its enterprise business, so it began looking for potential employment candidates across the CCaaS industry, including those at Genesys and many other companies. Talkdesk gained knowledge about potential candidates in the industry based on its recruiting team's investigations, such as using LinkedIn. Using this knowledge, Talkdesk's recruiting team began contacting potential sales leaders. Talkdesk interviewed many more candidates than it hired, and it interviewed and hired candidates from a number of companies in

the CCaaS industry (Filing No. 274-8 at 5–6, 12–14, 21; Filing No. 274-7 at 3–7; Filing No. 274-11 at 15–17, 20–21).

During the summer of 2018, Manno had discussions with the Chief Executive Officer (CEO) of Talkdesk, Tiago Paiva ("Paiva"), about joining Talkdesk and leading its sales team. Paiva knew Manno was employed by Genesys, and he recruited Manno to join Talkdesk. Manno put together and presented to Paiva a plan for building Talkdesk's sales team (Filing No. 259-8 at 27–29; Filing No. 257-29 at 2–3). On July 12, 2018, Manno told Paiva he wanted to bring two "RVPs" (regional vice presidents Strahan and Hertel) and have them "start when I do and if we can get them offers with me they can then recruit the worthwhile Genesys players and I can have Shauna and team start calling." (Filing No. 257-30 at 3.) Paiva knew Manno, Strahan, and Hertel worked for Genesys, and Paiva did not know who were the "worthwhile Genesys players." (Filing No. 259-8 at 29, 33–34.)

Shauna Geraghty ("Geraghty"), Talkdesk's vice president of global talent, also was communicating with Manno during the summer of 2018, and she worked on recruiting Manno, Strahan, and Hertel for Talkdesk. When Geraghty was recruiting Manno, she knew that Manno was the vice president of sales at Genesys (Filing No. 259-4 at 6, 10–11). On June 25, 2018, Manno wrote to Geraghty,

> I know there are people to hire and what not, so I don't want to be the bottleneck. I'm pretty sure I can get the two RVP's [sic] accepted in July and they can start interviewing candidates accordingly. I need to be very careful while employed at Genesys as the employment agreement is pretty clear on doing work for anyone else while employed, I'm sure you know that already though.

(Filing No. 258-29 at 2.) Geraghty later had a conversation with Strahan in August 2018, during which she asked Strahan if he had an employment agreement with Genesys, and Strahan did not tell her no (Filing No. 261-24 at 23–27).

After committing to Talkdesk but while still employed by Genesys, Manno contacted Hertel in August 2018 about leaving Genesys to join Talkdesk. Manno told Hertel that they had an opportunity to build something special. They had between ten to fifteen discussions about leaving Genesys and joining Talkdesk. Manno told Hertel he was trying to get other Genesys employees, including Strahan, to leave Genesys to go to Talkdesk (Filing No. 261-27 at 23–25). Manno also had discussions with Strahan in August and September 2018 about leaving Genesys to join Talkdesk (Filing No. 259-11 at 15). Similarly, Strahan and Hertel had between six to ten conversations in August and September 2018 about leaving Genesys to work for Talkdesk. While it was ultimately an individual decision, Strahan and Hertel influenced each other to decide to join Talkdesk (Filing No. 261-27 at 18, 21; Filing No. 261-30 at 34).

Manno discussed with Strahan and Hertel what their financial requirements were to join Talkdesk, and Manno communicated this information to Paiva. Manno also coordinated with Talkdesk's recruiting team regarding hiring Strahan and Hertel, including their compensation (Filing No. 259-11 at 14–16, 56–57, 61–62, 76–77; Filing No. 259-8 at 40–41). While he was still employed by Genesys, Manno considered himself to be a part-decision maker for Talkdesk with Paiva in Strahan's and Hertel's Talkdesk employment offers and eventual hires (Filing No. 259-11 at 17–18, 56–57, 66–67; Filing No. 259-10 at 3). At that time, Manno was even considered within Talkdesk to be a department head (Filing No. 259-11 at 105–06; Filing No. 261-4 at 1–2).

On August 9, 2018, Manno, Strahan, and Hertel participated in a conference call with Paiva during which they were encouraged to join Talkdesk and build its sales team. Later that day, Strahan informed Manno that he and Hertel were excited for the Talkdesk opportunity and would get eight to ten productive sales employees in place within three to four months. Strahan also communicated his and Hertel's compensation requirements to Manno (Filing No. 258-1 at 2; Filing

No. 258-2 at 2; Filing No. 259-11 at 57–60; Filing No. 259-6 at 98; Filing No. 261-27 at 26–27). The following day, on August 10, 2018, Manno and Paiva communicated about Hertel's and Strahan's Talkdesk offers. Manno explained that the three of them planned to start working for Talkdesk on October 1, 2018, but they could begin recruiting immediately, and they would "be building the team ASAP once we sign." (Filing No. 257-3 at 2–3.) Talkdesk then extended official employment offers to Strahan and Hertel, and they accepted and signed the offers on August 11, 2018, with a start date of September 17, 2018, for Strahan and a start date of October 1, 2018, for Hertel (Filing No. 257-2; Filing No. 257-21).

Manno, Strahan, and Hertel then began recruiting efforts for Talkdesk while still employed at Genesys (Filing No. 259-11 at 111; Filing No. 261-30 at 92). On August 12, 2018, Manno identified for Geraghty three Genesys employees to pursue for Talkdesk, including Doug Cahhal who was later hired (Filing No. 258-5; Filing No. 259-11 at 70–73). In August 2018, Manno worked on recruiting Chuck Krogman ("Krogman"), a Five9 employee, to work for him at Talkdesk as another regional vice president. Manno helped coordinate the compensation package and was a decision-maker for hiring Krogman at Talkdesk. Manno also had Hertel help recruit Krogman (Filing No. 259-11 at 49–50, 66–67; Filing No. 257-23; Filing No. 259-6 at 10). Throughout August, Manno provided insights about Genesys' personnel to Talkdesk's recruiting team (Filing No. 258-3 at 2; Filing No. 258-5).

On August 22, 2018, Strahan recommended to Talkdesk's recruiting team that Talkdesk adopt Genesys' model of utilizing demo engineers, and Strahan provided the names of the members of Genesys' demo engineer team to consider hiring them (Filing No. 261-2). Also on August 22, 2018, Strahan had lunch with Craig Holloway ("Holloway"), another Genesys employee, and then told Geraghty that Holloway was interested in and would be a good fit for a sales position at

Talkdesk, reporting to Strahan. The Talkdesk recruiting team reached out to Holloway later that day (Filing No. 257-4 at 2).

On August 22, 2018, Hertel emailed Geraghty to explain that he had multiple candidates "to get queued up for a September/October start date" at Talkdesk (Filing No. 257-24 at 2). Hertel passed on the names of the recommended candidates to the recruitment team, and the individuals were hired by Talkdesk (Filing No. 259-6 at 7–10).

In August and September 2018, Strahan and Manno communicated with the Talkdesk recruitment team to recommend Genesys employee Mike Tews ("Tews") for Talkdesk's team. Strahan believed that Tews would benefit Talkdesk, and Strahan and Manno wanted Tews to get an offer from Talkdesk. Strahan also recommended Talkdesk recruit Genesys employee Jeremy Mann, whom Strahan disclosed as a top mid-market employee. Strahan and Manno again recommended Holloway and Danielle Morales ("Morales") and reminded the Talkdesk recruitment team to keep their recruiting efforts secret (Filing No. 258-31; Filing No. 261-30 at 90–91, 101–02). On August 27, 2018, Manno emailed Paiva to let him know that "we have the West team built already," and "I want to take the Genesys reps before they go elsewhere." Paiva responded that he was "[e]xcited for this!" (Filing No. 258-7 at 2–3.) He also encouraged Manno to hire another Genesys employee. *Id.*

Talkdesk's recruitment team had some concerns about Tews after his interview, and Strahan and Manno responded to those concerns by defending Tews' abilities and again pushed for Talkdesk to hire him. They also advised on compensation for Tews. On September 10, 2018, Strahan submitted a Talkdesk employment offer request for Tews, listing himself as the hiring manager. The Talkdesk recruitment team and Manno gave their approval. Geraghty then authorized Strahan, still a Genesys employee, to extend the verbal offer to Tews to work at

Talkdesk. The next day, on September 11, 2018, Strahan asked to increase the Talkdesk offer to Tews, which was approved, and then Tews accepted the employment offer extended by Strahan (Filing No. 261-4; Filing No. 261-16; Filing No. 257-10).

