UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GENESYS CLOUD SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-00695-TWP-DML |
| | ) | |
| DANIELLE MORALES, | ) | |
| MICHAEL STRAHAN, | ) | |
| TALKDESK, INC., | ) | |
| RALPH MANNO, | ) | |
| MARK HERTEL, | ) | |
| | ) | |
| Defendants. | ) | |

## Order on Talkdesk's Motion to Exclude Expert Testimony (Dkt. 320)

Defendants—Talkdesk, Inc., Ralph Manno, Michael Strahan, and Mark Hertel—have moved to exclude on *Daubert* grounds the testimony of seven experts designated by plaintiff Genesys Cloud Services, Inc. Talkdesk[1] has asked the court to exclude the testimony of Genesys's proposed (1) damages experts, Dr. Brian Dineen and Carrie Distler; (2) non-retained expert witnesses, Jessica Coburn, Alex Ball, and Cory Sanders; and (3) liability experts, Rebecca Green and Jeremy York. (Dkt. 320.)

### Genesys's Allegations in Third Amended Complaint[2]

---

[1]   Except where the court distinguishes among them, it will hereafter use "Talkdesk" both when referring to the company individually and when referring to the defendants collectively.

[2]   This background regarding Genesys's claims is taken from the Third Amended Complaint and is provided to give context to the *Daubert* motion. These

1

Genesys Cloud Services, Inc. is a provider of cloud and on-premises customer experience and contact center solutions.  (Third Amended Complaint, Dkt. 235 at ¶2.)  It alleges that, starting in September of 2018, another company in the contact center industry, Talkdesk, Inc., and its Founder, Chairman of the Board, and CEO, Tiago Paiva, began recruiting Genesys employees, including 100% of mid-market vice presidents, 100% of mid-market area directors, and most mid-market personnel.  (*Id.* at ¶¶3, 5-6.)  At least 14 Genesys employees left; Talkdesk succeeded in recruiting 50% of mid-market vice presidents, 66% of mid-market area directors, about 25% of mid-market sales executives, and one technical sales consultant.  (*Id.*)

Genesys further alleges that Talkdesk's recruitment efforts were assisted by Ralph Manno, Mark Hertel, and Michael Strahan—who were each employed by Genesys but had agreed to work for Talkdesk.[3]  (*Id.* at ¶8.)  Using their knowledge of the Genesys team's performance, compensation, job satisfaction levels, and account relationships, Manno, Hertel, and Strahan recruited Genesys employees on behalf of Talkdesk.  (*Id.*)  Talkdesk also began to target customers and prospects with which the former Genesys employees—now Talkdesk employees—were familiar.  (*Id.* at ¶9.)  After officially resigning from Genesys, Manno, Hertel, and

_____

are not findings by the court and are merely allegations Genesys intends to prove at trial.

[3]     Genesys also asserted claims against former Genesys employee Danielle Morales, but Genesys and Morales stipulated to dismissal of these claims on May 14, 2021.  (Dkt. 245.)

Strahan continued to access information from Genesys and transmit it to Talkdesk, including to Paiva.[4]  (*Id.* at ¶¶11, 17-18.)  Based on these allegations, Genesys initiated this lawsuit for, among other things, breach of fiduciary duty, misappropriation of trade secrets, breach of contract, and interference with contract.[5]  (*Id.* at ¶1.)

## The *Daubert* Standard

Federal Rule of Evidence 702 permits expert testimony—defined as testimony regarding scientific, technical, or other specialized knowledge—if the testimony (a) is given by a person qualified as an expert by her knowledge, skill, experience, training, or education; (b) will assist the trier of fact to understand evidence or determine a fact at issue in the case; and (c) is sufficiently reliable; that is, it is based on "sufficient facts or data," is the product of reliable principles and

---

[4]    Genesys filed its Amended Motion for Preliminary Injunction (Dkt. 164) on November 8, 2019, seeking to prohibit defendants from misappropriating its trade secrets, to prohibit defendants from interfering with employee contracts, to prohibit defendants from soliciting customers, and to obtain an order for the inventory and return of all Genesys property.  The court denied this motion on December 6, 2019. (Dkt. 199.)

[5]    On February 24, 2022, the court granted in part and denied in part the parties' cross motions for summary judgment.  (Dkt. 351.)  The court ruled that the following claims may proceed to trial: (1) breach of contract based on the confidentiality provision against Manno and Strahan; (2) misappropriation of trade secrets against defendants; (3) aiding and abetting a breach of the fiduciary duty of loyalty against defendants; (4) civil conspiracy against defendants; (5) tortious interference with contract against Manno and Talkdesk; and (6) raiding against Talkdesk.  (*Id.*)  Defendants filed a motion for reconsideration (Dkt. 365), but the court denied that motion on April 21, 2022.  (Dkt. 380.)

methods," and "the witness has applied the principles and methods reliably to the facts of this case."

The court serves as gatekeeper to bar expert testimony that is not sufficiently reliable or relevant to issues in the case or testimony offered by a person lacking the necessary expertise in the field of study that her testimony concerns. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Determining whether expert testimony is sufficiently reliable for a jury to consider requires a flexible approach, and courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (internal citations omitted) (emphasis in original). However, the court must focus solely on principles and methodology. *Daubert*, 509 U.S. at 595. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The court's role as gatekeeper is not "meant to supplant the adversary system, or the role of the jury." *C.A. ex rel Aguinaga v. AMLI at Riverbend, L.P.*, 2010 WL 3326847, at *3 (S.D. Ind. Aug. 20, 2010) (internal citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

It is important to read the analysis that follows in light of the court's role in fulfilling its *Daubert* function.  The court's review of the arguments and, in particular, its rejection of specific *Daubert* arguments Talkdesk has advanced is not an endorsement of the expert or the expert's opinions for trial purposes.  Moreover, the court will rule based on the evidence submitted in connection with the *Daubert* motions, and it assumes for the purposes of this motion that this evidence accurately reflects the experts' experience and qualifications.  This order does not obviate the parties' obligation to establish these matters at trial.  *See* Dkt. 229, p. 14.

The court will first address preliminary matters related to rebuttal reports and the scope of Genesys's reports and then turn to Talkdesk's challenges to each of Genesys's experts and analyze each challenge by the *Daubert* standard.

