UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GENESYS CLOUD SERVICES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 1:19-CV-00695-TWP-DML |
| ) | |
| TALKDESK, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OF PLAINTIFF'S DESIGNATED DEPOSITION TESTIMONY**

Plaintiff Genesys Cloud Services submits this brief in Response to the Defendants' Motion to Exclude Certain of Plaintiff's Designated Deposition Testimony. [ECF 425]. Defendants filed the motion in conjunction with their objections to Plaintiff's proposed deposition designations. The Case Management Plan did not call for motions. Genesys continues to narrow its deposition designations and will work in good faith with Defendants to do the same.

**A. Genesys' Proposed Deposition Designations From Mervyn Alamgir Are Admissible.**

Defendants objected to the following deposition designations on grounds that they improperly seek legal conclusions and assume facts not in evidence: 39:21–25; 41:4–8. The testimony of Mr. Alamgir, a Talkdesk Vice President, is not the type of testimony of "legal duties" that the court excluded in the case cited by Defendants, *RAP Indy, LLC v. Zurich Am. Ins. Co.*, No. 1-19-CV-04657-JRS-MJD, 2021 WL 5029520, at *1 (S.D. Ind. Sept. 15, 2021). Defendants presented Alamgir as an expert in the contact center industry. The testimony elicited by Genesys seeks his opinion, as a Talkdesk Vice President working in the industry, as to what conduct he expects from employees. In this case, Genesys alleges that Talkdesk, through its highest ranking executives, participated in a

1

conspiracy with Genesys sales employees to steal information and talent to better Talkdesk's position in the market. In such a case, a Talkdesk Vice President's perception of how an employee is to behave while working for an employer is plainly relevant. Genesys will not use Mr. Alamgir's testimony to argue that any Defendant breached a legal duty.

Defendants objected to the following designations on grounds that they lack relevance or probative value: 11:9–24; 14:18–15:15; 15:20–16:14; 17:23–19:1; 19:6–11; 20:20–21:6; 21:20–25; 22:4–18; 29:15–30:11. This testimony elicited the following information: 1) Alamgir was hired by CEO Paiva into a high-paying executive position; 2) Alamgir was given a budget of roughly $150,000 to $200,000 for marketing technology and between $2 million and $4 million for promotions; 3) Alamgir's budgets have since increased; 4) Alamgir's budgets are used to generate leads and to compete with Talkdesk's competitors; 4) Alamgir has four direct reports, of which three were new hires that each make six figures in salary and received stock from Talkdesk; 5) Alamgir believes his department is important to Talkdesk's marketing efforts; and 6) Alamgir's team uses lead generation software, including 6sense, to generate leads for Talkdesk.

This testimony is relevant to Genesys' claims and damages and also to the Defendants' defenses. Indeed, the defense has used Talkdesk's lead generation budget and technology expenditures for its own purposes, including by disclosing Mr. Alamgir as a non-retained expert and then using a declaration from Mr. Alamgir in its cross-motion for summary judgment. Defense damages expert Dr. Robert Maness also cited to this declaration and information in his report. [*See* ECF 309-1 (Alamgir 26(a)(2)(C) disclosure); ECF 273-12 (Alamgir Declaration); ECF 314-1 (Maness Report)].

For example, in Alamgir's Rule 26(a)(2)(C) disclosure, the defense states that Alamgir has familiarity with "lead generation software" and states that "Mr. Alamgir may also testify regarding his experience with the lead generation software used by Talkdesk." [ECF 309-1 at 3]. Thus, Alamgir's testimony regarding the software Talkdesk has purchased is plainly relevant.

Then, in a declaration relied upon in its cross-motion for summary judgment, Alamgir specifically mentions his software budget, that 6sense makes up around 90% of that budget, and how his team uses 6sense. [ECF 273-12]. Finally, Alamgir's testimony regarding 6sense and other lead generation software utilized by Talkdesk is explicitly relied upon by Maness in forming his opinion of Genesys' alleged damages. [ECF 314-1 at 28, 32].

Further, the fact that Talkdesk has increased the amount of budget it devotes to lead generation (including in headcount and technology) is relevant in a case where Genesys alleges that Talkdesk stole Genesys' PureCloud List as a means to cut corners in developing its own sales leads, opting to use a list of Genesys customers instead of its own leads. The Rules of Evidence define relevant evidence broadly as that which has any tendency to make a fact of consequence (in determining the action) "more or less probable than it would be without the evidence." Fed. R. Evid. 401. Alamgir's testimony is relevant under this standard.