In August or September 2018, Hertel had six in-person conversations with Morales (Hertel's direct report at Genesys) about joining Talkdesk as part of his team. Hertel knew that Morales was not happy at Genesys, and he considered her to be "the best." (Filing No. 261-27 at 5–6, 12; Filing No. 259-3 at 13–14.) On September 5, 2018, Manno told Hertel to convey information to Morales about her Talkdesk employment offer, and Morales signed with Talkdesk later that day (Filing No. 257-26).

On September 10, 2018, Manno updated Paiva on recruiting efforts for Talkdesk, and Paiva responded, "we are moving forward! I hope you're having all the help you need from our side." (Filing No. 258-9 at 2.) The following day, on September 11, 2018, Strahan recommended that Talkdesk hire Genesys' Holloway. Strahan believed he could get Holloway to commit to a particular offer, and he would submit the offer request within Talkdesk; Holloway was hired by Talkdesk (Filing No. 257-6; Filing No. 261-30 at 93–94). On September 21, 2018, following Strahan's earlier suggestion to utilize demo/sales engineers, Talkdesk's recruitment team pursued Genesys' Jason Carter ("Carter"), whom Strahan had earlier recommended, and Manno provided positive feedback regarding Carter to Geraghty in the recruiting process (Filing No. 258-12). On September 25, 2018, Strahan submitted a Talkdesk employment offer request for Genesys' employee Diane Sparks ("Sparks"). Talkdesk approved the request, and Geraghty authorized Strahan "to extend the verbal offer to Diane." Strahan extended the verbal offer to Sparks, and she accepted the offer the same day. Sparks' written offer was extended and accepted later that same day (Filing No. 257-11).

Approximately one month earlier, on August 14, 2018, Manno emailed Paiva and asked, "Can you tell me who to speak with in ops to get me set up on email and a laptop. Seems as if we will have a bit going on even before I start and I think it would be easier than gmail." (Filing No. 258-3 at 2.) By August 30, 2018, Manno was using a Talkdesk email account for Talkdesk (Filing No. 258-8 at 2). In late August 2018, a Talkdesk vice president discussed with Manno how they should split up Talkdesk's territories (Filing No. 258-8). Manno sought input about the territories from Strahan and Hertel, noting that "none of us are working yet, but we are trying to get a jump on things since we all delayed our start dates." (Filing No. 257-25 at 2.)

On September 14, 2018, Strahan gave his two-week notice to Genesys and promptly took two weeks of paid time off. He did not perform any work for Genesys during his two-week leave period (Filing No. 261-12 at 2; Filing No. 183-8 at 5). On September 17, 2018, Strahan formally began his employment with Talkdesk (Filing No. 257-9 at 2; Filing No. 261-30 at 64; Filing No. 257-1 at 3). Between September 17 and 30, 2018, Strahan attended a conference for Talkdesk, took a business trip for Talkdesk, and participated in training and sales calls for Talkdesk, all while still employed by Genesys but during his two-week leave period. Strahan's last day of employment with Genesys was September 30, 2018 (Filing No. 261-24 at 6–8, 10–15, 32; Filing No. 261-30 at 50).

On September 20, 2018, Talkdesk's head of product marketing asked Paiva, "how long before we can dance on genesys' grave?!" (Filing No. 258-23 at 2.) Paiva responded, "You can do it already. They are all giving notice tomorrow. I think we have 18 people start[ing] on October 1, 7–8 total from genesis? 3 vps from genesis, 1 from Five9." *Id.* That same day, Paiva informed Talkdesk's investor that it had solved its "main issue" of "sales heads" because "Oct 1 we have a

batch of 13 starting. All experienced in the space (most from genesys)." (Filing No. 258-22 at 2.) (Punctuations in originals.)

On September 22, 2018, Bret Pughe ("Pughe"), a Talkdesk account executive, who was working on the Bank of Hawaii deal for Talkdesk, emailed Hertel and attached Talkdesk's current proposal, seeking Hertel's feedback and inviting him to the next meeting (Filing No. 257-27). Strahan watched a Talkdesk videoconference presentation given to Bank of Hawaii (Filing No. 261-30 at 97). Then on September 29, 2018, Strahan emailed Pughe, Paiva, Manno, and Hertel. Strahan began, "Hey Bret, per our conversation yesterday, here are the areas of weakness I would focus on with [Genesys'] PureConnect Cloud." (Filing No. 261-5 at 2–3.) Strahan then explained various negative aspects of Genesys' product that Pughe could use while pursuing the Bank of Hawaii deal, and Paiva responded, "Mike, [t]his is gold! Can we put this in our competitive intelligence playbooks?" *Id.* at 2. Strahan replied, "Of course!" *Id.* at 1.

Manno provided his notice of resignation to his supervisor on September 24, 2018. Manno was requested to stay at Genesys until the end of the third quarter (end of September), which he did. On October 1, 2018, Manno left Genesys and began working for Talkdesk as its vice president of sales for North America. Manno did not receive any compensation from Talkdesk prior to this date for any of the activities that he had conducted for the benefit of Talkdesk. Following his September 21, 2018 resignation letter, Hertel completed the third quarter with Genesys and then joined Talkdesk on October 1, 2018 (Filing No. 261-13; Filing No. 259-11 at 130–32; Filing No. 274-16 at 76–77; Filing No. 183-6 at 5; Filing No. 274-23 at 7; Filing No. 183-5 at 4; Filing No. 257-21 at 4; Filing No. 261-17).

In November 2018, Talkdesk announced that it had made fifty-three industry hires in 2018: twenty from Genesys, seventeen from NICE-InContact, four from Five9, four from 8x8, and eight

from other competitors (Filing No. 274-24 at 3). Between September 2018 and early February 2019, Talkdesk hired fifteen Genesys employees, including nine mid-market sales employees: Manno, Strahan, Hertel, Tews, Holloway, Morales, Sparks, Jennavieve Johnson, and Susanne Sayer (Filing No. 258-35 at 7–8; Filing No. 261-28 at 13–19). Only five of the fifteen employees hired between September 2018 and February 2019 remain currently employed by Talkdesk. Hertel and Strahan are not currently employed by Talkdesk (Filing No. 273-15 at 2–3).

On September 11, 2018, prior to leaving Genesys and joining Talkdesk, Manno provided to Paiva a Genesys "win report" with a bold heading: "Confidential! FOR INTERNAL USE ONLY!" (Filing No. 258-10 at 2.) The report detailed a recently closed Genesys deal and explained details regarding the value of the contract, why Genesys won the contract, and the reasons the customer chose Genesys over a competitor. That same day, Paiva forwarded the Genesys report to two other Talkdesk employees and an investor (Filing No. 258-20; Filing No. 258-21). However, this Genesys customer spoke publicly at a Genesys industry event about why it chose Genesys over Genesys' competitors (Filing No. 273-7 at 5; Filing No. 274-16 at 56–59).

Also on September 11, 2018, Hertel emailed Paiva, disclosing Genesys' information on the Bank of Hawaii deal for which Talkdesk and Genesys were competing, and which Hertel oversaw for Genesys. Hertel emailed "talking points" to Paiva, including the cost the Genesys customer paid previously, details regarding the Genesys proposal, Genesys' discounted price, Genesys' timeline, and Genesys' product design (Filing No. 261-8; Filing No. 259-6 at 24–34). Genesys and Bank of Hawaii had entered into a non-disclosure agreement to protect confidential information shared between the two entities (Filing No. 261-1).

Talkdesk began having discussions about Bank of Hawaii in March 2018 (Filing No. 274-9 at 2). Bank of Hawaii considered Talkdesk and other CCaaS providers in 2018 to replace the

system that Genesys sold to Bank of Hawaii in 2016 (Filing No. 274-13 at 9–15). Bank of Hawaii provided information to Talkdesk, and the information provided by Hertel on September 11, 2018, was given to Paiva directly from a Bank of Hawaii employee who was a friend of Paiva (Filing No. 274-15 at 20–21, 24, 29–30). Bank of Hawaii ultimately decided to stay with Genesys because of the money it had already put into the system Genesys sold it in 2016. Any reduction in price for the system sold by Genesys in 2018 to Bank of Hawaii was not due to competing offers from Talkdesk or other CCaaS competitors. Instead, any reduction in price was given in order to compensate Bank of Hawaii for the system Genesys sold to it in 2016 that did not perform as expected (Filing No. 274-13 at 20–22, 25).