## I.    <u>**Preliminary Matters**</u>

On September 9, 2021, the day after Talkdesk completed the depositions of Genesys damages experts Brian Dineen and Carrie Distler, Genesys served what it has denominated "rebuttal" expert reports for Dineen and Distler.  Talkdesk argues that rebuttal reports are not permitted under the case management plan ordered in this case, and that even if rebuttal reports were permitted under Fed. R. Civ. P. 26(a)(2)(D), Dineen's and Distler's reports contain new evidence and opinions and therefore are not timely rebuttal reports.  Talkdesk also argues that the relevance of Genesys's expert reports is limited to just two of Genesys's claims.

Though Talkdesk's briefing focuses primarily on the argument that Dineen's and Distler's reports go beyond mere rebuttal of Talkdesk's experts, the court first addresses the threshold question of whether rebuttal reports were permitted in this case. If they weren't, then it is unnecessary to determine if those reports exceed the scope of rebuttal and offer new evidence and opinions.

### A. The case management plan entered in this case does not supersede Rule 26.

Federal Rule of Civil Procedure 26(a)(2)(D) sets out the deadlines for serving the expert disclosures required by Rule 26(a)(2)(A), (B), and (C). Section D provides, among other things, that the disclosures must be made "at the time and in the sequence that the court orders," and that "absent a stipulation or a court's order," a disclosure "intended solely to contradict or rebut evidence on the same subject matter identified [by another party in its Rule 26 disclosures]" must be made "within 30 days after the other party's disclosure." The Dineen and Distler rebuttal reports were indisputably served within 30 days of Talkdesk's expert disclosures. But Talkdesk argues that the case management plan ordered in this case sets deadlines only for Genesys's and Talkdesk's principal reports and includes no allowance for rebuttal reports. That order, Talkdesk argues, is a "court order" under Rule 26(a)(D) that withdraws the authorization of rebuttal reports that Rule 26 would otherwise provide.

The case management plan does not bear the weight Talkdesk has loaded upon it. The CMP is silent on the question of rebuttal reports. The experts provision in the case management plan at Section III.H., like most of the other

provisions in the court's uniform CMP, sets deadlines for certain submissions, but the absence of a deadline for rebuttal reports is different from a prohibition of rebuttal reports.  Indeed, it would be necessary to establish a deadline for rebuttal reports only if the court wanted to depart from the 30-day deadline Rule 26(a)(2)(D) already supplies.  The court knows how to go beyond mere deadlines to prohibit additional filings when it chooses to do so.  For example, Section IV of the uniform CMP sets out a deadline for the filing of dispositive motions, but it also prohibits a party from filing more than one summary judgment motion absent leave of court.[6] The CMP does not supersede Rule 26(a)(2)(D), and the Dineen and Distler rebuttal reports will not be stricken on this basis.

All that said, what happened here is not consistent with best practices.  First, the court finds it highly likely that counsel did contemplate or could have contemplated at the time they were preparing the proposed CMP the desire to serve rebuttal reports.  They could have addressed it with one another and with the court at the initial pretrial conference to avoid motions practice and to establish an orderly discovery schedule for experts.  Had the trial proceeded on its originally scheduled date, the service of rebuttal reports could have been very disruptive. Second, Genesys should have disclosed to Talkdesk its intent to serve rebuttal reports before Distler's and Dineen's depositions so that Talkdesk could have, had it chosen, postponed those depositions.  Instead, Genesys served them the day after

---

[6]     Interestingly, Genesys and Talkdesk omitted this provision from the CMP they proposed in this case, but the court added it.  *See* Dkts. 205, 208.

the depositions had been concluded.  Service of rebuttal reports after the experts' depositions is inconsistent with the spirit of Rule 26(b)(4)(A), which provides that depositions may be conducted only after the expert report has been provided.[7] Because the trial has now been continued to late February 2023, the court can ameliorate some of the effects of these departures from best practices.  Talkdesk is permitted to depose Dineen and Distler on their rebuttal reports before the end of 2022 for up to three hours each.[8]

### B. Talkdesk has not demonstrated that the rebuttal reports of Dineen and Distler exceed the scope of reports permitted by Rule 26(a)(2)(D)(ii).

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party."  *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir.2008).  If testimony is not offered "to contradict, impeach or defuse," it is not proper rebuttal.  *Id.*  Talkdesk argues that both Dineen's and Distler's rebuttal reports offer new arguments and new evidence to bolster their original reports—not to rebut the opinions of Talkdesk's damages expert, Dr. Robert Maness.  But in making this argument, it appears that Talkdesk

---

[7]     *Talkdesk* did not violate the spirit or the letter of the rule because it did not conduct Dineen's and Distler's depositions until it had their original reports.

[8]     To be clear, the court is not permitting these supplemental depositions to remedy prejudice attributable to a "rebuttal" report that impermissibly strays from the scope of a true rebuttal report.  As explained in the following section, Talkdesk has failed to show that the rebuttal reports of Dineen and Distler exceed the scope of rebuttal reports authorized by Rule 26(a)(2)(D).  Rather, the court will permit these depositions because of the circumstances noted in this paragraph.  And the court will not allow "surrebuttal reports" from Talkdesk because, among other reasons, they would not be timely under Rule 26.

assumes that any "new" statements included in Dineen's and Distler's rebuttal reports must have been added solely to bolster their original reports. Genesys correctly asserts that rebuttal reports will always contain new statements because they are in response to something that did not exist (the other party's expert report) when original reports are drafted. Thus, even if the court accepts Talkdesk's claims that Dineen and Distler offer new arguments and opinions in their rebuttal reports, this alone does not show that their rebuttal reports go beyond contradicting, impeaching, or defusing Maness's report.