Defendants are free to present their own testimony as to Talkdesk's lead generation department and what that department uses its budget for (indeed, the defense has already done so through the declaration from Alamgir and purported expert testimony), but there is no basis for excluding this relevant testimony.

Defendants objected to the following lines as seeking speculation and not based on personal knowledge of Mr. Alamgir: 38:6–18. This is simply not true. Alamgir responded to each question stating he "was not aware". Thus, while Alamgir was not aware of the information he was being asked, he answered those questions based on his personal lack of knowledge.

Defendants objected to lines 16:6–9 and 32:1–4 as attorney objections and instructions. Genesys agrees that these attorney objections can be removed from the deposition designations.

Finally, Defendants objected to 33:6–9 on grounds that it inquires into discovery-related issues. Genesys agrees that lines 6-9 on page 33 can be removed from the deposition designation.

3

### B. Genesys' Proposed Deposition Designations From Shauna Geraghty Are Admissible.

Defendants objected to the following testimony as improperly seeking legal conclusions, while also assuming facts not in evidence: 10:5–9, 11:12–19, 18:16–19:4, 26:20–28:2. For the same reasons as discussed above with respect to similar testimony from Mr. Alamgir, this testimony should not be excluded. Dr. Geraghty is a senior executive at Talkdesk and its head HR employee. As such, her opinion on employees acting in the best interests of their employer is plainly relevant. Indeed, Genesys alleges in this case that Talkdesk, through both Dr. Geraghty and other senior executives such as CEO Paiva, encouraged and directed the individual Defendants to assist Talkdesk in recruiting, raiding, and stealing information from Genesys, while those employees were still employed by Genesys and soon thereafter. Further, Talkdesk's knowledge of the employees' employment at Genesys and Talkdesk's actions in assisting the individual Defendants' wrongdoing is relevant to Genesys' remaining claims, including conspiracy, aiding and abetting breach of fiduciary duty, misappropriation of trade secrets, and others, and is further relevant to Genesys' punitive damages claim. Genesys will not use Dr. Geraghty's testimony to argue that any Defendant breached a legal duty, but as a senior executive at Talkdesk, this testimony is highly relevant.

Defendants objected to a line of questioning, 16:19-17:1, in which counsel accurately questioned Dr. Geraghty regarding testimony from Strahan that he was asked by Dr. Geraghty if he had an employment agreement with Genesys, to which he said he was not sure but did not deny that he had such an agreement. The defense characterizes this as assuming facts not in evidence, but this is factually untrue. Mr. Strahan testified under oath on April 22, 2019 as follows:

> Q. When did you first have any discussions with anyone at -- at or on behalf of Talkdesk that you had any type of employment agreement with Genesys?
> A. I don't recall.
> Q. Was it before or after you received the offer from Talkdesk?
> A. It would have been before.
> Q. And whom would you have had that interaction with?
> A. Shauna Garrity.

> Q. And tell us about that interaction. Was it in person? By phone? Video? Or electronic, where your agreement with Genesys was discussed?
> A. It would have been by phone.
> Q. And how did the topic come up of your agreement with Genesys during that phone conversation?
> A. I believe it was a specific inquiry from her.
> Q. And what is your recollection of what she asked?
> A. She asked if I was under any sort of employment agreement with Genesys.
> Q. And that was a phone call?
> A. (Witness nods.)
> Q. Was -- yes?
> A. Yes. Sorry.
> Q. And was that in August of 2018 12 or earlier?
> A. I don't know. I'm sorry.
> Q. You said yes in August of 2018, so it was sometime prior to when you said yes; correct?
> A. Yes.
> Q. And what did you say in response to her question?
> A. I don't -- I don't recall specifically, because I wasn't -- I wasn't certain if I was still under -- if I was still under an employment agreement. The original employment agreement I signed was in 2000, and I did not have a copy of it.
> …
> Q. You had this phone conversation with Ms. Garrity sometime prior to saying yes in August of 2018; correct?
> A. Yes.
> Q. She asked you whether you had an agreement with Genesys; correct?
> A. Yes.
> Q. Were those her exact words or do you have any other recalls of her words?
> A. My recollection is those were her exact words.
> Q. And you did not answer no; correct?
> A. I did not answer no.

[ECF 261-24 at 24-27]. The question posed to Dr. Geraghty was both accurate and proper and there is no basis for exclusion.