After leaving Genesys and joining Talkdesk, Strahan sent an email to Manno and Lisa Kelly (Talkdesk's vice president of operations) on October 17, 2018, with a list of Genesys' PureCloud customers (Filing No. 257-28). The list is thirty-two pages long and contains more than 1,200 Genesys PureCloud customers' names, contract effective dates, user counts, and customer configuration. The following day, Manno told Kent Venook ("Venook") (Talkdesk's vice president of global sales development) about "a nice list of 1100 Pure Cloud users with renewal dates." (Filing No. 258-36 at 2.) Manno told Venook that "if your team is ready to strike given the recent outage Genesys had yesterday, I would like to send it over." *Id.* Venook responded, "Absolutely! Send it over." *Id.* Manno replied, "[W]ill do. Just sent it and I'm working on a replacement program, so just sort it out and give me a day or two to get a promotion to you. I will keep it simple." *Id.* Venook again responded, "Copy that. This list is great!" *Id.* When sending the list to Venook, Manno also explained, "I think we should hit these customers with our 100% uptime (Opentalk announcement) against Genesys' multiple outages." (Filing No. 257-28 at 2.)

After receiving the list from Manno on October 18, 2018, Venook's sales operations team converted the list, enriched it with additional information, and uploaded it to Talkdesk's Salesforce database so that the Talkdesk sales team could use it to pursue Genesys customers (Filing No. 258-38; Filing No. 258-16; Filing No. 257-14; Filing No. 257-15 at 3–4). Manno then implemented a Talkdesk "competitive replacement program" that provided a 125% quota credit for any deal where a Talkdesk sales representative replaced a Genesys PureCloud product with a Talkdesk product. Manno's replacement program to get Genesys customers to switch to Talkdesk also included promotions for the potential customers, thereby incentivizing both the customer and Talkdesk's sale representatives (Filing No. 257-14 at 3; Filing No. 261-14). Manno explained to his team that he thought it was "a great time to strike" and that they needed to "jump on this hard." (Filing No. 257-14 at 3.) Manno specifically encouraged former Genesys employees Sparks and Johnson, even after receiving cease and desist letters from Genesys, to "[k]eep selling and sell especially hard against Genesys." (Filing No. 258-37 at 2.)

On October 18, 2018, Manno emailed Paiva to let him know that they had the Genesys PureCloud customer list and that he had provided the list to Venook. He explained that they planned to "strike fast and hard," and "we need to hit them from all angles before they figure it out. The uptick is nominal, but [we] will have old Genesys' reps go hit the accounts they sold that are struggling." (Filing No. 258-27 at 2–3.) Paiva responded that he was "good with that," and that they should go after PureCloud. *Id.* at 2.

In October, November, and December 2018, Manno and Strahan disclosed to Paiva and others at Talkdesk information about Genesys' pricing and discounting practices to help Talkdesk formulate its own competitive pricing (Filing No. 258-17 at 2; Filing No. 257-17 at 2–3; Filing No. 257-18; Filing No. 258-18; Filing No. 258-34; Filing No. 258-28; Filing No. 261-6). In one

such email, Manno disclosed that "PC" would only discount ███ (Filing No. 258-17 at 2); however, in another email he indicated that "[t]here was no discount policy, but eventually they allowed one month free which was ███." (Filing No. 257-17 at 2.) Genesys advertises its pricing publicly, including its one-month-free offers (Filing No. 273-1 at 8; Filing No. 273-9; Filing No. 273-10).

On October 17, 2018, soon after joining Talkdesk, Manno provided to Paiva and other Talkdesk executives a Genesys financial letter that was signed by Genesys' chief financial officer and contained the disclaimer, "GENESYS CONFIDENTIAL AND PROPRIETARY INFORMATION UNAUTHORIZED DISCLOSURE IS PROHIBITED." (Filing No. 258-14.) The letter contained Genesys' financial information and was occasionally provided to prospective customers to give them assurances regarding Genesys' financial condition. However, the letter further indicated that "[t]hese highlights have been made known publicly through a series of press releases and/or public financing activities . . . ." *Id.* at 3.

Prior to departing Genesys, Hertel downloaded his entire Genesys Outlook account with thousands of emails. He did this so that he could ensure that he was paid his earned commissions. Because he received his earned commissions, Hertel never accessed the downloaded files (Filing No. 259-6 at 37–40; Filing No. 183-5 at 5). On November 10, 2018, after leaving Genesys and joining Talkdesk, Hertel emailed to Paiva a Genesys NPS survey with detailed customer satisfaction data. Hertel had forwarded the email from his Genesys email account to his personal email account in July 2018 (Filing No. 261-7; Filing No. 259-6 at 58–63).

On February 15, 2019, Genesys brought this lawsuit against Strahan, Hertel, and Morales (Filing No. 1). On March 4, 2019, Genesys amended its Complaint and added Talkdesk as a defendant (Filing No. 22). On July 2, 2019, Genesys again amended its Complaint, adding Manno

as a defendant (Filing No. 89). Genesys requested a preliminary injunction, and after considering the parties' briefing and oral argument, the Court denied a preliminary injunction on December 6, 2019 (Filing No. 199). Then on February 9, 2021, Genesys filed its Third Amended Complaint— the operative pleading in this matter (Filing No. 235). In the Third Amended Complaint, Genesys asserted thirty-nine claims against the five defendants. The two claims asserted against Morales were dismissed by stipulation of the parties (*see* Filing No. 251), and then the parties filed their Cross-Motions for Summary Judgment on the remaining claims (Filing No. 253; Filing No. 270).

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet

this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## III.  **DISCUSSION**

In their Cross-Motions for Summary Judgment, the parties ask for entry of summary judgment on the thirty-seven remaining claims brought in the Third Amended Complaint. The Court will address the claims in turn.

A.    **Breach of Contract Claims**

Genesys brings breach of contract claims against Manno and Strahan based upon their employment agreements and founded upon non-solicitation of employees while still employed by Genesys, confidentiality, competing during employment, preparing to compete during employment, failure to surrender records, and failure to devote substantial time and provide faithful service.

"The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (internal citation and quotation marks omitted). Furthermore, "a person is assumed to have read and understood documents that they sign; a lack of understanding or failure to read the contract's provisions does not relieve a party from the terms of that agreement." *Flynn v. AerChem, Inc.*, 102 F. Supp. 2d 1055, 1060 (S.D. Ind. 2000).

1.    **Non-solicitation of Employees While Still Employed by Genesys**

Genesys argues that Manno and Strahan solicited Genesys' employees to leave Genesys and join Talkdesk. Their activities occurred while they were still employed by Genesys, and their efforts to get Hertel, Tews, Holloway, and Sparks to leave Genesys violated the non-solicitation provision of their employment agreements. The Defendants respond that the breach of contract claims based on the non-solicitation provision fail as a matter of law because the Indiana Supreme Court held that non-solicitation provisions that apply to "all employees" are overbroad and unenforceable. *See Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150 (Ind. 2019). Genesys argues that *Heraeus* is distinguishable from this case because it involved post-employment solicitation of the employer's employees whereas this case is limited to Manno's and Strahan's solicitation activities while they still were employed by Genesys.

The Court concludes that the Defendants' position is well-taken, and they are entitled to summary judgment on the breach of contract non-solicitation claims. The Indiana Supreme Court held that a non-solicitation covenant "is unreasonably broad [when] it extends to 'any individual employed' by [plaintiff]—not just to those who 'have access to or possess any knowledge that would give a competitor an unfair advantage,'" which would be "a legitimate interest to be protected." *Heraeus*, 135 N.E.3d at 155. The Indiana Supreme Court further explained, "the covenant not to solicit 'any individual employed' by [plaintiff] cannot be blue-penciled because there is no language that we could excise to render its scope reasonable. Thus, the overbroad covenant is void and unenforceable." *Id.* at 156. The court did not make any distinction between current or former employees, and the overbreadth analysis was not based on current or former employee status. Rather, the court focused on the "any individual employed" language, which was determined to be too broad to be enforceable. The language in Manno's and Strahan's employment contracts is nearly identical to the *Heraeus* language and is similarly overbroad, applying to "any employee of the Company." Therefore, the Court concludes that **the non-solicitation provision at issue here is unenforceable and denies Genesys' Motion for Summary Judgment and grants the Defendants' Motion as to the breach of contract claims based on the non-solicitation provision**.