The court also does not find that prohibiting Dineen and Distler from offering *any* new facts, opinions, or arguments would be appropriate. To impose such a prohibition on experts would require them to conceive of and dispense with every possible criticism of their initial reports, which would undermine the very purpose of rebuttal reports.[9] Rule 26(a)(2)(D)(ii), by allowing for rebuttal reports, does not contemplate that experts will submit a carbon copy of their original reports. Additionally, while "[t]estimony offered *only* as additional support to an argument made in a case in chief" is improper, Talkdesk merely shows that Distler's and Dineen's original and rebuttal reports differ in certain respects—not that these new arguments were offered *only* to bolster their original opinions or that they were *not*

---

[9]    "Rule 26 does not automatically exclude evidence that an expert could have included in his original report as such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing relevant material." *See Green v. Kubota Tractor Corp.*, 2012 WL 1416465, at *5 (N.D. Ill. Apr. 24, 2012) (quoting *Crowley v. Chait*, 322 F.Supp.2d 530, 551 (D.N.J. 2004)) (internal citations omitted).

offered to rebut Maness's report.  *Peals*, 535 F.3d at 630 (emphasis added).  Thus, Talkdesk focuses entirely on comparing Dineen's and Distler's rebuttal reports to their original reports, but the court's inquiry is not whether these reports are identical but rather whether their rebuttal reports are directed to contradicting, impeaching, and defusing Maness's report.  Talkdesk has not convinced the court that the additions to Dineen's and Distler's rebuttal reports go beyond proper rebuttal.

> ### C. The court will not at the *Daubert* stage determine that Genesys's expert testimony relates to only two of its claims.

Talkdesk claims that Genesys's proposed expert witness opinions and testimony relate only to its claims of raiding and trade secret misappropriation and that if summary judgment were entered on these counts, its *Daubert* motion would be moot.  (Dkt. 321 at 5.)  Genesys's raiding and trade secret misappropriation claims have survived summary judgment.  (Dkt. 351 at 42.)  Summary judgement was also denied for the following claims: breach of contract based on the confidentiality provision against Manno and Strahan, aiding and abetting a breach of fiduciary duty, civil conspiracy, and tortious interference with contract against Manno and Talkdesk.  Accordingly, the present motion is not moot.  (*Id.*)

Moreover, Genesys disputes Talkdesk's claim that its proposed expert witness opinions and testimony relate only to its claims of raiding and trade secret appropriation; it argues that its proposed expert opinions are applicable to Talkdesk's "overall misconduct" and to each of its claims.  (Dkt. 326 at 2.)  These issues are outside the scope of the court's *Daubert* inquiry.  Whether an expert's

10

opinion or testimony "relates" to a particular claim does not have any bearing on the substance of the expert's report or affect the court's *Daubert* inquiry.

II.     **Talkdesk's *Daubert* Challenge to Genesys Damages Experts Dr. Brian Dineen and Carrie Distler**

### A. Dineen's Qualifications and Anticipated Expert Opinions

Dr. Brian Dineen has a Bachelor of Business Administration from the University of Notre Dame, a master's degree in Labor and Human Resources from The Ohio State University, and a PhD in Labor and Human Resources from The Ohio State University. (Dkt. 322-1 at ¶2.) After receiving his Ph.D. in 2003, Dineen accepted a position as Assistant Professor of Management at the University of Kentucky; he was promoted to Associate Professor with tenure status in 2009 and remained at the university until 2013. (*Id.*) Dineen thereafter accepted a position as Associate Professor of Management at Purdue University, and in 2017, he was promoted Full Professor of Management. (*Id.*) Dineen has been published over 25 times in various professional journals and has experience editing various industry volumes. (*Id.* at 3.)

Dineen was retained in this case to assist with quantifying human resources-related damages. (*Id.* at 1.) In his report, Dineen assessed various costs, including (1) predeparture administrative damages "such as exit interview administration time, severance pay, and payout of time off balances"; (2) recruiting and selection damages, including "sourcing strategy meeting time, time spent reviewing resumes for open positions," and interview administration costs; (3) formal orientation and training damages; (4) informal orientation and training damages; (5) and lost

11

productivity of the departing employees and newly-hired/transferred employees.
(*Id.* at 7-12.)  Dineen also opined that, because of the raid, "Talkdesk was able to
save money on potential HR costs that it would normally incur in the course of
conducting its HR affairs appropriately."  (*Id.* at 14.)  Therefore, he assessed savings
"associated with (1) sourcing and vetting potential candidates for job openings, and
(2) ramp period savings as a result of Genesys employees already working for
Talkdesk" before they began their employment with Talkdesk.  (*Id.*)  Dineen
considered these various costs and savings, among other things, and ultimately
assessed overall human resources damages of "at least 1.2 million."  (*Id.* at 23.)

### B. Analysis of Talkdesk's *Daubert* Challenges to Dineen

Talkdesk argues that Dineen's opinions are unreliable because they (1)
improperly assume that all employees in question would have remained at Genesys;
(2) are based on improper assumptions about required hours, ramp times,
productivity, and training; and (3) are based on industries other than the CCaaS
industry and do not account for differences within the CCaaS industry.  (Dkt. 321 at
6-13.)

Talkdesk's first argument, that Dineen assumes all employees at issue would
have never left Genesys, does not show that Dineen's opinions are unreliable, and
Talkdesk can address this matter through cross-examination or through direct
examination of its damages expert.  And in his rebuttal report, Dineen
acknowledged Genesys's normal turnover rate:

> [T]here is a clear turnover peak during the raid period (Aug. – Nov. 2018), in
> which 13 employees voluntarily departed (including the nine in question,

eight of whom left within a one-week period during this time).  The next
closest number of departures during this three-year span was four employees
leaving, with an average of 1.78 employees leaving during any other given
four-month period.  In my professional opinion, the raid-period turnover is
atypical and non-normal.

(Dkt. 314-5 at 6.)  Dineen even states that "Dr. Maness is correct in claiming that

turnover, at some point, is inevitable" because "every single employee who is

currently working at every single company in the world will eventually leave that

company—either by termination, layoff, leaving for another job, leaving to become

unemployed, retiring, or dying." (*Id.* at 5.)  Thus, Dineen does not conclude that the

employees at issue would have never left.  Rather, Dineen criticizes Maness's but-

for approach because "it excuses all behavior that may occur before the supposed

inevitable cessation of employment, and it "does not appropriately apply to turnover

costs, especially those incurred when employees are raided in a narrow window of

time." (*Id.* at 4-5.)  The parties' damages experts take different approaches to

calculating turnover costs, but this difference in opinion does not render their

respective methodologies unreliable; the finder of fact must consider their

approaches and determine whether the expert is persuasive.