The Defense further objected to a question asking Dr. Geraghty if she had "any regrets about [her] professional conduct in the recruitment of those Genesys personnel?" The defense calls this "argumentative" and that it "implies that her actions have been improper." First, the question is not "argumentative" simply because it asks about one of Genesys' allegations of misconduct, and even if it were, Defendants cite no authority for why this warrants exclusion. Second, Genesys is entitled to ask Dr. Geraghty questions about the wrongdoing it alleges Talkdesk engaged in, through its senior

5

executives including Dr. Geraghty. Dr. Geraghty is free to disagree with Genesys' allegations, indeed she did so by responding "I don't regret because I don't believe I engaged in any unprofessional misconduct." The jury will have to decide if Dr. Geraghty is credible as a witness and whether it believes her, but this testimony is relevant.

Defendants objected to 35:6-11 as speculation and lack of personal knowledge. This passage asked Dr. Geraghty a question about an e-mail she received and how she interpreted a statement from defendant Manno that was contained in the e-mail. The e-mail itself is a highly relevant communication between Manno, CEO Paiva, and Dr. Geraghty, in which Manno tells the Talkdesk senior executives that he, Strahan, and Hertel want to build Talkdesk's team "ASAP," which Genesys alleges was done while they were still employed by Genesys. The question posed at 35:6-11 is not speculation as the question asked for Dr. Geraghty's understanding as to how she understood the e-mail.

Defendants objected to 34:12-20 as "argumentative" and seeking an answer already answered. This is not so, with regards to 34:12-20, Dr. Geraghty was asked a question to which she responded with a speculative answer. She was then asked a follow up question asking her specifically <u>not</u> to speculate in her responses. There is no basis for excluding this testimony. Defendants' object to 37:9 and Genesys agrees that portion of the question can be excluded.

### C. **Genesys' Proposed Deposition Designations From Tiago Paiva Are Admissible.**

Defendants objected to various lines of questioning and testimony from its CEO Tiago Paiva, who Genesys alleges was personally involved in Talkdesk's raid, information theft, conspiracy, and related wrongdoing.

Defendants objected to the testimony at 20:16–21:3, 21:4–25 as improperly seeking legal conclusions, while also assuming facts not in evidence: In these passages, CEO Paiva is asked about Talkdesk's development of its own confidential information and trade secrets, and Talkdesk's expectation that its employees protect certain Talkdesk confidential information. This does not seek

a legal conclusion, and it is highly relevant information. In a case where Genesys alleges that Talkdesk engaged in a conspiracy with Genesys employees to steal confidential trade secret information, what Talkdesk's CEO expects from his own employees on the issue is relevant to Genesys' claims and also the Defendants' defenses (for example, that Genesys does not take sufficient steps to keep its information secret). Further, this is relevant to Genesys' punitive damages claims as it is probative of the involvement of Talkdesk's CEO in the unlawful conduct.

Defendants objected to 11:7–11, 11:16–20, 12:11–14, and 13:8–13 as irrelevant because they relate to Talkdesk's equity funding and valuations.

First, these passages do not disclose any information related to Talkdesk's valuation or funding level. Rather, these questions relate to what Talkdesk did prior to hiring Genesys personnel in 2018 and what Talkdesk's motivations were in raiding Genesys' mid-market sales team. For example, CEO Paiva confirmed that Talkdesk did not seek approval from its primary funder prior to hiring Genesys personnel and that Talkdesk provided certain information, including sales plans, to its funding sources. CEO Paiva's testimony is highly relevant because it is probative of what Talkdesk did (or did not do) in effectuating the raid of Genesys personnel in 2018, is probative of what Genesys believes Talkdesk's goal was: to save costs and time by pilfering Genesys' sales team so that it could hit its sales goals, and is therefore relevant to Genesys' claims. Further, this evidence is relevant to Genesys' punitive damages claims.

Second, to the extent these questions do relate to Talkdesk's funding and evaluations, that information is relevant to Genesys' claims. Specifically, Genesys asserts that Talkdesk's status as a startup competitor with a high level of financial funding ultimately spurred it to grow its sales organization at a quick pace, opting to steal talent and trade secrets from Genesys rather than invest to develop its own talent and sales processes. Therefore, the fact that Talkdesk is funded by Viking Global and received such funding is relevant to Genesys' claims against Talkdesk. Indeed, Talkdesk's

7

funding is probative of punitive damages. Indeed, Seventh Circuit Pattern Instruction 3.13 provides that Talkdesk's financial condition should be considered if the jury finds that punitive damages are appropriate. The authority cited by Defendants is unpersuasive for the reasons stated in Genesys' Opposition Brief to Defendants' Motion In Limine. *See* ECF 428 at 9-11. Rather, this information is relevant for punitive damages. *See Newport v. Fact Concerts*, 453 U.S. 247, 270, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("[e]vidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded ..."); *see also* Restatement (Second) of Torts § 908(2) (1979); D. Dobbs, Law of Remedies § 3.9, pp. 218–219 (1973). Defendants' objection to 87:10-25, which sought information on Talkdesk's ability to pay a damages award, is similarly relevant and should not be excluded.