### 2.    Competing and Preparing to Compete During Employment

Genesys further argues that Manno and Strahan competed against and prepared to compete against Genesys while they were still employed by Genesys, thereby violating Section 7 of their employment contracts. Genesys asserts that Manno and Strahan acted as agents of Talkdesk in competition with Genesys and that Strahan actually started employment with Talkdesk while he still was employed by Genesys. Manno and Strahan each performed recruiting activities for the

benefit of Talkdesk while still employed by Genesys. Manno requested a Talkdesk email account in August 2018 because he had "a bit going on" before even starting employment with Talkdesk. Manno prepared a plan for building Talkdesk's sales team and discussed how to split up sales territories for Talkdesk. Strahan even began his employment with Talkdesk before ending his Genesys employment; he received training, attended a conference, went on a business trip, and was on various Talkdesk telephone calls. "In sum, Manno and Strahan served as Talkdesk's recruiters while still working for Genesys, and they served as Talkdesk agents in other ways, including helping Talkdesk's competitive position against Genesys—all in violation of their contractual obligations." (Filing No. 266 at 29.)

The Defendants respond that the contractual provision prohibiting "preparing to compete" is overbroad and unenforceable. They point out that employees have "the privilege . . . to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty." *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011). Furthermore, where a non-compete provision is overly broad and prohibits permissible activity, the provision will be held unenforceable. *See Sharvelle v. Magnante*, 836 N.E.2d 432, 437–39 (Ind. Ct. App. 2005). Likewise, they argue that the provision prohibiting competing is overly broad because it has no limitations regarding past or future positions or geography, and they assert there is no evidence that they were agents of Talkdesk or paid by Talkdesk while still employed by Genesys.

The Court agrees with the Defendants that the employment contract's provision prohibiting "preparing to compete" is overly broad and unenforceable. Employees may prepare to compete by seeking employment, interviewing for employment, and accepting employment, but these activities would be prohibited under Manno's and Strahan's contract. Therefore, the Court

concludes that **the "preparing to compete" restriction is unenforceable, and the Defendants are entitled to summary judgment on the breach of contract claims brought pursuant to that provision.**

However, an employer has a legitimate interest in its employees not competing against it while they are still employed. Manno and Strahan contracted that they would not, during their employment, directly or indirectly become employed by or serve as an agent of a competing company. The designated evidence indicates that they served as agents of Talkdesk while still employed by Genesys by performing recruiting activities, planning sales team coordination, and establishing a Talkdesk email account.   Furthermore, Strahan began his employment with Talkdesk on September 17, 2018, and remained employed by Genesys until September 30, 2018 (even if he used accrued vacation days the last two weeks of employment). Even if they did not receive a paycheck from Talkdesk while still employed by Genesys, Manno and Strahan still breached their contractual obligation to not compete with Genesys during their employment with Genesys by acting as agents of Talkdesk. Thus, **Genesys is entitled to summary judgment against Manno and Strahan on the breach of contract claims brought pursuant to the non-compete provision during their employment with Genesys**. The amount of damages must be determined by the trier of fact.

### 3.    Failure to Devote Substantial Time and Provide Faithful Service

Next, Genesys argues that Manno and Strahan breached their contracts by failing to devote substantial time and provide faithful service to Genesys during their employment. The employment contract required that they "devote substantially all of [their] business time, attention, energy and skill to the business of the Company, and shall perform such services in a faithful, competent and diligent manner." (Filing No. 261-3 at 1.) Genesys contends that Manno and Strahan breached this

obligation by recruiting for Talkdesk and helping Talkdesk compete against Genesys all while they still were employed by Genesys.

In response, the Defendants assert that this provision is overbroad and unenforceable because it does not define "substantially all," and it could implicate activity that is harmless and permissible under the law. They contend Genesys' argument that they violated the "substantially all" provision by securing new employment and preparing for that employment shows that the contract provision is unreasonable and void. Additionally, they contend there is no evidence to show a breach; they completed their work for Genesys, and they had a right to look for new employment and then communicate with their future employer. They argue that Genesys ignores the entire length of service (14 years and 18 years) during which Manno and Strahan provided faithful service to the company and, instead, Genesys points to only discrete acts during a short time frame to allege a breach. "Interviewing for a new job or spending a few minutes to type non-work e-mails does not show that Manno and Strahan failed to devote 'substantially all' of their time on Genesys matters while working there." (Filing No. 271 at 39.)

Upon review of the designated evidence, the Court concludes that Genesys' position is well-taken. Even if the Court were to determine that the "substantially all" language is overly broad, the Court could "blue-pencil" that language under Indiana law, and Manno and Strahan still would be left with the contractual obligation to perform their work responsibilities in a faithful, competent, and diligent manner. The designated evidence leads to the conclusion that Manno and Strahan did not perform their work responsibilities in a faithful manner. They may have given many years of faithful service to their employer (the evidence does not speak to the earlier years of their employment); however, the evidence shows that, during work hours, Manno and Strahan performed recruiting efforts on behalf of Talkdesk—Genesys' competitor—and they had numerous

conversations with Talkdesk personnel about hiring and sales plans and strategies. Manno's and Strahan's activities went well beyond what their counsel characterized as "spending a few minutes to type non-work e-mails." **The designated evidence supports entry of summary judgment in favor of Genesys on its breach of contract claims against Manno and Strahan based on the "faithful service during employment" provision**. The amount of damages must be determined by the trier of fact.

### 4.    <u>Failure to Surrender Records</u>

Next, Genesys argues that Manno and Strahan breached their contract by failing to surrender records when their employment with Genesys ended. The employment contract provides,

> Upon termination of the Employee's employment for any reason, the Employee shall immediately surrender to the Company any and all records, notes, documents, forms, manuals, photographs, instructions, lists, drawings, blueprints, programs, diagrams or other written, printed or electronic material (including any and all copies made at any time whatsoever) in his or her possession or control which pertain to the business of the Company.

(Filing No. 261-3 at 6.)

Genesys asserts that Manno failed to return Genesys' chief financial officer's letter after Manno's employment with Genesys ended.  The letter is a Genesys record that includes private financial information about Genesys, and Manno provided the letter to Talkdesk employees after leaving Genesys.  Furthermore, both Manno and Strahan failed to return the PureCloud list, which is a Genesys record, after their Genesys employment ended. Manno and Strahan sent the PureCloud list to Talkdesk employees after leaving Genesys and joining Talkdesk.

The Defendants respond,

> Manno and Strahan each returned all information known to them (aside from their own personnel information) at the end of their employments with Genesys. D.I. 183-8 ¶ 17; D.I. 183-6 ¶ 17. But even if the employees had not done so, the

provision is too broad to be enforceable. Indeed, the restriction applies to "any and all" information that "pertains to the business of the Company," without limitation. As such, the provision would require an employee to return their own personal human resource documents that they are entitled by law to retain, as well as all information that indisputably can be received from third-parties or through public sources, including Genesys's own website. Such an overbroad provision cannot be enforced in Indiana.

(Filing No. 271 at 37–38.)

The Court is not persuaded by the Defendants' fleeting argument that the "surrender of records" provision is overly broad and unenforceable. Businesses have a legitimate interest in their records, and the Court cannot justify ignoring or invalidating the contracting parties' agreement to surrender records at the end of employment based on a passing, generic assertion of overbreadth. The Defendants point to Strahan's affidavit wherein he asserts that when he left Genesys, he did not have in his possession "any documents specific to Genesys." (Filing No. 183-8 at 5.) They also point to Manno's affidavit wherein he asserts that when he left Genesys, he did not have in his possession "any sales or product documents specific to Genesys" and that he did not take any Genesys "equipment, documents, or other information" when he left (Filing No. 183-6 at 5). However, the documentary evidence clearly indicates that Manno and Strahan had Genesys' records in their possession after leaving their employment with Genesys. This conclusion from the evidence does not require the Court to weigh conflicting evidence. It is plain from Manno's and Strahan's own email correspondence that they had Genesys' PureCloud list and Manno had Genesys' chief financial officer's letter in their possession after leaving Genesys, and they shared these Genesys records with others at Talkdesk on October 17 and 18, 2018 (*see* Filing No. 258-36 at 2; Filing No. 257-28; Filing No. 258-14). The Court notes that the "surrender of records" provision is not dependent upon the nature of the record—such as being confidential or a trade secret—or whether it was known in the industry. **The designated evidence supports entry**

**of summary judgment in favor of Genesys on its breach of contract claims against Manno and Strahan based on the "surrender of records" provision**. The amount of damages must be determined by the trier of fact.