Talkdesk's additional claims—that Dineen's opinions are based on improper

assumptions and non-CCaasS industry sources—are matters for cross-examination

and do not warrant exclusion.  The Seventh Circuit has explained that "the

soundness of the factual underpinnings of the expert's analysis and the correctness

of the expert's conclusions based on that analysis are factual matters to be

determined by the trier of fact."  *Smith*, 215 F.3d at 718.  The court has reviewed

each of Talkdesk's criticisms here:

(1) Dineen assumes that salaried employees at Genesys would perform 1,920 hours of work per year without actually checking if anyone at Genesys worked this amount or was required to work this amount;

(2) Dineen's opinions with respect to "informal training" ignore that employees are salaried and that Genesys's labor costs remain the same no matter the number of hours these employees work;

(3) Dineen assumes that "ramp time" estimates are based on the unverified opinion of Genesys's Vice President;

(4) Dineen's "lost time" assumptions are based on the unverified say-so of Genesys's attorneys;

(5) Dineen's "productivity" analysis is based on improper assumptions that the former Genesys employees would have had lower productivity during their final months and on a misreading of his source, *The Cost of Turnover*; and

(6) Dineen relies on sources from other industries and across a wide range of time periods, instead of sources from the CCaaS industry.

(Dkt. 321 at 7-12.)  Each of these arguments relates to the "factual underpinnings"

of Dineen's opinions and is therefore appropriate for cross-examination.  For

example, Talkdesk claims that Dineen misread *The Cost of Turnover* and that

"[i]nstead of following the methodology of his source and calculating productivity

costs as part of turnover costs, Dineen calculates productivity as *additional costs*."

(*Id*. at 11.)  This does not show that Dineen's methodology is unreliable, but rather,

attacks assumptions he made about a source of information and the "correctness" of

his conclusions.  Thus, these claims do not warrant exclusion and should be left to

the trier of fact.  The court therefore denies Talkdesk's *Daubert* motion as it is directed to Genesys expert Brian Dineen.

### C. Distler's Qualifications and Anticipated Expert Opinion

Carrie Distler is the Senior Managing Director for FTI Consulting, Inc., a business advisory firm.  (Dkt. 323-5 at ¶3.)  Distler is a member of FTI's Forensic Litigation Consulting Practice and is on the leadership team for the National Intellectual Property Practice.  (*Id.*)  For the past six years, Distler has been recognized by *Intellectual Asset Management Magazine's Patent 1000 – The World's Leading Patent Professionals* guide as a leading patent litigation expert witness. (*Id.*)  Distler has analyzed economic and financial issues in various commercial and IP disputes, and she has experience conducting studies of damages.  (*Id.* at ¶4.)  She has worked on over 100 projects that involved calculating damages, including performing lost profits and lost wages calculations, and she has opined on reasonable royalties in infringement and misappropriation matters.  (*Id.*)  Distler has also assisted companies in creating, acquiring, managing, protecting, and extracting value from intellectual property assets, and she has advised clients on intellectual property transactions.  (*Id.* at ¶5.)  Distler has a Bachelor of Arts in Economics and a Master of Arts Degree in Economics—both from the University of Missouri.  (*Id.* at ¶6.)

Distler was retained in this case to assist in determining damages related to the alleged misappropriation of trade secrets. (*Id.* at ¶2.)  Her damages calculation is based on a reasonable royalty that Genesys and Talkdesk would have agreed to in

a hypothetical negotiation for the PureCloud list as of October 1, 2018.  (*Id.*)
Ultimately, Distler concludes that a reasonable royalty for the PureCloud list
"would have been no less than $2.0 million."  (*Id.* at ¶12.)

### D. Analysis of Talkdesk's *Daubert* Challenges to Distler

Talkdesk argues that Distler's valuation of the PureCloud list fails to
apportion, includes information irrelevant to a hypothetical negotiation strategy,
and inflates the resulting damages conclusion.  But notably, Talkdesk does not
attack Distler's methodology—her use of a hypothetical negotiation.  Instead,
Talkdesk argues that Distler's conclusion—her measure of a reasonable royalty—is
wrong.  For example, Talkdesk argues that Distler should have excluded from her
analysis approximately 200 names on the PureCloud list that are not Genesys
customers.  (*Id.* at 25.)  Talkdesk also claims that Distler's calculation of "at-risk"
profits is skewed because she included in her analysis profits from customers "that
were not 'secret' and could not provide any possible value in the hypothetical
negotiation." (*Id.* at 26.)

Again, the Seventh Circuit has explained that attacks on the "correctness" of
an expert's opinion concern factual matters that should be left for trial.  Therefore,
Talkdesk's criticisms do not warrant exclusion because they attempt to show that
"the resulting numbers that Distler arrives at are accordingly purposefully
inflated"—which are attacks on Distler's conclusions, not on her methodology.
Talkdesk can attempt to show that Distler should have excluded certain
information from her calculations, but it must do so through cross-examination or

direct examination of its own damages expert.[10]  The court therefore denies

Talkdesk's *Daubert* motion as it is directed to Genesys expert Carrie Distler.

### III.   Talkdesk's *Daubert* Challenge to Non-Retained Witnesses Jessica Coburn, Alex Ball, and Cory Sanders[11]

#### A. Analysis of Talkdesk's *Daubert* Challenge to Jessica Coburn

Jessica Coburn is a Human Resources Business Partner at Genesys.  (Dkt.

334-1 at 2.)  She has a bachelor's degree and a master's degree in business

administration, and she "has decades of experience in human resources, employee

relations, and recruiting."  (*Id.*)  Coburn is expected to offer expert opinion

testimony that "Genesys takes reasonable steps to keep its valuable employee

personnel information secret" and that "Genesys personnel information disclosed by

---

[10]     In its reply brief, Talkdesk claims that "apportionment is a necessary component to any methodology used to determine a reasonable royalty of trade secrets" and that "trade secret damages are calculated analogously to patent damages, and case law is clear that apportionment is required in all intellectual property damages assessment[s]."  The court is not convinced.  Distler's hypothetical negotiation methodology is used to value the PureCloud list—which Talkdesk claims is *not* a trade secret at all. *See* Dkt. 351 at 28.  To accept Talkdesk's argument (*i.e.*, to require apportionment because trade secret damages are calculated in the same manner as patent damages), the court would need to assume that the PureCloud list does indeed contain trade secrets, and at the same time accept Talkdesk's assertion that it does not.  This is a key merits issue in this case, and it would be inappropriate for the court to opine on it here.  Further, it would be highly speculative for this court to require apportioning of "irrelevant" or "invaluable" information from an expert's analysis; whether information would be relevant or of value to the parties in a hypothetical negotiation is a matter that can be addressed at trial.