Defendants objected to 66:7–68:7, 84:20–22, 85:15–86:11, and 86:15–22 as impermissibly inquiring into discovery-related issues.

Importantly, Defendants mischaracterize the testimony that they object to as relating to "discovery-related issues." In doing so, Defendants are impermissibly seeking to exclude highly relevant testimony that has nothing to do with discovery-related issues but rather is an e-mail that Genesys has long argued supports its raiding claim and punitive damages claims because it shows Talkdesk harbored the intent to damage Genesys by raiding its mid-market sales team.

Specifically, at 66:7-67:17, Paiva was questioned about the highly relevant e-mail between he and former Talkdesk marketing executive Janice Rapp, who remarked in the e-mail: "how long before we can dance on Genesys' grave?" to which Paiva responded "You can do it already. They are all giving notice tomorrow. I think we have 18 people start October 1. Seven to eight total from Genesys, three VPs from Genesys." This key testimony has nothing to do with discovery-related issues and there is no basis for excluding such highly relevant testimony on a key issue that comes from a Talkdesk-produced email.

8

Rather, Defendants' motion lumps in this proper questioning with testimony that follows at 67:18-68:3, in which Paiva testifies to what efforts Talkdesk undertook to preserve relevant information, because Paiva had testified that he was unsure where certain information was because it was "two years ago." This information, along with the information at 68:4-7, in which Paiva confirmed that as of November 2018, he had no chief legal officer or general counsel, is relevant to Genesys' claims because it is probative of Genesys' position that Talkdesk was a startup company who cut corners and took risks in an attempt to grow quickly by stealing Genesys information and personnel.

Genesys agrees that 84:20–22, 85:15–86:11, and 86:15–22 can be excluded.

Defendants objected to 7:17-24, 8:25-9:3, and 9:7-10 generally as irrelevant and prejudicial, and also as seeking a legal conclusion and potentially privileged by the attorney-client relationship. These questions elicited the following testimony from CEO Paiva: 1) that he understands his deposition was Genesys' opportunity to ask him questions and is an important step in the litigation; and that 2) CEO Paiva was prepared to answer questions at his deposition both because he consulted with counsel and because he had the opportunity to review relevant materials. Nothing in the subject questions sought a legal conclusion or sought information protected by the attorney-client relationship. Rather, these questions are relevant as to Paiva's preparation and the truthfulness of his testimony. Such information is probative of Paiva's credibility and relevant to Genesys' claims.

Defendants objected to 9:15–22, 9:24–10:1, 10:12-15, 10:16–11:4, and 11:5–6 that pertains to whether Talkdesk had or inquired with legal counsel in 2018 relating to its raid of Genesys' mid-market employees. Defendants argue this line of questioning is "irrelevant" and "impermissibly implies that Talkdesk should have consulted with (or had an obligation to consult with) legal counsel, and seeks to elicit attorney-client communications to rebut the premise of the questions." This testimony confirmed that when it raided Genesys' mid-market sales team, Talkdesk had no general counsel, chief legal officer, compliance officer, or ethics committee, and that it had just two Board members, one of

9

which was CEO and Founder Tiago Paiva, who Genesys alleges orchestrated the raid. The testimony also confirmed that Talkdesk did not seek the advice of legal counsel regarding the hiring of Genesys personnel. Defendants argue this is irrelevant because Talkdesk did not have an obligation to seek counsel and that such conversations would be privileged.

First, attorney-client privilege is irrelevant here where Talkdesk's CEO, Founder, and Board Chair confirmed he did not seek legal advice. Second, the non-privileged area of inquiry at issue: whether or not Talkdesk sought legal advice, is highly relevant. Whether Talkdesk had an obligation to seek advice or not does not make the testimony irrelevant. The testimony is probative of Genesys' position that Talkdesk was a startup competitor with poor corporate governance and high sales goals, which prompted it to cut corners in order to speed its growth, including by opting to steal talent and trade secrets from Genesys rather than invest to develop its own talent and sales processes.

Paiva's testimony regarding what Talkdesk did (or did not do) in preparing for its hiring of Genesys' personnel in 2018 is therefore highly relevant to Genesys' claims, including its raiding claim and its claim for punitive damages.