### 5. Confidentiality

Genesys also brings breach of contract claims against Manno and Strahan based on the confidentiality provision of the employment contract. Genesys presents this argument alongside its argument concerning the trade secrets claims. The confidentiality provision of the employment agreement provides,

> "Confidential Information" [includes] customer lists, trade secrets and information, know-how, skills, knowledge, ideas, knowledge of customer's commercial requirements, pricing methods, sales and marketing techniques, . . . financial information . . . used in or pertaining to the Company's business (i) which relate in any way to the Company's business, products or processes; or (ii) which are discovered, conceived, developed or reduced to practice by the Employee, either alone or with others either (x) during the term of this Agreement; or (y) at the Company's expense; or (z) on the Company's premises or with the Company's equipment.

([Filing No. 261-3 at 3](Filing No. 261-3 at 3)–4.)

> The employment agreement explains,
>
> The Employee shall not, directly or indirectly, use any Confidential Information for any purpose other than the benefit of the Company or communicate, deliver, exhibit or provide any Confidential Information to any person, firm, partnership, corporation, organization or entity, except other employees or agents of the Company as required in the normal course of the Employee's service as an employee . . . .

*Id.* at 4. The confidentiality provision provides protection "until such Confidential Information becomes obsolete" or "until such Confidential Information becomes generally known in the Company's trade or industry by means other than a breach of this covenant." *Id.*

As Genesys sales leaders, Manno and Strahan had access to Genesys' confidential information related to personnel information, sales deals, customer and prospect information,

pricing and discounting information, and financial information. Genesys argues that Manno and Strahan shared this information with Talkdesk for the benefit of Talkdesk, which violated the confidentiality provision of the employment agreement.

In response, the Defendants contend,

> Genesys does not distinguish its breach of confidentiality claims against Manno (Count 3) and Strahan (Count 18) from its trade secret claims. D.I. 266 at 17 n.3. Thus, as discussed with regard to Genesys's "trade secret" claims in Section IV.D. below, Genesys's breach of confidentiality claims likewise fail. Each of Strahan and Manno's agreements make clear that confidential information does not extend to information that is "generally known in the Company's trade or industry…." D.I. 266 at 2 (citing Section 8[c]). As set forth in Section IV.D. below, Genesys cannot rebut the weight of evidence showing that the "information" claimed as "confidential" or "trade secret" is indeed information known and readily ascertainable in Genesys's "trade or industry" through customers, industry analysts, lead-generation software, or other third-party sources in the contact center industry. The breach of confidentiality claims likewise fail.

(Filing No. 271 at 35.)

Upon review of the designated evidence submitted by the parties as to personnel information, sales deals, customer and prospect information, pricing and discounting information, and financial information, the Court concludes that factual questions—which are not to be resolved at the summary judgment stage—preclude entry of judgment for either party. Factual questions exist concerning the nature of some of the information as well as whether the information was known in the industry, obsolete, publicly available, previously disclosed by customers or other employees or other sources, or available on Genesys' own website. Therefore, the Court **denies the parties' Motions for Summary Judgment as to the breach of contract claims based on the confidentiality provision**.

## B.    **Trade Secrets Claims**

The parties argue that they are entitled to summary judgment on the eight trade secrets claims brought pursuant to federal and state law against Manno, Strahan, Hertel, and Talkdesk.

"The elements of a claim under the [Defend Trade Secrets Act] and [Indiana Uniform Trade Secrets Act] are similar; key to each is the existence of a trade secret and its misappropriation." *Hartford Steam Boiler Inspection & Ins. Co. v. Campbell*, 2021 U.S. Dist. LEXIS 62332, at *12 (S.D. Ind. Mar. 31, 2021). Under both statutes, information is a "trade secret" if the owner makes reasonable efforts to maintain its secrecy and it derives actual or potential economic value from not being generally known to or readily ascertainable by others. 18 U.S.C. §1839(3); Ind. Code § 24-2-3-2. Under both statutes, "misappropriation" is either the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent . . . ." 18 U.S.C. §1839(5)(A), (B); Ind. Code § 24-2-3-2.

Genesys argues that Manno, Strahan, and Talkdesk misappropriated its trade secrets when they took, shared, and used the PureCloud list and pricing and discounting information without consent. Genesys also argues that Manno, Strahan, Hertel, and Talkdesk misappropriated its trade secrets when they used Genesys' personnel information. Genesys further argues that Manno, Hertel, and Talkdesk misappropriated its sales deal information—another trade secret. Genesys contends that Hertel and Talkdesk misappropriated trade secrets when they shared Genesys' NPS survey that contained detailed customer satisfaction data. Lastly, Genesys argues a misappropriation of trade secrets when Manno and Talkdesk took and shared Genesys' chief financial officer's financial comfort letter. Genesys argues that it took various measures—such as storing the information on systems that limited access and required passwords, requiring non-disclosure agreements, or utilizing confidentiality agreements—to maintain the secrecy of this information, and the information's secrecy provided economic value to Genesys' business.

The Defendants argue that the trade secrets claims fail because the information at issue is generally known or readily ascertainable by others. The Defendants contend that much of the information is readily available through Genesys' own website, by disclosure from the customers themselves, and by disclosure from other employees as they search for employment and share information on their resumes and LinkedIn. The Defendants assert that the information also is available or ascertainable through third-party lead generation programs and databases, trade publications, product literature, and industry events open to the public. The Defendants also argue that their opinions about a potential employee's skills cannot be a trade secret, and the Genesys financial comfort letter was shared with prospective customers; thus, it is not a trade secret.

After reviewing the designated evidence and considering the parties' arguments, the Court determines that factual questions preclude entry of summary judgment on the trade secrets claims. Questions remain regarding whether the information at issue was generally known or readily ascertainable by others. Therefore, the Court **denies the parties' Motions for Summary Judgment as to the trade secrets claims**.

**C.      Breach of Fiduciary Duty of Loyalty Claims**

Genesys brings claims against Manno, Strahan, and Hertel for breach of fiduciary duty of loyalty, and the parties each argue that they are entitled to summary judgment on these claims. To support a claim for breach of fiduciary duty, a plaintiff must show, "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Magnesita Refractories Co. v. Mishra*, 2018 U.S. Dist. LEXIS 206856, at *42 (N.D. Ind. Dec. 7, 2018). "Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer." *Potts v. Review Bd. of Ind. Emp't Sec. Div.*, 475 N.E.2d 708,

712 (Ind. Ct. App. 1985). Furthermore, "an agent is subject to a duty to his principal to act solely for the benefit of the principal." *Id.* at 711.

Genesys contends that Manno, Strahan, and Hertel, as high-ranking trusted Genesys employees, owed Genesys a fiduciary duty of loyalty. Genesys asserts that Manno and Strahan repeatedly breached their fiduciary duty of loyalty by soliciting Genesys' employees while still employed by Genesys, by disclosing Genesys' confidential information to Talkdesk, by directly competing with Genesys for Talkdesk's benefit, and by failing to exert their best efforts on behalf of Genesys. Genesys argues that Manno's and Strahan's breach of their fiduciary duty of loyalty is coextensive with their breaches of their employment agreement—soliciting employees while employed, becoming an agent of a competitor, disclosing confidential information, and failing to devote substantial time and faithful service—and rests on the same facts. Furthermore, Genesys points out, Strahan began employment with Talkdesk two weeks before his Genesys employment ended. Similarly, Genesys argues, Hertel also breached his fiduciary duty of loyalty by recruiting Genesys' employees for Talkdesk while still employed by Genesys, by disclosing Genesys' confidential information to Talkdesk, by directly competing with Genesys, and by failing to exert his best efforts on behalf of Genesys. Genesys asserts that it suffered harm because of their breach of fiduciary duty of loyalty with the loss of sales personnel who were recruited by the Defendants while still working for Genesys as well as monetary losses.