[11]     As non-retained experts, Coburn, Ball, and Sanders were not required to provide Rule 26(a)(2)(B) expert reports.  Instead, Genesys disclosed a summary of the facts and opinions on which its non-retained witnesses are expected to testify as required by Rule 26(a)(2)(C).

former Genesys employee[s] is confidential or proprietary Genesys information that is the subject of … protections by Genesys." (*Id.* at 3-4.)

Genesys has not met its burden of showing that Coburn is qualified as an expert. Coburn is an HR Business Partner, but Genesys does not disclose how long she has served in this role, if she has served in similar roles, or what this position entails. Coburn has a bachelor's degree (Genesys provides no information about her major or field of study) and master's degree in business administration; Genesys provides no additional discussion of her educational background. Though Genesys states that Coburn has "decades of experience in human resources, employee relations, and recruiting," this does not demonstrate that Coburn is qualified to testify about confidential or proprietary information—including protecting such information—or about what steps are "reasonable" to keep personnel information secret. Genesys provides a mere two sentences in its 26(a)(2)(C) disclosure describing Coburn' qualifications. Genesys is correct in asserting that a witness can be both a fact witness and an expert witness, but "the proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* Standard," and Genesys has failed to establish that Coburn has expert qualifications to testify about these matters. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Talkdesk's motion to preclude her testimony as an expert is therefore granted.

Much of Genesys's disclosure summary for Coburn appears to contain potential fact testimony based on Coburn's personal experience as a Human

Resources Business Partner—the admissibility of which must be determined at trial.  This order does not preclude Coburn from testifying about factual matters of which she has knowledge, including the protection Genesys affords personnel information.  But she cannot opine on its reasonableness or on other matters outside her personal knowledge.

### B. Analysis of Talkdesk's *Daubert* Challenge to Alex Ball

Alex Ball is Genesys's Vice President of Mid-Market Sales.  (Dkt. 334-1 at 6.)  He has a bachelor's degree and "a decade of experience in the cCaaS industry, including several years as a sales leader at Genesys."  (*Id.*)  Ball is expected to offer expert testimony that "Genesys' Trade Secrets have actual or potential value by virtue of being secret."  (*Id.*)

Genesys has failed to meet its burden of showing that Ball is qualified as an expert.  Genesys claims that "Ball's testimony regarding the value of Genesys' alleged trade secrets is proper Rule 702 evidence because it is based on his knowledge, training, and experience as a Genesys sales leader."  (Dkt. 326.)  But Genesys's demonstration of Ball's qualifications is severely lacking: it provides two sentences explaining that Ball is a vice president of sales, that he holds a bachelor's degree (Genesys does not provide any information about his major or field of study), and that he has a decade of experience in the CCaaS industry.  Genesys does not describe—in any detail whatsoever—what Ball's position at Genesys entails, including whether he has any familiarity with the PureCloud list or has used its information to generate sales.  Further, Genesys does not provide any discussion

regarding Ball's decade of experience in the CCaaS industry. Accordingly, the court cannot conclude that Genesys has met its burden of demonstrating that Ball is qualified as an expert, and Talkdesk's *Daubert* motion to preclude his testimony as an expert is therefore granted.[12]

Further, much of Genesys's disclosure summary for Ball appears to contain potential fact testimony based on Ball's personal experience as Vice President of Sales—the admissibility of which must be determined at trial. It is entirely possible that Ball does have personal knowledge that certain Genesys information has value by virtue of its being secret and, if otherwise admissible he can testify about that—but not as an "expert."

### C. Analysis of Talkdesk's *Daubert* Challenge to Cory Sanders

Cory Sanders is Genesys's Senior Director of IT Operations. (*Id.* at 11.) Sanders has been employed in the Genesys IT department since 2013. (*Id.*) He is expected to offer expert testimony that "Genesys takes reasonable information technology means to protect its confidential data." (*Id.*)

Aside from asserting that Sanders is an "important leader" for its IT department and that his proposed testimony concerns "technical information that Sanders has learned in his high-level IT role," Genesys does not provide any information about what Sanders's job entails or any basis for the court to find that he is an expert qualified to opine on the reasonableness of the IT measures Genesys

---

[12]    Genesys notes in its briefing that Ball's "testimony *may* ultimately fall under Rule 702." (Dkt. 326 at 33) (emphasis added).

takes to protect its data.  (*Id.*; Dkt. 326 at 33.)  As with Coburn and Ball, Genesys has failed to meet its burden of showing that Sanders is qualified as an expert. While experience alone can qualify an expert, mere statements that Sanders has been employed in the IT department for several years and that he has a "high-level" role with Genesys do not demonstrate that Sanders is qualified under *Daubert*. Talkdesk's *Daubert* motion to preclude his testimony as an expert is therefore granted.

Once more, though, much of Genesys's disclosure summary for Sanders appears to contain potential fact testimony based on Sanders's personal knowledge as Senior Director of IT Operations—the admissibility of which must be determined at trial.  Sanders may testify based on his personal knowledge of the measures Genesys takes to protect certain information, but he is not qualified to render expert opinions.