Defendants objected to 19:15–20, 19:22–20:15, 32:13–15, 35:6–8, 44:14–17 as seeking speculation and not based on personal knowledge. This is not so. 19:15-20 sought CEO Paiva's knowledge of the agreements signed between Genesys and the employees hired by Talkdesk. Whether CEO Paiva had knowledge of those agreement is highly relevant to Genesys' claims, seeking this relevant fact through such a question did not elicit any speculation on CEO Paiva's part, rather it simply asked if he was aware of those agreements.

In 19:22-20:15, Paiva confirmed that Talkdesk has hired personnel who previously worked at other companies, a fact plainly within his knowledge as the CEO and Founder of Talkdesk. Paiva further responded that he did not remember asking any of the Genesys employees hired by Talkdesk in 2018 whether or not they had any agreement with Genesys that would preclude or limit them from

10

working for Talkdesk. In this case, Talkdesk specifically disputes that it had knowledge of the agreements between Genesys and its former employees hired by Talkdesk, making this line of questioning highly relevant not only to Genesys' claims but also Talkdesk's defenses.

Similarly, Defendants objected to Paiva's testimony that he was generally aware of employment agreements in the industry. Such testimony is relevant for the same reasons as discussed above. Defendants argue that this is not relevant because it is not asking about the specific agreements at issue (ironically, Defendants also object to Paiva's testimony about those specific agreements at 19:15-20). Genesys' position in this case is that Talkdesk, through senior executives like Shauna Geraghty and Tiago Paiva, were aware of the Genesys employment agreements and interfered with the same. Probative of that key issue is CEO Paiva's knowledge of such agreements within the industry, as testimony from several witnesses show that such agreements are common in the industry in which Paiva is a CEO and Founder of a company.

In 32:13-15 and 44:14-17 Paiva opined on e-mails written to him from Manno and what his understanding was of Manno's communication. Asking Paiva his understanding of what Manno meant in an e-mail is not speculative. The same is true with regards to e-mails from Strahan at 75:6-16. In 35:6-8 Paiva said that he "assume[d]" the "two RVPs" Manno referenced in a July 12, 2018 e-mail were Strahan and Hertel. This line of questioning is not speculative when read in its context, which is that Paiva was involved in a four-way call around this time with Manno, Strahan, and Hertel, during which he was aware they all worked for Genesys.

Defendants objected to testimony from Paiva at 22:1–6, 22:8–15, 22:15–23:9, 25:3–6, and 65:5–14, relating to a lawsuit filed by Talkdesk against several former employees who Talkdesk alleged breached their contracts and misappropriated Talkdesk trade secrets. In this case, Talkdesk claims it was unaware of Genesys' employment agreements with Manno, Strahan, and others, and that it only took its actions with respect to Genesys employees for lawful competitive reasons. Paiva's testimony

11

regarding that lawsuit is relevant to Talkdesk's defense and Genesys' claims of interference with contract, because it shows that Talkdesk not only uses its own employment agreements with employees, but is intimately familiar with enforcing employment agreements when an employee leaves for a competitor. It is further probative of the fact that Talkdesk was aware that former employees can owe their employer contractual and statutory obligations and that Talkdesk was not entitled to bury its head in the sand and not ask any Genesys employee about such agreements, as it claims it did. Courts will permit evidence of past lawsuits where it is for a relevant and proper purpose, as Genesys provides here. When doing so, courts will issue a limiting instruction to narrow the exhibit or testimony to its proper limited purpose. *See e.g., Hickey v. Myers,* No. 09-CV-01307 (MAD/ DEP), 2013 U.S. Dist. LEXIS 77419, at *11-14 (N.D.N.Y. June 3, 2013) (admitting evidence of unrelated lawsuit to show relevant fact and issuing limiting instruction).

Defendants objected to various other testimony from Paiva. For example, Defendants object to 33:12-14 as including "counsel's argumentative statement". Defendants cite no authority for why a portion of counsel's question should be excluded as being "argumentative." There is no basis to exclude the full context of this question.

Defendants objected to 42:11-16 as "a question that is not clear or comprehensible as to what information it seeks," which is not true. In that passage of testimony, Paiva is asked a clear question about an August 2018 e-mail chain in which Manno, Hertel, and Strahan discussed the compensation packages they wanted to receive from Talkdesk. Paiva, who was privy to the e-mail, was simply asked to confirm that the e-mail represented Strahan, Manno, and Hertel discussing the compensation packages they wanted to receive from Talkdesk, while all three were still employed by Genesys. Paiva confirmed that was "correct." This testimony regarding an e-mail produced by Talkdesk and to which Paiva was a recipient, is admissible.