The Defendants respond that, under Indiana law, employees may "prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty." *SJS Refractory*, 952 N.E.2d at 768. Thus, the privilege of preparing to compete anticipates certain activities related to future employment, and those activities do not result in a breach of fiduciary duties. The Defendants argue that "while Manno, Strahan, and Hertel may have taken steps to prepare to

29

compete while working for Genesys, there are no facts to support that Manno, Strahan, or Hertel did not also exert best efforts in finishing out their work for Genesys." (Filing No. 271 at 41.)

The Defendants also argue that Genesys' alleged harm is not supported because employee turnover in 2018 was not abnormal for Genesys, only some of the employees who left were top performers, Genesys used its internal recruiting team to replace employees, and Genesys had sales growth rather than losses. The Defendants contend that there is no causal connection between any harm and the Defendants' actions. They also advance the same arguments that they asserted concerning the breach of contract claims.

For the reasons discussed above when considering the breach of contract claims, the Court concludes that summary judgment is appropriate in favor of Genesys on its claims against Manno, Strahan, and Hertel for breach of fiduciary duty of loyalty. Genesys' position is well-taken that Manno, Strahan, and Hertel owed a duty of loyalty to Genesys while they were high-ranking employees of Genesys. These three employees, while still employed by Genesys, served as agents of Talkdesk by performing recruiting activities and planning sales team coordination. During work hours, they performed recruiting efforts on behalf of Talkdesk and had numerous conversations with Talkdesk personnel about hiring and sales plans and strategies. Strahan even began his employment with Talkdesk while still employed by Genesys. Their actions were in direct competition with Genesys while they were still employed by Genesys; their activities went well beyond simply preparing to compete or preparing to start a new job. The designated evidence leads to the conclusion that they did not fulfill their fiduciary duty of loyalty to Genesys while they were still employed by Genesys. Therefore, the Court **grants summary judgment in favor of Genesys on its breach of fiduciary duty of loyalty claims against Manno, Strahan, and Hertel**. The amount of damages must be determined by the trier of fact.

D.    **Aiding and Abetting Breach of Fiduciary Duty Claims**

Genesys brings four claims against the Defendants for aiding and abetting a breach of the fiduciary duty of loyalty, and the parties each argue that they are entitled to summary judgment on the claims. To support a claim for aiding and abetting a breach of the fiduciary duty of loyalty, Genesys must prove (1) the party whom the aider and abettor assisted breached a fiduciary duty owed to Genesys, (2) the aider and abettor knowingly and substantially assisted the breach, and (3) the aider and abettor was aware of its role when it provided the assistance. *Abrams v. McGuireWoods, LLP*, 518 B.R. 491, 500 (N.D. Ind. 2014); *see also Crown Holdings, LLC v. Berkley Risk Adm'rs Co. LLC*, 2016 U.S. Dist. LEXIS 17425, at *4–6 (S.D. Ind. Feb. 12, 2016).[2]

Genesys asserts,

> [T]he trio breached their fiduciary duty of loyalty by soliciting Genesys employees while still employed by Genesys, by disclosing Genesys' confidential trade secret information to Talkdesk, by directly competing with Genesys for Talkdesk's benefit, and by failing to exert their best efforts on behalf of Genesys. These breaches were not done alone but in concert with each other and with Talkdesk's substantial assistance.

> Talkdesk, through its CEO (Paiva), Head of Talent (Geraghty), and other high ranking officers, aided and abetted Manno, Strahan, and Hertel's breaches of their fiduciary duties of loyalty owed to Genesys. Talkdesk knowingly and substantially assisted that breach by encouraging the trio of Genesys sales leaders to serve as Talkdesk's recruiting team, to provide it with Genesys confidential trade secret information, and to assist Talkdesk in competing with Genesys. Further,

---

[2]    The Defendants argue that the aiding and abetting claims fail because such a claim is not recognized by Indiana courts. The Indiana Court of Appeals noted, "To the extent that the allegation that Appellees 'helped' [Defendant] breach his fiduciary duties resembles a claim of aiding and abetting a fiduciary in the breach of a fiduciary duty, we note that Indiana does not recognize such a cause of action." *Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d 646, 656 (Ind. Ct. App. 2014). "[T]he decision to adopt a new cause of action for aiding and abetting in the breach of fiduciary duty is a decision better left to the legislature or our supreme court." *Id.*

However, as noted in *Abrams* and *Crown Holdings*, Indiana recognizes claims for aiding and abetting torts. And as one judge from this court noted when rejecting the view of an Indiana intermediate appellate court, "this District Court [is] duty bound to predict how the Indiana Supreme Court would rule." *Yasuda Fire & Marine Ins. Co. v. Lake Shore Elec. Corp.*, 744 F. Supp. 864, 871 (S.D. Ind. 1990). The Court agrees with the sound analysis of the court in *Abrams* and concludes that a claim for aiding and abetting the breach of a fiduciary duty of loyalty may proceed.

Talkdesk was aware of its role in those breaches as it knew the trio was working for Genesys during this time.

(Filing No. 266 at 54.) Genesys additionally argues that Manno, Strahan, and Hertel aided and abetted the breach of each other's fiduciary duties by encouraging each other to recruit for Talkdesk and planning sales territories for Talkdesk while still employed by Genesys.

The Defendants argue that "Genesys's 'aiding and abetting' claims fail for the same reasons the 'breach of fiduciary duty' claims fail." (Filing No. 271 at 65.) Furthermore, a plaintiff must "sufficiently allege that [the aiding and abetting party] acted with such knowledge or intent concerning [defendant's] fiduciary duties . . . ." *Crystal Valley Sales*, 22 N.E.3d at 656. Without sufficiently alleging that the party was "aware of [defendant's] fiduciary duties," then the claim still fails. *Id.* The Defendants argue that Genesys makes a conclusory assertion as to each Defendant that the party "knowingly and intentionally aided and abetted" another party "in breaching that duty." But this fails to sufficiently plead knowledge by the aider and abettor of the specifics of the alleged fiduciary duty owed by the other party to Genesys. Indeed, the Defendants contend, the statement amounts to nothing more than a statement that the party knowingly and intentionally acted in a certain manner that caused another party to breach its duty. This does not show that each party "acted with such knowledge or intent concerning another party's fiduciary duties to" Genesys as required to support the claim.

As the Seventh Circuit has explained, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact, and the process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *R.J. Corman Derailment*, 335 F.3d at 647–48. After considering the evidence and the parties' arguments, the Court concludes that neither side has enough to prevail without a trial. Factual

questions regarding the Defendants' knowing and substantial assistance in the breach, knowledge or intent concerning the others' fiduciary duties, and their awareness of their role make summary judgment inappropriate. Thus, the Court **denies the parties' Motions for Summary Judgment as to the claims against the Defendants for aiding and abetting a breach of the fiduciary duty of loyalty**.

### E. Conspiracy Claims

Genesys brings four claims against the Defendants for civil conspiracy. "A civil conspiracy is a combination of two or more persons engaging in a concerted action to accomplish an unlawful purpose, or to accomplish some lawful purpose by unlawful means," and the elements of the claim are "an object to be accomplished, a meeting of the minds on the object or course of action, one or more overt acts, and damages proximately caused by those acts." *Carmichael v. Separators, Inc.*, 148 N.E.3d 1048, 1058 (Ind. Ct. App. 2020).

Genesys argues,

> First, the Defendants' objective was to build Talkdesk's team using Genesys' confidential trade secret information—unlawful means. Second, Defendants reached a meeting of the minds on this goal during the summer of 2018, with Paiva and Manno first agreeing that the trio would "recruit the worthwhile Genesys players." *Supra* at p.2-3. After a four-way conference call between Paiva, Manno, Strahan, and Hertel during which Paiva pitched the Genesys trio on building Talkdesk's sales organization, Strahan and Hertel committed to the conspiracy by noting they would recruit 8-10 employees for Talkdesk and Manno told Paiva they would "be building the team ASAP once we sign." *Id.* at 3-4.