### IV.   Talkdesk's *Daubert* Challenge to Liability Experts Rebecca Green and Jeremy York

#### A. Green's Qualifications and Anticipated Expert Opinion

Rebecca Green has over 30 years of experience working in information technology for a variety of companies, including as a chief technology officer where she was "responsible for every aspect of information technology."  (Dkt. 322-5 at 4.) For the past 18 years, Green has "served as an expert in Electronically Stored Information," managing approximately 600 different projects involving litigation, corporate investigations, and organizational consulting.  (*Id.*)  Her experience also includes serving as a Special Master in the Northern District of Indiana and

assisting the Elkhart, Indiana County Commissioners with rebuilding their IT department.  (*Id.*)  Green is certified as a digital forensics examiner from two different organizations—AccessData and Blackbag Technologies—and she has enrolled in a PhD program in cyber-forensics.  (*Id.*)

She has been retained in this case "to opine on the systems, technology, processes, policies, and protocols of Genesys as they pertain to protecting the confidential and trade secret information of Genesys."  (*Id.* at 5.)  In reaching her conclusions, Green conducted an interview with Cory Sanders, the Senior Director of Information Technology at Genesys; reviewed industry standards; reviewed various Genesys policies; reviewed Genesys's Third Amended Complaint; reviewed the deposition transcripts for Manno, Strahan, Hertel, and Paiva; and reviewed several publications and articles.  (Dkt. 322-5 at 5-7.)  Ultimately, Green comes to three conclusions:

1. Manno, Strahan, Hertel, and others violated Genesys' Information Technology Policies, and, in some cases, their employment agreements.

2. Talkdesk employees, including their Chair Board & CEO Paiva, would have been obligated to report the conduct of any Talkdesk employee who was conducting themselves in the same manner as Mr. Manno, Mr. Strahan, and Mr. Hertel, as their actions violated Talkdesk policies.

3. When Talkdesk employees, including Talkdesk's Chair Board & CEO Paiva used their unauthorized access of Genesys' information assets for unfair competitive advantage, their conduct was in direct violation of the Talkdesk published Code of Conduct which states such conduct could result in termination of employment.

(*Id.* at 34.)

**B. Analysis of Talkdesk's *Daubert* Challenges to Green.**

1. <u>Green is not qualified to opine that Manno, Strahan, and Hertel breached their employment contracts but can opine on IT policies and whether such policies were violated.</u>

It is necessary at the outset to distinguish between the contracts (employment agreements) and the IT policies Green concludes Manno, Strahan, and Hertel breached. Her conclusion that Manno, Strahan, and Hertel breached their employment contracts with Genesys goes far beyond opining on IT policies and procedures. Green may have experience in writing, interpreting, and applying *IT policies* as part of her prior work as an IT professional, but this does not qualify her as an expert in contract interpretation, including determining whether a valid contract exists, is enforceable, and has been breached. Although an expert can opine on an ultimate factual issue, Green is not qualified to opine on these contract issues. *See Pansier*, 576 F.3d at 738 (holding that "an expert may testify about an ultimate issue to be decided by the jury"). She can, however, opine on the violation of IT *policies*.

Green's expert report includes two primary sections: (1) "Policies Violated" and (2) "Policies Reviewed." In section one—Policies Violated—Green interprets various policies of Talkdesk and Genesys. She also reviews provisions in the employment contracts of Manno, Strahan, and Hertel with Genesys and concludes that these individuals violated them in a number of ways. As the court has held, Green is not an expert in contract interpretation and enforceability and cannot opine on such matters. Green also opines that Manno and Strahan "had duties and obligations to Genesys" under their employment agreements; these conclusions are

23

outside the scope of Green's expertise for the same reasons.  (*Id.* at 23.)   However,

Green has worked in all aspects of information technology for upwards of 30 years.

This experience qualifies her to review and offer opinions about IT policies—

including whether the actions of Manno, Strahan, and Hertel violated those policies.

In section two—Policies Reviewed—Green reviews Genesys's IT policies and

compares those policies to different industry standards and frameworks, ultimately

making the following conclusions:

- My conclusion is that the Information Technology policies described in the Documents Reviewed portion of this report, to a reasonable degree of professional certainty, are realistic and [I] found them to be typical for Information Technology focused organizations.

- NQA is a global certification body in the realm of Information Technology. Using their process framework found in Figure 7. I reviewed the Genesys policies and, to a reasonable degree of professional certainty, found Genesys policies addressed the key components found within the framework.

- On the following page is a diagram explaining the logical flow of the ISO27001 standard.  I reviewed the Genesys policies and, to a reasonable degree of professional certainty, found Genesys' policies fulfilled the framework of the ISO27001 diagrammed Information Security Management Systems (ISMS) boundary.

- Below are the principles related to the processing of personal data as defined by the General Data Protection Regulation (GDPR).  In my review of the Genesys policies, I found, to a reasonable degree of professional certainty, the Genesys' [sic] policies addressed these GDPR principles.

(*Id.* at 5, 17-19.)  The court finds that Green is appropriately qualified to testify

about such matters; she has over 30 years of IT experience with a variety of

companies and is therefore well-positioned to review IT policies and opine on

whether they meet certain industry standards.  Talkdesk claims that Green lacks

experience in the CCaaS industry, but Talkdesk has not demonstrated that IT

policies and procedures are unique in the CCaaS industry. The court is not convinced that Green's lack of CCaaS industry experience diminishes her decades of experience in information technology with a diverse array of companies. Accordingly, aside from offering opinions that Manno, Strahan, and Hertel breached their employment contracts with Genesys, Green is qualified as an expert.

2. Green's opinions are reliable under Rule 702 and *Daubert*.

In addition to its claims that Green is unqualified, Talkdesk advances numerous challenges that attack Green's reliability. As mentioned above, Green took several steps in formulating her opinions: she interviewed a Senior Director of Genesys's IT department; reviewed industry standards, including ISO27001, GDPR, and NIST security framework; reviewed Genesys policies; and reviewed Genesys's Third Amended Complaint. (*Id.* at 5.) In total, Green relied on 23 different sources. (*Id.* at 6.)[13] In her "Policies Reviewed" section, Green includes links to and screenshots of different industry sources to which she compares Genesys's policies. (*Id.* at 17-19.) And in her "Policies Violated" section, Green cites to and provides screenshots of the various policy provisions she discusses. (*Id.* at 20-33.)