Defendants objected to 79:6-8 as referencing that a document was labeled "attorneys' eyes only". Genesys agrees that such labeling can be handled through a limiting instruction or redaction and that the specific testimony about the same can be excluded on lines 6 and 7 of page 79.

Defendants objected to 71:20-73:7 as irrelevant because it relates to "a Talkdesk employee who is not involved in the case" but ignores the clear relevancy of the testimony. Paiva was asked about a communication, which occurred on September 28, 2018, in which he suggested that Michael Strahan opine on questions that another Talkdesk employee had about Genesys. Strahan responded to the questions noting "No, no, no, no. Genesys will not white-label rebrand for anyone." On September 28, 2018 Strahan was still employed by Genesys, making his activities working for Talkdesk on that date, and Talkdesk's CEO's knowledge of the same, highly relevant.

### D. Genesys' Proposed Deposition Designations From Taylor Knudson Are Admissible.

Defendants objected to a segment of testimony at 22:16-22 in which former Talkdesk recruiter Taylor Knudson was asked about Talkdesk's funding in relation to a strategy meeting held with CEO Paiva in which he announced a new hiring strategy to target talent at top competitors in the industry, including Genesys. As explained above, information regarding Talkdesk's funding is relevant. But further, this testimony is relevant as it is probative of Genesys' argument that Talkdesk was a startup competitor who used its funding to cut corners in order to speed its growth, including by opting to steal talent and trade secrets from Genesys rather than invest to develop its own talent and sales processes.

Defendants seek to exclude testimony at 37:14-38:14, arguing that it is irrelevant and relates to discovery-related issues. This is not true. The testimony elicited from Knudson, the Talkdesk recruiter primarily responsible for working with Manno, Strahan, and Hertel on Talkdesk recruitment activities while they were still employed by Genesys, testified to the various ways she communicated with the Genesys sales leaders, including by e-mail and phone, before memorializing the information

she learned from them on a spreadsheet. Nowhere in this testimony is a discovery-related issue raised or referenced. Rather, this information – which shows the level of interaction between Talkdesk's recruiter and Genesys' sales leaders, while they were still working for Genesys – is relevant to Genesys' claims regarding the misconduct of Manno, Strahan, and Hertel while they were still employed by Genesys, and Talkdesk's involvement in the conspiracy and in aiding and abetting the Genesys sales leaders' breach of fiduciary duty and interference with Manno and Strahan's employment agreements.

Defendants seek to exclude testimony that it characterizes as Taylor Knudson reading e-mails at 51:12–52:5, 60:23–61:6, and 71:5–72:6, arguing there is no probative value and it lacks foundation and hearsay. This is not true. At 60:23-61:6, Knudson is asked to read an e-mail produced by the Defendants and containing an e-mail from Ralph Manno (the defense hearsay objection is meritless as this is a statement from a party opponent) and she is then asked a question about the e-mail at 61:23-3. The context of that question relies on her reading of the e-mail and therefore is relevant. Indeed, this testimony relates to Manno's Talkdesk recruitment activities while he was still a Genesys Vice President, making it relevant to Genesys' claims. Similarly, the testimony at 71:5-72:6 is relevant because Knudson opined on an e-mail (again, produced by Defendants) and which individual Defendant the e-mail came from. Again this e-mail relates to the recruiting activities by the Genesys sales leaders while they were still working for Genesys, so testimony on the same is relevant. Genesys agrees that 51:12-52:5 can be excluded.

Defendants also seek to exclude testimony from Knudson at 47:15–17, 61:23–62:3, and 72:23–73:3 as speculation and not based on personal knowledge. At 47:15-17, Knudson opines on who was making the decision to hire Genesys employee Craig Holloway. Knudson responds "I guess Mike" in reference to Michael Strahan, the Genesys Area Director who at the time he was making the decision to hire Holloway for Talkdesk, was still employed by Genesys. Knudson's testimony is not speculation, she was the Talkdesk recruiter working with Manno, Strahan, and Hertel in recruiting Genesys

14

employees. She therefore has personal knowledge of those recruitment activities and has personal knowledge as to who was making the decision to hire certain employees. To the extent her belief as to who the decision maker was is not credible, that is for the jury to weigh, but it does not make this plainly relevant testimony excludable.