(Filing No. 266 at 57–58.) Genesys further argues that the actions the Defendants took that breached contracts, breached fiduciary duties, and aided and abetted the breaches serve as overt acts to further the conspiracy. "Finally, Genesys suffered extensive damages, to be proven at trial, related to this conspiracy. Genesys suffered losses in sales and expense in replacing the raided employees as a result of the conspiracy." *Id.* at 58.

The Defendants respond that the civil conspiracy claims fail because Genesys cannot prove the impropriety of any of the underlying claims. There is no separate civil cause of action for conspiracy, and allegations of civil conspiracy cannot be based on speculation alone. *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 962–63 (Ind. Ct. App. 2014). The Defendants contend that Genesys relies solely on speculation to support its allegations of an intent to conspire. The Defendants argue that Genesys must show an unlawful act underlying the Defendants' concerted action, but Genesys only makes sweeping accusations of a conspiracy without identifying the underlying act of each separate co-conspirator. The Defendants assert that the four of them individually did not join in any common underlying unlawful act, so the conspiracy claims must fail.

The Defendants further argue that the Indiana Uniform Trade Secret Act "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets," Ind. Code § 24-2-3-1(c), so the conspiracy claim cannot survive to the extent it is based on misappropriation of trade secrets. Additionally, the Defendants contend conspiracy must be pled with specificity under Rule 9(b), and Genesys failed to do so.

The Court first notes that the heightened pleading standard of Rule 9(b) does not apply to the civil conspiracy claims because they are not based upon fraud. The case upon which the Defendants rely applied Rule 9(b) because the civil conspiracy claim was based upon fraud. *See C&S Mgmt., LLC v. Superior Canopy Corp.*, 2008 U.S. Dist. LEXIS 100800, at *17 (N.D. Ind. Dec. 12, 2008) ("The heightened specificity requirements of Rule 9(b) extends to any claim premised upon a course of fraudulent conduct, including charges of civil conspiracy to defraud."). Furthermore, the Indiana Uniform Trade Secret Act does not displace or preempt the civil conspiracy claims because they are not a separate, independent civil cause of action. *See HDNet*

*LLC v. N. Am. Boxing Council*, 972 N.E.2d 920, 924–25 (Ind. Ct. App. 2012) ("preemption provision abolishes all free-standing alternative causes of action").

Like the aiding and abetting claims, the Court concludes that neither side has enough to prevail without a trial on the civil conspiracy claims. Factual questions regarding meeting of the minds and unlawful means preclude summary judgment for either side. As the Court noted above, factual questions exist as to the confidentiality and trade secrets claims, and Genesys bases the civil conspiracy claims on those claims, so the Court concludes these claims must be resolved by the trier of fact. Therefore, the Court **denies the parties' Motions for Summary Judgment as to the claims against the Defendants for civil conspiracy**.

**F.    <u>Constructive Fraud Claims</u>**

Genesys brings claims of constructive fraud against Manno, Strahan, and Hertel.

The elements of constructive fraud are: (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996).

Genesys asserts that Manno, Strahan, and Hertel owed a fiduciary duty of loyalty to Genesys while they were high-ranking employees of Genesys. Genesys argues that Manno, Strahan, and Hertel each violated this duty by material misrepresentations of past or existing fact and by failing to disclose their competition with Genesys and their use of Genesys' confidential information to compete against Genesys and to recruit Genesys' employees while still employed by Genesys. They did not inform Genesys that, while being paid by Genesys, they also were serving as Talkdesk's recruiting team. They also were deceptive with their resignations from

Genesys and concealed that they were immediately joining a competitor. "The trio engaged in a constructive fraud by failing to disclose the actual facts as they knew them: since August 2018 they competed with Genesys, recruited Genesys employees for Talkdesk, and provided Genesys information to Talkdesk." (Filing No. 266 at 57.)

Genesys concludes that it "relied on the misrepresentations and was therefore unaware of the raid, unprepared for a mass exodus in the mid-market group, and unprepared to combat the theft of Genesys confidential information." *Id.* And "Manno, Strahan, and Hertel enjoyed an advantage at Genesys' expense because they were able to remain employed by Genesys while competing with Genesys and serving Talkdesk, building Talkdesk's new team on Genesys' dime, allowing them to hit the ground running at Talkdesk." *Id.*

In response, the Defendants assert that Genesys makes unsupported and conclusory assertions that Manno, Strahan, and Hertel remained silent where a duty to speak existed instead of setting out a specific omission of fact as well as the circumstances surrounding the omission as required by Rule 9(b). While Genesys generally cites dates for the alleged omissions or misrepresentations, it does not provide the specific statements it deems to be a misrepresentation, the specific omissions of fact, or the circumstances surrounding such omissions. Further, the Defendants contend, Genesys has not identified a legal duty regarding any alleged omissions. Genesys asserts constructive fraud based on Manno, Strahan, and Hertel not disclosing their future employment plans and Talkdesk's recruiting activities, but there is no legal duty to provide this information to Genesys. The Defendants argue that "there is no requirement that an employee disclose that they are seeking future employment, the reasons for seeking such employment, the reasons for leaving their current job, or the knowledge that others are seeking future employment." (Filing No. 271 at 61.) "Because there is no duty to speak relating to the information complained

of by Genesys, the claims are futile." *Id.* Furthermore, the Defendants argue that the alleged misrepresentations cannot support the claims because they are opinions or statements as to the future. *See Shriner v. Sheehan*, 773 N.E.2d 833, 849 (Ind. Ct. App. 2002) ("Constructive fraud requires the misrepresentation of past or existing fact; statements of opinion and representations as to the future are not actionable.").

While the Defendants argue that representations as to the future are not actionable, one case the Defendants rely upon holds the opposite: "unlike claims for actual fraud, representations as to future conduct may be actionable as constructive fraud." *C&S Mgmt.*, 2008 U.S. Dist. LEXIS 100800, at *17. "[G]enerally, fraud may not be based on representations of future conduct. However, representations as to future conduct may, in some situations, give rise to a constructive fraud and particularly so when a fiduciary relationship or duty is implicated." *Yeager v. McManama*, 874 N.E.2d 629, 637 (Ind. Ct. App. 2007) (internal citations omitted).

However, the Court is persuaded by the Defendants' argument that, because there is no duty to speak relating to the information complained of by Genesys, the constructive fraud claims cannot survive summary judgment. Genesys complains about not being informed about Manno's, Strahan's, and Hertel's future employment and their competition with Genesys. Yet, Genesys has not pointed to any Indiana case law showing there is a duty to disclose one's future employment or a duty to disclose that one is engaging in competition with his employer. While Manno, Strahan, and Hertel had a fiduciary duty of loyalty to Genesys while still employed by Genesys (thereby satisfying the first element of a constructive fraud claim), the Court concludes that the constructive fraud claims must be dismissed because it appears there is no duty to speak under Indiana law concerning the omissions at issue in this case. Therefore, the Court **grants summary judgment in favor of Manno, Strahan, and Hertel on Genesys' constructive fraud claims**.

**G.**     **Tortious Interference with Contract Claims**

Genesys brings claims against Manno and Talkdesk for tortious interference with contract, asserting that Manno tortiously interfered with Strahan's employment contract and Talkdesk interfered with Manno's and Strahan's employment contracts. This claim requires "(1) the existence of a valid and enforceable contract; (2) the defendants' knowledge of the existence of the contract; (3) the defendants' intentional inducement of breach of the contract; (4) the absence of justification; and (5) resultant damages." *Zimmer, Inc. v. Stryker Corp.*, 2016 U.S. Dist. LEXIS 151607, at *10 (N.D. Ind. Nov. 1, 2016) (internal citation and quotation marks omitted).

Genesys argues that Manno induced Strahan to breach the provisions prohibiting Strahan from soliciting Genesys employees while employed, using or providing confidential information, becoming employed or serving as an agent of a competitor and preparing to compete while employed, and failing to devote substantial time and faithful service. Manno knew that he had an employment agreement with Genesys, evidenced by the fact that he told Talkdesk his employment agreement was pretty clear about doing work for anyone else while he was employed. Genesys argues that Manno "necessarily understood the same about Strahan, a fellow Genesys sales leader hired by Interactive Intelligence around the same time as Manno. And, such agreements are commonplace in the industry." (Filing No. 266 at 49.)