Talkdesk's challenges do not warrant exclusion of her proposed testimony. For example, Talkdesk claims that Green's reasoning is circular: she begins with the improper assumption that information alleged to be confidential or trade secret is indeed confidential or trade secret information. But this is an attack on a factual

---

[13]     Talkdesk also argues that Green improperly relied on her own definitions of legal terms, but this argument attacks Green's conclusions involving contract/policy interpretation, which the court has already addressed. (Dkt. 321 at 24-25.)

assumption that Green makes, which is an issue appropriate for trial but is not a basis for exclusion under *Daubert*. *See Smith*, 215 F.3d at 718 (finding that "[t]he soundness of the factual underpinnings of the expert's analysis … are factual matters to be determined by the trier of fact").  Further, Green's reasoning is not circular.  She does not assume that certain information is trade secret or confidential to prove that that information is indeed trade secret or confidential. Rather, she makes this assumption as a predicate for her opinion that Manno, Strahan, and Hertel violated certain policies.  Talkdesk is free to challenge these predicates at trial.

Talkdesk's arguments that Green did not "verify" certain information, "did zero investigation" into certain matters, and improperly "assumed" certain facts in reaching her conclusions also do not show that Green's opinions are unreliable. Each of these arguments, and similar ones that Talkdesk brings, attacks factual underpinnings and the correctness of York's opinions, which are matters appropriate for cross-examination.  *See Smith v. Ford Motor Co.*, 215 F.3d at 718 (7th Cir. 2000).  Similarly, Talkdesk's arguments that Green failed to define certain terms in her report—such as "Change of Business Role" and "actively working"—are matters that can be addressed at trial, but they do not render Green's opinions unreliable.

Further, Talkdesk claims that Green fails to explain how "Genesys addressed key components withing [sic] the ISO27001 and GDPR security frameworks," but this is also an issue that can be addressed through cross-examination.  (Dkt.

321 at 24.)  Talkdesk also argues that "Green's report is overwhelmingly dominated by citations to Genesys's Third Amended Complaint," but given that she did not rely solely on the operative complaint but on many other sources as well, the court cannot find her opinions unreliable.  Talkdesk does not attack Green's methodology of comparing Genesys policies to different industry standards and frameworks, and Talkdesk does not suggest that these industry standards and frameworks are unreliable.  Thus, the court finds that Green's opinions—except her opinions for which the court has found her not qualified to render—are reliable for *Daubert* purposes.

### C. York's Qualifications and Anticipated Expert Opinion

Jeremy York has a bachelor's degree in organizational leadership, a master's degree in management, and a human resource management certificate.  (Dkt. 322-7 at 6.)  York is also recognized as a "certified professional in human resources" by the Society for Human Resource Management and a "senior professional in human resources" by the Human Resource Certification Institute.  (*Id.*)  He has worked in human resources for over 20 years and has held various leadership roles.  (*Id.*)  Since 2014, York has served as the Lead Consultant and President of InvigorateHR, where he advises clients, manages staff, and scouts potential business opportunities. (*Id.*)  Before InvogorateHR, York served as the Director of Human Resources at Novia CareClinics; he was hired in 2010 "to build [its] human resource department from the ground up," and he ultimately oversaw the company's entire HR function.  (*Id.*)  York also worked as a consultant on human resources matters

27

and as a human capital specialist.  (*Id.*)  In addition to his current position at

InvigorateHR, York is an adjunct faculty member at IUPUI, where he teaches one

or two courses per semester in human resource management;

personnel/employment law; ethical decision-making; and diversity, equity, and

inclusion.  (*Id.* at 7.)  York has also served on the board of directors for various

professional associations, and he is currently the Membership Advisory Council

Representative for the Society of Human Resource Management.  (*Id.*)  He regularly

speaks at human resource and leadership conferences, is currently coauthoring a

book "on the importance of alignment between organizational strategy and people

strategy," and publishes a monthly blog regarding current trends in human

resources and other information concerning the human resources profession.  (*Id.* at

7-8.)  York has been retained in this case to offer expert testimony "on whether

Genesys treats its employee personnel information such as employee sales

information, employee compensation information, employee sales data, and other

non-public employee data as confidential information."  (*Id.* at 4.)

　　　To prepare his report, York reviewed several Genesys policies, including the

Genesys US Handbook, Genesys Personnel Security Management Policy, and

Genesys's Code of Conduct.  (*Id.* at 9.)  He also interviewed Jessica Coburn—

Genesys's Human Resources Business Partner—and reviewed employment

agreements for Hertel, Manno, and Strahan.  (*Id.*)  York looked at case filings,

including Genesys's Third Amended Complaint, and several scholarly sources on

employee data, confidentiality, and trade secrets.  (*Id.*)  He offers two opinions:

1. Genesys takes reasonable steps to protect the secrecy of its employee personnel information.

2. Genesys's employee personnel information has economic value and provides a competitive advantage.

(*Id.* at 22, 26.)

### D. Analysis of Talkdesk's *Daubert* Challenges to York

1. <u>York is qualified to offer both of his opinions.</u>

York has worked in human resources for over 20 years.  (*Id.* at 6.)  He has held various positions, including his current position as Lead Consultant and President at InvigorateHR.  (*Id.*)  York provides a detailed summary of what his positions have entailed and outlines some of his major responsibilities throughout his career:

- York "oversaw the entire human resource function" at Novia CareClinics.

- York "was hired by Novia CareClinics, LLC to build their human resource department from the ground up."

- York "worked as a consultant for Flashpoint Human Resource Consulting advising various clients on human resource related matters."

- York "was responsible for all human resource related needs for over 300 employees in various departments."

(*Id.* at 6.)  In addition to his work experience, York is an adjunct faculty member at IUPUI, where he teaches courses in HR-related subjects.  (*Id.* at 7.)  He is also very involved in professional organizations and regularly speaks and writes on HR issues.  (*Id.* at 7-8.)  In sum, York has extensive HR-related experience.

Talkdesk attempts to diminish York's decades of experience by claiming that "he has no experience in a consulting or employment role with any company

providing contact center products and is not an expert in the contact center industry." (*Id.* at 22) (internal quotations omitted). Thus, Talkdesk argues that York is not qualified to opine on what "reasonable steps" to protect employee personnel information would be in the CCaaS industry. Talkdesk has not explained why the CCaaS industry is unique in measures taken to secure personnel information, and the court has no reason to require an expertise so narrow. (*Id.* at 11-16.) Confidentiality agreements, employee handbooks, and HR-related software offered by third party companies are not unique to the CCaaS industry. Therefore, York's lack of consulting or employment experience in the CCaaS industry does not mean that he cannot review such measures and opine on whether they are reasonable for securing employee personnel information. For the same reasons, CCaaS industry experience is not necessary to opine that certain employee personnel information is generally not publicly available.