At 61:23-62:3, Knudson was asked, as a Talkdesk recruiter receiving an e-mail from Manno, how she understood a message from Manno that he was going to put "a hard push" on certain Genesys employees. Knudson testified that she understood this to mean that Manno wanted to keep recruiting those employees as they were top performers and would be a good asset to Talkdesk. Knudson, as the primary Talkdesk recruiter involved in the alleged raid, has personal knowledge as to those recruitment activities and this testimony is not speculation. Genesys agrees that 72:23-73:3 can be excluded.

Defendants also seek to exclude 54:2-19 in which Knudson was asked if she agreed with a statement that Morales was "at the top of the list" for Talkdesk. First, this statement was testified to by Knudson's colleague Jessica Lu, so it does not assume a fact in evidence. Indeed, that testimony was designated by Genesys at 45:21-47:9 of Ms. Lu's deposition and Defendants did not object. But second, Defendants cite no authority for why such a question is improper. Knudson's testimony that she agreed with the statement is admissible.

Defendants seek to exclude 65:20-21, which asked Knudson where CEO Paiva lives, before then eliciting testimony as to Knudson's experience working with Paiva directly on recruiting matters. The whereabouts of CEO Paiva, a key witness that Genesys alleges was intimately involved in the unlawful raid and conspiracy, is probative of Genesys' claims including interference with Genesys' employment agreements.

### E. **Genesys' Proposed Deposition Designations From Jessica Lu Are Admissible.**

Defendants objected to a segment of testimony at 56:14-58:21, characterizing the testimony as "questions and answers regarding Ms. Lu's employment agreement with Talkdesk." ECF 425 at 9. Rather, this line of questioning relates to Talkdesk's policy on employees not engaging in other employment that would conflict with Talkdesk and Talkdesk's policy on employees maintaining the confidentiality of its own information and using trade secret or confidential information belonging to another party, "including any former employers." Such a policy, found in Talkdesk's offer letters, is plainly relevant to this case, where Genesys alleges that Talkdesk and its CEO Paiva and other senior leaders disregarded the notion that its employees would not use confidential information belonging to former employers, and encouraged the use of Genesys confidential trade secret information provided by the individual Defendants. Jessica Lu provided testimony regarding those policies and the fact that she, as a recruiter, has never discussed that policy with recruits, has never heard Shauna Geraghty talk about such policy, was never trained on that policy, and indeed has never heard anyone at Talkdesk talk about such policy. This line of testimony is highly relevant to Genesys' claims against Talkdesk and should not be excluded.

Defendants objected to 6:8-18 generally as irrelevant. These questions confirmed with Jessica Lu that she understood the importance of providing truthful questions in her deposition. These questions are relevant as to Lu's preparation and the truthfulness of his testimony. Such information is probative of Geraghty's credibility and relevant to Genesys' claims.

Defendants also seek to exclude testimony from Jessica Lu at 26:22-27 and 27:7-13 as speculation and not based on personal knowledge. At 26:22-27 Lu testified that she believed that former Genesys mid-market sales employee Danielle Morales chose to come to Talkdesk because of "a boss from, like, Genesys" who came over to Talkdesk. Lu's understanding of what motivated Morales is highly relevant and is not speculation. Lu was one of the recruiters responsible for recruiting

16

Morales and therefore has personal knowledge as to that process. At 27:7-13, Lu testified as to who she meant by "a boss from, like, Genesys" and specifically named Manno, Strahan, and Hertel. This is not speculation.

Defendants seek to exclude testimony at 40:12-16 as relating to discovery-related issues. In the cited testimony, Lu testified as to what Slack is, noting that it is a corporate messaging service that Talkdesk uses, and that Strahan sent Lu potential recruits through Slack. Nowhere in the testimony is any discovery related issue or dispute mentioned. Lu's communications with the individual Defendants in carrying out Talkdesk's recruitment activities is highly relevant. Like Defendants' meritless objection to similar testimony from Taylor Knudson, this is highly relevant and does not relate to discovery-related issues and should not be excluded.

Defendants objected to lines 16:3-17:4 and 27:1-2 as attorney objections and instructions, but Defendants citation is too broad and includes highly relevant testimony that does not include attorney objections.

Genesys agrees that attorney objections can be removed from the deposition designations, but the attorney objections occur at only 16:22-24 and 27:1-2. These are the only lines that should be excluded. The rest of the testimony at 16:3-21 and 16:25-17:4 includes Lu testifying as to what Talkdesk's recruitment strategy was at the time of the raid, specifically that it was targeting the employees of its competitors.