Manno had discussions with Strahan to induce Strahan to recruit for Talkdesk, use confidential information for Talkdesk, and create sales territories for Talkdesk in violation of Strahan's employment agreement.  Genesys argues that Manno was not justified in inducing these breaches because his conduct was inherently unfair and unreasonable. Manno's conduct also violated his fiduciary duty of loyalty and breached his own employment contract thereby further undermining any justification.

As to Talkdesk, Genesys asserts that Talkdesk was aware of Manno's and Strahan's contracts because Manno told Geraghty of his contract, and when Geraghty asked Strahan if he had an employment contract, he did not tell her "no." Furthermore, Talkdesk utilizes employment agreements and knows they are commonplace in the industry. Talkdesk encouraged Manno and Strahan to recruit Genesys' employees while they were still employed by Genesys, and Talkdesk authorized Strahan to extend employment offers on its behalf while he was still a Genesys employee. Talkdesk also encouraged them to share confidential information with it and encouraged them to undertake activities for Talkdesk's benefit while still employed by Genesys— all in violation of their employment contracts. Genesys contends that "Talkdesk was not justified by competition because its competition included unlawfully raiding." (Filing No. 266 at 52.)

The Defendants respond that tortious interference requires knowledge of an enforceable contract and intentional conduct to cause the breach without justification. They contend,

> [T]here is no evidence that Manno knew of any enforceable provisions of the InIn agreement asserted against Strahan in this case. Indeed, evidence shows that Strahan himself was not aware of the terms of the InIn agreement—or that the agreement still applied during his time at Genesys. Accordingly, even if Strahan breached his InIn agreement . . . , it is factually impossible that Manno could have intentionally encouraged Strahan to violate provisions of an agreement unknown to both of them.

(Filing No. 271 at 30–31 (internal citations omitted; emphasis in original).)

The Defendants further contend that Talkdesk was not aware of Manno's and Strahan's employment agreements or any specific provisions of such contracts. Thus, the knowledge element cannot be met for this claim against Talkdesk. Additionally, Talkdesk is a competitor of Genesys, and it was investing in talent from across the industry in 2018. Hiring to compete provided Talkdesk substantial justification for its actions. Talkdesk was motivated by its growing business needs, not exclusively directing its actions to the injury and damage of Genesys.

In its reply brief, Genesys acknowledges that factual issues exist regarding Manno's knowledge of the existence of Strahan's contract thus precluding summary judgment.

The designated evidence and the reasonable inferences drawn therefrom lead the Court to the conclusion that factual issues exist as to Manno's knowledge of the existence of Strahan's contract and his intentional inducement of breach of the contract. Factual issues also exist regarding Talkdesk's knowledge of Strahan's contract—not saying "no" is not the same as saying "yes"—and factual issues exist regarding Talkdesk's justification for its actions and whether it intentionally induced Manno's and Strahan's breaches of contract. While legitimate business competition may provide justification, employing wrongful means will undermine that justification, and these are factual issues that must be resolved by the trier of fact. The Court **denies the parties' Motions for Summary Judgment on the claims for tortious interference with contract against Manno and Talkdesk**.

## H.    <u>Raiding Claim</u>

Lastly, Genesys brings a claim of raiding against Talkdesk. Genesys asserts,

> This Court has recognized a raiding claim where a competitor raids an entity's workforce with the intent to cripple its business. *See CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1063 (S.D. Ind. 2010) ("raiding" actionable where purpose of destroying a competing business). This has been recognized as unfair competition, which in Indiana "does not describe a single course of conduct and is not defined by a specific number of elements." *Howmedica*, 2018 WL 3130969 at *7. Further, intent to cripple a business can be shown by intent to cripple *a segment of a larger business*.

> Talkdesk is liable for raiding Genesys' workforce because it did so with an intent to cripple Genesys' mid-market sales. In the span of a few weeks in September and October 2018, Talkdesk raided and hired 15 Genesys employees, including three of four mid-market leaders and nine total mid-market employees. *Supra* at p. 9-10. The raid was part of Talkdesk's plan to cripple Genesys' mid-market sales group by poaching its leadership and relying on those leaders to bring the "worthwhile Genesys players." *Id.* at 2-3. Indeed, Talkdesk wanted to "dance on genesys' grave" which Paiva hoped to accomplish by hiring most of its sales team from Genesys. *Id.* at 10.

([Filing No. 266 at 52](#)–53.)

The Defendants respond,

>    As to Genesys's "raiding" claim, there are no facts supporting that Talkdesk
> hired Genesys employees for the underlined primary purpose of destroying Genesys's business
> as is required to support such a claim. *See Heckler & Koch, Inc. v. German Sport
> Guns GmbH*, No. 111CV01108SEBTAB, 2013 WL 12291720, at *12 (S.D. Ind.
> Sept. 27, 2013) (finding that "the tort [of unfair competition] require[s] a showing
> that the defendant acted intentionally—'for the primary purpose of destroying a
> competing business.'). Indeed, as discussed in Section II.D. above, it is undisputed
> that Talkdesk sought to hire the best people it could find across the industry to fill
> its sales roles in late 2018. MSF #1. Further, Genesys's reference to out-of-context,
> offhand comments relating to competition between the parties does not support the
> claim. *See, e.g., The Finish Line, Inc. v. Foot Locker, Inc.*, No.
> 1:04CV877RLYWTL, 2006 WL 146633, at *9 (S.D. Ind. Jan. 18, 2006) ("Finish
> Line cites no authority to support its contention that Foot Locker's hiring plan can
> be rendered unlawful merely by virtue of offhand statements that in addition to
> filling open positions, the plan would 'hit the competition where it hurts' or 'destroy'
> Finish Line's business."). Instead, the actions of Talkdesk to hire qualified
> candidates is determinative. *Id.* at *7. Because Talkdesk undertook legitimate
> efforts to hire qualified employees for its business, the claim of "raiding" fails as a
> matter of law. *Konecranes, Inc.*, 2013 WL 1566326, at *3 (alteration omitted).

([Filing No. 271 at 66](#)–67 (footnote omitted; emphases in original).)

After reviewing the evidence and the parties' arguments, the Court concludes that the

parties have created and presented factual issues regarding Talkdesk's actions, statements, and

intent to raid Genesys, which must be resolved by the trier of fact. Therefore, the Court **denies the**

**parties' Motions for Summary Judgment on the raiding claim against Talkdesk**.

## IV.        <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** the parties'

Cross-Motions for Summary Judgment ([Filing No. 253](#); [Filing No. 270](#)).

Summary judgment is **GRANTED in favor of the Defendants** on the claims for (1) breach

of contract based on the non-solicitation provision against Manno and Strahan; (2) breach of

contract brought pursuant to the "preparing to compete" provision against Manno and Strahan; and (3) constructive fraud against Manno, Strahan, and Hertel.

Summary judgment is **GRANTED in favor of Genesys** on its claims for (1) breach of contract based on the non-compete provision against Manno and Strahan; (2) breach of contract based on the "faithful service during employment" provision against Manno and Strahan; (3) breach of contract based on the "surrender of records" provision against Manno and Strahan; and (4) breach of fiduciary duty of loyalty against Manno, Strahan, and Hertel. The amount of damages on these claims must be determined by the trier of fact.

Summary judgment is **DENIED** on the claims for (1) breach of contract based on the confidentiality provision against Manno and Strahan; (2) misappropriation of trade secrets against the Defendants; (3) aiding and abetting a breach of the fiduciary duty of loyalty against the Defendants; (4) civil conspiracy against the Defendants; (5) tortious interference with contract against Manno and Talkdesk; and (6) raiding against Talkdesk. These claims may proceed to trial or settlement.

       **SO ORDERED.**

Date: 2/23/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

John R. Maley
BARNES & THORNBURG, LLP
jmaley@btlaw.com

Kathleen M. Anderson
BARNES & THORNBURG, LLP
kathleen.anderson@btlaw.com

Thomas C. Payne
BARNES & THORNBURG, LLP
Thomas.Payne@btlaw.com

David S. Moreland
MEUNIER CARLIN & CURFMAN LLC
dmoreland@mcciplaw.com

John W. Harbin
MEUNIER CARLIN & CURFMAN LLC
jharbin@mcciplaw.com

Fred Anthony Paganelli
PAGANELLI LAW GROUP
tony@tonypaganelli.com

James P. Strenski
PAGANELLI LAW GROUP
jstrenski@paganelligroup.com