Talkdesk further argues that, because York is not an economist or accountant, he cannot opine on the value of the alleged trade secret information. But York is not attempting to quantify the value of this information—a task that the court agrees would require expertise similar to that of an economist or accountant. Rather, he is opining, based on his years of HR experience, that this information provides an economic advantage in the HR context. For example, York explains that "Genesys employee personnel information helps the organization identify, reward, promote, and retain top performing employees, which impacts its operations and productivity." (*Id.*) He further explains that competitors "would

economically benefit from the disclosure of Genesys's employee data by 1) allowing them to target Genesys' high performing employees; 2) saving time and costs on sourcing, interviewing, and recruiting qualified candidates—saving on both internal recruiting costs and external headhunters; [and] 3) reducing training costs, 'ramp-up' time, and lost productivity typically resulting from hiring a new employee." (*Id.* at 27.)  Thus, York opines on the economic utility of employee personnel information in an HR context; his years of HR experience and the breadth of that experience qualify him to do so.  His experience similarly qualifies him to opine on whether this information, within his experience and understanding, is confidential or trade secret.  Talkdesk argues that he cannot opine on what these "legal terms mean" because he is not an attorney.  (Dkt. 321 at 22.)  But whether information is a "trade secret" is a question of fact.  *See, e.g., Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).

Likewise, Talkdesk has not shown that determining whether certain information is confidential is an impermissible legal conclusion.  For example, Genesys requires that "[u]pon starting employment with Genesys, all employees sign a confidentiality agreement which requires them to protect Genesys' proprietary information, including information about our business, customers, finances, research and development, technology, marketing practices, and personnel."  This suggests, at the very least, that determining whether information is confidential requires an inquiry into whether the holder of such information considers it confidential.  Thus, one must conduct a factual inquiry into whether, for

example, the holder designates such information confidential in a confidentiality agreement—which is not a pure legal question. *See EarthKind, LLC v. Lebermuth Company, Inc.*, 2021 WL 2226492, at *1 (W.D.N.C Jun. 2, 2021) (holding that "[t]he parties' dispute over what evidence was or was not confidential is a question of fact that should be resolved by a jury").

York has years of HR experience that render him qualified to opine on the reasonableness of measures a company takes to protect its personnel information and whether that information has economic value; he does not need to be an attorney to opine on these factual questions.[14]  In all, York is qualified to offer opinions that Genesys uses reasonable measures to keep its employee personnel secret and that Genesys's employee personnel information has economic value. Talkdesk's criticisms do not demonstrate that York is so unqualified that his opinions must be excluded under *Daubert*.

> 2. York's opinions are reliable under Rule 702 and *Daubert*.

Talkdesk argues that both of York's conclusions rely on "improper speculation, his own definitions of legal terms, and the allegations contained in documents provided to him by Genesys counsel," but these challenges do not demonstrate that York's opinions are unreliable.  (Dkt. 321 at 19.)  For example, Talkdesk makes several arguments that York does not define "trade secret"

---

[14]    An expert opinion is not impermissible merely because it goes to "an ultimate issue."  That is what expert evidence does: it goes to one or more of the factual elements of the offering party's claims or defenses.  *See Pansier*, 576 F.3d at 738 (holding that "an expert may testify about an ultimate issue to be decided by the jury").

properly or that he relies on a "lay" understanding of the term trade secret.  But the court does not expect York to offer expert opinion testimony that personnel information is trade secret under Indiana law; his report offers two opinions and neither defines trade secret.  To the extent he relies on sources that define "trade secret" from an HR perspective, York is permitted to testify about his understanding of these sources and how trade secrets are defined in the HR field.  But because York does not opine on the definition of trade secret, the court must treat his references to this term as assumptions that Talkdesk can attack at trial.

Talkdesk challenges several other factual assumptions that underlie York's opinions.  For example, Talkdesk argues that York improperly assumes that access to systems such as Otka, Callidus, and Oracle "is limited and [that] the information contained [in such systems] is not public knowledge."  (*Id.* at 27.)  But "the soundness of the factual underpinnings of the expert's analysis" are factual matters appropriate for cross-examination.  *See Smith*, 215 F.3d at 718.  Likewise, Talkdesk makes numerous arguments that York should have verified certain information or that he did he did not properly analyze certain facts, but these are all attempts to show that York's conclusions are wrong or to challenge the facts he relied upon—not that his methodology is unreliable.  *See id.* (holding that "the correctness of the expert's conclusions based on [his] analysis are factual matters to be determined by the trier of fact").  Therefore, these arguments, and similar ones Talkdesk advances, do not warrant exclusion under *Daubert*.

As mentioned above, York took several steps in preparing his report, including reviewing Genesys policies, documents, and case filings; interviewing Jessica Coburn; and reviewing scholarly literature.  Coburn walked York through the various measures Genesys employs to safeguard and protect employee personnel information.  And he verifies the existence of such policies and procedures by citing to and providing screenshots of various Genesys policies throughout his report.  This methodology is sufficiently reliable under *Daubert*.  Talkdesk claims that York failed to perform any economic valuation to support his conclusion that employee personnel information has economic value, but this does not render his methodology unreliable.  As explained above, York is opining that employee personnel information has economic value in an HR context, which he can conclude from his years of HR experience; he is not attempting to quantify the value of that information, which would require that he employ a different type of methodology than the one he uses here.[15]  But with respect to the conclusions he reaches in his report, the court concludes that York's opinions are reliable for *Daubert* purposes.

## Conclusion

For the foregoing reasons, the Defendants' Motion (Dkt. 320) is GRANTED IN PART AND DENIED IN PART as set forth above.

So ORDERED.

Date: 9/30/2022

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

---

[15]   Talkdesk's arguments that York does not verify that employee personnel information is actually secret is merely a challenge to a factual predicate for his opinions and can be addressed at trial.

34

Distribution:

All ECF-registered counsel of record via email