Lastly, Defendants seek to exclude 53:18-54:3 from Jessica Lu's deposition testimony, and Genesys agrees it can be excluded.

### F. Genesys' Proposed Deposition Designations From Janice Rapp.

Defendants objected to testimony at 16:11–17:10, 18:5–14, 19:6–21:2, and 24:2–10. Genesys agrees this testimony can be excluded.

17

### G. Genesys' Proposed Deposition Designations From Danielle Morales Are Admissible.

Defendants objected to 5:20-23 generally as irrelevant. These questions confirmed with Danielle Morales that she understood she was providing responses under oath. These questions are relevant as to Morales' preparation and the truthfulness of his testimony. Such information is probative of Morales' credibility and relevant to Genesys' claims.

Defendants seek to exclude 27:1–29:6, 57:8–58:1, and 82:6–9 as seeking legal conclusions while assuming facts not in evidence.

First, 27:1-29:6, contains a lengthy line of questioning relating to relevant information that goes far beyond the objection to a "legal conclusion." For example, Morales testifies as to the steps she has taken to comply with her Talkdesk employment agreement, when she started working at Talkdesk, why there was a delay between when she signed her Talkdesk offer letter and when she began, all of which are relevant to Genesys' claims. At 28:21-29:6, Morales was asked if undertaking activities for the benefit of Talkdesk, while still employed by Genesys, is improper. This does not seek a legal conclusion but rather Morales' own understanding of what type of competition is and is not proper. Morales was also asked whether she thought helping Talkdesk compete against Genesys, while still working for Genesys, would violate the duties she owed to Genesys, to which she answered yes. Again, this does not seek a legal conclusion but rather Morales' understanding of what type of conduct is proper and what is not. Morales' testimony is highly relevant in this case, where Genesys alleges that Morales' direct boss and others engaged in such misconduct.

At 57:8-58:1, Morales was asked what steps she took at Genesys to protect its confidential information. This testimony is highly relevant to Genesys' claims and also to the Defendants' defenses, as the Defendants have argued that Genesys does not take sufficient steps to maintain the secrecy of its alleged confidential information. There is simply no question in this cited testimony that seeks a

18

legal conclusion. Genesys is entitled to present factual testimony as to the steps that Genesys (and Talkdesk) employees take to protect confidential information.

At 82:6-9, Danielle Morales testifies that the PureCloud List is confidential information. Predictably, Defendants seek to include this damning testimony. This testimony is highly relevant and should not be excluded. Genesys will not proffer this testimony as being dispositive of the question of whether the PureCloud List is a confidential trade secret, and the jury will be instructed on the proper test to employ to decide that important legal question. However, the testimony of a former Genesys and Talkdesk employee that she considered the information in the PureCloud List to be confidential and valuable information, is highly relevant. If needed, a limiting instruction could be issued to the jury that Morales' opinion on confidentiality is not dispositive of the legal issue.

Defendants also seek to exclude testimony from Danielle Morales at 46:7–19 and 57:21–58:1 as speculation and not based on personal knowledge. This is not so. At 46:7-19, Morales was asked questions about who had access to her sales history and compensation information. Specifically, she was asked whether her direct boss (Hertel) and his boss (Manno) would have had access to that information. Morales confirmed that they would and did not give any indication that she lacked personal knowledge of that fact. Indeed, it is not speculative of her to know that such information, which forms the basis of her very performance as a sales employee, is evaluated and available to her boss. Similarly, at 57:21-58:1 Morales confirmed 1) that Talkdesk has its employees sign an employment agreement that has a confidentiality provision and 2) that such agreements are "pretty much" everywhere in the industry. Morales has personal knowledge of both facts. First, she herself signed such an agreement at Talkdesk, and she has worked for various industry companies that require the same.

H. **Conclusion.**

Defendants' attempts to object to highly relevant information that is probative of key issues in this case should be denied. Genesys has in good faith conceded that certain designated testimony objected to will be withdrawn. Genesys will continue to work with Defendants to narrow the parties' respective deposition designations in advance of trial.

Respectfully submitted,

GENESYS CLOUD SERVICES, INC.

By its Attorneys,

*s/John R. Maley*
John R. Maley
Thomas C. Payne
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:   (317) 236-1313
E-mail:        jmaley@btlaw.com
                  tpayne@btlaw.com

Kathleen M. Anderson
BARNES & THORNBURG LLP
888 South Harrison Street, Suite 600
Fort Wayne, Indiana 46802
Telephone:   (260) 425-4657
Facsimile:    (260) 424-8316
E-mail:        kanderson@btlaw.com

DMS 23855010.1